IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| JUSTEN GRANT HALL, | § | CASE NO. |
| | § | ~~3:10-cv-00213~~ |
| Petitioner, | § | 3:10 - cv - 00135 - FM |
| | § | Related Case No. |
| v. | § | ~~3:10-cv-00135-FM~~ |
| | § | 3:10 - cv - 00213  →PB |
| RICK THALER, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

2010 J... 10 PM 12: 02

**MEMORANDUM IN SUPPORT OF**
**<u>PETITION FOR WRIT OF HABEAS CORPUS</u>**

June 10, 2010

FN 1: Please note related matter number 3:10 - cv - 00213, which Petitioner opened when he attempted, unsuccessfully to file this Petition electronically. A copy of this petition has been filed under related matter number 3:10 - cv - 00213.

A/73401003.1

## TABLE OF CONTENTS

Page

I.     SUMMARY OF ARGUMENT ................................................................................ 1

II.    STATEMENT OF FACTS .................................................................................... 5

III.   PROCEDURAL HISTORY.................................................................................. 13

       A.    PRETRIAL PROCEEDINGS........................................................................ 13

       B.    TRIAL............................................................................................................ 14

       C.    POST-TRIAL PROCEEDINGS ................................................................... 14

             1.    Direct Appeal ...................................................................................... 15

             2.    State Habeas Proceeding .................................................................... 15

IV.    ARGUMENT ........................................................................................................ 17

       A.    PETITIONER'S RIGHTS UNDER THE FOURTEENTH AMENDMENT
             WERE VIOLATED BY THE STATE'S MISCOUNDUCT IN FAILING
             TO DISCLOSE MATERIAL EVIDENCE FAVORABLE TO HIM IN
             VIOLATION OF BRADY ............................................................................ 17

             1.    The Supreme Court Has Repeatedly Held That The Law Requires
                   the State to Disclose Evidence Favorable to the Accused ...................... 18

             2.    The Brady Doctrine Requires The State To Disclose Tacit
                   Agreements With Witnesses .................................................................. 20

             3.    The State's Misconduct In Failing To Disclose Brady Evidence
                   Requires That The Petitioner Be Granted A New Trial........................... 23

                   a.    The State Withheld Material Evidence of Immunity
                         Agreements With Two Of The State's Key Witnesses................ 24

                   b.    The State's Key Witnesses Testified Under Oath To A
                         Number of Crimes, Yet Were Never Charged, Thereby
                         Demonstrating The Existence Of Undisclosed Agreements
                         With The State ......................................................................... 26

             4.    The State's Further Failure To Disclose Possible Evidence Of
                   Deals Offered By The Police Requires That The Petitioner Be
                   Granted A New Trial ............................................................................. 34

             5.    The State Failed To Disclose Correspondence With One Of The
                   State's Key Witnesses That Demonstrates The Witness's True
                   Motivation For Testifying Against The Petitioner................................... 37

       B.    PETITIONER'S CONVICTION VIOLATES THE FIFTH AND
             FOURTEENTH AMENDMENTS TO THE UNITED STATES
             CONSTITUTION BECAUSE THE TRIAL COURT ERRED IN
             DENYING THE MOTION TO SUPPRESS PETITIONER'S
             INVOLUNTARY CONFESSION.................................................................. 39

i

TABLE OF CONTENTS
(continued)

Page

1.  Relevant Circumstances for Determining Voluntariness Under
    Governing Law. .................................................................................. 40

2.  The Record Evidence Establishes That The Petitioner Was Not
    Capable Of A Knowing, Intelligent, And Voluntary Waiver Of His
    Rights At The Time He Was Interrogated By Detective
    Samaniego. .......................................................................................... 41

3.  Detective Samaniego's Interrogation of the Petitioner ........................... 44

4.  Detective Samaniego Coerced The Petitioner Into Providing A
    Statement In Violation Of The Petitioner's Fifth And Fourteenth
    Amendment Rights. .............................................................................. 45

C.  PETITIONER'S CONVICTION VIOLATES THE SIXTH
    AMENDMENT TO THE UNITED STATES CONSTITUTION
    BECAUSE THE PETITIONER'S LEAD TRIAL COUNSEL SLEPT
    DURING THE GUILT/INNOCENCE PHASE OF THE TRIAL ....................... 49

D.  PETITIONER'S CONVICTION VIOLATES THE FIFTH AND
    FOURTEENTH AMENDMENTS TO THE UNITED STATES
    CONSTITUTION BECAUSE THE TRIAL COURT ERRED IN
    DENYING THE PETITIONER'S MOTION FOR A CONTINUANCE. .......... 55

E.  PETITIONER'S CONVICTION AND SENTENCE OF DEATH
    VIOLATE THE DUE PROCESS CLAUSE OF THE UNITED STATES
    CONSTITUTION BECAUSE THE EVIDENCE ADDUCED AT TRIAL
    WAS INSUFFICIENT TO PROVE THAT THE PETITIONER
    MURDERED THE VICTIM IN THE COURSE OF COMMITTING OR
    ATTEMPTING TO COMMIT THE OFFENSE OF RETALIATION. .............. 57

F.  PETITIONER'S SENTENCE OF DEATH VIOLATES THE SIXTH
    AMENDMENT TO THE UNITED STATES CONSTITUTION
    BECAUSE TRIAL COUNSEL FAILED TO INVESTIGATE AND
    PRESENT SUBSTANTIAL, READILY AVAILABLE EVIDENCE IN
    MITIGATION OF THE DEATH PENALTY. ................................................. 61

1.  The Supreme Court's Strickland Decision Established a Nuanced
    Standard to Evaluate Ineffective Assistance of Counsel ....................... 61

    a.  Strickland Prong One: Deficient Investigation ........................... 61

    b.  Strickland Prong Two: Prejudice ................................................. 63

2.  Strickland's Progeny Demonstrate the Breadth of Viable
    Ineffective Assistance of Counsel Claims, with a Focus on
    Fundamental Fairness ......................................................................... 65

3.  The Petitioner's Trial Counsel Failed to Present a Sufficient
    Mitigation Defense to the Jury .............................................................. 68

TABLE OF CONTENTS
(continued)

Page

a.    Trial Counsel's Mitigation Case was Constitutionally Deficient.................................................................... 68

b.    Substantial And Compelling Mitigation Evidence Could Have Been Uncovered and Presented .......................................... 70

G.    PETITIONER'S SENTENCE OF DEATH VIOLATES THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION BECAUSE TRIAL COUNSEL ARGUED TO THE JURY, WITHOUT ANY PLAUSIBLE TACTICAL REASON AND CONTRARY TO EVIDENT DEFENSIVE STRATEGY, THAT PETITIONER DESERVED TO DIE FOR HIS ALLEGED CRIME. ........................................ 76

1.    The Supreme Court's Strickland Decision Established the Standard to Evaluate Ineffective Assistance of Counsel: Fundamental Fairness ................................................................... 77

2.    Fundamental Fairness Requires a Finding that the Petitioner's Trial Counsel Offered an Ineffective Defense by Advocating for the Death Penalty ................................................................. 77

H.    PETITIONER'S DEATH SENTENCE VIOLATES THE SIXTH AMENDMENT BECAUSE TRIAL COUNSEL RELINQUISHED TWO PEREMPTORY CHALLENGES AGAINST OBJECTIONABLE JURORS BY FAILING TO REQUIRE THAT EACH ELIGIBLE JUROR BE PASSED FOR PREEMPTORY CHALLENGE FIRST BY THE PROSECUTION. ........................................................................ 80

1.    Article 35.13 Provides Capital Defendants with an Important Strategic Advantage in Jury Selection Proceedings ................................. 81

2.    Mr. Macias Lost Two Peremptory Strikes Against Potential Jurors by Failing to Require That Each Eligible Juror Be Passed for Peremptory Challenge First by the Prosecution As Prescribed by Article 35.13. .............................................................. 83

3.    Mr. Macias's Forfeit of Mr. Hall's Article 35.13 Strategic Advantage in Jury Selection Caused At Least Two Biased Jurors to Serve on the Panel That Delivered The Petitioner's Death Sentence ...... 84

4.    Mr. Macias Had No Strategic or Reasonable Explanation For Failing To Require That Each Eligible Juror Be Passed for Preemptory Challenge First by the Prosecution As Set Forth In Article 35.13. .............................................................. 88

I.    PETITIONER'S DEATH SENTENCE VIOLATES THE SIXTH AMENDMENT BECAUSE TRIAL COUNSEL AGREED TO EXCUSE DEATH-QUALIFIED VENIRE MEMBERS WHO WERE OPPOSED TO CAPITAL PUNISHMENT WITHOUT QUESTIONING THEM. ............. 92

iii

TABLE OF CONTENTS
(continued)

|  | Page |
|---|---|

J. PETITIONER'S SENTENCE OF DEATH VIOLATES THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION BECAUSE TRIAL COUNSEL FAILED TO OBJECT TO THE COURT'S FAILURE TO INSTRUCT NUMEROUS VENIRE MEMBERS AS REQUIRED BY TEXAS CODE OF CRIMINAL PROCEDURE ART. 35.17(2). ........................................................................ 95

    1. Judge Woodard Did Not Comply With the Article 35.17(2) Requirements. ........................................................................ 96

    2. Mr. Macias Had No Tactical or Strategic Reasoning For Failing to Raise An Objection To the Omission of the Article 35.17(2) Requirements. ........................................................................ 97

    3. Mr. Hall Suffered Substantial Prejudice From Mr. Macias's Failure to Object Regarding The Improperly Omitted Article 35.17(2) Principles. ........................................................................ 99

V. PRAYER FOR RELIEF ........................................................................ 102

A/73401003.1

## TABLE OF AUTHORITIES

Page(s)

CASES

*Adams v. Quarterman,*
    324 Fed. App'x 340 (5th Cir. 2009) ....................................................................67

*Adams v. Texas,*
    448 U.S. 38 (1980).........................................................................................84

*Ainsworth v. Woodford,*
    268 F.3d 868 (9th Cir. 2001) ........................................................................67

*Alcorta v. Texas,*
    355 U.S. 28 (1957).........................................................................................18

*Anderson v. State,*
    633 S.W.2d 851 (Tex. Crim. App. 1982).........................................................84

*Arizona v. Fulminante,*
    499 U.S. 279 (1991).......................................................................................40

*Bell v. Bell,*
    512 F.3d 223 (6th Cir. 2008) ...................................................................20, 22

*Bigby v. Dretke,*
    402 F.3d 551 (5th Cir. 2005) ...................................................................64, 65

*Bigby v. State,*
    892 S.W.2d 864 (Tex. Crim. App. 1994), *denial of habeas corpus aff'd in part, rev'd*
    *in part on other grounds, Bigby v. State,* 340 F.3d 259 (5th Cir. 2003) ...........................82, 89

*Bouchillon v. Collins,*
    907 F.2d 589 (5th Cir. 1990) ........................................................................64

*Brady v. Maryland,*
    373 U.S. 83 (1963).................................................................................18, 19

*Cannan v. McBride,*
    395 F.3d 376 (7th Cir. 2005) ........................................................................67

*Clay v. Bowersox,*
    367 F.3d 993 (8th Cir. 2004) ........................................................................20

*Colorado v. Connelly,*
    479 U.S. 157 (1986).......................................................................................40

*Cronic v. United States,*
    466 U.S. 648 (1984)..................................................................................49

*Diaz v. Quarterman,*
    228 Fed. App'x 417 (5th Cir. 2007) ........................................................88

*Dobbs v. Turpin,*
    142 F.3d 1383 (11th Cir. 1998) ..............................................................67

*Douglas v. Workman,*
    560 F.3d 1156 (10th Cir. 2009) .........................................................21, 22

*Dowthitt v. State,*
    931 S.W.2d 244 (Tex. Crim. App. 1996)................................................89

*DuBose v. Leferve,*
    619 F.2d 973 (2nd Cir. 1980).................................................................21

*Freeman v. Georgia,*
    599 F.2d 65 (5th Cir. 1979) .............................................................35, 36

*Giglio v. United States,*
    405 U.S. 150 (1971)......................................................................20, 26, 27

*Ex parte Gonzales,*
    204 S.W.3d 391 (Tex. Crim. App. 2006)...............................................64

*Graves v. Dretke,*
    442 F.3d 334 (5th Cir. 2006) ..................................................................24

*Greenwald v. Wisconsin,*
    390 U.S. 519 (1968) (per curiam)...........................................................47

*Haber v. Wainwright,*
    756 F.2d 1520 (11th Cir. 1985) ..............................................................20

*Hatten v. Quarterman,*
    570 F.3d 595 (5th Cir. 2009) ..................................................................84

*Haynes v. Washington,*
    373 U.S. 503 (1963)................................................................................39

*Hernandez v. State,*
    563 S.W.2d 947 (Tex. Crim. App. 1978)................................................85

*Herrara v. Collins,*
    506 U.S. 390 (1993)................................................................................58

A/73401003.1

*Hughes v. State,*
    24 S.W.3d 833 (Tex. Crim. App. 2000)....................................................................82, 83, 89

*Jackson v. Virginia,*
    443 U.S. 307 (1979)..............................................................................................57, 58

*Janecka v. State,*
    739 S.W.2d 813 (Tex. Crim. App. 1987).................................................................81, 89

*Knox v. Collins,*
    928 F.2d 657 (5th Cir. 1991) ......................................................................................96

*Kyles v. Whitely,*
    514 U.S. 419 (1995)..............................................................................19, 20, 24, 34

*Lewis v. Dretke,*
    355 F.3d 364 (5th Cir. 2003) ......................................................................................64

*Loyd v. Whitley,*
    977 F.2d 149 (5th Cir. 1992) ......................................................................................79

*Mallet v. State,*
    65 S.W.3d 59 (Tex. Crim. App. 2001).........................................................................96

*Maryland v. Shatzer,*
    130 S.Ct. 1213 (2010)................................................................................................40

*Mayfield v. Woodford,*
    270 F.3d 915 (9th Cir. 2001) ......................................................................................67

*Miranda v. Arizona,*
    384 U.S. 436 (1966)....................................................................................................40

*Missouri v. Seibert,*
    542 U.S. 600 (2004).....................................................................................41, 45, 48

*Mooney v. Holohan,*
    294 U.S. 103 (1935)....................................................................................................18

*Moore v. Johnson,*
    194 F.3d 586 (5th Cir. 1999) .............................................................................. passim

*Napue v. Illinois,*
    360 U.S. 264 (1959)........................................................................................18, 19, 23

*Neal v. Puckett,*
    286 F.3d 230 (5th Cir. 2002) .............................................................................62, 77

A/73401003.1

*Neder v. United States,*
  527 U.S. 1 (1999)...................................................................................................84

*Oregon v. Elstad,*
  470 U.S. 298 (1985)...............................................................................................48

*Payne v. Arkansas,*
  356 U.S. 560 (1958)...............................................................................................40

*Pierce v. Thaler,*
  355 Fed. App'x 784 (5th Cir. 2009) ......................................................................65

*Pyle v. Kansas,*
  317 U.S. 213 (1942)...............................................................................................18

*Richards v. Quarterman,*
  566 F.3d 553 (5th Cir. 2009) ...........................................................................78, 79

*Riles v. McCotter,*
  799 F.2d 947 (5th Cir. 1986) .................................................................................95

*Rompilla v. Beard,*
  125 S.Ct. 2456 (2005)..................................................................................... passim

*S.D.G. v. State,*
  936 S.W.2d 371 (Tex. Ct. App. 1996)...................................................................96

*Soffar v. Dretke,*
  368 F.3d 441 (5th Cir. 2004) .................................................................................67

*Strickland v. Washington,*
  466 U.S. 668 (1984)..........................................................................................61, 77

*Strickler v. Greene,*
  527 U.S. 263 (1999)....................................................................................19, 34, 37

*Tassin v. Cain,*
  517 F.3d 770 (5th Cir. 2008) ...........................................................................20, 21

*Tennard v. Dretke,*
  542 U.S. 274 (2004)...............................................................................................65

*Tong v. State,*
  25 S.W.3d 707 (Tex. Crim. App. 2000)................................................................49

*Ungar v. Sarafite,*
  376 U.S. 575 (1964)..........................................................................................55, 56

A/73401003.1

*United States v. Bagley,*
    473 U.S. 667 (1985)........................................................................19

*United States v. Pennington,*
    20 F.3d 593 (5th Cir. 1994) ..........................................................58

*United States v. Rusmisel,*
    716 F.2d 301 (5th Cir. 1983) ...........................................78, 79, 80

*United States v. Shaffer,*
    789 F.2d 682 (9th Cir. 1986) ........................................................20

*United States v. Sipe,*
    388 F.3d 471 (5th Cir. 2004) ........................................................37

*United States v. Vasquez,*
    889 F.Supp. 171 (M.D. Pa. 1995) .................................................46

*Washington v. State,*
    388 U.S. 14 (1967)........................................................................55

*Ex parte Welborn,*
    785 S.W.2d 391 (Tex. Crim. App. 1990)......................................63

*Wiggins v. Smith,*
    539 U.S. 510 (2003)............................................................. passim

*Williams v. Brown,*
    609 F.2d 216 (5th Cir. 1980) ........................................................27

*Williams v. Taylor,*
    529 U.S. 362 (2000).................................................61, 64, 65, 66

*Wilson v. United States,*
    162 U.S. 613 (1896)......................................................................39

*In re Winship,*
    397 U.S. 358 (1970)......................................................................57

*Wisehart v. Davis,*
    408 F.3d 321 (7th Cir. 2005) ........................................................20

*Witherspoon v. Illinois,*
    391 U.S. 510 (1968)......................................................................92

*Withrow v. Wilson,*
    507 U.S. 680 (1993)......................................................................40

A/73401003.1

*Wyrick v. Fields,*
    459 U.S. 42 (1982)................................................................................................46

*Yanez v. State,*
    677 S.W.2d 62 (Tex. Crim. App. 1986)................................................................99

STATUTES

28 U.S.C. § 2254.......................................................................................1, 102

Texas Code Crim. Proc. Article 35.13 ...........................................................84

Texas Code Crim. Proc. Article 35.16 ...........................................................84

Texas Code Crim. Proc. Article 35.17(2) ................................................. passim

Texas Code Crim. Proc. Article 37.071 § 2(e)(1)...........................................64

Texas Code Crim. Proc. Article 11.071 § 2(c) ...............................................14

Texas Penal Code Ann. § 36.06.................................................................3, 58

Texas Penal Code § 37.09...............................................................................29

OTHER AUTHORITIES

Texas Rule of Evidence 609 .......................................................................23, 34

A/73401003.1

This Memorandum in Support of Petition for Writ of Habeas corpus is submitted pursuant to 28 U.S.C. § 2254, and challenges Petitioner Justen Grant Hall's conviction for capital murder and sentence of death in cause No. 20030D00505 in the 34th Judicial District Court, El Paso, Texas.

## I.     SUMMARY OF ARGUMENT

Petitioner's conviction and sentence of death are based on numerous and egregious violations of his constitutional rights.  These violations were caused by errors of the trial court (failure to exclude the Petitioner's involuntary statement); misconduct by the State (failure to disclose tacit offers of immunity to key fact witnesses); and by the stunningly ineffective (and affirmatively prejudicial) performance of the Petitioner's lead trial counsel, Frank Macias. Among other examples, Mr. Macias slept during portions of the trial, relinquished critical statutory advantages during jury selection, without any reasoned basis or even explanation, and inexplicably argued to the jury during the punishment phase of the trial that his own client deserved to die.   Individually or as a whole these errors deprived the Petitioner of his constitutional rights, and require redress by this Court.

*First,* the Petitioner's due process rights under the Fourteenth Amendment were violated by the State's failure to disclose critical information concerning fact witnesses who testified against him.  Specifically, the State withheld material information concerning offers of immunity made to witnesses by both prosecutors and police officers in exchange for testimony against the Petitioner at trial.   The suppression of these tacit agreements deprived the defense of the opportunity properly to impeach those witnesses.  As such, the Petitioner is entitled to a new trial.

*Second,* the Petitioner's conviction violates the Fifth and Fourteenth Amendments because the trial court erred in denying the motion to suppress the Petitioner's involuntary confession. The record evidence in this case leaves no doubt that the Petitioner's confession was obtained under a totality of circumstances evidencing an involuntary admission of guilt. At the time his statement was coerced, the police had deliberately withheld prescription medications needed to treat the symptoms of his mental illness, including schizophrenia, depression, and anxiety disorders. The Petitioner was also suicidal, had not slept in days, and was experiencing the after effects of a weeks-long methamphetamine binge. Despite knowledge of the Petitioner's state of mind, the police proceeded to engage him in casual conversation, without any *Miranda* warnings, before asking the Petitioner directly if he had committed the murder. Only then, after obtaining the answer he had sought, did the detective conducting the interrogation advise the Petitioner of his *Miranda* rights and proceed to extract a detailed statement. Such deliberate and coercive circumvention of the Petitioner's rights is not permitted under the Fifth and Fourteenth Amendments.

*Third,* the Petitioner's conviction violates the Sixth Amendment guarantee of effective assistance of counsel in light of uncontroverted evidence that the Petitioner's lead trial counsel slept during portions of the guilt/innocence phase of the trial. Several jurors noted that Petitioner's lead counsel, Frank Macias, slept during the examination of witnesses. Jurors even discussed the "spectacle" of Petitioner's sleeping counsel amongst themselves. This "spectacle" not only deprived the Petitioner of his counsel's assistance during the trial, it also left the jurors with the highly prejudicial impression that the Petitioner's own lawyer was not engaged or interested in the defense of his client. Mr. Macias's sleeping violated the fundamental principle

A/73401003.1

of fairness in the adversarial process and is *per se* ineffective under the governing law of this Circuit.

*Fourth*, the Petitioner's conviction violates his constitutional right to due process because the trial court arbitrarily denied the Petitioner's request for a short continuance before trial. The Petitioner sought a continuance of less than a month in order to: 1) undergo evaluation by an expert addictionologist; 2) conduct DNA testing of physical evidence that the State had not tested; and 3) conduct interviews with fact witnesses who were called to testify against the Petitioner. The trial court's denial of the continuance prevented the Petitioner from taking these steps, and thus prevented him from being able to prepare his defense, which is a fundamental element of due process.

*Fifth*, the Petitioner's conviction and sentence of death violate the due process clause because the evidence at trial was insufficient to prove that the Petitioner murdered the victim in the course of committing or attempting to commit the offense of retaliation. Indeed, the testimony of the State's own witnesses clearly demonstrates the lack of evidence sufficient for a rational jury to find beyond a reasonable doubt that the Petitioner killed Melanie Billhartz in order to prevent her from reporting the occurrence of a crime to the authorities, as required by Texas Penal Code Ann. § 36.06.

*Sixth*, the Petitioner's sentence of death violates the Sixth Amendment because trial counsel failed to investigate and present substantial, readily available evidence in mitigation of the death penalty. Specifically, trial counsel failed to investigate and present overwhelming and powerful evidence of childhood abuse, neglect, and mental illness. Such evidence was material, and would have caused at least one juror to have decided the Petitioner's fate differently had she been informed of the Petitioner's compelling, tragic, and sympathetic personal story.

A/73401003.1

*Seventh,* the Petitioner's death sentence violates the Sixth Amendment because Petitioner was deprived of the effective assistance of counsel at the punishment phase of his trial when trial counsel argued to the jury that the Petitioner deserved to die.  Trial counsel's bizarre and highly prejudicial comments to the jury completely sabotaged any opportunity for effective assistance of counsel during the punishment phase of his trial, and undermined even the poor mitigation case that trial counsel had presented.  The Petitioner was thus prejudiced by his counsel's unprofessional performance, and in accordance with *Strickland* principles, his petition for relief should be granted.

*Eighth,* the Petitioner's sentence of death violates the Sixth Amendment because trial counsel inexplicably relinquished two preemptory challenges against objectionable jurors by failing to follow the procedures set forth in Article 35.13 of the Texas Code of Criminal Procedure.  Under that provision, the State is required to exercise challenges for cause and peremptory strikes to potential jurors *before* a capital defendant exercises his.  This allows the defendant to maximize his use of peremptory strikes by only having to strike objectionable jurors who cannot be challenged for cause, but who the State has accepted.  Petitioner's trial counsel, however, unreasonably, and without any strategic or tactical motive, made an agreement with the State to exercise simultaneous and independent peremptory strikes.  As a result of this agreement, at least two jurors who demonstrated improper bias were permitted to serve on the panel that delivered the Petitioner's death sentence.

*Ninth,* the Petitioner's death sentence violates the Sixth Amendment because trial counsel agreed to excuse without questioning death-qualified venire members who had indicated opposition to capital punishment.  This decision was by no means required – the law permits individuals opposed to the death penalty to serve as long as they are able to obey the oath they

-4-

must take as jurors.  Thus, the venire members in question were not *per se* unqualified.  Yet, without any reasonable explanation or justification, the Petitioner's trial counsel agreed to excuse, without questioning, numerous potential jurors who were opposed to the death penalty.  Taken in tandem with the fact that trial counsel was later denied nine challenges for cause and a motion for a mistrial based on the lack of qualified jurors, it is clear that this decision was both unreasonable and highly prejudicial.

 *Tenth,* the Petitioner's sentence of death violates the Sixth Amendment because trial counsel failed to object to the trial court's failure to instruct numerous venire members as required by Texas Code of Criminal Procedure Article 35.17(2).  Under that provision, a capital trial court is required to "propound to the entire panel of prospective jurors questions concerning the principles, as applicable to the case on trial, of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion."  A court's failure to administer such questions constitutes reversible error when a capital defendant is denied a federal right as a result.  In the instant case, the judge presiding over voir dire examinations failed to question the jury regarding the Article 35.17(2) principles before allowing the State and the Petitioner's trial counsel to proceed with their voir dire examinations.  Petitioner's trial counsel failed to object to the deviation from statutory procedure.  As a result, at least one juror with questions regarding the principle of reasonable doubt was seated on the jury that delivered Mr. Hall's death sentence.

A/73401003.1

## II.    STATEMENT OF FACTS

The victim, Melanie Billhartz, left her grandfather's home at 6:00 p.m. on the evening of

October 28, 2002. (RR v68 at 59).[1] The victim's grandfather, F.O. Rountree, expected her home

that evening at around 8:00 p.m., but she never returned. (*Id.* at 61-62). Mr. Rountree searched

for Ms. Billhartz the following morning. When he was unable to find her, he contacted the El

Paso Police Department and filed a missing persons report. (*Id.* at 66). Detective Chavarria of

the El Paso Police Department was assigned the case regarding Ms. Billhartz's disappearance,

but the investigation made little headway over the next four weeks. (*Id.* at 58).

The El Paso Police Department received the first potential lead in Ms. Billhartz's

disappearance on November 20, 2002. Chase Hale, who had just been arrested by the El Paso

Police Department for unlawful delivery of marijuana and conspiracy to deliver marijuana,

informed the arresting officers that he had information relating to a murder and asked to speak

with El Paso detectives. (*Id.* at 155). Mr. Hale met with detectives from the Crimes Against

Persons unit and proceeded to relate to them his version of the events of October 28, 2002. (*Id.*

at 131). Mr. Hale not only told the police that he knew what happened to Ms. Billhartz that

evening, but also that he could lead them to her body. (*Id.* at 131-32).

According to Mr. Hale, he was living at a house located at 5608 Melody in El Paso at the

time of Ms. Billhartz's disappearance. (*Id.* at 122). Ms. Billhartz arrived at the house on the

evening of October 28, 2002, visibly upset after an altercation she had just had with her

boyfriend, Ted Murgatroyd, who was also at the house on Melody. (*Id.* at 124). Mr. Hale

testified at trial that the Petitioner, Justen Grant Hall, who was also at the house, called a meeting

---

[1] References herein to the court reporter's transcripts from the trial are designated "RR" followed by the volume and page numbers. References to the transcripts from the state habeas proceeding are designated "S.H.," and references to the clerk's record are designated "C.R."

A/73401003.1

of some of those present to discuss the incident.  (*Id.* at 127).  According to Mr. Hale, he was asked to leave the shed where the meeting took place (along with other individuals including Hector Lopez, Nicole Kays and Kelly Mancha), however he recalls walking past Ms. Billhartz who was outside the house next to her pickup truck.  (*Id.* at 128).  That was the last time Mr. Hale ever saw Ms. Billhartz.  (*Id.*)

Mr. Hale returned to the house after a period of approximately twenty to thirty minutes. (*Id.* at 128).[2]  Mr. Hale testified that he returned to the house with his friend, Hector Lopez, who told Mr. Hale he had left a tote bag in Ms. Billhartz's truck and needed to retrieve it.  (*Id.* at 194-95).[3]  Mr. Hale testified that as he and Mr. Lopez approached Ms. Billhartz's pickup truck to retrieve the bag, the Petitioner came running outside and told them not to get near the truck because he "just killed that bitch Melanie."  (*Id.* at 129).[4]  Mr. Hale left the house shortly thereafter.  (*Id.* at 137).

Mr. Hale told the detectives that he knew Ms. Billhartz's body was in the desert because that was "where Ted [Murgatroyd] thought of taking her." (*Id.* at 132).[5]  Mr. Hale led the police

---

[2] Mr. Hale also said in his witness statement taken by the El Paso Police Department on December 3, 2002, approximately five weeks after the events in question took place, that he was gone from the house for approximately 20 minutes and that Ms. Billhartz was killed during that time period.

[3] Mr, Hale later testified that Mr. Lopez returned to the house separately from Mr. Hale, approximately one-half hour later, at which point Mr. Hale said they tried to approach Ms. Billhartz's vehicle. (*Id.* at 209-210).  Under either timeline of events, Mr. Hale's testimony is inconsistent with the testimony of others present at the house that evening.

[4] Mr. Lopez testified during the trial that contrary to Mr. Hale's testimony about their alleged encounter with the Petitioner, not only did he not leave a tote bag in Ms. Billhartz's truck, he never returned to the house that evening.  (RR v75 at 93).  Mr. Lopez gave a statement to the El Paso Police on December 14, 2002 in which he also stated he never returned to the house. *See* Exhibit 1.

[5] Although Mr. Hale never mentioned this during the trial, his December 3, 2002 witness statement reflects that he had a conversation with Mr. Murgatroyd during which Mr. Murgatroyd allegedly told him that the Petitioner had killed Ms. Billhartz and he was forcing Mr. Murgatroyd to help him dispose of the body.  Any mention of this conversation is conspicuously absent from both Mr. Murgatroyd's trial testimony (RR v72 at 27-28), and his two witness statements from November 2002.

into the New Mexico desert in search of Ms. Billhartz's body, but he was unable to lead the detectives to the location where he believed Ms. Billhartz was buried. (*Id.* at 133).

The next day, November 22, 2002, El Paso detectives met with Mr. Murgatroyd to question him about the events of October 28, 2002. According to Mr. Murgatroyd, he had accompanied Ms. Billhartz to the store that evening. (RR v72 at 16). On their way back to the house from the store, Mr. Murgatroyd and Ms. Billhartz got into a fight in Ms. Billhartz's pickup truck after Mr. Murgatroyd made a "sarcastic comment" to her. (*Id.* at 18). Ms. Billhartz pushed Mr. Murgatroyd out of the vehicle and drove to the 5608 Melody address on her own, allegedly bleeding as a result of Mr. Murgatroyd hitting her as he was getting out of the truck. (*Id.*).

By the time Mr. Murgatroyd arrived at the 5608 Melody address on foot, some of the other men at the house were waiting for him and confronted him to find out why he had struck Ms. Billhartz. (*Id.* at 20). Ms. Billhartz had allegedly been threatening to call the police to report that Mr. Murgatroyd had assaulted her. (*Id.* at 24). After Mr. Murgatroyd explained that he had only struck Ms. Billhartz in self-defense, the group met to discuss how to best handle Ms. Billhartz. (*Id.* at 22). Those participating in the meeting included the Petitioner, Mr. Murgatroyd, Tim Ray Davis, Jesse Eddy and James Eaton, all of whom were associated with an organization known as the Aryan Circle. (*Id.*).

While Mr. Murgatroyd's two witness statements and trial testimony contained numerous inconsistencies, he testified at trial that Mr. Hall asked for a shotgun and garbage bags in order to kill Ms. Billhartz and dispose of her body. (*Id.* at 23).[6]  Mr. Murgatroyd testified that Ms. Billhartz could normally be "calmed down" with some "speed" (methamphetamine),

---

[6] Of all the individuals present at that meeting, Mr. Murgatroyd is the only one who testified that the Petitioner asked for a shotgun.

however no one had any on hand to give her.[7]  Mr. Murgatroyd testified that the Petitioner

proceeded to take Ms. Billhartz for a ride in her pickup truck to try to calm her down, and that

when he returned Ms. Billhartz had been strangled by the Petitioner and was dead.[8]

Mr. Murgatroyd testified that the Petitioner then threatened him and forced him to assist in

disposing of Ms. Billhartz's body. (*Id.* at 28).  Mr. Murgatroyd stated that he picked up a shovel

and machete and got into Ms. Billhartz's pickup truck with the Petitioner, and that

Ms. Billhartz's body lay on the floor in the back of the cab.  (*Id.* at 27-29).  Mr. Murgatroyd

testified that the two of them drove to a location in the New Mexico desert called "Kilbourne's

Hole" where they removed Ms. Billhartz's body and threw it into a crevice.  (*Id.* at 31).[9]

According to Mr. Murgatroyd, the Petitioner then directed him to cut off Ms. Billhartz's fingers

because Ms. Billhartz had Mr. Murgatroyd's DNA on her fingers.  (*Id.* at 30).[10]

---

[7] Mr. Murgatroyd's statement is also inconsistent with testimony of others present in the shed during the meeting as to whether there was any "speed" to give to Ms. Billhartz to calm her down. Jesse Eddy and Tim Ray Davis both testified that Mr. Eddy was in the process of preparing a "batch" of methamphetamine at the time the meeting was taking place. (RR v74 at 90-91; RR v73 at 138). Mr. Eddy testified, in fact, that he was preparing some of the methamphetamine specifically for Ms. Billhartz. (RR v73 at 160). The State alleged during the trial that the whole reason the Petitioner allegedly killed Ms. Billhartz was to prevent her from calling the police and having them locate the "meth lab" (*i.e.*, the dish and burner that Mr. Eddy kept in his backpack.) (RR v79 at 95).

[8] In another significant inconsistency among the State's witnesses, Mr. Murgatroyd testified at trial that the Petitioner and Ms. Billhartz were gone "three, maybe five hours." In his statement to the police, however, he said it was a "couple of hours." On both occasions Mr. Murgatroyd's testimony was inconsistent with Mr. Hale's December 2002 statement to the police, and later testimony at trial, when he stated that Ms. Billhartz was killed during a thirty minute time window.

[9] Mr. Murgatroyd testified at trial that Ms. Billhartz "appeared to be naked," however when the body was eventually located by El Paso and Doa Ana County police, she was clothed. (*Id.* at 29).

[10] Mr. Murgatroyd omitted the fact that he cut off Ms. Billhartz's fingers when he first gave a statement to the police on November 22, 2002.  El Paso detectives re-interviewed him on November 26, 2002, at which time he admitted to doing so.

A/73401003.1

Mr. Murgatroyd testified that he and the Petitioner then returned to El Paso and went their separate ways. (*Id*. at 34). Mr. Murgatroyd claims that he only saw the Petitioner one time after that, approximately two days later when he came by Mr. Murgatroyd's house. (*Id*.).

After giving the El Paso Police a statement on November 22, 2002, Mr. Murgatroyd then led them into the desert to search for Ms. Billhartz's body. By the time they reached the Kilbourne's Hole area, it was already early morning of November 23, 2002. Mr. Murgatroyd was able to lead the detectives to the body after searching for approximately forty-five minutes to an hour. (*Id*.).

At approximately the same time Mr. Murgatroyd was leading the El Paso detectives to Ms. Billhartz's body, Detective Tommy Baker of the Hale County Sheriff's Office encountered a white pickup truck pulled over on the side of the highway outside of Plainview, Texas. (RR v69 at 67). Deputy Baker called in his location and the truck's license plate number. (*Id*. at 68). He then approached the driver's side of the truck and noticed that the occupants were asleep. (*Id*. at 69). Deputy Baker woke the occupants and spoke briefly to them, instructing them to move further up the highway to a lit area. (*Id*.)

When he returned to his patrol car, Deputy Baker heard an emergency tone coming over his radio alerting him to the fact that there was a missing person's alert for the owner of the pickup truck. (*Id*. at 70). As Deputy Baker was rechecking the tag number, the truck drove off so he turned on his lights and pulled it over. (*Id*. at 71).

Deputy Baker approached the truck again, asked the occupants for identification, and identified the driver as the Petitioner, Justen Grant Hall. Deputy Baker identified the other occupants of the vehicle as Jesse Eddy, his girlfriend, Aimee Quintela, and their infant daughter. (*Id*. at 73-75). Other officers arrived on the scene and conducted a search of the vehicle. During

-10-

the search the officers came across a bag of white powder, and believing it to contain narcotics, they placed both Mr. Hall and Mr. Eddy in handcuffs. (*Id.* at 78). The officers proceeded to conduct field tests on the substance in the bag and concluded that it was in fact laundry detergent. (*Id.* at 79).

At approximately the same time that the officers were concluding their field tests on the laundry detergent, Deputy Baker received a call from his dispatch telling him to treat the pickup as a homicide scene. (*Id.* at 80). The information had come from the El Paso detectives who had just discovered Ms. Billhartz's body in the New Mexico desert. The officers in Plainview placed the three adults under arrest for unauthorized use of a motor vehicle and transported them back to the Hale County's Sheriff's Office.

Later that same morning, the Petitioner was brought before the local magistrate in Hale County, Texas. When he was taken into custody in Plainview, the Petitioner – who had a long history of mental illness, drug abuse, and suicide attempts – was determined by officers there to be a suicide risk and he was placed in observation for that reason. (RR v5 at 108-09).

At approximately the same time, El Paso detectives obtained a warrant against the Petitioner for capital murder. Detectives Samaniego and Pantoja from the El Paso Police Department and Detective Cooper from the Doa Ana Sheriff's Office flew to Hale County that evening in order to interview the Petitioner and the other individuals who were in the vehicle with him.

The detectives first met with Ms. Quintela, who, according to the detectives' notes, stated she had no knowledge of any murder and only knew that the Petitioner had arrived in Carlsbad, New Mexico approximately two to three weeks earlier along with Mr. Eddy. She further stated that the Petitioner had left Carlsbad for a brief period of time, but had returned. The Petitioner

A/73401003.1

was driving Mr. Eddy, Ms. Quintela and their daughter to Indiana in order to start a new life when they were stopped in Plainview.

On November 24, the detectives then interviewed Mr. Eddy who agreed to give a statement implicating the Petitioner in the murder of Ms. Billhartz. Detective Samaniego stayed behind to write up Mr. Eddy's statement while Detectives Pantoja and Cooper went to interview the Petitioner. According to Mr. Eddy's statement as written up by Detective Samaniego, Mr. Eddy confirmed the events of that evening with respect to Ms. Billhartz arriving at the house in a "hysterical" state, stating that Ted Murgatroyd had struck her and that she was going to have him arrested. Mr. Eddy also alleged that the Petitioner had threatened to kill Ms. Billhartz shortly before Mr. Eddy left the shed.[11] According to Mr. Eddy's statement, the first time he learned of Ms. Billhartz's death was around 6:00 a.m. the next morning when Mr. Murgatroyd showed up and told him Ms. Billhartz was dead and that he and the Petitioner had just dumped her body in the desert.

Detectives Pantoja and Cooper interrogated the Petitioner for approximately an hour and twenty minutes on November 24, 2002. They showed him witness statements they had obtained implicating him in Ms. Billhartz's death. (RR v69 at 219). Despite the detectives' efforts, the Petitioner steadfastly denied any involvement in Ms. Billhartz's murder. During this initial interrogation, the Petitioner asked the detectives how he could obtain the prescription medications he needed to control the symptoms of his mental illness, but the detectives made no attempt to obtain the medications for him. (RR v45 at 131).

---

[11] During the trial, Mr. Eddy testified that he walked past Ms. Billhartz on his way out and told her she should leave. (RR v73 at 146). According to Detective Cooper's notes of the interview with Mr. Eddy in the Hale County jail in November 2002, however, Mr. Eddy stated that after leaving the shed he walked right past Ms. Billhartz but did not tell her to leave.

A/73401003.1

At approximately 11:20 a.m., after concluding his interview with Mr. Eddy, Detective Samaniego entered the interview room where the Petitioner was being interrogated. (*Id.*) Detectives Pantoja and Cooper left the room to allow Detective Samaniego to conduct the next interrogation alone, without any witnesses or recording devices. (*Id.* at 220). After approximately thirty-five minutes, Detective Samaniego emerged from the room and told the other detectives that Mr. Hall had agreed to give a statement admitting to his involvement in Ms. Billhartz's murder.[12]

### III.   PROCEDURAL HISTORY

#### A.   PRETRIAL PROCEEDINGS

The Petitioner was indicted for capital murder in the 34th District Court, El Paso County, Texas, Judge William Moody presiding. (RR v1 at 3).

Mr. Jaime Olivas was appointed on February 19, 2003 to represent the Petitioner in his capital murder trial. (RR v1 at 28). Mr. Charles McDonald subsequently noticed his appearance as co-counsel on September 6, 2004. (RR v2 at 239).

On September 20, 2004, the court questioned the Petitioner's attorneys regarding the Petitioner's desire to replace Mr. Olivas with Mr. McDonald. (RR v7 at 5-26). In particular, the court questioned the attorneys regarding their relative levels of experience. (*Id.*). The questioning revealed that Mr. McDonald had never worked on a death penalty case, and his education in the area was entirely self-study. (*Id.* at 16). Mr. McDonald was also not at that

---

[12] Although there are serious questions as to the tactics used by Detective Samaniego to obtain the Petitioner's "confession" which are discussed herein, it is also noteworthy that the "confession" is to a large extent a combination of the other witness statements that the detectives had in their possession and showed Mr. Hall that morning. (RR v69 at 219). To the extent the "confession" contained additional statements which did not fit into the State's later-developed trial theories and timeline of events or were contradicted by the testimony of the State's own witnesses, those statements  were conveniently ignored during the Petitioner's trial.

time on the list for appointment in capital litigation, and had participated as second chair in a murder case for the first time only that year.  (*Id.* at 17).

After noting his concerns about replacing Mr. Olivas, the court allowed Mr. Olivas to withdraw as counsel, and appointed Mr. Frank Macias as lead counsel, with Mr. McDonald as co-counsel.  (RR v7 at 22-25).  Even after he had rendered his decision, however, the judge expressed concern regarding Mr. McDonald's level of experience. (RR v7 at 27-28).

The Petitioner filed two pretrial motions to suppress his involuntary statement, first on February 2, 2004 and again on September 9, 2004.  (RR v1 at 56-64).  Both motions were denied, following evidentiary hearings.

On January 11, 2005, the Petitioner also moved for a short continuance – seeking to move the trial date from January 24, 2005 to February 21, 2005. (RR v65 at 4-5).  The Petitioner sought the continuance in order to: 1) allow the Petitioner to be evaluated by an expert addictionologist in order to further support the argument that the confession was not knowing and voluntary (RR v65 at 16); 2) allow the Petitioner to conduct DNA testing of physical evidence that the State had not tested (RR v65 at 17-20); and 3) conduct interviews with fact witnesses who the State planned to call to testify against the Petitioner (*id.*).  The following day, the court denied the motion.  (RR v66 at 28).

**B.    TRIAL**

On March 22, 2005, after 12 days of trial, the jury found the Petitioner guilty of capital murder (CR IV at 1162).  After a subsequent punishment phase of the trial, the jury then answered the first and second special issues "yes" and "no," respectively, and the court sentenced the Petitioner to death (CR IV at 1184-1185).  The Petitioner filed a motion for new trial (CR IV, at 1196) which was denied (RR v89 at 17, 22).

-14-

## C.    POST-TRIAL PROCEEDINGS

Although the Petitioner expressed a preference for his trial counsel, Mr. Macias and Mr. McDonald, to continue to represent him in his direct appeal and his state habeas proceeding, the trial court expressed apprehension regarding their qualifications and objectivity (RR v88 at 4-6), and appointed Mr. Robin Norris to represent the Petitioner in his state habeas proceedings pursuant to Texas Code of Criminal Procedure Article 11.071, §2(c).  Mr. Louis Lopez was appointed to represent the Petitioner in his automatic appeal to the Court of Criminal Appeals.

Mr. Norris and Mr. Lopez each contacted Mr. Macias, lead trial counsel, in order to obtain Mr. Hall's files.  Mr. Macias, however, informed them that Mr. McDonald had kept the files.  Tragically, Mr. McDonald committed suicide on June 2, 2005, and the files were never found.  (S.H. Tr. at 4-6, 97-100).  As a result, Mr. Norris and Mr. Lopez were forced to rely entirely on the trial record and files provided by the district attorney.

### 1.    Direct Appeal

Mr. Lopez filed the Petitioner's direct appeal on May 30, 2006.  The appeal raised sixteen points of error, including:

- that the verdict was not supported by evidence, either legally or factually, that the Petitioner committed murder in the course of retaliation;

- that the evidence obtained after the stop of the Petitioner's vehicle should have been suppressed;

- that the Petitioner's statement to the police was not voluntary and should have been excluded;

- that the court erroneously prevented the questioning of venire persons;

- that the court did not grant additional preemptory strikes to the Petitioner which resulted in the seating of three objectionable jurors;

- that the court did not grant a pre-trial motion for a continuance;

A/73401003.1

- that the court denied the Petitioner's motion to suppress DNA results;

- that the court should have given the jury an instruction on the lesser included offense of murder; and

- that the court should have impaneled a new jury to hear punishment;

On June 27, 2005, the Texas Court of Criminal Appeals affirmed the conviction and sentence on direct appeal. *Hall v. State,* No. AP-75,121 (Tex. Crim. App. June 27, 2007) (not designated for publication).

### 2.   State Habeas Proceeding

Mr. Norris timely filed an Application for Writ of Habeas Corpus on the Petitioner's behalf in State court on March 18, 2007. (Exhibit 2, State Habeas Application). The application raised seven claims, including a *Brady* claim, and several ineffective assistance of counsel claims. *Id.* A hearing on the state habeas application was held on July 2, 2008. The witnesses called included the district attorneys who had tried the case and Frank Macias, the Petitioner's surviving trial attorney.

In late August 2008, Mr. Hall wrote a letter to the trial court requesting that he be allowed to "drop all his remaining appeals." On September 29, 2008, Mr. Norris filed a Motion to Dismiss Application for Writ of Habeas Corpus and for Competency Evaluation based on that request. Pursuant to that motion, the trial court appointed two experts who evaluated the Petitioner at the Polunsky Unit to determine whether he was competent to waive his state habeas proceedings. A hearing was scheduled to consider the motion and Mr. Hall's competency.

At the March 6, 2009 hearing on that motion, however, the Petitioner informed the judge that he no longer wanted to drop his appeals, and that he instead wanted to represent himself *pro se,* and dismiss his existing state habeas application so that he could file a new one. (March 6, 2009 S.H. Tr. at 8-10).

-16-

Because of the Petitioner's last-minute change of heart, the court did not explore the issue of competency at the hearing, but instead attempted to advise the Petitioner of the consequences of dismissing the application filed by Mr. Norris.  The advice given by the court, however, was ambiguous and misleading.  When the court asked Mr. Hall whether he understood the potential procedural consequences of what he was attempting to do, Mr. Hall's response clearly indicated that he did not, as he responded by stating, "I'll be filing a motion to get a printed copy of the whole case file and everything." (March 9, 2009 S.H. Tr. at 39:6)

Although it was clear that Mr. Hall did not understand the potential procedural consequences of his request, the trial court entered Findings of Fact and Conclusions of Law recommending that the Court of Criminal Appeals dismiss Mr. Hall's then-pending state habeas application, allow Mr. Norris to withdraw, and allow Mr. Hall to proceed *pro se* in his state habeas proceedings, with Mr. Norris available to assist him as stand-by counsel. (*Ex parte Hall*, No. 20030D00505-34-1, Findings of Fact, Recommendation, and Order (March 9, 2009)).

After returning to the Polunsky Unit, Mr. Hall was visited by an attorney from the Texas Defender Service, who explained to Mr. Hall the potential significance of his request to dismiss his then-pending state application. Mr. Hall immediately submitted a motion in the form of letter to the Court of Criminal Appeals asking that his pending application for writ of habeas corpus *not* be dismissed. (*Ex parte Hall*, No. 20030D00505-34-1, Letter from Justen Hall (March 31, 2009)). Despite receipt of this motion expressly withdrawing Mr. Hall's previous request to dismiss his state application, the Court of Criminal Appeals inexplicably proceeded to dismiss the application on June 10, 2009 - in the absence of any pending motion to do so. (*Ex parte Hall*, No. WR-70, 824-01 (Tex. Crim. App. 2009)).

-17-

The Court of Criminal Appeals ignored the Petitioner's subsequent "Suggestion that the Court, on Its Own Motion, Reconsider Its June 10, 2009 Order Dismissing Mr. Hall's Application for Post-Conviction Writ of Habeas Corpus" filed on July 16, 2009.

## IV.   ARGUMENT

**A.   PETITIONER'S RIGHTS UNDER THE FOURTEENTH AMENDMENT WERE VIOLATED BY THE STATE'S MISCOUNDUCT IN FAILING TO DISCLOSE MATERIAL EVIDENCE FAVORABLE TO HIM IN VIOLATION OF *BRADY***

The Petitioner's conviction violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution because the State of Texas failed to disclose material evidence of tacit offers of immunity made to witnesses by both prosecutors and police officers in exchange for testimony against the Petitioner at trial.   The Supreme Court has interpreted Fourteenth Amendment due process violations to require a new trial when convictions are obtained through the suppression of material evidence.   *See, e.g., Brady v. Maryland*, 373 U.S. 83, 87 (1963).   As such, the Petitioner is entitled to a new trial.

**1.   The Supreme Court Has Repeatedly Held That The Law Requires the State to Disclose Evidence Favorable to the Accused**

The Supreme Court has issued a number of opinions dating back to the 1930's which have served to identify an important class of due process rights commonly referred to simply as the *Brady* doctrine.   The *Brady* doctrine prohibits the State from presenting false evidence to the court, presenting evidence which the State knows will create a false impression in the mind of the fact finder, or withholding exculpatory evidence from the defense.

In *Mooney v. Holohan*, 294 U.S. 103 (1935), the first decision dealing with this issue, the Court held that a defendant's due process rights are violated when the "state has contrived a conviction...through a deliberate deception of court and jury by the presentation of testimony

-18-

known to be perjured." 294 U.S. at 112.  The Court extended this principle in *Pyle v. Kansas*, 317 U.S. 213, 216 (1942) to include "the deliberate suppression by those same authorities of evidence favorable to [the accused]."

The Court was faced with a similar issue in *Alcorta v. Texas*, 355 U.S. 28 (1957) (per curium).  In *Alcorta*, the prosecution told a witness not to volunteer specific information but to be truthful if asked about it by the defense.  *Id.* at 31.  The Court found the prosecution's actions to have served to suppress evidence favorable to the defense since the evidence in question corroborated the defendant's theory of the case.  As a result, the prosecution's conduct violated due process as set forth under *Mooney* and *Pyle*.

In *Napue v. Illinois*, 360 U.S. 264 (1959), the Court held that false evidence that is left "uncorrected when it appears" is equivalent to the state offering false evidence.  360 U.S. at 268.  The Court held that under the rule in *Mooney*, the prosecution's obligation extends beyond evidence going just to the credibility of the witness.  The Court stated "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."  *Id.* at 269.

In the landmark decision of *Brady v. Maryland*, the Court brought together the principles set forth in all the decisions discussed above to form a broad doctrine applicable to the State's obligation to disclose evidence.  The Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.

-19-

The Court in *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) identified what it referred to "as the three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." The Court went on to explain that prejudice occurs under the third element "when the suppressed evidence is material for *Brady* purposes." *Id.* at 282.

Under *United States v. Bagley*, 473 U.S. 667, 682 (1985), evidence is material for *Brady* purposes if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." The Court in *Kyles v. Whitely*, 514 U.S. 419 (1995), further examined the aspects of materiality under *Bagley*. The Court stated that "a showing of materiality does not require demonstration of a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant.)" *Id.* at 434. The Court further noted that under *Bagley* it is "not a sufficiency of the evidence test" and "a defendant need not demonstrate that after discounting the inculpatory evidence, there would not have been enough left to convict." *Id.* The Court also observed that in determining whether a *Brady* violation exists, the evidence that the prosecution failed to disclose at trial is viewed collectively rather than on a case-by-case basis. *Id.* at 436-37.

2.      **The *Brady* Doctrine Requires The State To Disclose Tacit Agreements With Witnesses**

The prosecution is required to disclose evidence of any deals it makes with witnesses where the credibility of the witness is material. *Giglio v. United States*, 405 U.S. 150 (1972). It

is immaterial whether the prosecution's nondisclosure is intentional or simply negligent. *Id.* at 154.

Many circuits, including the Fifth Circuit, have extended *Giglio* to recognize that the State is required to disclose evidence regarding tacit agreements with witnesses. *See, e.g., Tassin v. Cain*, 517 F.3d 770, 777 (5th Cir. 2008) (jury entitled to know about "evidence of any understanding or agreement as to a future prosecution"); *United States v. Shaffer*, 789 F.2d 682, 689 (9th Cir. 1986) (evidence that witness was paid in the form of leniency for his cooperation was material); *Wisehart v. Davis*, 408 F.3d 321, 324 (7th Cir. 2005) ("Express or tacit, either way there would be an agreement, it would be usable for impeachment, and it would have to be disclosed to the defense"); *Clay v. Bowersox*, 367 F.3d 993 (8th Cir. 2004) (noting that due process requires a prosecutor to disclose any promise that a key witness will not be prosecuted if he testifies for the state); *Bell v. Bell*, 512 F.3d 223, 233 (6th Cir. 2008) (stating that less formal, unwritten, or tacit agreements are also subject to *Brady's* disclosure mandate); *Haber v. Wainwright*, 756 F.2d 1520, 1523-24 (11th Cir. 1985) (even a prosecutor's "advice" can violate *Brady* "since it could constitute an informal understanding which could directly affect the witness's credibility before the jury"); *DuBose v. Leferve*, 619 F.2d 973, 979 (2nd Cir. 1980) (noting that *Brady* may not be avoided by keeping a deal "general in language or tone"); and *Douglas v. Workman*, 560 F.3d. 1156, 1186 (10th Cir. 2009).

In *Tassin*, the defense asked the State to disclose any information it had regarding leniency for the State's main witness. 517 F.3d at 773. The State responded that it had no information regarding any deal. The witness testified during the course of the trial that she faced a possible sentence between five and ninety-nine years for armed robbery, and that no deals had been made relating to her testimony. *Id.* However the judge presiding over her case had already

A/73401003.1

indicated that he would sentence her to between twenty and thirty years, or possibly as low as fifteen years, if she waived the marital privilege and testified against her husband, and as low as ten years if her testimony was consistent with her statement to the police. *Id.* at 774. The district court overruled the state court in finding that the suppressed bargain between the State and the witness did not need to be "a firm 'promise' in order to mislead the jury with respect to the [witness's] credibility." Rather, the "State was 'Constitutionally required' to 'reveal its deal with the witness to the jury.'" *Id.* at 776, *citing Tassin v. Cain*, 482 F.Supp.2d 764, 773, 775 (E.D. La. 2007).

The State appealed the district court's decision, and the Fifth Circuit affirmed, noting that "[a]lthough *Giglio* and *Napue* use the term 'promise' in referring to covered-up deals, they establish that the crux of a Fourteenth Amendment violation is deception..." and "a promise is unnecessary." *Id.* at 778. The Fifth Circuit went on to note that "[w]here, as here, the witness's credibility 'was...an important issue in the case...evidence of *any understanding or agreement as to a future prosecution* would be relevant to his credibility and the jury was entitled to know of it." *Id. citing Giglio*, 405 U.S. at 154-55 (emphasis in the original). The court looked to the Supreme Court's holding in *United States v. Bagley* in emphasizing that "the fact that the *stake was not guaranteed through a promise or binding contract*, but was expressly contingent on the Government's satisfaction with the end result, *served only to strengthen any incentive to testify falsely* in order to secure a conviction." *Id. citing* 473 U.S. at 683 (emphasis in the original).

Similarly in *Douglas v. Workman*, two defendants were convicted and sentenced to death based upon, among other evidence, the eyewitness testimony of one of the individuals present at the scene of the murder. 560 F.3d at 1163. The witness later recanted his testimony identifying the defendants, and alleged that not only had the prosecutor suborned perjured testimony from

-22-

him concerning the identification of the defendants, the prosecutor had also elicited false testimony from him denying the existence of any deal in exchange for his testimony. *Id.* at 1167.

The court in *Douglas* held that the *Brady* doctrine requires the disclosure of any deal between the State and a witness, be it explicit or tacit. *Id.* at 1186. The court, in reaching its conclusion, quoted from the dissent in *Bell v. Bell*, 512 F.3d 223 (6th Cir. 2008), which observed that tacit agreements, similar to explicit agreements, are relevant to credibility, and in some cases may be more likely to skew the witness's testimony because the witness may believe that the more valuable his or her testimony, the more valuable the reward will be in the end.[13] The dissent in *Bell* went on to note that tacit agreements are additionally harmful in that a prosecutor may argue that the witness is disinterested which may increase the witness's credibility with the jury, yet that underlying premise would be false. *Id.*

Even in instances in which the State makes some type of disclosure which could call the credibility of the witness into question (*e.g.*, disclosing that the testifying witness is a convicted felon), the State is still required to disclose the existence of any other motivating factor, especially that of a tacit agreement tied to the witness's testimony. "[T]he fact that the jury was apprised of other grounds for believing that the witness ... may have had an interest in testifying against petitioner [does not turn] what was otherwise a tainted trial into a fair one." *Napue v. Illinois,* 360 U.S. at 270.

---

[13] The majority in *Bell* agreed that a tacit agreement or "understanding" was subject to disclosure under *Brady*, however the court was unable to conclude that such a tacit agreement existed in that specific case.

A/73401003.1

3.      **The State's Misconduct In Failing To Disclose** *Brady* **Evidence Requires That The Petitioner Be Granted A New Trial**

In the present case, the Petitioner made a Motion For Discovery And Inspection on January 6, 2005. (*See* January 6, 2005 Motion for Discovery and Inspection). The Motion asked the trial court to compel the District Attorney to disclose evidence which would serve to impeach any potential prosecution witness, including evidence of "deals, agreements, offers of immunity, or the like given or offered to any witness or potential witness," which the State was in possession of at the time the Motion was filed or learned of in the future. (*Id.*). Although the State did disclose criminal convictions of certain witnesses as it was required to do under Tex. R. Evid. 609, the State failed to comply with the Motion in that it failed to disclose the existence of tacit agreements with key witnesses who testified against the Petitioner, and whose testimony was fundamental to the jury's decision.

The undisclosed *Brady* evidence consisted of promises or tacit agreements made with the State's key witnesses who testified against the Petitioner. The suppression of these tacit agreements deprived the defense of the opportunity properly to impeach those witnesses. As such, the Petitioner is entitled to a new trial.

a.      **The State Withheld Material Evidence of Immunity Agreements With Two Of The State's Key Witnesses**

Undisclosed *Brady* evidence is material if there is a reasonable probability that had the evidence been disclosed by the State, the results of the trial would have been different. *Kyles,* 514 U.S. at 434. "A 'reasonable probability of a different result' is shown when the suppression 'undermines confidence in the outcome of the trial.'" *Graves v. Dretke*, 442 F.3d 334, 340 (5th Cir. 2006) (quoting *Kyles*, 514 U.S. at 434). The State's suppression of draft immunity

-24-

agreements prepared for two key witnesses clearly undermines confidence in the jury verdict of guilt against the Petitioner.

The State relied heavily on the testimony of Ted Murgatroyd and Jesse Eddy to obtain the Petitioner's conviction.  Mr. Murgatroyd testified that the Petitioner killed Ms. Billhartz and disposed of her body in New Mexico.  (RR v72 at 31).  Mr. Eddy testified that he heard the Petitioner say he was going to kill Ms. Billhartz.  (RR v73 at 143).  What the State failed to disclose was that it prepared draft immunity agreements for both of these key witnesses which granted them immunity from prosecution for the very serious crimes they admitted to on the stand while under oath.[14]  (*See* Exhibits 3 and 4, Draft Immunity Agreements).

Of all the witnesses the State called to testify during the trial, the State only felt the need to prepare immunity agreements for Mr. Murgatroyd and Mr. Eddy.  This demonstrates the importance the State placed upon the testimony of these two witnesses:   apparently the prosecution felt the need to draft explicit agreements either to show to the witnesses to secure their testimony or in case either witness threatened to back out of testifying.  The State's suppression of these immunity agreements deprived the defense of the ability to impeach the witnesses in front of the jury, clearly undermining confidence in the outcome of the trial.  If the immunity agreements had been disclosed to the defense and defense counsel had been able to confront the witnesses with the agreements in order to impeach their credibility, there is a reasonable probability a different result would have occurred at trial, given the importance of their proffered testimony.

---

[14] There is no evidence that the State ever disclosed the draft agreements to the Petitioner's trial counsel.  The prosecutors, Ms. Meraz and Mr. Hicks, were both asked about the draft agreements after the attorney handling Mr. Hall's state habeas proceedings first discovered them in the El Paso District Attorney's files.  Neither Ms. Meraz nor Mr. Hicks gave any indication that they were disclosed to the defense and there is no mention of the immunity agreements in the trial record.

Significantly, the testimony of the lead prosecutor concerning offers of immunity is inconsistent with the facts.   Assistant District Attorney Meraz, the lead prosecutor at the Petitioner's trial, testified during the state habeas hearing in July 2008: "I know from the get-go we told [the witnesses] that we weren't going to make any deals that we were interested in them just testifying truthfully, *but that as far as any deals we weren't cutting any.*" (S.H. Tr. at 102 (emphasis added)).   Ms. Meraz further testified that Ted Murgatroyd was the only one of the witnesses to even bring up the possibility of cutting a deal in exchange for his testimony (*Id.* at 109).   Ms. Meraz later contradicted her earlier testimony, however, when she stated that Chase Hale also inquired about the possibility of a deal but was told that the State was not offering any. (*Id.* at 124).

Despite her emphatic insistence that she made it clear to the witnesses that no deals would be offered, the State obviously prepared immunity agreements for at least Mr. Murgatroyd and Jesse Eddy.   When Mr. Murgatroyd and Mr. Eddy were both asked on the stand whether they were testifying pursuant to a deal with the State, they both denied that they were. (RR v72 at 38, RR v73 at 135).   Because the State failed to disclose the draft immunity agreements, the Petitioner's trial counsel was unable to impeach that testimony and further explore the tacit agreements clearly represented by the drafts.   The agreements would have served as a significant factor for the jury to consider as they weighed the credibility of Mr. Murgatroyd and Mr. Eddy.

When Ms. Meraz was questioned about the draft agreements during the state habeas hearing in July 2008, she testified that the agreements were prepared in case one of the witnesses tried to "wiggle out" of giving testimony during the course of the trial. (S.H. Tr. at 131). Ms. Meraz further testified that she did not believe the trial attorneys even spoke with the El Paso District Attorney, Jaime Esparza, about getting his approval for offering the immunity

-26-

agreement – approval that she testified she thought was required in order to make the offers. Her recollection on that point was clearly incorrect, however, as the immunity agreements for Mr. Eddy, a key witness for the State, was in fact *signed by the District Attorney himself.* (*See* Exhibit 4, Signed Immunity Agreement).

Whether the State intentionally suppressed the existence of the draft immunity agreements or did so out of negligence is immaterial. *Giglio*, 405 U.S. at 154. Because the State failed to disclose the existence of the immunity agreements, the defense was deprived of the ability to probe the extent and scope of any alleged understanding between Mr. Murgatroyd, Mr. Eddy and the State concerning leniency for pending or prior crimes. Due to the State's suppression of this material evidence, the Petitioner is entitled to a new trial.

> **b.** **The State's Key Witnesses Testified Under Oath To A Number of Crimes, Yet Were Never Charged, Thereby Demonstrating The Existence Of Undisclosed Agreements With The State**

The State relied heavily on the testimony of a number of witnesses with lengthy criminal records in order to convict the Petitioner. (*See* Exhibit 5, Notice of Prior Convictions). While on the stand, many of these witnesses testified under oath to committing crimes, including felonies during the time period when the murder was committed and immediately thereafter, yet none of them was charged. The State's failure to prosecute these individuals demonstrates the existence of tacit agreements providing the witnesses with immunity for their crimes in exchange for their testimony.

In *Williams v. Brown*, evidence of possible tacit agreements with two key witnesses who testified against the defendant was uncovered after trial. 609 F.2d 216 (5th Cir. 1980). One of the key witnesses confessed to committing forty-eight burglaries, yet he was only charged with fourteen and sentenced to ten years imprisonment with only one year to serve. *Id.* at 221. The

other witness had a twenty-year sentence later reduced to nine years to run concurrently with a

federal sentence. *Id.* The State failed to disclose the existence of any tacit agreements prior to

trial. The Fifth Circuit remanded the case to the district court to resolve the factual dispute as to

whether any "promises, understandings, or agreements" were made with one of the witnesses.

*Id.* at 222.

Similar to the witnesses in *Williams v. Brown*, the witnesses against the Petitioner

admitted committing serious crimes for which they were never charged. Ted Murgatroyd, one of

the State's key witnesses, testified to mutilating the body of the victim, Melanie Billhartz:

> A.  I swung the machete, ma'am. I wasn't really looking at where I swung it, and I
>     got nauseous. And I told him, "No, I can't do it." And he goes, "No, that's not
>     good enough."
> Q.  What did you chop off?
> A.  I didn't even look. It was part of her fingers.

(RR v72 at 31).

The State even elicited testimony from Mr. Murgatroyd as to the potential penalties he

faced for his crimes:

> Q.  Now, when you were providing this information to the police, you were on parole,
>     weren't you?
> A.  Yes, ma'am.
> Q.  Did you have a deal with the police that your parole wouldn't be revoked if you
>     talked.
> A.  No, ma'am.
> Q.  Have we offered you any deals to testify here today?
> A.  No, ma'am.
> Q.  Are you aware that, under New Mexico law, you could be charged with the
>     mutilation of a body?
> A.  Yes, ma'am.
> Q.  And here in Texas, you could be charged with tampering with evidence and
>     receive two to ten?
> A.  Yes, ma'am. But I've got to do what's right.
> Q.  And are you aware, since there are no deals, you could still be charged?
> A.  Yes.

(RR v72 at 38).

A/73401003.1

Despite Mr. Murgatroyd's testimony that there was no deal in place, the very nature of the questions in this exchange between the State and one of its key witnesses indicates the existence of a tacit agreement. Ms. Meraz testified during the state habeas hearing on July 2, 2008 that Mr. Murgatroyd was already aware that he could face charges in New Mexico when she first questioned him, and that she also informed him that he could be charged in Texas. (S.H. Tr. at 109-110). Ms. Meraz further testified in response to questioning from Robin Norris:

> Q.  So and -- and do you recall Ted Murgatroyd expressing any other concern about being prosecuted?
> A.  No. Just those two things. I know he brought that up, and -- and he was scared about that, about being prosecuted for those two offenses. And I said that was a possibility,   but I didn't know if they would do anything about it. I said it could happen but I -- I don't know.
> Q.  I can't help you out here. Is that it?
> A.  Right.
> Q.  And as far as you know, he didn't express any concern about being prosecuted by you for anything here in Texas. You said tampering with -- with evidence he could be prosecuted for here?
> A.  Right.
> Q.  That would probably be your decision or the decision of your office whether to seek - -
> A.  That's true.
> Q.  An indictment for that. And he was concerned about that?
> A.  Well --
> Q.  You don't let him walk when it came to that.
> A.  I just said it could happen and that we couldn't make any deals with him.
> Q.  So you're just going to have to take your chances, Ted, whether I prosecute you for    this or not?
> A.  That's what I told him.

(S.H. Tr. at 116-17). In addition, Mr. Murgatroyd testified that he could still face charges even though the crime he admitted to happened in October 2003, almost fifteen months prior to his testimony. (RR v72 at 38).

Mr. Murgatroyd's testimony indicates that the State was still threatening (implicitly or otherwise) to charge him with a felony for tampering with evidence unless he testified favorably for the State during Mr. Hall's trial. Paired with the fact that the State withheld the existence of

-29-

the draft immunity agreement Mr. Murgatroyd, this constitutes significant evidence of a tacit agreement. In fact, the draft agreement for Mr. Murgatroyd specifically referenced "the offenses committed during the months of September, October, and November, 2002, involving narcotic possession, consumption and distribution or *the tampering with physical evidence as a party*." Exhibit 3 (emphasis added).

The State contends that Mr. Murgatroyd, who was out on parole at the time, took the stand under his own free will and admitted to a third degree felony charge under Tex. Penal Code § 37.09. Not only did Mr. Murgatroyd admit to a felony, but he did so to the very prosecutor who herself testified that she informed Mr. Murgatroyd prior to his testimony that she could charge him with that crime and he could face a prison sentence of up to ten years. Furthermore, the State contends that Mr. Murgatroyd made these admissions in order to "do what's right" despite the fact that he admitted to complicity in disposing of Ms. Billhartz's body, to cutting off her fingers with a machete, and never telling the police about the murder until he was picked up for questioning more than three weeks later, knowing all the while that Ms. Billhartz's body lay in a shallow hole exposed to the elements in the New Mexico desert. The State would have the Court believe that Mr. Murgatroyd's sudden bout of guilt superseded any concern he had of a lengthy prison sentence, and that he gave his testimony without any tacit agreement in place. Under the totality of the circumstances, that explanation simply is not credible.

Ms. Meraz was also questioned at the state habeas hearing in July 2008 regarding admissions that other witnesses made on the stand regarding their own criminal activities. Ms. Meraz testified that none of these witnesses, who according to their own testimony elicited by the State were essentially career criminals, expressed any concern about admitting to additional crimes while under oath. Ms. Meraz stated, in response to Mr. Norris' questioning:

-30-

Q.    Now, also their testimony at trial involved a good deal of testimony about the kind of activities that had been going on out there, as I mentioned, not necessarily connected with the murder itself or in assisting with the murder or failure to report the intention of somebody to commit murder but the manufacture and use of methamphetamine, the association with people who are on parole with others that would be a violation of their parole. Were any of them concerned about that?

A.    No.

Q.    None of them brought it up with you, look, I'm worried that the testimony I might give at trial could be used as a basis to revoke my parole, send me back to prison?

A.    No, they didn't bring it up.

Q.    None of them brought it up at all?

A.    Not that I remember. I -- you know, and I don't remember if at this point they were -- what was going on exactly prior to the murder, if they had been involved in manufacturing methamphetamine. And if they were, I don't remember any of them coming out and saying that that's what they had been doing.

Q.    Well, in particular the --

A.    -- prior to --

Q.    -- the Eddy testimony, I mean the whole reason he was there --

A.    Yes.

Q.    -- was because people wanted him to come over and make some meth for everybody. That's why everybody was there, in fact?

A.    Right. And I don't remember specifically if anyone actually came out and said they had been cooking.

Q.    You mean during there testimony at trial?

A.    Right.

Q.    Or in --

A.    Or in the statement. I don't remember reading that specifically.

(S.H. Tr. at 128 – 29) (emphasis added).

Ms. Meraz apparently forgot that *two* witnesses testified under oath that methamphetamine was being manufactured at the house on the night of the murder, including the "cook" himself. Specifically, Jesse Eddy, one of the State's key witnesses, testified:

Q.    What were you doing within the Aryan Circle, within that group, at that time, in regards to methamphetamine?

A.    I was cooking methamphetamine, making it, dealing it.

        …

Q.    While you were at the Melody address, what were you doing?

A.    I was drawing up a plate of methamphetamine.

(RR v. 73 at 138). Mr. Eddy further testified:

Q.    (BY MR. MACIAS)   And why did you not want the police?

A.    Because I was cooking down meth.

-31-

Q.      Excuse me?
A.      Because I was cooking down methamphetamine.
Q.      And what -- why were you cooking down the meth, specifically? Who were you
        going to sell it to?
A.      To Melanie and Ted.

(*Id.* at 160).  Although Mr. Eddy testified to being the main methamphetamine "cook" for the

group, and further testified that he was cooking methamphetamine to sell to two individuals that

evening, Mr. Eddy was never charged in connection with these crimes.  (*Id.* at 152).

As noted above, Mr. Eddy was the other individual for whom the State had drafted up an

immunity agreement and had gone as far as to have the El Paso District Attorney sign the

agreement. Mr. Eddy's Agreement For Honest Testimony specifically referenced "the offenses

committed during the months of September, October, and November, 2002, involving narcotic

possession, consumption and distribution."  (*See* Exhibit 4).   Despite the fact that the draft

immunity agreement specifically covered charges relating to distribution of methamphetamine,

Ms. Meraz claimed not to recall that Mr. Eddy had admitted that he was at the house

manufacturing methamphetamine that evening or that he was the "cook" for the Aryan Circle

during any of his witness preparation for the trial.

As with Mr. Murgatroyd, the defense had no knowledge of the existence of this immunity

agreement at the time Mr. Eddy testified to his crimes and testified that there was no deal in

place.  Assuming, arguendo, that Mr. Eddy was truthful when he stated he was not testifying

pursuant to an explicit deal with the state (*i.e.*, that he had not signed the immunity agreement),

the defense was entitled to know of its existence and its specific terms as evidence of a tacit

agreement.  The defense was entitled to question Mr. Eddy under oath whether he negotiated the

terms of the agreement, whether he disclosed to the State that he was at the house that night

committing the crimes listed in the draft immunity agreement, and if the agreement was in any

way linked to Mr. Eddy's willingness to give the State the testimony it desired against the

Petitioner.

A third key witness for the State, Tim Ray Davis, one of the individual's living at the

5608 Melody address, further corroborated Mr. Eddy's testimony about manufacturing drugs at

the time of the murder, and further testified that Mr. Eddy was manufacturing the drugs partially

for Mr. Davis.   Mr. Davis also identified another of the State's key witnesses as being at the

house manufacturing methamphetamine the evening Ms. Billhartz was killed:

> Q.     Okay. So people would come to your house to cook the meth?
> A.     Yeah. And they would give me a little off the top, just -- you know, for putting my house in jeopardy.
> Q.     Okay. Now, that night, October 28th, 2002, at that Melody address, did anyone come over to cook meth?
> A.     Yes, ma'am.
> Q.     Who was that?
> A.     Jesse Eddy -- Eddy came over to cook, to finish up some dope that he had, and to give me what he owed me from a day previous.  And I - I think Chase was there. I mean, Chase had something going. I'm not sure if anyone else, but I think that's the only two that had something going that night.

(RR v74 at 90-91). Mr. Davis further admitted to attempting to "corner" the methamphetamine

business in El Paso:

> A.     In all honesty, I was trying to take over the meth business, to be in the middle of the meth business, to have whatever proceeds and whatever comes with that, coming to me and my -- my gang, my boys.
>        …
> Q.     …Now if you corner the market in meth, is there some violence involved in it?
> A.     Yes, there is.
> Q.     Okay. And you were willing to take on that violence in order to corner the meth market?
>        …
> A.     …Yes, sir. To a degree, yes, sir.

(*Id.* at 123-24).  Mr. Davis also stated that he was not testifying pursuant to an agreement,

however he was never charged in connection with his testimony despite the fact that he was on

probation at the time he testified to attempting to "take over the meth business" and allowing

-33-

people to come over to his house to cook methamphetamine and give him some in exchange "for putting [his] house in jeopardy." (*Id.* at 88).

Although Mr. Davis was never charged in connection with his attempt to corner the El Paso methamphetamine market, he was charged by the El Paso Police Department on November 21, 2002, for violating Tex. HS Code 481.124, Possession or Transport of Certain Chemicals With Intent to Manufacture Controlled Substance, yet the police apparently dropped the charges. (*See* Exhibit 6). Mr. Davis was charged on the same day that Chase Hale first informed the El Paso Police Department that the Petitioner allegedly killed Ms. Billhartz. The defense never knew of this arrest, however, because the State repeatedly refused to turn over any of the witnesses' National Crime Information Center (NCIC) reports during the trial, including the NCIC report for Mr. Davis.[15] Although the State was not required to disclose the arrest under Texas Rule of Evidence 609, if the El Paso Police Department or El Paso District Attorney dropped the charge against Mr. Davis in return for his testimony against Mr. Hall, the defense could have questioned him about that in the presence of the jury. The jury would then have been able to take that information into account in weighing Mr. Davis's credibility and his motive for testifying against the Petitioner.

All of these witnesses testified under direct examination to a long list of past convictions as well as to the fact that some of them were on parole at the time they committed additional

---

[15] Although the State refused on numerous occasions to turn over NCIC reports, the following exchange took place specifically regarding Mr. Davis's NCIC report:

MR. MACIAS: Your Honor, I need the NCIC report.

MS. MERAZ: No. I mean, he's not entitled to see the NCIC report. I mean, we gave him the notice of the prior convictions.

(RR v74 at 126). The Petitioner obtained the partial excerpt of Mr. Davis's NCIC Report during the State Habeas proceedings.

crimes. Despite these facts, the State maintained that these witnesses took the stand to "do what was right," and ran the risk that they could face serious criminal liability for admitting to additional crimes under oath, all without at least some tacit agreement in place. The Petitioner is entitled to a new trial during which he will have the opportunity to fully investigate and learn the truth about why these witnesses took the stand and admitted to these crimes, yet were never charged by the State.

        **4.**      **The State's Further Failure To Disclose Possible Evidence Of Deals Offered By The Police Requires That The Petitioner Be Granted A New Trial**

Under the *Brady* line of cases, the prosecutor is responsible for disclosing not only the existence of any deals offered by the prosecutor's office, but also any deals offered to witnesses by the police. *See, e.g., Kyles*, 514 U.S. at 438 ("the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police"); *see also Strickler*, 527 U.S. at 280-81 ("Moreover, the rule encompasses evidence 'known only to police investigators and not to the prosecutor.'"). The Fifth Circuit has also stated "that when an investigating officer willfully and intentionally conceals material information, regardless of his motivation and the otherwise proper conduct of the state attorney, the policeman's conduct must be imputed to the state as part of the prosecution team." *Freeman v. Georgia*, 599 F.2d 65, 69 (5th Cir. 1979).

Chase Hale, who was the first person to inform the El Paso Police Department that Justen Hall had allegedly killed Melanie Billhartz, testified:

> Q      Okay. Now, unlike the prosecution, when the El Paso Police Department spoke with you, they promised you things, didn't they?
> A      Yes, they did.
> Q      Tell the jury what the El Paso Police Department promised you for your testimony.
> A      They *promised they would drop my charges.*

-35-

> Q      And we're talking about that 54 pounds of marijuana?
> A      Yes.

(RR v68 at 153) (emphasis added).

Mr. Hale proceeded to testify:

> Q.     And so [the police] talked to you that first time and you gave them information?
> A.     Yes.
> Q.     And they made promises to you?
> A.     Yes.
> Q.     Now, you were asked whether they made some promises to you. And did they make some promises to you?
> A.     Yes, they did.
> Q.     And did they follow through?
> A.     No, they did not.
> Q.     Did you think they were going to work out a deal for you?
> …
> A.     Yeah, they told me they were going to.
> Q.     Okay. As a matter of fact, Mr. Hale, did you receive any deals as a result of giving that information?
> A.     No, ma'am, I did not.
> Q.     And right now, are you receiving any deals for you to testify?
> A.     No, ma'am, I'm not.

(*Id.*).

Mr. Hale gave additional testimony that the El Paso Police Department offered him a deal in exchange for information:

> Q.     And when Detective Samaniego told you "Hey, we'll get the charges dropped," how did you feel?
> A.     Well, a little better, you know. That, and that I wouldn't be brought up on anything.
> Q.     On anything at all?
> A.     Yeah.
> Q.     Not even the marijuana?
> A.     That's right.

(*Id.* at 154).

However when Detective Samaniego was asked under oath if he ever offered Mr. Hale any deals, he testified:

A/73401003.1

Q.   As part of Mr. Hale giving you that information, did you strike any sort of a deal with Mr. Hale?

A.   No.

Q.   And did he want you to?

A.   He wanted us to, but I told him I did not have that authority to do so.

(RR v73 at 9-10).

Despite the fact that they both testified that Mr. Hale was not testifying pursuant to a deal, Mr. Hale and Detective Samaniego directly contradicted one another in their testimony as to whether the El Paso Police Department ever offered Mr. Hale a deal.  Mr. Hale had no reason to fabricate an answer that he was originally offered a deal by the El Paso Police Department.  In addition, although Mr. Hale was arrested with a companion, Donald Erick Frank, and similarly charged with unlawful delivery of marijuana and conspiracy to commit delivery of marijuana, Mr. Hale received a lighter sentence.  (See Exhibit 7; see also Exhibit 5, Notice of Prior Convictions).  The State was obligated to disclose what the El Paso Police Department originally offered Mr. Hale and whether he received a lighter sentence in exchange for his testimony against the Petitioner.  As such, the Petitioner is entitled to a new trial.

5.   **The State Failed To Disclose Correspondence With One Of The State's Key Witnesses That Demonstrates The Witness's True Motivation For Testifying Against The Petitioner**

As the Court explained in *Stickler*, "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching."  527 U.S. at 281-82.  Evidence demonstrating the true motivation for a witness providing testimony may be used for impeachment and must be disclosed to the defense.

In *United States v. Sipe*, 388 F.3d 471 (5th Cir. 2004), the court affirmed the district court's holding that undisclosed evidence, including evidence of benefits provided to witnesses, constituted *Brady* evidence and warranted a new trial.  The Court found that the undisclosed

-37-

benefits, including allowing the witnesses who were illegal aliens to visit with family members in Mexico, went to the reliability of the witnesses and should have been disclosed at trial.

In the present case, one of the State's key witnesses against the Petitioner wrote a letter to the El Paso District Attorney's office in which he referenced the ability to visit his family in El Paso in connection with his testimony against the Petitioner. There is no indication that the letter was ever produced to the defense, but it was located in the El Paso District Attorney's files well after the trial had ended.[16] The defense was entitled to know of this correspondence and investigate whether Jesse Eddy had an ulterior motive in agreeing to testify against the Petitioner.

On April 12, 2004, Mr. Eddy began serving an eight-year sentence at the Correctional Industrial Facility in Pendleton, Indiana. In an undated letter from Mr. Eddy to Assistant District Attorney Bill Hicks, Mr. Eddy informed the State that he was in possession of additional information regarding Justen Hall that he had never disclosed to the El Paso Police Department. (Exhibit 11). Mr. Eddy further inquired if he was "really going to EPT because i [sic] do not want to get my hopes up about seing [sic] family and then not going to EPT." (*Id.*).

---

[16] The El Paso District Attorney's Office granted access to its files on April 7, 2010. The above-referenced correspondence was located in those files. A letter was sent to Tom Darnold, Chief of Appeals of the El Paso District Attorney's Office, on April 14, 2010 asking as to whether additional correspondence existed between the State's witnesses and the El Paso District Attorney's Office in any of the folders that were removed from the files prior to inspection (according to the District Attorney's Office, at least five folders were removed from the files.) (*See* Exhibit 8). Mr. Darnold responded via email on April 26, 2010 acknowledging receipt of the letter and advising that he would look into the request. Mr. Darnold failed to follow up on his initial email, so an email was sent to him on May 21, 2010 asking for a status on the Petitioner's request. (*See* Exhibit 9). On May 27, 2010, Mr. Darnold responded via letter. (*See* Exhibit 10). With respect to the Petitioner's request as to whether additional correspondence with witnesses existed, the letter simply stated "our file was made available for your review and remains available for your review in our office." Since the District Attorney's Office indicated that a number of files had been removed from the State's files prior to allowing inspection and the response letter does not address the files that were removed, the Petitioner is unaware whether additional correspondence with the State's witnesses exists in any of those files.

-38-

A second letter, dated November 30, 2004, from Mr. Hicks to Mr. Eddy was also located in the El Paso District Attorney's files. (Exhibit 12). In the letter, Mr. Hicks informed Mr. Eddy that the State intended to bring him back "to El Paso sometime shortly before Christmas to allow us plenty of time to meet with you to discuss what you know of Justen Hall. We anticipate your return to Indian [sic] sometime in early February, 2005." Mr. Hicks' letter indicates that Mr. Eddy was able to convince the State to bring him home for approximately a six-week period, which encompassed the Christmas holiday, thereby allowing him to be closer to his family during that lengthy time period. In addition, it appears from Mr. Hicks' letter that Mr. Hicks believed that Mr. Eddy had indeed withheld information from the El Paso Police Department.

Had the State turned this letter over to the defense, Mr. Eddy would have been impeached as to whether his true motivation in testifying against the Petitioner at trial was simply to get the El Paso District Attorney's Office to bring him back to El Paso, Texas from his prison cell in Indiana so that he could see his family over the holidays. The defense would also have been in a position to ask Mr. Eddy exactly what additional information he originally withheld from the El Paso Police Department. Mr. Eddy could also have been cross-examined as to whether he told Mr. Hicks that he had additional information simply to entice Mr. Hicks to bring him back to El Paso to see his family, and thereby gave false testimony. Additionally, if the State had disclosed the existence of the draft immunity agreement for Mr. Eddy, the defense could have questioned Mr. Eddy as to whether the immunity agreement was in any way tied to the additional information he allegedly withheld from the El Paso Police Department.

Had the jury known of both Mr. Eddy's letter and the draft immunity agreement, the jurors would have been able to weigh these material pieces of information in assessing

-39-

Mr. Eddy's credibility and motivation for testifying.  The State's failure to disclose this material evidence thus requires that the Petitioner be granted a new trial.

> **B.    PETITIONER'S CONVICTION VIOLATES THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE THE TRIAL COURT ERRED IN DENYING THE MOTION TO SUPPRESS PETITIONER'S INVOLUNTARY CONFESSION.**

In determining whether an accused's confession was involuntary, and thus obtained in violation of the Fifth and Fourteenth Amendments, "the question in each case is whether the defendant's will was overborne at the time he confessed." *Haynes v. Washington,* 373 U.S. 503, 513-14 (1963), *quoting Lynumn v. Illinois,* 372 U.S. 528, 534 (1963).  The basic requirement at the heart of this inquiry is that the confession be "made freely, voluntarily, and without compulsion or inducement of any sort." *Haynes v. Washington,* 373 U.S. at 513-14, *quoting Wilson v. United States,* 162 U.S. 613, 623 (1896).  This can be determined "only by an examination of all the attendant circumstances. *Haynes,* 373 U.S. at 513-14.  Here, the record evidence leaves no doubt that the Petitioner's confession was obtained under a totality of circumstances evidencing an involuntary admission of guilt. *Id.*  As a result, the trial court erred in denying the Petitioner's motion to suppress the confession.

> **1.    Relevant Circumstances for Determining Voluntariness Under Governing Law.**

The potential circumstances relevant to a determination that a confession was obtained in violation of an accused's due process rights include: "the crucial element of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." *Withrow v. Wilson,* 507 U.S. 680, 693 (1993) (internal citations omitted).  Although a defendant's mental condition by itself "and apart from its relation

to official coercion" is not dispositive, it is nonetheless a relevant factor in the "'voluntariness' calculus." *Colorado v. Connelly*, 479 U.S. 157, 164 (1986). Specifically, evidence of mental health issues, substance abuse, and cognitive function may all be relevant in determining whether a particular defendant was subject to coercion – whether his or her "will has been overborne." *Arizona v. Fulminante*, 499 U.S. 279, 286 n.2 (1991) (defendant's low intelligence, upbringing, and even his subjective feeling of stress and intimidation in prison were all relevant factors that helped establish that his confession was coerced); *see also Payne v. Arkansas*, 356 U.S. 560, 567 (1958) (lack of education was relevant factor).

For a confession to be voluntary it is also necessary for the defendant to have a clear awareness of his rights at the time the confession is made. No statement by a defendant should be admitted unless the State can establish that the defendant knowingly and intelligently waived his Fifth Amendment rights prior to making the statement at issue. *Miranda v. Arizona*, 384 U.S. 436 (1966). The Supreme Court has "adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of custodial interrogation." *Maryland v. Shatzer*, 130 S.Ct. 1213, 1219 (2010), *quoting* 384 U.S. at 467. These include a requirement that police officers must "warn a suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney." 130 S.Ct. at 1219, *citing* 384 U.S. at 467. Although a defendant can waive these rights, it is the State's burden to establish that a waiver was knowing, intelligent, and voluntary. *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004) (government bears the burden of showing, by a preponderance of the evidence, that a confession is voluntary).

2.    **The Record Evidence Establishes That The Petitioner Was Not Capable Of A Knowing, Intelligent, And Voluntary Waiver Of His Rights At The Time He Was Interrogated By Detective Samaniego.**

To fully understand the Petitioner's physical and mental state at the time of his interrogation – as well as his interrogators' full knowledge of that state – it is necessary to begin several months before the interrogation at issue.

The Petitioner made his alleged confession in this case to Detective David Samaniego – a detective with the El Paso Police Department. The interrogation in Plainview on November 25, 2002, however, was not the first time that Detective Samaniego had encountered and interrogated the Petitioner. Rather, in April 2002 – six months earlier – Detective Samaniego and his partner Detective Pantoja, interrogated the Petitioner and extracted a confession from him in a completely unrelated case. The Petitioner was indicted for that unrelated offense, and was released on bond several weeks later on June 15, 2002. (RR v46 at 45).

While he was awaiting his release on bond, the Petitioner attempted suicide and was admitted to the psychiatric ward in the El Paso jail for several weeks. Detective Samaniego admits that he was aware of this suicide attempt. (RR v5 at 172). While in custody, and following his suicide attempt, the Petitioner was seen by a psychiatrist, Dr. Vanderpool, who prescribed a number of psychotropic drugs for the Petitioner's mental illness, including Zyprexa for schizophrenia, Zoloft for his depression, lithium and Trazodone for mood control, and Clonazepam for his anxiety disorder. (RR v46 at 6-7, 42-43).

When he was released on bond on June 15, the Petitioner was not given any information on how to secure continuing care for his mental illness. (RR v46 at 8). He took it upon himself after his release to go the Life Management center and obtain prescriptions from Dr. Vanderpool for the same medications he had been prescribed while in custody following his suicide attempt. (RR v46 at 8-9).

-42-

When deprived of his medications, the Petitioner loses touch with reality. (RR v46 at 9). Also, while under the influence of methamphetamine (which he used heavily between his release on June 15 and his arrest in Plainview on November 23, 2002), the Petitioner experiences extreme paranoia, hallucinations, and blackouts. (RR v46 at 10).

In late October or early November of 2002, the Petitioner traveled to Carlsbad, New Mexico to join two other individuals, Jesse Eddy and Aimme Quintela. (RR v67 at 13-14). While there, the Petitioner continued using large amounts of methamphetamine – approximately four grams every day. (RR v67 at 15-16). During that time he rarely slept. (RR v67 at 16-17).

On approximately November 22, 2002, the Petitioner, Mr. Eddy, and Ms. Quintela left New Mexico for Indiana. At that point, according to Ms. Quintela's testimony, the Petitioner had not really slept at all in almost a week. (RR v67 at 18-19). When the Petitioner was stopped in the early morning of November 23, he had pulled over to the side of the highway and fallen asleep, crashing from the effects of his weeks-long methamphetamine binge. (RR v67 at 18-19). When coming off a methamphetamine binge, the Petitioner is dazed and unable to focus. (RR v46 at 40).

When he was taken into custody in Plainview, Mr. Hall was determined by officers there to be a suicide risk and he was placed in observation for that reason. (RR v5 at 108-09). By November 24, 2002, just prior to the interrogation, Mr. Hall had been in custody for more than twenty-four hours, held alone in an observation room and without access to his prescription medications. It was at that point that Detectives Samaniego, Pantoja, and Cooper arrived from El Paso to interrogate him.

The Petitioner was first interrogated for an hour and a half by Detectives Pantoja and Cooper. During that interrogation, Mr. Hall denied any involvement in the murder. (RR v5 at

-43-

121).   Detective Pantoja then showed Mr. Hall several witness statements that implicated him in

the murder of Melanie Billhartz.   (RR v45 at 97-99).   After being confronted with these

statements, Mr. Hall continued to maintain his innocence.   (RR v45 at 98).   He also became

visibly upset as the interrogation continued, and asked for access to his medications:

> Q.   Now, after reading the statements, he became very upset and he talked about
> being on medication or wanting to know where his medication was; isn't that
> correct?
>
> A.   Yes, sir.

(RR v45 at 99).

The two detectives made no attempt to obtain Petitioner's medications for him.   They

told him he would have to ask the jail staff in Plainview, but they gave him no opportunity to do

so.   (RR v45 at 131).   They did not even ask what medications he was taking.   (RR v45 at 131-

32):

> Q.   What did he say about his medication?
>
> A.   Said that he had medication with him, and I believe he asked if he was going to be
> able to get it.   And my response to him – and I responded.   I said, "we have to
> check with the jail."   Because jails – each jail has a policy about accepting outside
> medication or prescription medication, so you would have to talk to them about it.
>
> Q.   That's what you told him?
>
> A.   Yes, sir.

(RR v45 at 131-32).

### 3.   Detective Samaniego's Interrogation of the Petitioner

Detective Samaniego claims that when he first entered the interview room where the

other two officers were interrogating the Petitioner, the Petitioner recognized him from the

previous, unrelated case, and asked to speak with him alone.   (RR v5 at 161).   Attempting to take

advantage of that misplaced trust, the other two detectives left the room at 11:25 a.m., and

Detective Samaniego began his interrogation of the Petitioner alone, without any witnesses or

recording devices.

-44-

Detective Samaniego did not provide any *Miranda* warnings to the Petitioner at the beginning of his interrogation. Instead, he offered the Petitioner something to eat, and allegedly engaged the Petitioner in small talk about Plainview. (RR v5 at 161-62). This odd choice of conversation topic is Detective Samaniego's only excuse for his failure to provide the Petitioner with *Miranda* warnings – he did not believe it was necessary because he "didn't start off talking about the case," although he admits he had every intention of doing so eventually:

> Q.   And my question to you, sir, is very specific.  Why did you not – in the initial conversation when you introduced yourself, why did you delay in having him sign the Miranda warning card that's in front of you?
> A.   Because we didn't start off talking about the case.
> Q.   Sir, you understand that that's where you were heading?
> A.   Well, that's where I was heading, yeah.

(RR v5 at 176-77).

This tactic might have been permissible if Detective Samaniego had then provided the warnings after he finished his small talk but before he reached the topic of the case, but that is not what he did.  Rather, taking full advantage of the Petitioner's weakened, paranoid, and anxious state of mind – and still without giving him any *Miranda* warnings at all – Detective Samaniego began working his way around to the case, ultimately asking the Petitioner directly whether he had committed the murder:

> Q.   And at this point is it just small talk, or at any point did you start talking about the capital murder?
> A.   At one point. Initially, he denied it. Then when he implicated Ted Murgatroyd –
> Q.   And then what happened when he did that?
> A.   *We started discussing about, you know, how wrong it was to implicate somebody that didn't do it.  I asked him if he did it, and he nodded his head.  And that's when I then Mirandized him.*

(RR v5 at 162) (emphasis added).

Only after he had gotten the answer he was seeking did Detective Samaniego read the Petitioner his rights and proceed to coach him through a full statement that conveniently mirrors

-45-

much of the language contained in statements that Detective Samaniego obtained from other fact witnesses prior to interrogating the Petitioner (and which were shown to the Petitioner during his prior interrogation by Detectives Pantoja and Cooper).

> **4.     Detective Samaniego Coerced The Petitioner Into Providing A Statement In Violation Of The Petitioner's Fifth And Fourteenth Amendment Rights.**

Investigators are not permitted intentionally to withhold *Miranda* warnings until after a defendant has made admissions, and only then provide such warnings before obtaining a full written confession. *Missouri v. Seibert,* 542 U.S. 600 (2004) (plurality).[17]  That, however, is precisely what Detective Samaniego did in this case.

At the time Detective Samaniego entered the interview room, he knew that the Petitioner was suicidal, and that he had in fact made a serious suicide attempt just several months earlier. His colleagues, who had just interrogated the Petitioner without success for an hour and a half, had also refused the Petitioner's request for his medications – telling the Petitioner that he would have to seek his medications from the local jail staff (which the Petitioner was in no position to do while he was being interrogated in a closed interview room).

The Petitioner was thus in an extremely vulnerable position – mentally ill, deprived of his medications, sleep-deprived, and suicidal.  Knowing the Petitioner's vulnerable state, Detective Samaniego was reluctant to risk losing the Petitioner's misplaced trust by warning him of his Fifth Amendment rights at the outset of his solo interrogation.   Instead, he began the

---

[17] In *Seibert,* the suspect was intentionally interrogated without the benefit of *Miranda* warnings until she confessed. There, unlike here, she was then at least provided with a short break before the investigators resumed the interrogation, provided the warnings, and then elicited the same confession. Here, Detective Samaniego did not even pause – he simply provided the warnings and then picked up where he had left off, displaying the same "psychological skill" demonstrated by the investigator in *Seibert,* and the same deficient attention to his suspect's constitutional rights.

interrogation with a casual and entirely pretextual conversion about the Petitioner's stay in Plainview, which he later used as an excuse for failing to provide the warnings required by the Fifth Amendment. (RR v5 at 161-62; 176-77). He then worked his way back to a discussion of the case and asked the Petitioner point blank whether he had committed the crime, all without providing any warnings.[18] (RR v5 at 162).

There can be no doubt that the circumstances of this interrogation establish that it did not result in a voluntary confession. Indeed, the totality of circumstances in this case bears a striking resemblance to those in *Greenwald v. Wisconsin,* 390 U.S. 519, 519-21 (1968) (per curiam). In *Greenwald,* the defendant was arrested and held in custody for approximately twelve hours before he was interrogated – during which time he did not sleep, and was not given access to his prescription medications. *Id.* When officers began to interview him, they failed to provide him with any warnings of his rights until *after* he had made oral admissions of guilt. *Id.* at 519-20.

Here, the circumstances are similar, but even more egregious. In *Greenwald* there was no indication that the defendant expressly requested his medications and was refused, whereas

---

[18] The State will likely try to argue that because Detectives Pantoja and Cooper provided *Miranda* warnings at the beginning of their interrogation, and because Detective Samaniego's interrogation followed immediately thereafter, this should suffice as a voluntary waiver for purposes of the Petitioner's statements to Detective Samaniego. The totality of the circumstances, however, refutes that argument. Although it may be true there is no *per se* requirement that an accused be continually reminded of his rights once he has intelligently waived them, that begs the question whether a prior warning provides a knowing waiver for a subsequent interview. That question is decided by examining the totality of circumstances, not simply how much time elapses between the two interrogations. *Wyrick v. Fields,* 459 U.S. 42, 47 (1982). Here, the circumstances clearly negate the sufficiency of any initial warning. First, the officer who conducted the second interrogation was not the same officer who gave the warnings in the prior interrogation. Second, Detective Samaniego deliberately changed the tone and nature of the interrogation in a deceptive and dramatic way when he took over from Detectives Pantoja and Cooper – switching from an accusatorial style to a casual style calculated to make the Petitioner forget that he was being interrogated. Third, the Petitioner's state of mind – sleep-deprived, mentally ill, and without his prescription medications – was not such as to permit a knowing waiver even for the first interrogation with Detectives Pantoja and Cooper. Finally, the statement elicited by Detective Samaniego differed significantly from the statements that the Petitioner gave to Detectives Cooper and Pantoja – a fact that helps show that a second warning was required. *United States v. Vasquez,* 889 F.Supp. 171, 177 (M.D. Pa. 1995).

-47-

here the Petitioner clearly asked how he could obtain his medications while being interrogated by Detectives Cooper and Pantoja. (RR v45 at 131). Instead of stopping the interrogation and obtaining his medications, they shrugged it off and told the Petitioner he would have to ask the staff at the Plainview jail. (*Id.*). While being interrogated in an isolated interview room, however, the Petitioner clearly did not have an opportunity to do that – nor did Detectives Cooper and Pantoja provide him such an opportunity before handing him off to Detective Samaniego for a second interrogation.

Also, whereas in *Greenwald* the medications at issue were not psychotropic, the medications that Mr. Hall was deprived of were necessary to treat the symptoms of his schizophrenia, anxiety disorders, depression, and other mental illness. (RR v46 at 6-7, 42-43). Without them, he was incapable of providing a knowing and voluntary waiver or his rights, or a knowing and voluntary confession.

Also, whereas in *Greenwald* the defendant was kept in custody and did not sleep for just twelve to eighteen hours before his interrogation, here the Petitioner was taken into custody more than twenty-four hours before he was first interrogated, and had not slept for days even before he was taken into custody.

Finally, as in *Greenwald,* Detective Samaniego carefully refrained from issuing a *Miranda* warning to the Petitioner until *after* he had obtained oral admissions. In light of the other circumstances described above, it is clear that this was a deliberate, calculated and coercive circumvention of *Miranda* intended specifically to obtain an involuntary confession.[19]

---

[19] Although a *Miranda* warning delivered between two separate interrogations may in some circumstances be adequate to render a subsequent statement admissible, that is not the case where, as here, the warning comes in "the midst of coordinated and continuing interrogation" by the same interrogator. *Seibert,* 542 U.S. at 613-14. In that circumstance, the warnings is likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" *Id. (quoting Moran v. Burbine,* 475 U.S. 412, 424 (1986)). It is

-48-

In sum, the totality of the circumstances clearly indicates that the Petitioner's statement was involuntary, and obtained in violation of his Fifth and Fourteenth Amendment rights. As a result, the trial court erred in admitting the statement at trial. For the same reasons, the Court of Criminal Appeals' terse and summary rejection of this claim on the Petitioner's direct appeal was unreasonable, contrary to established Federal law, and also based on factual determinations that were unreasonable in light of the record before the state court. 28 U.S.C. § 2254(d)(1)-(2). Given the critical role that the statement played in the State's case, that error by the trial court and the Court of Criminal Appeals was clearly prejudicial, and the Petitioner is entitled to a new trial on that basis.

C.     **PETITIONER'S CONVICTION VIOLATES THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION BECAUSE THE PETITIONER'S LEAD TRIAL COUNSEL SLEPT DURING THE GUILT/INNOCENCE PHASE OF THE TRIAL.**

Generally, when a defendant alleges he has been deprived of effective assistance of counsel he must show, in addition to the fact that counsel's performance was deficient, that he was prejudiced by counsel's conduct. *Strickland*, 466 U.S. at 688-89. Prejudice occurs when a defendant demonstrates that "but for counsel's unprofessional errors," there is a "reasonable probability" that the jury would have decided his case differently. *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000) (citing *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* However, there are some circumstances where harm to the defendant will be "so likely that a case-by-case inquiry into

---

simply "unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle." *Id. See also Oregon v. Elstad,* 470 U.S. 298, 309-10 (noting that in deciding whether a defendant's second confession is the product of a coerced first confession, courts should look at circumstances that show a break in the causal link between the initial and subsequent confessions, including passage of time, change in venue, change in interrogators and use of *Miranda*).

A/73401003.1

prejudice is not worth the cost." *Strickland*, 466 U.S. at 692. Where trial counsel is totally absent during a critical stage of the trial, or present but prevented from providing effective assistance, prejudice is presumed, and a defendant's Sixth Amendment right to counsel is violated. *Cronic v. United States*, 466 U.S. 648, 659 n.25 (1984).

In 2001, the Fifth Circuit held that where trial counsel sleeps during "critical" or "not insubstantial portions" of the guilt-innocence phase of trial, he is in effect absent and thus unable to provide effective assistance to the defendant, and prejudice to the defendant is presumed. *Burdine v. Johnson*, 262 F.3d 336 (5th Cir. 2001). "Critical" or "not-insubstantial" portions of trial are occasions when evidence is being presented against the defendant. *Id.* at 347 (court will presume prejudice when state court makes factual finding defense counsel slept during introduction of evidence against defendant).

In *Burdine*, three jurors and the deputy clerk of the court testified during Petitioner Burdine's state habeas hearing that they observed defense counsel sleeping during the guilt-innocence phase of Burdine's six day capital trial. *Id.* at 339. One juror stated that he witnessed counsel nod off at least twice while the prosecution questioned a witness. *Id.* Another juror recalled "being struck by the spectacle of [trial counsel's] sleeping on the second day of trial," stating that counsel would "nod his head down on his chest with his eyes closed" while a witness was being questioned. *Id.* Still another juror attested that counsel would "nod his head down, bob it, with his eyes closed . . .," sleeping "for a good probably ten minutes" during witness questioning. *Id.*

Mr. Hall finds himself in a circumstance strikingly similar to that of the petitioner in *Burdine*. Multiple jurors observed the Petitioner's lead attorney, Mr. Frank Macias, sleeping during the guilt-innocence phase of Mr. Hall's trial. (*See* Exhibit 13, Affidavit of Irene

-50-

Rodriguez at 2; Exhibit 14, Affidavit of Gloria Lopez).   Juror Irene Rodriguez observed Mr. Macias with "his head down for a while" while one witness was being questioned:

> I noticed that the lead trial attorney, Frank Macias, was sleeping during one part of the guilt-innocence phase.  Do you know how you nod off sometimes?  This wasn't just nodding off.  He had his head down for a while.  It was while a witness was being questioned.

*Id.*  In addition, Ms. Rodriguez stated that "the other jurors brought [Macias's sleeping] up later." *Id.*  She recalls that one juror was so struck by the spectacle of Macias asleep during trial, that it caused the juror to comment "[p]oor kid.  His life's on the line and his lawyer's sleeping."  *Id.*

Juror Gloria Lopez also observed Mr. Macias sleeping on multiple occasions during trial. According to Ms. Lopez, Mr. Macias would "put his head down on his chest," during the questioning of a witness, to the point that "there would be no motion for several minutes." (Exhibit 14, Affidavit of Gloria Lopez).  Ms. Lopez stated that she believed "this happened more than once."  *Id.*[20]

A sleeping lawyer cannot "analyze, object, listen or in any way exercise judgment on behalf of a client" and therefore cannot provide competent counsel.  *Burdine*, 262 F.3d at 349. By sleeping through portions of witness testimony Mr. Macias failed to: (1) provide ongoing consultation with Mr. Hall; (2) formulate and adhere to a trial strategy; and (3) fulfill his responsibilities as trial counsel. *Id.*; *see also Javor v. United States*, 724 F.2d 831, 834 (9th Cir. 1984) (counsel who is asleep cannot "confer about testimony or evidence adduced at trial and . . . evaluate its impact.").   Moreover, the *Strickland* presumption "that counsel is present and conscious to exercise judgment on behalf of his client" does not apply.  *Id.*  Instead, counsel's

---

[20] Alternate Juror William Harmond also noticed the trial judge himself dozing off.  (Exhibit 26, Declaration of William Harmond).  This may give rise to an independent claim that the Petitioner was deprived of a fair trial.

A/73401003.1

lack of participation leaves the court with an "insufficient basis for trusting the fairness of that trial," and the court must presume prejudice. *Id.*

At least two other circuits follow the same *per se* ineffective rule for sleeping counsel that the Fifth Circuit announced in *Burdine*. *See Tippins v. Walker*, 77 F.3d 682 (2nd Cir. 1996) (granting writ where counsel slept during the testimony for a critical State witness, and during "damaging" testimony by a co-defendant); *Javor*, 724 F.2d 831.  The Ninth Circuit has held that the *per se* ineffective standard applies even when the lower court finds that counsel's sleeping was rare and that counsel rendered effective assistance to his client while awake. *Javor*, 724 F.2d at 932.

The State will likely try to argue that the *per se* rule announced in *Burdine* is not applicable here because Mr. Hall was represented by two lawyers, Mr. Macias and Mr. McDonald. As a result, the State may argue, Mr. McDonald was presumably available to make proper objections and exercise judgment on Mr. Hall's behalf while Mr. Macias slept.

The Supreme Court has made clear, however, that the mere physical presence of counsel (even conscious counsel) in the courtroom does not cure the absence of adequate representation. *Strickland*, 466 U.S. at 685 ("That a person who happens to be a lawyer is present at trial and alongside the accused, however, is not enough to satisfy the constitutional demand."); *Evitts v. Lucey*, 469 U.S. 387, 395 ("The Constitution cannot tolerate trials in which counsel, though present in name, is unable to assist the defendant to obtain a fair decision on the merits.").  Here, the record is clear that Mr. McDonald lacked the experience necessary to render effective counsel independent of Mr. Macias.  Mr. Macias was appointed as lead counsel because Mr. McDonald was not on the list for appointment in capital cases, and had never served as lead counsel in a murder trial.  (RR v7 at 17).  Indeed, given Mr. McDonald's inexperience, the trial

-52-

judge instructed Mr. McDonald explicitly to follow Mr. Macias's lead. (RR v7 at 26). Moreover the judge made clear that Mr. McDonald should defer to Mr. Macias's judgment at all times. (*Id.* at 28). To find, therefore, that Mr. McDonald's mere presence in the courtroom could otherwise cure Mr. Macias's *per se* ineffective representation would be "contrary to" and an "unreasonable application of" the Sixth Amendment right to counsel as set forth in *Cronic.*

In any case, the core of Mr. Hall's argument is "not that his lawyer should have taken any particular initiative" but that "at critical times, [Mr. Hall] had no counsel to sort out what initiatives were open." *Tippin*, 77 F.3d at 687. By sleeping through portions of witness testimony, Mr. Macias failed to: (1) provide ongoing consultation with Mr. Hall; (2) formulate and adhere to a trial strategy; and (3) fulfill his penalty phase responsibilities. *See Burdine*, 262 F.3d at 349 (a sleeping lawyer cannot "analyze, object, listen or in any way exercise judgment on behalf of a client" and therefore cannot provide competent counsel); *Javor v. United States*, 724 F.2d 831, 834 (9th Cir. 1984) (counsel who is asleep cannot "confer about testimony or evidence adduced at trial and . . . evaluate its impact").

As lead counsel, Mr. Macias bore sole responsibility for providing Mr. Hall with effective counsel during his trial. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting *Strickland*, 466 U.S. at 688) ("Lead counsel bears overall responsibility for the performance of the defense team, and should allocate, direct, and supervise its work in accordance with [the ABA] Guidelines and professional standards."). "An unconscious attorney does not, indeed cannot, perform at all," and Mr. Macias's sleeping during trial prevented him from fulfilling his responsibility. *Burdine*, 262 F.3d at 349. As such, Mr. Macias's sleeping per trial was *per se* ineffective.

Even if the *Strickland* test of prejudice were applicable, however, there is a "reasonable probability" that, but for Mr. Macias's sleeping, the jury would have decided Mr. Hall's case differently. *Tong*, 25 S.W.3d at 712 (*citing Strickland*, 466 U.S. at 694). Indeed, perhaps the most damaging and prejudicial aspect of Mr. Macias's sleeping was the message it sent to the jury concerning the evidence being presented, and concerning Mr. Macias's interest and engagement in his own client's fate. For example, Ms. Lopez stated that Mr. Macias's sleeping influenced her ability to give proper weight to the testimony of one of the witnesses. (Exhibit 14, Affidavit of Gloria Lopez). The spectacle of Mr. Macias sleeping during the testimony of a witness, made it extremely difficult for her to appreciate the relevance of that witness's testimony. *Id.* If the testimony did not interest the Petitioner's own lawyer, why should the jury give it any weight?

> There was testimony during the guilt-innocence phase that was a little hard to follow, and it was difficult for me to see the relevance of the testimony. When Mr. Macias would fall asleep, I got the impression that he felt the same way about the testimony that I did. Seeing Mr. Macias asleep made it more difficult for me to appreciate the relevance of the testimony being presented.

*Id.* Such prejudice caused by the sight of the Petitioner's sleeping attorney is "sufficient to undermine confidence in the outcome" of this case, and satisfies the *Strickland* standard for harm.

In any case, whether appointed one lawyer or two, Mr. Hall was entitled to "the guiding hand of counsel at every step in the proceedings against him." *Powell v. Alabama*, 287 U.S. 45, 69 (1932). The purpose of the Sixth Amendment is to "assure assistance at trial, when the accused [is] confronted with both the intricacies of the law and the advocacy of the public prosecutor." *United States v. Ash*, 413 U.S. 300, 309 (1973). Accordingly, the core of the right to counsel is the fair opportunity to fully present both sides of an argument. *See Cronic*, 466

U.S. at 656 ("[The Sixth Amendment right to counsel] is meant to assure fairness in the adversary criminal process.").

As lead counsel, Mr. Macias was responsible for giving Mr. Hall the fair opportunity to confront the arguments presented against him. By sleeping during the trial, he failed to fulfill that responsibility, and his conduct violated the fundamental principle of fairness in the adversarial process. To the extent that *Strickland* applies, the statements of Ms. Lopez that Macias's sleeping affected her consideration of the evidence being presented, and the statements of Ms. Rodriguez that multiple jurors were distracted by the spectacle of Mr. Macias's sleeping, are sufficient to undermine confidence in the jury's verdict. "Under these circumstances . . . there is little difference between saying that prejudice will be presumed and saying that prejudice has been demonstrated. *Tippins*, 77 F.3d at 687 (holding Petitioner "suffered prejudice, by presumption or otherwise," where his counsel repeatedly slept during periods where Petitioner's interests were at stake). Therefore this court should find that Mr. Hall's Sixth Amendment right to counsel was violated.

**D.    PETITIONER'S CONVICTION VIOLATES THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE THE TRIAL COURT ERRED IN DENYING THE PETITIONER'S MOTION FOR A CONTINUANCE.**

The right of an accused to present a defense is a "a fundamental element of due process." *Washington v. State*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). As a result, the denial of a motion for a continuance can serve as a basis for federal habeas relief where the trial court's action "is so arbitrary as to violate due process" by depriving the defendant of his right to present a defense. *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). Here, the trial court's denial of the Petitioner's motion for a continuance deprived the Petitioner of the opportunity to present a defense because Petitioner was unable to develop expert evidence to support his motion to

-55-

suppress his involuntary statement, perform critical DNA testing, and interview the State's key fact witnesses.

There are no "mechanical tests" for deciding when a denial of a continuance is so arbitrary as to violate due process. *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). Rather, a court must analyze "the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Id.*

On January 11, 2005, the Petitioner sought a short continuance of less than a month – to move the trial date from January 24, 2005 to February 21, 2005. (RR v65 at 4-5). The Petitioner sought the continuance in order to: 1) allow the Petitioner to be evaluated by an expert addictionologist in order to further support the argument that the confession was not knowing and voluntary (RR v65 at 16); 2) allow the Petitioner to conduct DNA testing of physical evidence that the State had not tested (RR v65 at 17-20); and 3) conduct interviews with fact witnesses who the State planned to call to testify against the Petitioner (*id.*). The following day, January 12, 2005, the Court denied the motion. (RR v66 at 28).

Here, the evidence that the Petitioner would have developed if the continuance had been granted was critical to his defense. In particular, the medical evaluation of the Petitioner that would have been conducted if a continuance had been granted would have established without any possible doubt that the Petitioner's statement to the police was involuntary and therefore inadmissible.[21]

An expert evaluation of the Petitioner would have shown, inter alia, that the Petitioner suffers from a cognitive disorder with impaired functioning of the frontal lobes of the brain due

---

[21] As explained in Part B above, the existing record evidence already establishes that the statement was involuntary, and the trial court erred in denying the motion to suppress. The additional expert testimony concerning the Petitioner's state of mind, however, would have removed any possibility that the trial court would have erred in denying the motion to suppress.

to a number of factors. (Exhibit 15, Martinez Report).  As a result, the Petitioner's "emotional and cognitive functioning is likely to fluctuate significantly based on medication efficacy and the presence of acute stressors.  His coping skills are limited and he is likely to exhibit episodes of acute emotional and cognitive decompensation if he is overwhelmed by stressors or if there are changes to his psychotropic medication regimen." (*Id.*).  Both factors were in play during the Petitioner's interrogation in that: 1) he was deprived of his prescribed psychotropic medications; and 2) he was experiencing the acute stress of a custodial interrogation.  In short, his statement resulted from acute emotional and cognitive decompensation, and was manifestly involuntary.

Because the trial court denied the motion for a continuance, however, the Petitioner was unable to develop this evidence to support his motion to suppress.  Given the small amount of time that the Petitioner requested to complete this evaluation, and the importance of the evaluation to the Petitioner's defense, the trial court's denial of the motion for a continuance was so arbitrary as to deny the Petitioner his right to present a defense.  The Court of Criminal Appeals' failure to correct this error on the Petitioner's direct appeal was unreasonable and contrary to established Federal law, and was also based on factual determinations that were unreasonable in light of the record before the state court. 28 U.S.C. § 2254(d)(1)-(2).

**E.    PETITIONER'S CONVICTION AND SENTENCE OF DEATH VIOLATE THE DUE PROCESS CLAUSE OF THE UNITED STATES CONSTITUTION BECAUSE THE EVIDENCE ADDUCED AT TRIAL WAS INSUFFICIENT TO PROVE THAT THE PETITIONER MURDERED THE VICTIM IN THE COURSE OF COMMITTING OR ATTEMPTING TO COMMIT THE OFFENSE OF RETALIATION.**

Section 1 of the Fourteenth Amendment of the U.S. Constitution prevents any State from depriving "any person of life, liberty, or property, without due process of law." A defendant may not be convicted of any crime except upon proof beyond a reasonable doubt of every element of

-57-

the crime with which the individual has been charged. *In re Winship*, 397 U.S. 358 (1970); *Jackson v. Virginia*, 443 U.S. 307 (1979).

The Court in *Jackson* noted that under the *Winship* decision, "it is clear that a state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt has stated a federal constitutional claim." 443 U.S. at 321. If a prisoner has exhausted all state remedies and there is no independent and adequate state grounds which stand as a bar, the prisoner's claim is cognizable as a federal habeas corpus proceeding. *Id.* This "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324, n.16.

Under *Jackson*, the reviewing court must view the evidence in the light most favorable to the prosecution in order to determine if any rationale trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 319. The standard under *Jackson* does not focus on whether the trier of fact made the correct determination on guilt or innocence, but rather whether the trier of fact made a rationale decision with respect to guilt or innocence. *Herrara v. Collins*, 506 U.S. 390, 402 (1993). However the Fifth Circuit has stated that "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, the conviction should be reversed." *United States v. Pennington*, 20 F.3d 593, 597 (5th Cir. 1994). If the reviewing court finds that no rational trier of fact could have found proof of guilt beyond a reasonable doubt, the petitioner is entitled to habeas relief. *Jackson*, 443 U.S. at 324.

In the present case, the State's evidence was insufficient for a rational jury to find beyond a reasonable doubt that Mr. Hall killed Melanie Billhartz in order to prevent her from reporting

-58-

the occurrence of a crime to the authorities.  The testimony of the State's own witnesses clearly demonstrates this.

The Petitioner was charged with intentionally causing the death of an individual in the course of committing and attempting to commit the offense of obstruction and retaliation.  Texas Penal Code Ann. § 36.06: Obstruction or Retaliation, provides in part:

> (a)   A person commits an offense if he intentionally or knowingly harms or threatens to harm another by an unlawful act:
>
> > (1)   in retaliation for or on account of the service or status of another as a:
> >
> > > (B)   person who has reported or who the actor knows intends to report the occurrence of a crime.

The State was required to prove beyond a reasonable doubt that the Petitioner killed Ms. Billhartz in order to prevent her from reporting the occurrence of a crime.  The State's theory, as stated in its closing argument, was that "[t]he only reason [the Petitioner] killed [Melanie Billhartz]  was so that she wouldn't report a crime, so that she wouldn't call the cops. Because, why? Because they had a meth lab going. *There was no other reason for him to kill Melanie but that.*" (RR v79 at 95) (emphasis added).  The State, however, failed to demonstrate the essential elements of the offense of retaliation beyond a reasonable doubt.

Contrary to the State's contention, one of the State's key witnesses testified that not only was there not a methamphetamine "lab" at the house, but that even if the police did show up at the scene, they would not have discovered any evidence that methamphetamine had been manufactured at the house.  No rationale trier of fact could have found that Mr. Hall killed Melanie Billhartz to prevent her from reporting the existence of the methamphetamine "lab" as the State contended.

-59-

Specifically, Mr. Eddy, the individual who was manufacturing methamphetamine on the

evening of October 28, 2002, testified:

> Q.   Okay. You're the cook?
> A.   Yes, sir.
> Q.   And you didn't have a lab down there, did you?
> A.   No, it was with me. I mean, my stuff stays with me.
>        …
> Q.   Okay. Now, when Melody [sic] came over complaining that Ted hit her and she
>        was going to call the police, all you had to do was turn off the heat, take your pan,
>        and carefully -- because you didn't want to spill any of that stuff, do you?
> A.   No, I could have -- I could have put it in a -- I could have still put it in a container.
> Q.   And then just walked off?
> A.   Yeah.
> Q.   *And as far as finding a meth lab at that address, the police were not going to find
>        a meth lab?*
> A.   *Not mine, no. I mean, not that I know of.*

(RR v73 at 158-59) (emphasis added).

Mr. Eddy also testified that the Petitioner was aware of the fact that Mr. Eddy was

finished cooking his "batch" of methamphetamine. Mr. Eddy testified:

> Q.   Now, in fact, once Justen called the meeting, you did pack that methamphetamine
>        away in a bottle and walk away, didn't you.
> A.   When he called the meeting, I was in -- I was in the back room of the house. And
>        he called the meeting to the garage. I moved -- I did take the pan out, went to the
>        garage, fired up the heater, just --
> Q.   Kept on cooking?
> A.   -- finished the plate up.
> Q.   And you did actually finish?
> A.   Yes, I did.

(*Id.* at 164). Mr. Eddy further testified:

> Q.   Okay. Did you stay in the shed or did you leave?
> A.   No. A little bit after that I left.
> Q.   What was the state of the meth that had been drying at the point that you left?
> A.   It was finished. I went inside and gave it to Tim.

(*Id.* at 146) (emphasis added). The State's own witness testified <u>unequivocally</u> that contrary to

the State's theory: 1) there was no "meth" lab to speak of at the house; 2) to the extent Mr. Eddy

had materials to manufacture methamphetamine, he could quickly pack those materials up and walk away at a moment's notice; and 3) the Petitioner knew that Mr. Eddy was done "cooking" his batch of methamphetamine and had already given it to Mr. Davis. No rational trier of fact could have found proof of guilt beyond a reasonable doubt that the Petitioner killed Ms. Billhartz in order to prevent her from reporting the commission of a crime, namely the existence of a methamphetamine lab. The Court of Criminal Appeals, however, failed to correct this error when the Petitioner raised it on direct appeal. That failure resulted from an unreasonable application of established Federal law, and an unreasonable determination of the facts in the record before the state court. 28 U.S.C. § 2254(d)(1)-(2). Thus, Petitioner is entitled to habeas relief and should be granted a new trial. *Jackson*, 443 U.S. at 324.

**F.   PETITIONER'S SENTENCE OF DEATH VIOLATES THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION BECAUSE TRIAL COUNSEL FAILED TO INVESTIGATE AND PRESENT SUBSTANTIAL, READILY AVAILABLE EVIDENCE IN MITIGATION OF THE DEATH PENALTY.**

The Petitioner's death sentence violates the Sixth Amendment to the U.S. Constitution because he was deprived of the effective assistance of counsel at the punishment phase of his trial in that trial counsel failed to investigate and present substantial, readily available evidence, including evidence of childhood abuse and neglect, and mental illness, in mitigation of the death penalty.

**1.   The Supreme Court's *Strickland* Decision Established a Nuanced Standard to Evaluate Ineffective Assistance of Counsel**

The Supreme Court established the modern legal principles governing claims of ineffective assistance of counsel under the Sixth Amendment in the seminal case of *Strickland v. Washington,* 466 U.S. 668 (1984). Under *Strickland,* ineffective assistance of counsel is defined

as the deficient performance by counsel that results in prejudice against the petitioner, with counsel's performance judged objectively "under prevailing professional norms." *Id.* at 688; *see also Wiggins v. Smith,* 539 U.S. 510, 521 (2003).  In *Williams v. Taylor,* 529 U.S. 362, 391 (2000), the Supreme Court made clear that *Strickland* qualifies as clearly established Federal law as determined by the Supreme Court.

### a.    *Strickland* Prong One: Deficient Investigation

*Strickland* offers a two-part test to determine whether a defendant has suffered a constitutional violation based on the ineffective performance of his counsel.  466 U.S. 668 (1984).  The first requirement is that the petitioner show his counsel's performance was deficient, based on the totality of the representation.  *Id.*  This is measured against an "objective standard of reasonableness."  *Neal v. Puckett,* 286 F.3d 230, 236 (5th Cir. 2002), *citing Strickland,* at 689.

In the context of capital cases, Supreme Court decisions have looked to "norms of adequate investigation in preparing for the sentencing phase of a capital trial, when defense counsel's job is to counter the State's evidence of aggravated culpability with evidence of mitigation." *Rompilla v. Beard,* 125 S.Ct. 2456, 2462 (2005).  These norms include the standard practices in the state in capital cases at the time of the trial at issue, as well as American Bar Association (ABA) standards, which serve as guides for determining what is reasonable. *Wiggins,* 539 U.S. at 524.

The ABA Standards for Criminal Justice in circulation at the time of the Petitioner's trial, which set forth the minimum required standards for performance of counsel, describe defense counsel's general duty to investigate as follows: "Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to

the merits of the case and the penalty in the event of conviction. . . .  The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty." *ABA Standards for Criminal Justice*, Standard 4-4.1(a) (3rd ed. 1993).  The Standards go on to explain that, "since the death penalty differs from other criminal penalties in its finality, defense counsel in a capital case should respond to this difference by making *extraordinary efforts* on behalf of the accused." *Id.* at 4-1.2(c) (emphasis added).

The ABA's Guidelines tailored specifically to the performance of defense counsel in capital cases set forth these expectations in greater detail. *ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (1989). "The investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered.  This investigation should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Id.* at 11.4.1(C).  Further, these guidelines recommend as a standard practice the creation of a social history, which involves obtaining virtually every document relating to the client's life, examining the accused's medical and education records, and interviewing family members as well as the defendant's doctors, teachers, pastors, neighbors, and friends. *See id.* at 11.4.1(D)2 & 11.8.3.

### b.    *Strickland* Prong Two: Prejudice

To meet the second prong of the *Strickland* test, a petitioner must show that his counsel's failures prejudiced his defense: that there is a "reasonable probability" the result of the proceedings would have been different, but for counsel's unprofessional performance. *Strickland*, 466 U.S. at 692.  A "reasonable probability" is one that is "sufficient to undermine

-63-

confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 694. Additionally, the cumulative impact of counsel's errors should be considered. *Ex parte Welborn*, 785 S.W.2d 391 (Tex. Crim. App. 1990).

This test of "reasonable probability" is not outcome determinative. Indeed, the *Strickland* Court expressly rejected an "outcome determinative standard" requiring the defendant to show that counsel's deficient conduct "more likely than not altered the outcome" of the case. *Strickland*, 466 U.S. at 693-94. Instead, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* Thus, the "reasonable probability" standard is a less onerous burden than even the preponderance of the evidence standard. This "lower burden of proof" was recognized by the Fifth Circuit in *Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990). Even when "the evidence arguably supports a different result under a preponderance standard," a reviewing court still can be "confident that it meets the 'reasonable probability' standard." *Id.*

In assessing prejudice, the Supreme Court requires the reviewing court to reevaluate "the evidence in aggravation against the totality of available mitigating evidence," both the evidence adduced at trial and at the habeas proceeding. *Wiggins*, 539 U.S. at 534; *Williams,* 529 U.S. at 397-98. [22] Additionally, in cases where the state court did not reach the prejudice prong of the

---

[22] In many states that have the death penalty, sentencing laws require the sentence in a capital case to be determined by weighing the aggravating factors against the mitigating factors found to exist by the decisionmaker. Thus, in accordance with *Strickland*, a court reviewing such judgments would assess the balance of these circumstances. The sentencing laws governing Texas capital trials do not require the decisionmaker to weigh aggravating factors and mitigating factors when deciding what penalty to assess. Instead, Texas asks jurors to answer two "special issues," the second of which asks them to consider mitigating circumstances that could warrant a sentence of life imprisonment rather than death. Tex. Code Crim. Proc. art. 37.071, § 2(e)(1). Thus, a Court reviewing a judgment imposing death from Texas must consider whether there is a reasonable probability that, absent counsel's errors, the jury would have answered the mitigation special issue differently. *See Lewis v. Dretke*, 355 F.3d 364, 369 (5th Cir. 2003)

-64-

*Strickland* standard in rejecting the petitioner's ineffectiveness claim, the federal court's "review is not circumscribed by a state court conclusion with respect to prejudice." *Wiggins,* 539 U.S. at 534.

The scope of information considered relevant mitigating evidence is extremely broad. "The Supreme Court recently held that a State cannot preclude the sentencer from considering any relevant mitigating evidence that the defendant proffers in support of a sentence less than death . . . Virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." *Bigby v. Dretke*, 402 F.3d 551, 565 (5th Cir. 2005) (internal citations omitted); *see also Pierce v. Thaler*, 355 Fed. App'x 784, 795 (5th Cir. 2009) ("[petitioner's] low intelligence, his poor health as a child, the physical abuse he suffered at the hands of his father, the extreme poverty in which he grew up, and other evidence of a similar nature - is all general mitigation evidence, i.e., evidence that might have elicited sympathy or reduced his general moral culpability"). In addition to difficult or sympathetic circumstances that may affect a jury's perspective, evidence of deficient intellect and/or mental illness may also be considered mitigating, and the petitioner is "not required to show that his condition be somehow linked to his conduct, only that it existed, and that it could lead a jury to find that a sentence other than death is warranted." *Id.* at 566; *see also Tennard v. Dretke*, 542 U.S. 274, 287 (2004) ("impaired intellectual functioning is inherently mitigating").

---

(relevant question is whether totality of evidence "would have affected the sentencing decision of at least one juror"); *Ex parte Gonzales*, 204 S.W.3d 391, 394 (Tex. Crim. App. 2006) ("We have adapted the Supreme Court's prejudice test to require a showing that there is a reasonable probability that, absent the errors, the jury would have answered the mitigation issue differently.").

A/73401003.1

2.    *Strickland's* Progeny Demonstrate the Breadth of Viable Ineffective Assistance of Counsel Claims, with a Focus on Fundamental Fairness

In *Strickland,* the Supreme Court adopted a particularized, case-by-case approach focusing on the totality of the evidence, and held that reviewing courts should not apply the *Strickland* standard in a mechanical fashion, but rather should focus on the fundamental fairness of the proceedings being challenged. 466 U.S. at 693-96.

The Court expanded on these concepts in three subsequent decisions: *Williams v. Taylor, Wiggins v. Smith,* and *Rompilla v. Beard.* 529 U.S. at 397-98; 539 U.S. at 534-38; 125 S.Ct. at 2469. These cases established that reviewing courts must evaluate the totality of the available mitigating evidence, which includes the evidence presented at trial and that adduced in habeas, and rebalance it against the aggravating evidence presented by the state. *Rompilla,* 125 S.Ct. at 2469; *Wiggins,* 539 U.S. at 534-38; *Williams,* 529 U.S. at 397-98.

In *Williams,* the Supreme Court applied *Strickland* and found that counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on Williams' voluntary confessions, because counsel had not fulfilled its obligation to conduct a thorough investigation of the defendant's background. 529 U.S. at 396.

In *Wiggins,* petitioner's capital defense counsel hired a psychologist to evaluate petitioner and review petitioner's life history and department of social service records documenting his foster care placements and difficult childhood. Nonetheless, the Supreme Court concluded that counsel was ineffective because "[c]ounsel's decision not to expand their investigation beyond the PSI and the DSS records fell short of the professional standards that prevailed in Maryland in 1989," which included the preparation of a social history report. 539 U.S. at 524. The Court also concluded that counsel's failure to expand the investigation into petitioner's life history also

-66-

"fell short of the standards for capital defense work articulated by the American Bar Association (ABA) standards to which we long have referred as 'guides to determining what is reasonable.'" *Id.*, quoting *Strickland*, 466 U.S. at 688. According to the Supreme Court, "[d]espite these well-defined norms," counsel "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524.

Finally, in *Rompilla*, the Supreme Court found meritorious a capital habeas petitioner's claim of ineffective assistance of counsel because "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." 125 S.Ct. at 2460.

The *Strickland* standard is obviously case specific, and persuasive evidence does not need to comport precisely with the evidence presented in the above cases to be sufficient to show prejudice. Prejudice is shown if the mitigating evidence that was unavailable to the jury, compared to the evidence presented to the jury, might have influenced the jury's appraisal of the defendant and therefore offered the possibility of a different result. *See Rompilla,* 125 S.Ct. at 2469. Indeed, other federal courts have found prejudice in other cases with evidence less severe than that presented in *Williams* and *Wiggins. See, e.g., Canaan v. McBride,* 395 F.3d 376, 386-87 (7th Cir. 2005); *Mayfield v. Woodford,* 270 F.3d 915, 927-28 (9th Cir. 2001); *Ainsworth v. Woodford,* 268 F.3d 868, 875-76, 78 (9th Cir. 2001); and *Dobbs v. Turpin,* 142 F.3d 1383, 1390 (11th Cir. 1998).

-67-

This is particularly true in the Fifth Circuit.  For example, in *Adams v. Quarterman*, the Fifth Circuit affirmed a limited grant of habeas corpus relief.  324 Fed. App'x 340 (5th Cir. 2009).  With regard to mitigation, the Court found that defense counsel did not sufficiently explore all avenues of mitigating evidence.  *Id.* at 347.  Similarly, in *Soffar v. Dretke*, the Court held, in accordance with *Strickland* principles, that counsel's failure to interview eyewitnesses to a charged crime constitutes constitutionally deficient representation.  368 F.3d 441, 474-75 (5th Cir. 2004) (while "a lack of credibility might support a strategic decision not to call a witness to testify at trial," nevertheless, "a witness's character flaws cannot support a failure to investigate") (citations omitted).  Further, in *Moore v. Johnson*, the court found the petitioner's trial counsel ineffective because counsel failed to investigate, develop, and present evidence of the petitioner's organic brain damage.  194 F.3d 586, 618 (5th Cir. 1999).

> **3.**  **The Petitioner's Trial Counsel Failed to Present a Sufficient Mitigation Defense to the Jury**
>
> **a.**  **Trial Counsel's Mitigation Case was Constitutionally Deficient**

Trial counsel's investigation into available evidence in mitigation of the death penalty in this case was constitutionally deficient because trial counsel failed to discover and present the testimony of at least seven individuals – Marilu Folmer, Becky Garcia, Gloria Meinert, Ted Meinert, Jane Morgan, Susan Wohleking and Deborah Hall – who have knowledge of the Petitioner's horrific childhood and difficult past and who would have been willing to testify as effective mitigation witnesses during the punishment phase of the trial.  (*See* Declarations attached at Exhibits 16-22).  Trial counsel also failed to uncover and offer evidence of Mr. Hall's cognitive and emotional deficiencies, which could have been readily diagnosed and presented to the jury through the use of a neuropsychologist such as Dr. Martinez, whose report is attached at Exhibit 15.

Effective representation can only be built upon a foundation of adequate pretrial investigation. In a death-penalty case, this must include investigation of all circumstances that a jury might consider mitigating. Yet counsel failed to perform anything more than a cursory mitigation investigation. Indeed, surviving trial counsel testified during the state habeas proceedings regarding his lack of engagement and commitment with respect to the mitigation investigation before trial, admitting that he did not "remember much" about even the interview with Mr. Hall's mother, Deborah Hall, or even whether he asked her to testify (he did not). (S.H. Tr. at 107-08 and Exhibit 22, Deborah Hall Decl.).

This lack of recollection is the defining feature of counsel's description of his initial mitigation investigation: he testified at least fifteen times in only five pages of testimony that he did not remember the answer to queries regarding those efforts. (S.H. Tr. at 107-11). In contrast to the broad mandate of a mitigation investigation outlined in applicable caselaw and the ABA standards discussed above, trial counsel apparently had a very limited – and erroneous – view of the work required: "The main thing I wanted Sam [Streep, the mitigation investigator] to do was find his mother and find his father and find out what happened to him as a child." (S.H. Tr. at 107). Mr. Streep did not even draft a report regarding any findings from his supposed investigation. (S.H. Tr. at 108).

The perfunctory mitigation case offered by counsel during the punishment phase of the trial confirms that counsel's mitigation investigation was inadequate. Counsel offered very few witnesses during the punishment phase, three of whom were relatives. Mr. Hall's mother was not among the relatives called to testify, only his father, step-mother, and step-sister were called, and they provided bare, cursory testimony. None of them described the difficult circumstances surrounding Mr. Hall's life and childhood. Indeed, although this phase of Mr. Hall's trial

-69-

spanned over 1,100 pages of testimony, counsel elicited a mere 17 pages of testimony from those three family members, who primarily provided "good character" evidence.

The other witnesses who testified on Mr. Hall's behalf did not provide helpful mitigation testimony either. For example, counsel offered one witness, Mr. Escobedo, seemingly for the primary purpose of addressing guilt, rather than mitigation. Specifically, counsel attempted to offer testimony supporting the theory that Mr. Murgatroyd was the murderer, saying that Escobedo's testimony was necessary to demonstrate that Murgatroyd was "always on the fringes of death." (RR v83 at 92). Another witness, Dr. Aeschbach, was apparently offered to provide an abstract philosophical perspective. A student of an Austrian branch of research called ethology, Dr. Aeschbach's testimony ranged from the three stages of moral development to the rise of the Third Reich in Germany to the concept of free will. (RR v 85 at 6-7, 10-12, 14-15, 18-22). Aeschbach's scant testimony regarding the Petitioner was at best peripheral to his lengthy explication of his philosophical beliefs.

Counsel's inept mitigation efforts were further compounded by counsel's own closing statements. As discussed further below, the closing was dominated by highly prejudicial statements about the Petitioner's own character – statements made by his own counsel. For example, Mr. Macias stated: "he's a poor representative of . . . what it means to be a human being." (RR v86 at 55). Clearly counsel was not convinced by the mitigation case he himself had developed, since he freely told the jury that Mr. Hall did not deserve to be kept alive. (RR v86 at 55-57).

Further, the declarations of six other individuals close to Mr. Hall indicate that none of them was contacted about Mr. Hall's childhood or background, nor were any of them asked to testify on his behalf, although all of them would have been willing, and all had knowledge of

-70-

facts that jurors would have found to be compelling mitigation evidence. (*See* Exhibits 16-21, Declarations).

Due to trial counsel's failure to pursue a proper investigation into the Petitioner's background, the Petitioner was denied the effective presentation of extensive mitigation experience that very likely would have persuaded the jury not to impose the ultimate penalty.

### b.   Substantial And Compelling Mitigation Evidence Could Have Been Uncovered and Presented

The mitigation evidence that trial counsel failed to find or present presents a chilling and horrifying picture of the Petitioner's childhood, in which he was forced essentially to raise himself in a household environment dominated by drug use, physical and psychological abuse, and neglect. Three teachers and counselors of Mr. Hall's could have testified to the difficult circumstances of his childhood. Ms. Folmer, Ms. Garcia, and Ms. Wohleking all knew Mr. Hall as a child in school, and their declarations reveal his troubled upbringing, as well as his learning disabilities and unmet need for counseling services. (*See, e.g.,* Exhibit 21, Wohleking Decl. at ¶¶ 7, 9-10). All three of them express the view that Mr. Hall was a neglected child who appeared to be raising himself, getting himself to school without any help or involvement from his parents. (Exhibit 16, Folmer Decl. at ¶ 5; Exhibit 17, Garcia Decl. at ¶ 3; Exhibit 21, Wohleking Decl. at ¶ 7).

The jury was also denied the moving testimony of the Petitioner's mother, Deborah Hall, who provides a chilling account of the social environment that he experienced as a child. (*See* Exhibit 22, Deborah Hall Decl.). Ms. Hall recounts overwhelming mitigating circumstances surrounding the Petitioner's life, including clear themes of violence, drug abuse, and neglect. She explains: the Petitioner's father "was physically abusive towards me and Justen. Jimmy threatened to kill both Justen and me on numerous occasions. . . He often threatened to shoot me

-71-

or stab me." (*Id.* at ¶ 8). The Petitioner was wholly exposed to his father's unpredictable anger and violence: "Jimmy would simply go into rages due to his paranoia and jealousy. Justen was usually around when Jimmy started hitting me. Sometimes, Jimmy would lock Justen in his room while he beat me up. Jimmy would often have to drag Justen into his room to put him in there, as Justen always tried to jump in to protect me." (*Id.* at ¶ 9). "Any time I gave any indication that I wanted to take Justen with me, Jimmy would threaten to kill us both." (*Id.* at ¶ 22).

Mr. Hall was also exposed to drug abuse at a young age. He was two years old when his father began using cocaine. (Exhibit 22, Deborah Hall Decl. at ¶ 8). His father and step-mother's drug abuse was ever-present. On one occasion when Ms. Hall visited their house, she "observed drug paraphernalia, including needles and spoons, on the nightstand. Jimmy and Maggie were just lying in the bed." (*Id.* at ¶ 20). Ms. Hall also explained that "Jimmy was a long time drug dealer" and that he later hired Justen to work for him. (*Id.* at ¶ 29).

Had it been offered, the testimony of other relatives would have provided the jury with even more vivid details regarding the horrific conditions in which Mr. Hall was raised. His grandmother, Ms. Morgan, declares that his parents had a "very volatile relationship," were "never stable," were on drugs (father) or "not meant to be a parent" (mother), and abandoned Justen to "rais[e] himself." (Exhibit 20, Morgan Decl. at ¶¶ 5-9). She said: "I remember Justen just being shoved back and forth from pillar to post between Deborah and Jimmy." (*Id.* at ¶ 12).

Further, Justen's other relatives have detailed knowledge of his father's drug abuse and "uncontrollable rage," describing Jimmy as "always in a state of anger" and "very aggressive when he was on drugs." (Exhibit 19, T. Meinert Decl. at ¶ 5; Exhibit 18, G. Meinert Decl. at ¶ 7-9). These witnesses were also privy to the neglectful parenting and promiscuous behavior of

Justen's mother: as Mr. Meinert explained, "In my opinion, Deborah was not ready to be a mother when she had Justen. Whenever Jimmy was on the road, Deborah was out in the streets." (Exhibit 19, T. Meinert Decl. at ¶ 7).

Apparently, Justen's step-mother behaved similarly: "Maggie was known as a 'lot lizard' [prostitute] at the truck stops. . . I recall Jimmy bragging to me that Maggie had once been with over 40 men in a day, and now he had her as his wife." (*Id.* at ¶¶ 10-11). Mr. and Mrs. Meinert were never asked to be witnesses, but they would have been willing to testify to these circumstances on Mr. Hall's behalf if they had been asked. (Exhibit 19, T. Meinert Decl. at ¶ 15; Exhibit 18, G. Meinert Decl. at ¶ 16).

In many ways, Mr. Hall raised himself. His mother observed that Justen's home life with his father was an environment of filth and malnutrition: "I saw Justen leaving for school. He was wearing raggedy, wrinkled, dirty clothes that were much too large for him. He looked completely unkempt and disheveled. I also observed that he was extremely pale, appeared malnourished, and had dark circles under his eyes . . . . It was obvious to me that Justen was caring for himself." (Exhibit 22, Deborah Hall Decl. at ¶¶ 19-20).

This was echoed by others who actually tried to care for or educate for Mr. Hall. Ms. Folmer explains that she "tried to get in touch with Justen's parents on more than one occasion, but I was never able to get his parents to come to the school for a meeting. It seemed to me like there was no concern there whatsoever." (Exhibit 16, Folmer Decl. at ¶ 8). Ms. Wohleking reinforces this picture of neglect, remembering Justen "as a quiet child who was not very well kept. He had a shaggy appearance. It was almost as if he had just gotten up in the morning and gotten himself to school . . . . I had the impression that Justen was not a real high priority as home." (Exhibit 21, Wohleking Decl. at ¶ 7).

A parallel comment from Ms. Garcia is particularly vivid: "Justen seemed like a homeless kid." (Exhibit 17, Garcia Decl. at ¶ 3).  She also recalls multiple instances of tangible neglect, noting that Justen was often punished at school when he could not get school supplies or signed permission slips from his parents, and often did not have money for breakfast, lunch, field trips, or special class events.  (Exhibit 17, Garcia Decl. at ¶ 4-6, 10).  She explained: "I would often pay for his lunch, just to make sure that he ate that day" (*Id.* at ¶ 4).  Her comments on Mr. Hall's mood as a child are similarly telling: "Justen rarely smiled" and "he seemed sad." (*Id.* at ¶ 8).  This is consistent with the downtrodden image of Mr. Hall that Ms. Folmer remembers: "Justen was not a bully;" "Justen was picked on by other students because of his appearance;" "His hair was never cut and his clothes were rarely clean." (Exhibit 16, Folmer decl. at ¶ 5-6).

An appropriate mitigation case would also have offered the jury comprehensive evidence of the Petitioner's substantial mental health issues.  As a recent neuropsychological evaluation confirms, Mr. Hall suffers from a wide array of cognitive and intellectual deficits.  (Exhibit 15, Martinez Report).  Dr. Martinez concluded that Mr. Hall has "mild/moderate but substantial cognitive deficits that are likely related to the combined effects of his chronic affective disorder and other historical variables." (*Id.* at 13).  Those historical factors include the "reasonable probability of childhood brain injury due to a serious traffic accident," childhood attention deficit/hyperactivity disorder, childhood abuse, and the contraction of Hepatitis C.  (*Id.* at 13-14).  He also notes that Mr. Hall has been diagnosed with "Major Depressive Disorder and Bipolar II Disorder since 2002, with acute episodes of disturbed thought that may have been related to a mood congruent psychotic disturbance." (*Id.* at 12).  Testing revealed Mr. Hall's IQ to be 89, which Dr. Martinez explained further as follows:

> "His performance on a comprehensive measure of intelligence was
> in the average to low average range, with better scores on

nonverbal subtests.   However, there was significant scatter/fluctuation in subtest scores that was strongly suggestive of difficulty with thought and sustained attention.   These extreme fluctuations in cognitive subtest scores are consistent with *brain frontal lobe dysfunction* that is likely related to the combined effects of an *attention deficit disorder, possible childhood traumatic brain injury, a chronic mood disorder,* and a *history of acute polysubstance abuse*."

*Id.* at 13 (emphasis added).  And as Ms. Wohleking makes clear in her declaration, Mr. Hall's cognitive impairments are longstanding: he was coded as Learning Disabled in elementary school, and "slipped through the cracks," missing the Special Education and counseling services that he needed.  (Exhibit 21, Wohleking Decl. at ¶¶ 9, 16, and 20).

The failure of counsel to investigate and present this substantial mitigating evidence left the jury with only the barest understanding of the Petitioner's personal history and the challenges he faced throughout his life.  In fact, if anything, the testimony of many of the witnesses that trial counsel called during the punishment phase of the trial obscured the circumstances of the Petitioner's childhood.  Mr. Hall's step-mother, for example, provided only generic, positive remarks about her decade of interaction with Justen:

Q.   You have gotten to know him well, haven't you?
A.   Yes, during ten years.
Q.   What kind of man is he?
A.   He is not my son, but I see him as a son.
Q.   Has he ever been disrespectful to you?
A.   No, never.
Q.   Has he ever hit you?
A.   No.
Q.   How has he treated your daughters?
A.   Well, maybe even better than a normal brother.
Q.   Is his life worth saving?
A.   Yes.
Q.   Why?
A.   Because he is a good person.

(RR v81 at 40-41).  Nothing in her testimony suggests the challenges Justen faced while growing up in her care.  Justen's step-sister testified similarly, simply stating that Justen is a smart, hard-

working person who has always been nice to her. (RR v81 at 45). This testimony is equivalent to the "few naked pleas for mercy" that the *Rompilla* court found bearing "no relation" to the mitigation case that could have been built upon the evidence available. *Rompilla,* 125 S.Ct. at 2469.

A reasonable application of the law on ineffective assistance of counsel as determined by the Supreme Court in *Strickland* and its progeny makes clear that the evidence detailed above – that trial counsel could have discovered and presented, but did not - may well have influenced the jury's decision and should have been presented to them for consideration. *See Wiggins,* 123 S.Ct. at 2544 (the test is whether the available mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of the defendant's moral culpability).

Indeed, at least one juror who was interviewed after the trial indicated that if such mitigating evidence had been presented during the punishment phase of the trial, it would likely have caused her to decide against the death penalty. Irene Rodriguez reviewed the declarations discussed above, and offered her own declaration stating that she was not presented with this mitigating evidence during the punishment phase, though she wanted to know more then about who Justen was, and that "if I had heard the evidence in these declarations during the punishment phase, it would have changed my answer. I would have answered "yes," that *there was enough mitigation to warrant a life sentence.*" (Exhibit 13, Rodriguez Decl. at ¶¶ 7-9) (emphasis added).

*       *       *

In short, trial counsel's failure to present key mitigating evidence in a death-penalty case necessarily meets the first prong of *Strickland*. Given the significance of the mitigating evidence existing in Petitioner's background that was not presented at trial, and the fact that this Court now has before it at least one member of the jury that would have been compelled to decide

-76-

A/73401003.1

Mr. Hall's fate differently had she been properly informed of Mr. Hall's tragic and sympathetic personal story, Mr. Hall was severely prejudiced by his counsel's unprofessional and deficient conduct. Thus, in accordance with *Strickland* principles, Mr. Hall's petition for relief should be granted.

G. **PETITIONER'S SENTENCE OF DEATH VIOLATES THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION BECAUSE TRIAL COUNSEL ARGUED TO THE JURY, WITHOUT ANY PLAUSIBLE TACTICAL REASON AND CONTRARY TO EVIDENT DEFENSIVE STRATEGY, THAT PETITIONER DESERVED TO DIE FOR HIS ALLEGED CRIME.**

Petitioner's death sentence violates the Sixth Amendment to the United States Constitution because Petitioner was deprived of the effective assistance of counsel at the punishment phase of his trial when trial counsel argued to the jury, without any plausible tactical reason and contrary to the evident defensive strategy, that the Petitioner deserved to die.

1. **The Supreme Court's *Strickland* Decision Established the Standard to Evaluate Ineffective Assistance of Counsel: Fundamental Fairness**

As discussed in greater detail above, the Supreme Court set forth a two-part framework to govern claims of ineffective assistance of counsel under the Sixth Amendment in *Strickland v. Washington.* 466 U.S. 668 (1984). To meet the first requirement of the *Strickland* test, the petitioner must demonstrate that his counsel's performance was objectively deficient. *Id.* at 688-89; *see also Neal v. Puckett*, 286 F. 3d 230, 236 (5th Cir. 2002). The second requirement is that the petitioner establish a "reasonable probability" that, if counsel had not performed unprofessionally, the result of the proceedings would have been different. *Strickland*, 466 U.S. at 692.

A/73401003.1

Importantly, the *Strickland* Court adopted an individualized approach to its evaluation of ineffective assistance claims, holding that reviewing courts should focus on the fundamental fairness of the proceedings being challenged. 466 U.S. at 693-96.

> 2.   **Fundamental Fairness Requires a Finding that the Petitioner's Trial Counsel Offered an Ineffective Defense by Advocating for the Death Penalty**

*"He doesn't deserve not to be killed."* (RR v86 at 55) (emphasis added). This is a statement one might have expected from the State's attorneys prosecuting the case *against* the Petitioner. In fact, however, these words were uttered during the punishment phase of Hall's trial by Hall's own lead trial counsel, Frank Macias. This assertion, and many others like it, sabotaged any opportunity for effective assistance of counsel during the punishment phase of his trial.

When trial counsel's strategy is obviously flawed, courts are not reluctant to find that the defendant has been unconstitutionally denied the effective assistance of counsel. *See Richards v. Quarterman*, 566 F. 3d 553 (5th Cir. 2009) (finding that defense counsel's failure to present certain evidence was objectively unreasonable under prevailing professional norms and was not product of conscious and informed decision on trial strategy); *Moore v. Johnson,* 194 F. 3d 586, 604 (5th Cir. 1999) ("The Court is . . . not required to condone unreasonable decisions parading under the umbrella of strategy."); *United States v. Rusmisel*, 716 F.2d 301, 310 (5th Cir. 1983) (even if an attorney's manner of conducting a trial is trial strategy, it can be so ill chosen as to constitute ineffective assistance).

There can be no question that the tactics of the Petitioner's trial counsel during the punishment phase of the trial were deeply and inexcusably flawed. The statement referenced above was not the only example. It was instead part of a larger and inexplicable theme that

-78-

Petitioner's counsel wove throughout his arguments.   Consider another statement defense counsel made to the jury charged with determining the Petitioner's fate: "Justen has killed; why shouldn't we will him?  Why shouldn't we kill him?  *He doesn't need your sympathy.*  He showed no sympathy for those two people.  Why shouldn't we kill him."  (RR v86 at 49) (emphasis added).  Arguing to the jury weighing the value of the defendant's life that the defendant does not warrant sympathy cannot be considered effective assistance of counsel under any standard.

This refrain – "why shouldn't you kill him?" – was apparently a key part of trial counsel's strategy, as the phrase was repeated at least ten times in a mere twenty minutes of closing argument before the jury.  (RR v86 at 46-50).  However, rather than offering the jury a convincing answer to this (presumably) rhetorical question, which would have been the only plausible explanation for this strategy, defense counsel proceeded to make further prejudicial statements about the Petitioner's character: "he's a poor representative of . . . what it means to be a human being,"  (RR v86 at 55); "Why shouldn't you kill him?  He has killed two people," (*Id.*); "[e]ach one of you have a conscience that Justen maybe hasn't yet developed," (*Id.* At 52); "[i]f Justen Hall truly was having a trial and judged by his peers . . . he should have been shot when he shot Hector Diaz." (RR v86 at 51).

Counsel's only attempt to advocate against imposition of the death penalty was in the abstract, essentially arguing that Justen did not deserve to live, but that the jury should keep him alive in order to protect the justice system from "Old Testament" "eye for an eye" retribution. (RR v86 at 57; *see also id.* at 56 ("There is something in Justen that's worth keeping alive.  Not because – not because he deserves it, because he doesn't.  It's because of something greater than Justen.  It's because our system of justice, it's because your moral development, gives you the

-79-

ability to make him stay alive, to hopefully learn what it's like to develop a conscience, because he does have that spark. Death is too easy. Death is too quick.").

An intellectual argument against the death penalty cannot be deemed an effective defense strategy in the face of other statements by defense counsel that his particular client deserves to die. Indeed, defense counsel suggested on three separate occasions in his closing argument that the Petitioner did not deserve to be kept alive. (RR v86 at 55-57). As the *Richards* Court recently explained, whether counsel's decisions "were governed by a reasoned trial strategy is an important question." 566 F. 3d at 566; *see also Loyd v. Whitley,* 977 F.2d 149, 158 (5th Cir. 1992) (noting that "whether counsel's omission served a strategic purpose is a pivotal point in *Strickland* and its progeny" and that this "crucial distinction between strategic judgment calls and plain omissions has echoed in the judgments of this court.").

There is no way to describe what trial counsel did in this case as a "reasoned trial strategy." Indeed, if trial counsel's only strategy during the punishment phase was to advocate against application of the death penalty in general, his statements that his own client *deserved* to die are in direct conflict with that alleged strategy. Trial counsel's disastrous decision to marginalize the value of his client's own life entirely undermined the Petitioner's defense during the punishment phase of his capital trial. Counsel's testimony was unprofessional by any standard, and epitomizes ineffective assistance of counsel, essentially aligning his position with that of the prosecution.

Without the unified encouragement from counsel on both sides that the Petitioner deserved to die, it is entirely possible that the jury would have returned a different sentence. This is especially true because a jury most expects to hear arguments in support of mercy from the defendant's own attorneys, yet trial counsel here failed to offer the jury anything but support

-80-

for the prosecution.   The Petitioner was thus prejudiced by his counsel's unprofessional performance, and in accordance with *Strickland* principles, his petition for relief should be granted.  *See Rusmisel*, 716 F.2d at 310 (finding that counsel's "strategy" was so ill chosen that it rendered the trial fundamentally unfair).

> **H.**     **PETITIONER'S DEATH SENTENCE VIOLATES THE SIXTH AMENDMENT BECAUSE TRIAL COUNSEL RELINQUISHED TWO PEREMPTORY CHALLENGES AGAINST OBJECTIONABLE JURORS BY FAILING TO REQUIRE THAT EACH ELIGIBLE JUROR BE PASSED FOR PREEMPTORY CHALLENGE FIRST BY THE PROSECUTION.**

Under Article 35.13 of the Texas Code of Criminal Procedure, the State is required to exercise challenges for cause and peremptory strikes to potential jurors *before* a capital defendant exercises his. Mr. Macias violated the Petitioner's Sixth Amendment right to effective assistance of counsel when he unreasonably, and without any strategic or tactical motive, made an agreement with the State to exercise simultaneous and independent peremptory strikes. (*See* Exhibit 23, Agreed Procedure for Jury Selection).  As a result of this agreement, at least two jurors who demonstrated improper bias were permitted to serve on the panel that delivered Mr. Hall's death sentence.

Mr. Macias's conduct violated the Petitioner's Sixth Amendment right to counsel in that (1) Macias's performance was objectively deficient; and (2) but for Macias's deficient performance, there is a reasonable probability that "the jury may have answered the special issues submitted in the punishment phase differently." *Moore*, 194 F.3d at 619 (5th Cir. 1999) (citations omitted); *see also Strickland*, 466 U.S. at 688-89 (1984).  In determining whether Mr. Hall has been prejudiced by his counsel's conduct, the Court should consider the cumulative effect of Macias's deficient performance during both the trial and punishment phase proceedings. *Moore*, 194 F.3d at 619 ("When, as here, the same jury considered guilt and punishment, the

-81-

question is whether the cumulative errors of counsel rendered the jury's findings, either as to guilt or punishment, unreliable.") (*citing Strickland*, 466 U.S. at 687).

1.    **Article 35.13 Provides Capital Defendants with an Important Strategic Advantage in Jury Selection Proceedings.**

Article 35.13 of the Texas Code of Criminal Procedure provides: "A juror in a capital case . . .held to be qualified, shall be passed for acceptance or challenge *first* to the State and *then* to the defendant. Challenges to jurors are either peremptory or for cause." (emphasis added). By requiring the State to exercise its peremptory strikes first, a capital defendant is benefited any time the State strikes a juror on whom the defendant intended to exercise one of his own strikes. *Janecka v. State*, 739 S.W.2d 813, 833 (Tex. Crim. App. 1987). This advantage allows the defendant to maximize his use of peremptory strikes by only having to strike objectionable jurors who cannot be challenged for cause, but who the State has accepted.

By contrast, if a capital defendant and the State exercise strikes at the same time and independently, the defendant runs the risk of forfeiting any strikes he uses on jurors who are also stricken by the State. Forfeited strikes are a lost opportunity to remove an objectionable juror who cannot successfully be challenged for cause.

The Texas Court of Criminal Appeals ("CCA") has adopted two challenge procedures that it has found to be statutorily compliant. *Hughes v. State*, 24 S.W.3d 833, 841 (Tex. Crim. App. 2000) (citations omitted). The first procedure provides that "the State must voice both a challenge for cause or a peremptory challenge before the defendant." *Id.* The second provides "that both sides issue any challenges for cause before the State first lodges a peremptory challenge." *Id.* Paramount under either of these methods is the principle that "Article 35.13 requires the State to act before the defendant and ensures that any strategic advantage benefits the defendant." *Id.* (*citing Janeck*, 739 S.W.2d at 834, which found that capital defendants do

not have to exercise a peremptory strike against a prospective juror until the State has decided

whether to do so); *see also Bigby v. State*, 892 S.W.2d 864, 881 (Tex. Crim. App. 1994), *denial*

*of habeas corpus aff'd in part, rev'd in part on other grounds, Bigby v. State*, 340 F.3d 259 (5th

Cir. 2003) (finding Article 35.13 requires the State to exercise peremptory strikes and challenges

for cause before a capital defendant).

When Mr. Macias entered into an agreement allowing the State to exercise peremptory

challenges at the same time, and independent from, Mr. Hall, he deviated from the Article 35.13

challenge procedure, and unreasonably sacrificed Mr. Hall's critical statutory advantage in jury

selection procedures.

> 2.      **Mr. Macias Lost Two Peremptory Strikes Against Potential Jurors by
> Failing to Require That Each Eligible Juror Be Passed for
> Peremptory Challenge First by the Prosecution As Prescribed by
> Article 35.13.**

Article 35.13 "ensures that any strategic advantage [in jury selection] benefits the

defendant." *Hughes*, 24 S.W.3d at 841 (*citing Janecka*, 739 S.W.2d at 834). Prior to trial,

Mr. Macias and the State agreed that upon reaching 46 qualified jurors, the clerk of court would

provide each side with a list of the qualified jurors on which they would make their peremptory

strikes independently. (*See* Exhibit 23, Agreed Procedure for Jury Selection). Prior to

qualifying 46 jurors, each juror would be individually questioned first by the State, then by

Mr. Macias. (*Id.*). At the conclusion of each individual questioning, the State would raise any

challenges for cause, followed by Mr. Macias if the State's challenge was denied. (*Id.*). The

parties were not to make any peremptory challenges until at least 46 jurors were qualified. (*Id.*).

Questioning was to continue until 46 jurors had been qualified. (*Id.*).

Pursuant to this agreement, upon qualifying 48 jurors, the court summoned all 48 to

ensure they were still able to serve. (RR v66). After excusing two jurors by agreement,

-83-

Mr. Macias exercised nine challenges for cause and made nine requests for additional peremptory strikes with which to strike the challenged jurors. (RR v66 at 12, 15-18). The Court denied each of his challenges and requests. (*Id.*). Mr. Macias then unsuccessfully moved for a new trial, stating that some jurors were not properly qualified during voir dire. (*Id.*). Finally, and pursuant to their agreement, Mr. Macias and the State exercised all fifteen of their peremptory strikes *simultaneously* using two independent lists of the potential jurors provided by the Clerk of the Court. (RR v66 at 26).

Using this flawed procedure, Mr. Macias and the State each exercised a strike on jurors Edmundo Puga and Lucila Menchaca. (Exhibit 24, Petit Venire Listing for January 12, 2005). As a result, Mr. Macias lost two of Mr. Hall's peremptory strikes that would not have been used if Mr. Macias had followed the appropriate procedure.

3. **Mr. Macias's Forfeit of Mr. Hall's Article 35.13 Strategic Advantage in Jury Selection Caused At Least Two Biased Jurors to Serve on the Panel That Delivered The Petitioner's Death Sentence**

The Sixth Amendment guarantees the absolute right to trial by an impartial jury. U.S. CONST. amend. VI; *Neder v. United States*, 527 U.S. 1, 8 (1999) (holding the presence of a biased juror is a structural error "subject to automatic reversal."); *Hatten v. Quarterman*, 570 F.3d 595, 600 (5th Cir. 2009) ("the presence of a biased juror may require a new trial as a remedy"). Texas law grants a capital defendant an unlimited number of challenges for cause to remove a biased juror whose views or beliefs inhibit or prevent him from rendering an impartial decision. Tex. Code. Crim. Pro. art. 35.16; *Adams v. Texas*, 448 U.S. 38, 45 (1980) (finding a juror is biased when his views or beliefs "prevent or substantially impair the performance of his duties as a juror"). "Bias exists as a matter of law when a prospective juror admits that he is

biased for or against a defendant. . . ." *Anderson v. State*, 633 S.W.2d 851, 854 (Tex. Crim. App. 1982).

During his individual voir dire examination, James Griffith repeatedly stated that he was biased in favor of police officers and against gang members.  (RR v15 at 112) ("Well, I think I may be influenced at the beginning, biased toward a police officer . . ."); *see also* (RR v15 at 114-15; RR v16 at 49-50).  Further, Mr. Griffith felt that police officers have "some leeway in obtaining a confession," such that a law enforcement officer is allowed, in his opinion, to "grill the individual" and "put him under pressure" to obtain a confession.  (RR v16 at 46).  He then stated that he would find it very difficult to consider anything less than physical stress as evidence of a coerced confession:

> Mr. McDonald:  the opinions that you have expressed and the opinions that you hold, do you automatically exclude certain types of evidence as showing duress or coercion?  I think you that, because you said that you can't see a situation where someone being continually questioned, you know, would voluntarily confess to something that they didn't do?
>
> Mr. Griffith:  I find it hard to believe, yes.
> Mr. McDonald:  Very hard to believe, wouldn't you?
> Mr. Griffith:  Uh-huh
> Mr. McDonald:  And you really can't -- you really cannot envision any circumstances where that would be adequate evidence of coercion, can you?  And that's your opinion; you're entitled to it.
> Mr. Griffith:  Well, if the guy could show that, you know, three days and three nights he hadn't been able to sleep and he had been given little to eat, that type of thing, continually questioned and what have you, some extreme like that, I would think you would have to consider that that's bordering on physical coercion, you know because he's put under physical stress.

(RR v16 at 46-48).

During the voir dire examination of Mr. Griffith, Mr. Macias asked: "in general, without taking into account what they say, police officers, law enforcement, is going to start out more

credible.  That accurately reflects your opinion?" Mr. Griffith responded "I am not sure you are ever going to get me to admit to that."  (RR v16 at 57).

When the case against a defendant is largely dependent upon the testimony of law enforcement officials, a juror who is biased in favor of police officers is necessarily biased against the defendant.  *Hernandez v. State*, 563 S.W.2d 947 (Tex. Crim. App. 1978).  In *Hernandez*, the CCA found that a juror's "predisposition to believe police officers . . . effectively demonstrated bias against the appellant," where "three of the four State's witnesses were police officers . . . ."  *Id.* at 950 (finding juror's bias "would have prevented her from impartially judging the credibility" of other witnesses where she stated she felt police officers were always truthful).

As in *Hernandez*, the State's case against Mr. Hall was dependent upon the testimony of the three investigation police officers.  Indeed, the State's attorney testified that all six of the State's corroborating witnesses were dispensable. (S.H. Tr. at 17-18).  Because the officers were critical to the State's case and their testimony concerned, in large part, the voluntariness of Mr. Hall's confession, Mr. Griffith's inability to consider anything less than physical force as coercive also necessarily biased him against Mr. Hall.

"When a prospective juror is shown to be biased as a matter of law, he must be excused when challenged . . . ."  *Anderson*, 633 S.W.2d at 854.  "Where the juror states he believes that he can set aside any influences he may have, and the trial court overrules a challenge for cause, its decision will be reviewed in light of all of the answers the prospective juror gives."  *Id.*  Mr. Griffith indicated several times in the record that he was biased in favor of police officers.  (RR v15 at 144-15; RR v16 at 49-50, 60).  Mr. McDonald challenged Mr. Griffith for cause on two occasions on the grounds that his bias in favor of law enforcement prevented him from

A/73401003.1

remaining impartial. (RR v16 at 71; RR v66 at 11-12).  In addition to stating his bias explicitly,

Mr. Griffith alluded to it several times stating, "what I would be afraid of is a juror would sit up

here and make you believe that they would be impartial just to be able to sit on the jury;" and

responding, "I am not sure you are ever going to get me to admit that" when asked whether he

felt law enforcement officials were more credible than other witnesses. (RR v16 at 57, 60).

     Similar to Mr. Griffith, during his individual voir dire, juror Kenneth Sudimack disclosed

a bias which was relevant to the Petitioner's case.  Specifically, he admitted that he was against

life imprisonment for capital defendants accused of murders that he subjectively deemed

"horrific":

| | |
|---|---|
| Mr. Macias: | Now, the fact that you have a problem as a taxpayer with giving someone a roof over their head and three meals a day for doing nothing in return to the state, does that make you predisposed toward the death penalty? |
| Mr. Sudimack: | People like Charles Manson, yes.  That aggravates me that he's, you know, sitting in a jail in California after doing what he did.  Cases like that, yeah, I have a problem supporting him. |
| Mr. Macias: | Is there any difference between who he killed and who someone else kills? |
| Mr. Sudimack: | No. |
| Mr. Macias: | So if -- |
| Mr. Sudimack: | But the circumstances involved in that case were pretty horrific. . . When somebody accidentally kills somebody, I don't necessarily want them to die for it.  It depends on the circumstances.  But in cases like Charles Manson, I don't like paying for that. |

(RR v39 at 101).

     When asked whether that viewpoint left him predisposed to the death penalty,

Mr. Sudimack could not provide a definitive response:

| | |
|---|---|
| Mr. Sudimack: | But my point is this: It depends on the circumstances, okay?  It depends on the circumstances.  You know, I'm not saying everyone that's in jail for murder ought to be, you know, shot because it would save the state a lot of money than keeping them in jail.  I'm saying, in certain cases, obviously headline cases, whatever, I think it's, you know, not a good thing to keep these guys in jail for 40 years at taxpayer expense. |

A/73401003.1

| Mr. Macias: | And what I want to know is, how it affects you, as a juror, that you have that predisposition? |
| Mr. Sudimack: | I don't know.  That's up to you, I guess. |
| Mr. Sudimack: | I don't know what the circumstances of the case are.  I don't think I'm predisposed to saying anybody guilty ought to be -- whatever . . .Killed. |

(RR v39 at 104).

In *Diaz v. Quarterman*, the Fifth Circuit found that despite a juror's assertion that he was able to serve objectively on the panel, he had clearly demonstrated that his religious beliefs would prevent him from being unbiased:

> Although Albrecht may have equivocated about his position on capital punishment . . . he ultimately said that his religious beliefs would cause him to lean against the death penalty and that he would not be able to set aside those beliefs to render a decision based on the evidence.  For all intents and purposes, Albrecht stated that he would not be able to apply the law or view the facts impartially because of his religious beliefs.

*Diaz v. Quarterman*, 228 Fed. App'x 417, 426 (5th Cir. 2007).  Here, Mr. Sudimack ultimately stated that should he find Mr. Hall's murder to be "horrendous" or similar to those committed by Charles Manson, he was predisposed to delivering a death sentence.  Regardless of his own belief that he was able to sit impartially on the jury, Mr. Sudimack's voir dire examination demonstrated that he was not.  While Mr. Macias challenged Mr. Sudimack for cause, the challenge was denied, and the previous forfeit of two peremptory strikes prevented Mr. Macias from removing Mr. Sudimack from the jury.

The record shows juror Griffith's pro-law enforcement bias that limited his ability to follow the law and juror Sudimack's compulsion to return a death sentence based on his subjective view of the crime at issue.  Thus, each of these jurors was biased and should not have served on the jury that delivered Mr. Hall's sentence.  As such, Mr. Hall has suffered harm as he was not tried by an impartial jury, in violation of his Sixth Amendment rights.

-88-

4.    **Mr. Macias Had No Strategic or Reasonable Explanation For Failing To Require That Each Eligible Juror Be Passed for Preemptory Challenge First by the Prosecution As Set Forth In Article 35.13.**

To prove his ineffective assistance of counsel claim, the Petitioner must show that his counsel's performance was deficient and that the Petitioner suffered a substantial harm as a result. *Strickland*, 466 U.S. at 688-89. Where it is apparent from the face of the record that trial counsel's decisions were not the result of any strategic or tactical reasoning, the Court is not required to accept his decisions as reasonable. *Moore*, 194 F. 3d at 604 ("The Court is, therefore, not required . . . to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decisions at all."). The record in this case demonstrates that Mr. Macias's decision to allow the State to conduct simultaneous peremptory strikes was not driven by a tactical or strategic decision, as he did not ever understand the advantages provided by Article 35.13 to make an informed decision to forego them.

It is well settled that Article 35.13 affords capital defendants advantages in voir dire that non-capital challenge procedures do not. *See e.g.*, *Dowthitt v. State*, 931 S.W.2d 244, 251 (Tex. Crim. App. 1996) (listing individual juror voir dire, five additional peremptory strikes as examples of advantages of article 35.13 voir dire procedures); *Janecka*, 739 S.W.2d at 834 ("It can readily be seen that in many respects capital murder defendants have advantages in jury selection not enjoyed by non-capital felony defendants"). Texas courts have allowed for capital defendants to exercise their peremptory strikes retroactively after all jurors have been individually examined on voir dire. *See Bigby*, 892 S.W.2d 864. However, where a defendant exercises challenges unnecessarily and to the advantage of the State, Article 35.13 is violated. *Hughes*, 24 S.W.3d at 841 (finding that where defense counsel exercising a peremptory challenge saves the prosecutors a strike, forcing defendant to use a strike unnecessarily, Article 35.13 is violated and the court must examine for error) (citations omitted).

When asked whether he believed Article 35.13 provided Mr. Hall with an advantage in jury selection, Mr. Macias was adamant that he did not believe that Article 35.13 would have provided the Petitioner with any advantage:

> Q.   But the Code method for conducting a capital voir dire in this instance provides a benefit to the defense, does it not?
> A.   No, it doesn't.
> Q.   So you don't think requiring the State to exercise challenges before the defense is required to is a benefit for that?
> A.   No. I don't think the - - I don't think that the method of choosing a jury in a capital murder case has any benefit to the defendant whatsoever code or no code.
> Q.   Do you think the defendant is disadvantaged no matter how you do it?
> A.   However you do it in a capital murder trial, the fact that they have to be able to impose the death penalty takes away everything as far as I'm concerned an advantage to the defendant. I don't see how you could sit there and say that there is any advantage given to the defendant by the Code here in Texas.
> Q.   Okay. I need to be more specific about that. Let me ask you to imagine a situation in which the Legislature has said that you get to conduct your jury selection and make your strikes the way you like to do and the way that we all do in non death penalty trials by seeing the whole surviving panel and making our strikes. And suppose the Legislature said but in death penalty cases the State has to make all their strikes first and they have to show them to you before you have to make any of yours. Wouldn't you think that would be better for the defendant?
> A.   No let me repeat myself. The fact that the Legislature in Texas has made it that you have to be able to - - that you have to strike those people that can't consider the death penalty gives no advantage to the defendant under any form or shape.

(S.H. Tr. at 115).

When questioned about whether he thought his agreement with the State resulted in the unnecessary loss of two peremptory strikes for Mr. Hall, Mr. Macias further demonstrated his lack of understanding of the implications of his agreement:

> Q.   If you wind up exercising 15 challenges, Mr. Macias, and the State winds up exercising 15 peremptory challenges, and you each exercise five peremptory challenges against the same jurors whether it's a death penalty case or not you're losing five peremptory challenges. If somebody gave them back to you, are you telling me that you wouldn't take them?
> A.   I think you need to go back and look at the challenges and see if there were any double strikes.
> Q.   There were. There were two double strikes in your case.
> A.   Okay.
> Q.   You lost two peremptory challenges.

A/73401003.1

> A.   So I lost two peremptory challenges.
> Q.   If somebody were to give those back you're telling me you'd refuse to take them?
> A.   I don't -- I don't recall if I would have taken those two strikes or not.
> Q.   In other words, what you mean is you don't know whether there were two more jurors on that panel that you would have struck if you had two more strikes to use?
> A.   I don't remember.

(S.H. Tr. at 116-17).

Prior to exercising his peremptory strikes, Mr. Macias challenged nine jurors for cause, all of which the court denied. (RR v66 at 12, 15-18). Mr. Macias also requested a total of nine additional peremptory strikes for each of his challenges for cause that the Court denied. (*Id.*). After being denied additional strikes with which to remove the challenged jurors, Mr. Macias moved for a mistrial, citing his inability to properly voir dire the challenged jurors and generally asserting that all of the jurors were improperly qualified. (RR v66 at 23-24). The trial court denied his motion as well. (*Id.* at 24). On direct appeal, appellate counsel challenged three of the denied challenges for cause, asserting that the trial judge improperly limited the voir dire examination of Gloria Lopez, and that another two, Kenneth Sudimack and James Griffith, were openly biased in favor of law enforcement. *Hall v. State*, No. AP-75, 121, 2007 WL 1847314 (Tex. Crim. App. Jun. 27, 2007). Based on his requests for additional strikes, and subsequent motion for a mistrial, it is reasonable to conclude that if Mr. Macias had been given two additional strikes he would have used them to remove at least two of these three veniremembers. Yet, when pressed on the issue during the state habeas proceeding, Mr. Macias did not offer any plausible tactical reason for deviating from the Article 35.13 requirements:

> A.   The State is always in an advantage in a capital murder --
> Q.   Overall.
> A.   -- proceeding.
> A.   And so I decided to do it the way that I did it, and I don't think I would have changed. And I won't change.

(S.H. Tr. at 118).

The record clearly demonstrates that Macias did not understand the implications of the agreement he was making with the State to forego the Article 35.13 protections and advantages. By exercising two strikes unnecessarily and to the benefit of the State, Mr. Macias deviated from Article 35.13 with no tactical advantage, and hence, prejudiced Mr. Hall by allowing two biased jurors to serve on the jury that sentenced him to death.   This lack of understanding is unreasonable and, when considered within the totality of errors committed by Mr. Macias during both the trial and punishment phase of the trial, constitutes ineffective assistance of counsel.  *See Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999) ("When, as here, the same jury considered guilt and punishment, the question is whether the cumulative errors of counsel rendered the jury's findings, either as to guilt or punishment, unreliable") (*citing Strickland*, 466 U.S. at 687).

I.   **PETITIONER'S DEATH SENTENCE VIOLATES THE SIXTH AMENDMENT BECAUSE TRIAL COUNSEL AGREED TO EXCUSE DEATH-QUALIFIED VENIRE MEMBERS WHO WERE OPPOSED TO CAPITAL PUNISHMENT WITHOUT QUESTIONING THEM.**

A defendant is deprived of effective assistance of counsel when (1) counsel's performance was objectively deficient; and (2) that but for counsel's deficient performance, there is a reasonable probability that "the jury may have answered the special issues submitted in the punishment phase differently." *Moore*, 194 F.3d at 619 (citations omitted); *see also Strickland*, 466 U.S. at 688-89.

Here, Mr. Macias's deficient performance included his decision to excuse, without questioning, all venirepersons who indicated on their juror questionnaire that they were opposed to the death penalty.  This decision was by no means required – the law provides that: "[a] man who opposes the death penalty . . . can make the discretionary judgment entrusted to him . . . and can thus obey the oath he takes as a juror." *Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968). Thus, these veniremen were not *per se* unqualified.

-92-

During the state habeas proceedings, Petitioner's state habeas counsel informed Mr. Macias that because of the number of death-qualified jurors Mr. Macias agreed to excuse, the State did not raise a single challenge to a juror on the grounds they were not death-qualified. When asked whether his decision to excuse the jurors was strategic or tactical decision, Mr. Macias responded that he did not know:

| | |
|---|---|
| Mr. Norris: | Would it surprise you -- would it surprise you to know that during the entire jury selection process lasting about six weeks in this case that the State never made in this case a single challenge against any prospective juror upon the grounds that they couldn't consider the death penalty? |
| Mr. Macias: | I don't remember |
| Mr. Norris: | And that the reason that they didn't was because they didn't have to. And that the reason they didn't have to is because you already had agreed to let those jurors go. Why would you do that? |
| Mr. Macias: | (Indicating) |
| Mr. Norris: | And there were scores of them. Do you recall that in this case that there -- before each mini panel is called in for the day that --that you and Ms. Meraz agreed almost every day -- not every day -- to exclude by agreement certain prospective jurors? |
| Mr. Macias: | Yes. |
| Mr. Norris: | There were some days in which you would agree to exclude all of them and didn't have to do any voir dire that day? |
| Mr. Macias: | I don't -- I don't ever recall doing that. |
| Mr. Norris: | And a lot of those prospective jurors were people who had scruples against the death penalty, who answered one or more of the questionnaire questions in such a way as to make it appear as though they were against the death penalty in some way. And any one of them that was remotely against the death penalty in any way you agreed to exclude . . . Is that typical of every capital case? |
| Mr. Macias: | There is more agreements between myself and some attorneys and there is less agreement between myself and some attorneys. I find it easier to negotiate things with Meraz than I did -- than I do with a person by the name of Dixon. And I find it easier to negotiate things with Meraz than I do with some of the other attorneys in the DA's office. |

-93-

| | |
|---|---|
| Mr. Norris: | Why would you agree to exclude those people?  All you need to do is to get one on the jury who won't put somebody to death, and they're already convinced.  They could convince all 12 of those people.  All you need is one.  And you're going to agree with Ms. Meraz to excuse anybody who remotely has opposition to the death penalty? |
| Mr. Macias: | I think there was some trading going on, if I recall. |
| Mr. Norris: | I'm sure there was. |
| Mr. Macias: | But I don't recall what it was or why. |

(S.H. Tr. at 118-120).  When further questioned about why he excused jurors who indicated they were opposed to the death penalty, Mr. Macias still did not offer an explanation for his decisions, and acknowledged that Mr. Hall should raise his odd conduct on appeal:

| | |
|---|---|
| Mr. Macias: | There were several jurors I said I'm not going to agree to give these up, I want to question them.  Okay?  There were several jurors that I -- we get rid of these.  And she said no, I want to question these, and I said okay. |
| Mr. Norris: | Right. |
| Mr. Macias: | The ones we couldn't get rid of I might get -- you know, I saw these people. |
| Mr. Norris: | All right. |
| Mr. Macias: | And, you know, I decided to give the certain once-over.  And so I gave up certain ones to be able to get further into the panel. |
| Mr. Norris: | Okay. |
| Mr. Norris: | And as a result of that she never -- she never had to challenge for cause on death penalty grounds or a single one of the jurors that you guys have actually venired. |
| Mr. Macias: | Well- |
| Mr. Norris: | It sounds like you did her work for her.  All you needed was one of those guys on the jury and Justin Hall would get a life sentence instead of the death penalty. |
| Mr. Macias: | Put that in the appeal.  I mean you may be right. |
| Mr. Norris: | I wanted your explanation, if you have one. |

-94-

Mr. Macias:   I don't have an explanation.

(S.H. Tr. at 216-17).

Mr. Macias admits that there was no tactical reason or trial strategy that informed his decision to excuse, without questioning, numerous jurors who were opposed to the death penalty, to the detriment of his client. "The Court is, therefore, not required . . . to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decisions at all." *Moore*, 194 F.3d at 604.   Taken in tandem with the fact that Mr. Macias was later denied nine challenges for cause and a motion for a mistrial based on the lack of qualified jurors in the jury panel, it is clear that Mr. Macias made an unreasonable decision in failing to question numerous death-qualified jurors before excusing them.   As a result, Mr. Hall was sentenced to death by a jury unnecessarily containing at least one person biased against life imprisonment.

> **J.   PETITIONER'S SENTENCE OF DEATH VIOLATES THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION BECAUSE TRIAL COUNSEL FAILED TO OBJECT TO THE COURT'S FAILURE TO INSTRUCT NUMEROUS VENIRE MEMBERS AS REQUIRED BY TEXAS CODE OF CRIMINAL PROCEDURE ART. 35.17(2).**

Under Article 35.17(2), a capital trial court must "propound to the entire panel of prospective jurors questions concerning the principles, as applicable to the case on trial, of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion." Tex. Code. Crim. Pro. art. 35.17(2).   A court's failure to administer such questions constitutes reversible error when a capital defendant is denied a federal right as a result.   *See Riles v. McCotter*, 799 F.2d 947, 951 (5th Cir. 1986).   In the instant case, when Judge Woodard took over as presiding judge during voir dire examinations, he did not question the jury regarding the Article 35.17(2) principles before allowing the State and Mr. Macias to proceed with voir

-95-

dire examinations. As a result, at least one juror with questions regarding the principle of reasonable doubt was seated on the jury that delivered Mr. Hall's death sentence.

When trial counsel fails to raise an objection during trial proceedings that results in the defendant being denied a federal right, counsel has violated the *Strickland* standard for ineffective assistance of counsel. *See Tong*, 25 S.W.3d at 712 (addressing ineffective assistance of counsel claim for failure to object to State's mitigation instructions to jury during punishment phase). Generally, if trial counsel's performance is (1) objectively deficient, and (2) the defendant was prejudiced as a result, he has violated the *Strickland* standard. *Strickland*, 466 U.S. at 688-89. Where counsel has failed to object, he violates the *Strickland* standard when the record clearly demonstrates that the decision was not tactical or part of any sound trial strategy. *See Mallet v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001) ("any allegation of ineffectiveness must be firmly founded in the record and must demonstrate the alleged ineffectiveness").

The record demonstrates that Mr. Macias's failure to object to the voir dire proceedings was not based on any tactical or strategic reasoning. Rather, Mr. Macias's belated attempt to move for a mistrial falls far short of the objection that was needed. As a result, at least one unqualified juror was seated on the panel that ultimately delivered Mr. Hall's death sentence.

1.    **Judge Woodard Did Not Comply With the Article 35.17(2) Requirements.**

Article 35.17(2) requires that a court question the entire panel of prospective jurors on the principles of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion, prior to allowing the State and defendant to proceed with voir dire examination. Tex. Code. Crim. Pro. art. 35.17(2) (Vernon 1991). The purpose of voir dire examinations "are to develop rapport between officers of court and jurors, expose juror bias or interest warranting challenge for cause, and elicit information necessary for the defendant to

-96-

intelligently use his peremptory challenges." *S.D.G. v. State*, 936 S.W.2d 371, 380 (Tex. Ct. App. 1996) (citations omitted). While a trial court has discretion in determining how voir dire will run, the exercise of that discretion is "limited by the essential demands of fairness." *Knox v. Collins*, 928 F.2d 657, 661 (5th Cir. 1991). "A voir dire procedure that effectively impairs the defendant's ability to exercise his challenges intelligently is ground for reversal, irrespective of prejudice." *Id.*

In the instant case, Judge Moody was the presiding judge during the initial voir dire examinations. However, shortly after examinations commenced, Judge Woodard served as a substitute judge and presided over much of the remaining voir dire examinations. Judge Moody questioned individual jurors regarding reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion prior to allowing the State and Defense to proceed with their questioning. (RR v8 at 6). Judge Woodard, however, did not engage in any of the questioning called for under Article 35.17(2), and instead allowed the State to proceed with its voir dire examination immediately after each juror was sworn in. (*See* RR vl at 9-66). At no point did Mr. Macias raise an objection regarding Judge Woodward's failure to comply with Article 35.17(2). As a result, at least one juror who did not fully understand the Article 35.17(2) principles of reasonable doubt was seated on the jury panel that delivered Mr. Hall's death sentence. Mr. Macias's failure to object to Judge Woodward's violation of Article 35.17(2) therefore resulted in substantial prejudice to Mr. Hall and violated his Sixth Amendment right to counsel.

-97-

2. **Mr. Macias Had No Tactical or Strategic Reasoning For Failing to Raise An Objection To the Omission of the Article 35.17(2) Requirements.**

When questioned during the state habeas proceedings, Mr. Macias was unable to offer any tactical or strategic reason why he failed to object to the deficient voir proceedings. Indeed, Mr. Macias was unable to recall a single detail regarding the voir dire examination process:

> Q.   Okay. One of the other things I notice about the voir dire in this case is that part of it was conducted by Judge Moody and part of it was conducted by Judge Woodard.
>
> Q.   Judge Moody, when each panel comes in, a mini panel comes in, he goes through the questions and instructions that the Code of Criminal Procedure requires under Article 35.17, I think, but Judge Woodard never does. In fact, not one of the single -- of the mini panels that he presided over in jury selection did he comply with 35.17 Section 2 at all.   Do you recall that?
>
> A.   I don't recall.
>
> Q.   You know that the section of the Code of Criminal Procedure that requires in a capital murder voir dire for the trial judge to first propound questions to the jury and give instructions on certain issues such as reasonable doubt, the death penalty and those things. And then the Court turns them over to the lawyers to conduct the rest of the Code of Criminal Procedure?
>
> A.   Okay.
>
> Q.   Would it surprise you at all that Judge Moody did that every time, but Judge Woodard never once did. Do you remember that?
>
> A.   No.
>
> Q.   Why wouldn't you make an objection? That's a valuable part of the voir dire process, isn't it, including instructions on those things from the Judge?
>
> A.   Perhaps I wanted to instruct them myself. I don't know.
>
> Q.   You didn't think to object and say, Judge Woodard, I would sure like to get you to comply with 35.17?
>
> A.   No.
>
> Q.   Have you got any reason why you didn't do that?
>
> A.   I don't recall whether I did it or not. Obviously, I didn't or you wouldn't be asking about it.

(S.H. Tr. at 120-122).

Mr. Macias used the deficiency of the voir dire proceedings as the basis for nine challenges for cause and two motions for a new trial. (RR v66 at 14-17, 24-25; Exhibit 25, Motion for New Trial). In his oral motion for mistrial, Mr. Macias specifically asserted that the jurors qualified by Judge Moody were "imminently more qualified than those qualified under

-98-

Judge Woodard." (*Id.* at 25). Thus, despite the materiality of the omission of the Article 35.17 safeguards, Mr. Macias could not provide any explanation for his failure to object during the voir dire proceedings.

Further, Mr. Macias exacerbated his failings with a continued lack of diligence. When he orally moved for a mistrial, he stated that he would submit a detailed written memorandum in support of his motion prior to trial. (RR v66 at 24-25). The record does not reflect any written motion or memorandum in support of his oral motion for a new trial filed prior to the commencement of Mr. Hall's trial. Mr. Macias thus failed to follow through and address a clear error on the part of the trial court and his own failure to properly object, although he had an opportunity to do so. This is further and independent evidence of his failure to provide effective assistance of counsel to Mr. Hall and constitutes a violation of Mr. Hall's Sixth Amendment rights.

> 3. **Mr. Hall Suffered Substantial Prejudice From Mr. Macias's Failure to Object Regarding The Improperly Omitted Article 35.17(2) Principles.**

"The object of a voir dire examination of prospective jurors is to cause to be assembled a competent, fair, and impartial and unprejudiced jury to judge the facts of the case. *Yanez v. State*, 677 S.W.2d 62, 65 (Tex. Crim. App. 1986). Mr. Macias's failure to object to Judge Woodard's omission of article 35.17(2) legal principles violated Mr. Hall's right to a trial by a fair and impartial jury because the jurors were not properly instructed.

For example, Judge Moody, who instructed jurors in compliance with Article 35.17(2), provided the following instructions for the principle of reasonable doubt:

> Q.    Then the standard that they have to prove, it is beyond a reasonable doubt. . . .So what is beyond a reasonable doubt?  It's a very difficult term to define.  Most people find it very, very hard to tell you, in words, what is beyond a reasonable doubt.  I kind of compare it sometimes to looking at the flag over here and saying

. . . "Okay, now, does everybody see which part of it is red?"  Okay.  Nobody has any trouble with that.  But if you ask them, okay, "Now define red.  What is red," that's hard.  Because, well, I don't know.  It's red, and I know it when I see it because I know what it is, but I'm not sure I can put it into words. . . .It's somewhat like that with a trial . . . the state has to prove beyond a reasonable doubt the defendant committed this offense.  Okay.  And it's not enough that the state merely shows that the defendant maybe did it, possible did it, even probably did it.  That's not enough.  On the other hand, they don't have to prove that the defendant did it beyond all doubt whatsoever; there is absolutely not one doubt, because that seems beyond a reasonable doubt, not beyond all doubt whatsoever. . . The burden is not impossible for the state.  It's just beyond a reasonable doubt.  It's a term that you will have to define in your own heart, in your own mind.  But when doing it, you can't set it too high so it's impossible for the state.  But, again, you can't set it too low, because then that's not fair to the defense.

(RR v8 at 10-11).

During one of Judge Woodward's examinations, the State, not Judge Woodward, attempted to provide juror Kenneth Sudimack with similar instructions.  The State's attempt, however, left Mr. Sudimack confused and without a clear understanding of the definition and scope of "reasonable doubt":

Q.   Reasonable doubt is the highest level.  Now, the problem is, I can't define that for you, okay?

A.   Uh-huh.

Q.   I can tell you what it's not.  I just cant' tell you what it is.  It is not beyond all doubt.  It is not beyond a shadow of a doubt.  It's beyond a reasonable doubt.  And if you have a reasonable doubt, that doubt has to be based on the evidence and the law in front of you.  It can't be on something that's kind of in the back of your head or a what-if or something like that.  Has to be based on the evidence in front of you, right?

A.   But you can't come up with an example of beyond a reasonable doubt?  There is no definition in a law book or anything?

Q.   That's right.  It's kind of a you know it when you see it.  I mean, I can give you an example.

Q.   But if I ask you to define "black," well how do you define "black?"

Q.   Darker than dark, dark, dark, dark gray.  You know, you could it, maybe, but it's going to be difficult.

Q.   Well it's kind of the same thing with beyond a reasonable doubt.  You will know it when you get there.

Q.   You, as the juror, have to define what beyond a reasonable doubt means to you, and I can only tell you what it's not, what it isn't.  What it is to you is what it is.

-100-

(RR v39 at 73-74). Mr. Macias objected and asked the court to provide the juror with a proper

definition of reasonable doubt, but was unsuccessful:

> Mr. Macias:    Your Honor, I would object at this point. I think the juror asked a
> question, and I think it has to be answered for him truthfully. On the
> federal side, there is a definition of what "reasonable doubt" is.
>
> Mr. Hicks:    Your Honor, I'm going to object. This is not the federal side. This is the
> State of Texas.
>
> Mr. Macias:    We don't have it anymore. You need to tell him that.
>
> The Court:    Reasonable doubt means reasonable doubt.

(RR v39 at 75).

To a juror such as Mr. Sudimack, who had sincere and important questions that would

have been covered by Article 35.17(2) safeguards, the State's view of "reasonable doubt" should

not be given the same weight as Article 35.17(2) principles properly covered by the Court.

Instead of fulfilling his Article 35.17 responsibilities, Judge Woodard provided Mr. Sudimack

with a non-responsive definition that "reasonable doubt means reasonable doubt," failing to

provide the clarity needed and reasonably requested by Mr. Sudimack.

The Court's failure to administer the Article 35.17(2) requirements constituted reversible

error as an unqualified juror served on the panel that delivered Mr. Hall's death sentence,

violating Mr. Hall's Sixth Amendment right to trial by an impartial juror. The denial of this

federal right was a direct result of Judge Woodard's omissions. Mr. Hall was further prejudiced

by his trial counsel's failure to object to this glaring omission.

A/73401003.1

## V.    PRAYER FOR RELIEF

WHEREFORE, Justen Grant Hall prays that this Court:

1.    Issue a writ of habeas corpus that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death;

2.    Grant him further discovery and an evidentiary hearing at which he may present evidence in support of his claims, and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct, in which to brief the issues of fact and law raised by this Petition or such hearing;

3.    Direct that, under Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts, the record in this case be expanded to include the "additional materials relevant to the determination of the merits of the petition" which are found in the volume of exhibits filed with this Petition; and

4.    Grant such other relief as law and justice require.

Dated: June 10, 2010

By: _____

Kathryn M. Kase, Member of the Bar of this Court
Texas Defender Service
1927 Blodgett
Houston, TX 77004
Phone: 713.222.7788
Fax: 713.222.0260

William S.D. Cravens, admitted *pro hac vice*
Goutam Patnaik, admitted *pro hac vice*
Bingham McCutchen, LLP
2020 K Street NW
Washington, DC 20002
Phone: 202.373.6000
Fax: 202.373.6001

Counsel for Petitioner Justen Grant Hall

-102-

A/73401003.1

<u>VERIFICATION</u>

I, William S.D. Cravens, attorney for Petitioner in the above-entitled action, state that to the best of my knowledge and belief, the facts set forth in this Petition are true.  I declare under penalty of perjury that the foregoing is true and correct. Executed on June 10, 2010

William S.D. Cravens

A/73401651.1

# CERTIFICATE OF SERVICE

I, Stephanie J. Brett, HEREBY CERTIFY that on this 10th day of June, 2010, copies of the foregoing Brief in Support of Petition for Habeas Corpus were served upon the following parties as indicated:

**Via Federal Express:**

| | |
|---|---|
| **Thomas M. Jones** | 1 Copy |
| Assistant Attorney General | |
| Postconviction Litigation Division | |
| P.O. Box 12548 | |
| Capitol Station | |
| Austin, TX 78711 | |
| Phone: 512/936-1400 | |
| Fax: 512/936-1280 | |
| Email: thomas.jones@oag.state.tx.us | |
| *LEAD ATTORNEY* | |

| | |
|---|---|
| **Edward L. Marshall** | 1 Copy |
| Assistant Attorney General | |
| State of Texas | |
| P.O. Box 12548 | |
| Capitol Station | |
| Austin, TX 78711-2548 | |
| (512) 936-1400 | |
| Fax: (512) 936-1280 | |
| Email: edward.marshall@oag.state.tx.us | |

Stephanie J. Brett

A/73401651.1