# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| JUSTEN HALL, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIV. ACTION NO.: |
| | § | |
| RICK THALER, | § | 3:10-cv-00135-FM |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

**[PROPOSED] AMENDMENT TO
PETITION FOR WRIT OF HABEAS CORPUS**

Case 3:10-cv-00135-FM   Document 45-5   Filed 08/11/11   Page 3 of 49

Petitioner Justen Grant Hall hereby amends his petition for a writ of habeas to add the following:

## IV.   ARGUMENT

### A.   PETITIONER'S RIGHTS UNDER THE FOURTEENTH AMENDMENT WERE VIOLATED BY THE STATE'S MISCOUNDUCT IN FAILING TO DISCLOSE MATERIAL EVIDENCE FAVORABLE TO HIM IN VIOLATION OF *BRADY*

#### 3.   The State's Misconduct In Failing To Disclose *Brady* Evidence Requires That Petitioner Be Granted A New Trial

##### c.   Newly Obtained Evidence Reveals The Existence Of Previously Undisclosed *Brady* Evidence Including An Offer Of Immunity To A Key Witness

A defendant's due process is violated whenever the prosecution suppresses evidence favorable to the accused where such evidence is material to either guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 83 S. Ct. 1194 (1963). In order to prevail on a *Brady* claim, the petitioner must show that 1) the evidence at issue is favorable to the accused, either because it is exculpatory, or because it is impeaching; 2) the evidence must have been suppressed by the State either willfully or inadvertently; and 3) prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936 (1999).[1]

Petitioner made a Motion for Discovery and Inspection (the "Motion") prior to the trial in which he asked the trial court to compel the District Attorney to produce evidence which would serve to impeach any potential prosecution witness, including evidence of "deals, agreements, offers of immunity, or the like given or offered to any witness or potential witness," which the State was in the possession of at the time the Motion was filed or learned of in the future. (*See* Exhibit A -

---

[1] A more detailed analysis of the *Brady* doctrine was included in the Petitioner's Memorandum in Support Of Petition For Writ Of Habeas Corpus filed on June 10, 2010, Doc. No. 28 at pp. 18 - 20.

Motion for Discovery and Inspection at ¶¶15-16).  The State failed to produce evidence of any immunity agreements, either written or tacit, in response to Petitioner's motion. The State also failed to produce impeachment evidence with respect to the testimony of one of its' key witnesses, Jesse Eddy; namely that Mr. Eddy, after informing the detectives he had no independent recollection of the events that took place on October 28, 2002, the night the victim was killed, was pressured by the police to provide a written statement that was based solely on the statements of other witnesses.

Under the first prong of a *Brady* analysis, the evidence was certainly favorable to the Petitioner.  Mr. Eddy has provided a sworn affidavit disclosing that he was promised by the prosecutors that he would not be charged in connection with his illegal activities provided that he testified in accordance with his signed statement. (Exhibit B - Jesse Eddy Affidavit at ¶11).  Mr. Eddy also reveals that he had disclosed to detectives while in custody that he had no independent recollection of the events of the night of October 28, 2002, and his signed statement was actually based on the statements of other witnesses the detectives had collected prior to interrogating him. (*Id.* at ¶¶ 2, 6, 7). Further, Mr. Eddy discloses that he signed a document which was described to him as an immunity agreement, a document that has never been produced by the State. (*Id.* at ¶11).

Under the second prong of *Brady*, the evidence was never disclosed to the Petitioner.  Mr. Eddy's sworn affidavit is the first time the existence of an offer of immunity has been acknowledged. "Draft" immunity agreements were discovered by the Petitioner well after the conclusion of the trial. (S.H. Tr. at 130).  When confronted with the existence of the immunity agreements, Assistant District Attorney Meraz, the lead prosecutor at the Petitioner's trial, testified that the agreements were prepared in case one of the witnesses tried to "wiggle out" of their testimony.[2] (S.H. Tr. at

---

[2] Ms. Meraz also testified during the state habeas hearing in July 2008: "I know from the get-go we told [the witnesses] that we weren't going to make any deals that we were interested in them just testifying truthfully, *but as far as any deals*

-2-

Case 3:10-cv-00135-FM   Document 45-5   Filed 08/11/11   Page 5 of 49

131). Ms. Meraz further testified that she did not believe the prosecution team spoke with El Paso District Attorney Jaime Esparza about the immunity agreements *despite Mr. Esparza having signed Jesse Eddy's immunity agreement.* (*Id.*) (Exhibit C - State's Motion to Grant Limited Use Immunity, Order Granting Limited Use Immunity, and Agreement For Honest Testimony). The combination of the fact that the State's files contained a written immunity agreement for Mr. Eddy signed by District Attorney Esparza and that Mr. Eddy states that he signed a document which he was told was an immunity agreement undermines confidence in the jury's verdict.

The Petitioner has raised the possible existence of immunity agreements since prior to the start of the trial in 2005, but the State has consistently denied the existence of any written or tacit offers of immunity, even when faced with a copy of the Jesse Eddy "draft" immunity agreement signed by the El Paso District Attorney. (S.H. Tr. at 131). At every turn of the proceedings, the State has failed to disclose any offers of immunity, despite being obligated to do so. The State did not produce the draft immunity agreements in response to Petitioner's pre-trial motion, did not disclose the existence of any tacit offers, and ADA Meraz testified that no immunity agreements existed.[3]

---

*we weren't cutting any."* (S.H. Tr. At 102) (emphasis added).

[3] With respect to Mr. Eddy, Ms. Meraz testified:

Q:   Now, when [Jesse Eddy] came in to speak with you, did he have any concern about his charges? What was his attitude that day?

A:   Actually, I -- he didn't seem very -- very concerned. He was willing to -- to testify.

...

Q:   ...And he didn't bring up with you the fact that he was worried about some of his current charges?

A:   No.

Q:   He didn't ask you whether he could do anything about that?

A:   No.

S.H. Tr. at 18-19.

-3-

Case 3:10-cv-00135-FM   Document 45-5   Filed 08/11/11   Page 6 of 49

The State also failed to disclose that Mr. Eddy told the detectives that he had no independent recollection of the events of the night of October 28, 2002, and that the written statement he was pressured by the police into making was really just a combination of other witness statements. In fact, Mr. Eddy answered "yes" to a question from the prosecutor as to whether he remembered the day of October 28, 2002 followed by 10 pages of additional testimony recalling intimate details of the events of that evening. (RRv73 at 138 - 147).

Under the third prong of *Brady*, the withheld evidence was material and the State's failure to disclose it prejudiced the Petitioner. Had the State disclosed the existence of a deal offered to Mr. Eddy in response to the Petitioner's Motion for Discovery and Inspection, the defense would have been able to impeach the credibility of Mr. Eddy before the jury. The jury would have learned that Mr. Eddy was testifying under a belief that he had either a written or tacit grant of immunity from prosecution for the felonies he admitted to committing under oath. The jury would have had the opportunity to weigh the veracity of Mr. Eddy's testimony in light of the existence of the offer of immunity, taking into account the fact that if he waivered slightly from his prior statement, the State would have most likely brought felony charges against him in connection with his alleged use, manufacturing and distribution of methamphetamine.

In addition, if the State had revealed to the Petitioner that Mr. Eddy's written statement was actually based on written statements other witnesses had provided the El Paso Police, Mr. Eddy's testimony about the events of the night of October 28, 2002 would never have been presented to the jury, or at least would have been subject to rigorous cross-examination with the full context of Mr. Eddy's statement at Petitioner counsel's disposal. Mr. Eddy provided key testimony that the Petitioner called a meeting on the evening of October 28 to decide how to handle Ms. Billhartz (*Id.*

-4-

at 141) and that he heard the Petitioner state that he was going to kill Ms. Billhartz during that meeting. (*Id.* at 143).

Mr. Eddy disclosed in his affidavit that the reason he has no independent recollection was due to the fact that he was "under the influence of methamphetamine at the time." (Eddy Affidavit at ¶2). If the State had disclosed the fact that Mr. Eddy had told the detectives that he was not able to independently recall events during this time period, the jury would have most likely doubted Mr. Eddy's testimony related to that night and surrounding events, including that he later saw the Petitioner driving Ms. Billhartz's pickup truck after the Petitioner told him he purchased the truck from Ms. Billhartz. (*Id.* at 147-48).

There is more than a reasonable probability that had the State's offer of immunity to Mr. Eddy been disclosed, and Mr. Eddy's testimony about the night of October 28, 2002 never been presented to the jury or properly put into doubt, the result of the Petitioner's trial would have been different. *Kyles v. Whitely*, 514 U.S. 419, 434 (1995) This showing "does not require demonstration by a preponderance of the evidence that disclosure of the suppressed evidence would have ultimately resulted in the defendant's acquittal." *Id., citing United States v. Bagley*, 473 U.S. 667, 682 (U.S.). "A 'reasonable probability of a different result' is shown when the suppression 'undermines confidence in the outcome of the trial.'" *Graves v. Dretke*, 442 F.3d 334, 340 (5th Cir. 2006) (*quoting Kyles*, 514 U.S. at 434). The State's failure to disclose the immunity deal and its withholding of the fact that Mr. Eddy's written statement (and subsequent testimony) was actually an amalgamation of other witness statements, and not his own independent recollection of events, greatly undermines confidence in the verdict.

A/74466651.2

The existence of any offer of immunity was also material to the jury. Irene Rodriguez, one of the jurors who served during the Petitioner's trial, gave a sworn declaration in which she stated, "I would have liked to know whether any of [the witnesses] had been offered deals in exchange for testifying. If they had been, *that wouldn't have made them very credible* because it would have shown that they were testifying for their own personal gain." (Exhibit D - Declaration of Irene Rodriguez at 2) (emphasis added).

Mr. Eddy's arrangement raises the probability that other key witnesses were provided similar promises of immunity in exchange for their testimony. For instance, a draft immunity agreement for Ted Murgatroyd was discovered in the District Attorney's files after the trial. (*See* Exhibit E - State's Motion to Grant Limited Use Immunity, Order Granting Limited Use Immunity, and Agreement For Honest Testimony for Ted Murgatroyd). Mr. Murgatroyd admitted under oath to chopping off the victim's fingers with a machete. (RRv72 at 31). Mr. Murgatroyd also stated under oath that he was not testifying pursuant to an immunity agreement, yet he still acknowledged that he was facing potential charges in New Mexico for mutilating a body, as well as in Texas for tampering with evidence.[4] (*Id.* at 38). Similar to Mr. Eddy, Mr. Murgatroyd was *never* charged for either of those felonies, despite his sworn admissions. Despite ongoing efforts, Petitioner has been unable to locate Mr. Murgatroyd to date.

---

[4] Assistant District Attorney Meraz was the prosecutor who was weighing whether to bring felony charges against Mr. Murgatroyd for tampering with evidence at the time he took the stand in the Petitioner's trial. (S.H. Tr. at 110). Mr. Murgatroyd acknowledged on the stand that he could face "two to ten" years in prison on those charges. (RR v72 at 38).

Mr. Murgatryod's agreement offered him immunity for "possible offenses and lesser included offenses committed during the months of September, October, and November, 2002, including narcotic possession, consumption, and distribution *or tampering with physical evidence as a party*." (Murgatroyd Agreement for Honest Testimony at ¶ 1.) (emphasis added.)

A/74466651.2

Case 3:10-cv-00135-FM   Document 45-5   Filed 08/11/11   Page 9 of 49

The proper inquiry under *Brady* requires that the evidence be favorable to the defendant and that the net effect of all of the favorable evidence reasonably undermine confidence in the verdict. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Kyles*, 514 U.S. at 435-437 (court should consider the suppressed evidence collectively rather than judging materiality of each item of suppressed evidence). In addition to the *Brady* evidence withheld by the State as described in Petitioner's Memorandum in Support Of Petition For Writ Of Habeas Corpus filed on June 10, 2010 (Docket No. 28), the disclosure of the offer of immunity made to Mr. Eddy adds to the net effect of favorable evidence. This evidence, considered in combination with the State's failure to reveal that Mr. Eddy was pressured by detectives into giving a written statement based on the statement of other witnesses rather than his own independent recollection, reasonably undermines confidence in the verdict. As such, the Petitioner is entitled to a new trial.

> **d.     Mr. Eddy's Misleading Testimony, Left Uncorrected By The State, Resulted In A Violation of *Giglio* Entitling Petitioner To A New Trial**

The state denies a criminal defendant due process when it either uses perjured testimony during the trial or if the state allows untrue testimony to go uncorrected. *United States v. Barham*, 595 F.2d 231, 241-42 (5th Cir. 1979). The prohibition against the use of false testimony extends to cases where the false testimony was limited to the credibility of the witness. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173. 1177 (1959)("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.") The Fifth Circuit has explained that in order to prevail on a *Napue* claim, the petitioner must show: (1) the testimony was actually false; (2) the prosecution knew or should have known that the

-7-

testimony was false; and (3) the false testimony was material. *Reed v. Quarterman*, 504 F. 3d 465, 473 (5th Cir. 2007).

The Court in *Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 766 (1972) set forth the standard that controls when the state uses perjured testimony: "A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury." The Fifth Circuit has further elaborated upon that standard in stating, "[t]he reviewing court must focus on the impact on the jury. A new trial is necessary when there is any reasonable likelihood that disclosure of the truth would have affected the judgment of the jury." *United States v. Anderson*, 574 F.2d 1347, 1356 (5th Cir. 1978) The Fifth Circuit further explained that the "reasonable likelihood" standard of materiality when examining a *Giglio* claim is a "low threshold" standard. *Id.* at 1355.

In the present case, a key witness for the State has disclosed that he was testifying pursuant to a previously undisclosed offer of immunity. At trial, Assistant District Attorney Hicks engaged in the following exchange with Mr. Eddy in the presence of the jury:

> Q:   Mr. Eddy, have -- do you -- has anyone made any deals to you on behalf of --
> A:   No, sir.
> Q:   -- in exchange for your testimony?
> A:   No, sir.
> Q:   Are you expecting any kind of leniency or anything else in regards to testifying here?
> A:   No, sir.

(RR v73 at 135). Mr. Eddy, in his recently obtained sworn affidavit, disclosed that the State told him *prior* to the trial that he would not "get in trouble with other charges, including drug-related charges involving the house on Melody." (Affidavit of Jesse Eddy at ¶ 11). Mr. Eddy also disclosed in his affidavit that "[t]hey also asked me to sign a document that I understood was an immunity agreement, and I did sign the document." (*Id.*)

During the closing argument, Petitioner's counsel, Mr. McDonald, stated:

-8-

> I don't know how the prosecution can stand here and tell you that those people got no benefit. Yeah, they can stand here and tell you there was no written agreement, because then we would have a copy of that written agreement. Everyone of those people who testified got a benefit. Somebody -- some of them didn't take advantage of it, because they kept doing crimes thereafter.

(RR 79 at 50). Ms. Meraz proceeded to object, stating "there is no evidence whatsoever about what he's talking about right now." (*Id.*) Whatever document Mr. Eddy did sign, Mr. Eddy believed it to be an immunity agreement and he proceeded to testify for the State under that belief. Mr. Eddy's belief was apparently well-founded since he was never charged in connection with any of the crimes he admitted to under oath. [5]

Under the first factor set forth in *Reed v. Quarterman*, Mr. Eddy's affidavit demonstrates that his testimony at trial was indeed false. Mr. Eddy confirms that despite his denial in the presence of the jury that he was not testifying pursuant to an immunity agreement, he believed that the State had in fact promised not to prosecute him "with other charges, including the drug-related charges involving the house on Melody." (Eddy Affidavit at ¶ 11). Mr. Eddy's affidavit also reveals that he had no independent recollection of the events which took place on the evening of October 28, 2002. (*Id.* at ¶2) Despite this complete lack of memory, Mr. Eddy testified that he recalled October 28, 2002 and proceeded to testify in detail about those events based on what he read in other witness statements the detectives showed him. (RRv73, pp. 138-147, Eddy Affidavit at ¶¶ 2, 6, 7).   Mr. Eddy's false testimony satisfies the first prong of *Reed*.

---

[5] Mr. Eddy testified at trial under oath that he was "cooking methamphetamine, making it, dealing it." (RR v73 at 138). Mr. Eddy further testified that he was cooking methamphetamine for Ms. Billhartz and Mr. Murgaroyd the night Ms. Billhartz was murdered. (*Id.* at 160). Mr. Eddy's "draft" immunity agreement specifically referenced "the offenses committed during the months of September, October, and November 2002, involving narcotic possession, consumption and distribution," *the same offenses which he testified under oath to.* (*See* Agreement For Honest Testimony - Jesse Eddy at ¶ 1.)

-9-

Under the second *Reed* factor, the prosecution knew that the testimony was false. Even if Mr. Hicks was not the prosecutor who offered Mr. Eddy the immunity deal, the promise is nonetheless attributed to the State regardless of who made it. *See Giglio*, 405 U.S. at 153;  *see also Ex Parte Adams*, 768 S.W.2d 281, 292 (Tex. Crim. App. 1989)(citing *Giglio* in recognizing that the Supreme Court has endorsed the imputation of knowledge, at least from one prosecutor to another). Ms. Meraz also objected during the closing arguments to Mr. McDonald's statement that some type of deal was offered, further compounding the State's deception. (RR 79 at 50)  Knowledge of any offer of immunity was similarly imputed to Ms. Meraz regardless of whether or not she made the offer to Mr. Eddy.

According to Mr. Eddy's affidavit, the police were also aware that Mr. Eddy had no independent recollection of the events of October 28, 2002, and pressured him into providing the witness statement based on the statement of other witnesses. (Eddy Affidavit at ¶¶ 6, 7).  The prosecution is required to disclose any evidence favorable to the defense known to the police and failure to do so results in a *Brady* violation. *See, e.g., Kyles*, 514 U.S. at 438 ("the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in this case, including the police.); *Strickler v. Greene* , 527 U.S. 263, 280-81 (1999) ("moreover, the rule encompasses evidence 'known only to police investigators and not to the prosecutor'); *Freeman v. Georgia*, 599 F.2d 65, 69-70 (5th Cir. 1979)(imputing the police's conduct to the prosecution and stating that even where evidence is withheld from the prosecution, the state's failure to disclose is still not excused.)  As such, the State had imputed knowledge that Mr. Eddy's testimony was false, thereby satisfying the second prong of *Reed*.

A/74466651.2

Under the third *Reed* factor, the false testimony was unquestionably material to the jury. One of the jurors at the Petitioner's trial has explicitly stated that the existence of the immunity agreement would have been material to her.  Juror Irene Rodriguez gave a sworn declaration in which she stated had she known of any immunity agreements, she would have questioned the credibility of the witness knowing they were testifying for their own personal gain. (Declaration of Irene Rodriguez at ¶ 11).

Mr. Eddy was a key State witness who testified that he heard the Petitioner say that he was going to kill Ms. Billhartz. (RR v73 at 143). Mr. Eddy also testified that the Petitioner was the "District Captain" in the Aryan Circle (*id*. at 137); that the Petitioner called a meeting to discuss how to handle Ms. Billhartz (*Id*. at 141); that he told Ms. Billhartz she should leave, presumably based on his "knowledge" that the Petitioner had allegedly decided to kill her (*id*. at 146); and that he later saw the Petitioner driving Ms. Billhartz's truck which the Petitioner told him he purchased from Ms. Billhartz (*id*. at 147-48).  Mr. Eddy's testimony was instrumental to the State in obtaining the Petitioner's conviction. [6]

Mr. Eddy's sworn affidavit now reveals that not only was he testifying pursuant to an undisclosed offer of immunity, but that he also had no independent recollection of the events of the night Ms. Billhartz was killed because he was under the influence of methamphetamine. (Eddy Affidavit at ¶ 2, 11). Mr. Eddy's affidavit further reveals that the El Paso detective "suggested that I

---

[6] Mr. Eddy's sworn affidavit stating that his witness statement was a combination of other witness statements the detectives showed him and that he had no independent recollection of the events of October 28, 2002 may also explain the inconsistencies between Detective Cooper's notes from his November 25, 2002 interview (Exhibit F - Det. Cooper Incident Supplement, January 2, 2003) , Mr. Eddy's witness statement given during that interview (Exhibit G - Jesse Eddy Witness Statement), and the testimony Mr. Eddy gave at trial.

For example, Detective Cooper's notes from the witness interview state that Mr. Eddy walked past Ms. Billhartz but did not say anything to her. During his testimony, Mr. Eddy stated that he told Ms. Billhartz to leave. (RR v73 at 146).

A/74466651.2

should say the same things [as reflected in the other witness statements the detective had already

gathered] in [Eddy's] statement if [Eddy] wanted to avoid charges involving the murder of Melanie

Billhartz." (Eddy Affidavit at ¶ 6).  Mr. Eddy reveals that he made his witness statement "based

solely on the statements of other witnesses, and not based on any independent memory [Eddy] had of

what happened on October 28, 2002, or of any statements made to [Eddy] that night."  (Eddy

Affidavit at ¶ 7).

The existence of offer of immunity made to Mr. Eddy's and the State's suppression of the

fact that Mr. Eddy had no independent recollection of events and based his testimony of the

statements of other witnesses, is, in the words of the Supreme Court, "a corruption of the truth-

seeking function of the trial process." *United States v. Agurs,* 427 U.S. 97, 103 (1975).  The

Petitioner has met the "low threshold" standard described in *United States v. Anderson*, 574 F. 2d at

1356, in showing that there is a reasonable likelihood the false testimony left uncorrected by the

State affected the judgment of the jury.  As such, Petitioner is entitled to a new trial.


Dated:



By: _____

Kathryn M. Kase, Member of the Bar of this Court
Texas Defender Service
1927 Blodgett
Houston, TX 77004
Phone: 713.222.7788
Fax: 713.222.0260

William S.D. Cravens, admitted *pro hac vice*
Bingham McCutchen, LLP
2020 K Street NW

-12-

Washington, DC 20002
Phone: 202.373.6000
Fax: 202.373.6001

Goutam Patnaik, admitted *pro hac vice*
Pepper Hamilton LLP
600 Fourteenth Street, N.W.
Washington, D.C. 20005-2005
Phone: 202.220.1200
Fax: 202.220.1665

Counsel for Petitioner Justen Grant Hall

-13-

# EXHIBIT A

Jan 06 05 12:06p     Mc~~nald & Associates        91    42706           p.2

2005 JAN 6 PM 2 13

IN THE DISTRICT COURT OF EL PASO COUNTY, TEXAS
34TH JUDICIAL DISTRICT

BY

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | |
| v. | § | Cause No. 20030D00505 |
| | § | |
| JUSTEN GRANT HALL | § | |

## MOTION FOR DISCOVERY AND INSPECTION

The Accused, by and through his attorney of record, moves the Court for discovery and

inspection of the following items in the possession or control of the District Attorney:

1.     The name of all tests and scientific tests or examinations conducted with regard to this case,

including the following:

      (a)     Name of test.

      (b)   . Identify the party or parties performing the test by name, rank, home address, work
            phone number and present assignment.

      (c)     Supply a clear copy of the test examination report and all the papers, work sheets and
            notes (including bench notes) upon which it is based.

      (d)     A sample of the item tested so that the same can be examined by the defense experts.

2.     Accused demands the right to examine all physical property taken from his possession

whether by warrant or otherwise.

3.     Accused demands the right to examine all eavesdropping, recording, audiovisual or other

electronic devises used in the investigation and surveillance undertaken in this case.

4.     Accused demands an accurate and clear copy of all videotapes and sound recordings made in

this case.

5.     Accused demands copies of any statements made by him, or attributed to him whether

recorded or transcribed, written or oral, verbatim or summarized.

1

Jan 06 05 12:07p      McDonald & Associates        91!   42706              p.3

6.      Accused demands clear copies of all wiretap or eavesdropping warrants together with all

documents, memorandum and affidavits upon which they are based.

7.      Accused demands the names and present addresses of all persons who would qualify as

competent witnesses if called, whether or not the prosecution intends to call them as witnesses.

8.      Accused demands copies of all police memoranda, memo books, logs and any and all other

reports of all investigations carried on with respect to this case.

9.      Accused demands to be informed of the name, rank, shield number, home address and work

phone number and present assignments of all law enforcement personnel assigned to this case.

10.     Accused demands a copy of the personnel records of each of the above named individuals, or

in the alternative that same records be turned over to the Court for examination, in camera, to

determine what information contained therein would be relevant or material to the defense.

11.     Accused demands copies of the statements given to any law enforcement agents by witnesses

to any of the acts set forth in the indictment.

12.     Accused demands the names of any and all experts who have been consulted in this matter by

the prosecution whether or not said expert will be called as a state's witness during the trial or this

matter.

13.     Accused demands the El Paso County Sheriff's Department, the El Paso County District

Attorney, El Paso Police Department, and other state and county agency's vouchers, cash receipts,

statement or any other documents indicating payments to any person, officer, expert, or witness

involved in this case.

14.     Accused demands the transcript of testimony given by all witnesses before the Grand Jury

during its investigation and consideration of the charges contained in the indictment returned in this

cause, whether or not the state intends to call such person as a witness at the trial.

2

Jan 06 05 12:07p      McDonald & Associates        91!   42706                      p.4

15.   Any and all evidence of whatever form, source, or motive which tends to exculpate the

Accused either through an indication of the Accused's innocence or through the impeachment of any

potential prosecution witness, and all information of whatever form, source or nature which may

lead to evidence which tends to exculpate the Accused whether by indicating his innocence or

impeaching the credibility of any potential prosecution witness, and any other information which

may be or become of benefit to the Accused in preparing or presenting his defense of innocence at

trial. This request includes any such evidence or information now in possession of the state, or which

comes into possession of the state in the future, or which the state now has knowledge or in the

future obtains knowledge.

16.   Copies of any deals, agreements, offers of immunity, or the like given or offered to any

witness or potential witness.

17.   Copies of all toxicological examinations conducted with regard to this case.

18.   Copies of all serological examinations conducted during the investigation of the   crime

charged in the indictment returned in this cause.

19.   The manner of, type of and results of all laboratory examinations conducted with regard to

this case including but not limited to the results of all tests conducted on the clothing of the Accused

or of the deceased, the body of the deceased, and/or at the scene of the crime and/or upon any items

found at the scene of the crime.

20.   All of the items sought are both necessary and material to the preparation of the defense of

this case. The requests are authorized by the Fifth, Sixth, Eighth and Fourteenth Amendments to

the Constitution of the United States,  Article 39.14 of the Texas Code of Criminal Procedure, and

*Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *United States v. Bagley*,

473 U.S. 667 , 105 S.Ct. 3375, 87 L.Ed. 2d 481 (1985).

3

Jan 06 05 12:07p        Mc⌐⌐ald & Associates        91'   42706                   p.5

21.    Once the prosecution presents all of the requested items it can then be determined what will

be relevant and admissible as direct evidence, or for the purposes of impeachment. The Court,

prosecution, and perhaps the defense, cannot at this time decide what may be useful, relevant, or

admissible.

22.    Justification for discovery and inspection stands or falls on the equitable determination of

whether it makes the truth easier to determine or gives a party an advantage. Justification for

discovery and inspection must be viewed from the former standpoint.

23.    A criminal trial like a civil trial is a quest for the truth.  That quest will more often be

successful if both sides have an equal opportunity to interview the persons who have the information

from which the truth may be determined. The current tendency, and the better reasoned approach,

dictates complete discovery of the facts before the trial and the elimination of surprise at the trial.

The Accused should be given all discovery to which he would be entitled if he were a civil litigant.

Any denial of discovery to this Accused on the grounds that the criminal rules of discovery are not

as broad as the civil rules of discovery is a violation of of the Accused=s rights under the due

process and equal protection clauses of the United States Constitution.

25.    Without the requested discovery and inspection the Accused will be deprived of his

right to due process under the Fourteenth Amendment to the Constitution and the effective

assistance of counsel under the Sixth Amendment to the Constitution of the United States, and his

similar rights under the Texas Constitution.

WHEREFORE, it is respectfully requested that the relief sought herein be in all respects

granted, together with such other and further relief as may be just and proper.

Dated: January ____, 2004.                    Respectfully submitted,

                                              FRANCISCO F. MACIAS

4

Jan 06 05 12:07p        McDonald & Associates        91' 42706        p.6

CHARLES E. McDONALD
106 Santo Ysidro
Santa Teresa, NM 88008
(915) 545-2300 - phone
(915) 544-2706 – fax
State Bar No. 13538200
Attorneys for the Accused

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing motion was faxed to Diana Meraz, Assistant District Attorney's Office, 500 E. San Antonio, Room 201, El Paso, Texas via telephone number 533-5520 on January 6, 2005.

Charles E. McDonald.

5

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| JUSTEN GRANT HALL, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIV. ACTION NO.: 3:10-cv-00135-FM |
| | § | |
| RICK THALER, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

### AFFIDAVIT OF JESSE EDDY

1.      My name is Jesse Eddy.  I am currently incarcerated in the Marion County Jail in Indianapolis, Indiana.  My prison identification number is P00642595.

2.      I have no independent memory of any of the events that occurred on the night of October 28, 2002.  I know that I was at the house at 5608 Melody in El Paso, Texas that night, but I do not recall any of the events that occurred or any statements made to me that night because I was under the influence of methamphetamine at the time.

3.      When Justen Hall and I were arrested near Plainview, Texas approximately one month later, on November 23, 2002, we had both been using methamphetamine continuously for several weeks and had just run out of drugs so we had hit bottom physically and mentally.  We had not slept for days, which is why we had just pulled off on the side of the road to sleep when we were arrested.

4.    Our physical and mental condition had not improved when we were interviewed by the detectives from El Paso shortly after we were arrested in Plainview. The detectives from El Paso allowed me and Justen to eat lunch together before we were interviewed. While we were eating, Detective Samaniego told me that he knew Justen from another case, and that he would take care of him.

5.    After we ate lunch, Justen was interviewed by Detective Samaniego and I was interviewed by the other detective from El Paso and by a detective from New Mexico.

6.    The detective from El Paso was very aggressive and hostile to me during the interview. He showed me statements that other witnesses had made implicating Justen in the murder of Melanie Billhartz. He suggested that I should say the same things in my statement if I wanted to avoid charges involving the murder of Melanie Billhartz. He also threatened to take me to New Mexico so that I would be extradited to face other charges in Colorado if I did not cooperate.

7.    In order to avoid charges involving the murder, and to avoid being extradited to Colorado, I made my statement based solely on the statements of the other witnesses, and not based on any independent memory I had of what happened on October 28, 2002, or of any statements made to me that night.

8.    When the detectives left to take Justen Hall back to El Paso after he attempted suicide, they left me in jail in Plainview, Texas for three and a half months, on a charge for unauthorized use of a motor vehicle. The two detectives from El Paso said they were leaving me there because I was not being as cooperative as they wanted me to be.

-2-

9.     After three and a half months I was bonded out and returned to El Paso for a few days before leaving to go to Indiana, where I was later arrested and incarcerated on other charges.

10.     In December 2004, several months before Justen's trial, I received a letter from the prosecutors in Justen's case. They offered to bring me back to El Paso in time to see my family for the holidays if I would agree to a transfer request so they could work on my testimony for Justen's trial. I agreed to the transfer because I wanted to see my family for the holidays.

11.     The first thing the prosecutors allowed me to do when I arrived in El Paso was to call my family. When I met with the prosecutors to discuss my testimony they told me to stick to what I had said in my statement and I would not get in trouble with other charges, including drug-related charges involving the house on Melody. They went over my testimony again and again. They also asked me to sign a document that I understood was an immunity agreement, and I did sign the document.

12.     The testimony I gave at trial was based on the statements of the other witnesses, and not on any memory I had of what happened on the night of October 28, 2002, or of any statements made to me that night. I gave the testimony believing that I had been granted immunity from any charges in exchange for my testimony.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct and executed on this 20 day of July 2011.

_Jesse Eddy_
Jesse Eddy

# EXHIBIT C

IN THE DISTRICT COURTS OF EL PASO COUNTY
34th JUDICIAL DISTRICT COURT

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | |
| VS. | § | CAUSE NO.: 20030D00505 |
| | § | |
| | § | |
| JUSTEN HALL | § | |

## STATE'S MOTION TO GRANT LIMITED USE IMMUNITY

Now comes the State of Texas, by and through her District Attorney and makes this Motion to Grant Limited Use Immunity to and compel the honest testimony of Jesse Eddy, DOB:            , hereinafter referred to as "Witness", and in support thereof would show the Court as follows:

### I.

The State of Texas has set for trial the defendant JUSTEN HALL for the criminal offenses of Capital Murder.

### II.

The State would show that said Witness is believed to have material information regarding such criminal offense and that testimony regarding the same is crucial to the prosecution of this case.

### III.

Said Witness has indicated that he will refuse to give testimony or provide other information on the basis of his privilege against self-incrimination.

### IV.

That in order to obtain such testimony, the State requests this Court to grant Limited Use Immunity to said Witness and to compel said Witness to testify truthfully, accurately, and consistently, if called by either side, during the prosecution of this case.

### V.

Limited Use Immunity, as herein used, is defined by the attached Agreement for Honest Testimony.

Wherefore, premises considered, the State requests the Court to compel said Witness to truthfully testify after having granted this Witness Limited Use Immunity from prosecution or penalty or forfeiture for or on account of any transaction, matter or thing concerning which said witness may testify as outlined in the attached "Agreement for Honest Testimony"; except that said Witness shall not be exempt from prosecution for perjury or contempt while giving testimony before the Trial Court pursuant to this Grant of Limited Use Immunity.

Respectfully submitted,

Jaime Esparza
34th Judicial District Attorney
State Bar No. _____
500 E. San Antonio, Suite 201
El Paso, Texas 79901
(915) 546-2059
f-(915) 533-5520

## CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2005, a true and correct copy of the foregoing STATE'S MOTION TO GRANT LIMITED USE IMMUNITY was provided to Mr. Charles E. McDonald and Francisco F. Macias, the Attorney for the Defendant, by one or more of the listed means below:

☒   Mailed to 4150 Rio Bravo Dr. Suite 136, El Paso, TX 79902
      1001 N. Campbell St., El Paso, Texas 79902
☒   Faxed to Number (915) 544-2706
      (915) 544-5345
☐   Hand delivered

Jaime Esparza
District Attorney

IN THE DISTRICT COURTS OF EL PASO COUNTY
34th JUDICIAL DISTRICT COURT

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | |
| VS. | § | CAUSE NO.: 20030D00505 |
| | § | |
| JUSTEN HALL | § | |

## ORDER GRANTING LIMITED USE IMMUNITY

On this the _____ day of January, 2005, came on to be heard the State's Motion to Grant Limited Use Immunity, and the State having appeared, and the Witness having appeared in person and by his attorney, and the Court having heard the evidence, and argument of counsel, and after having considered the motion, is of the opinion that such motion should be **GRANTED.**

**IT IS THEREFORE ORDERED** that the Agreement attached to the State's motion is approved by the Court, and that the Witness, Jesse Eddy, DOB:            upon his abiding by all of the terms of the agreement, is hereby granted Limited Use Immunity under the terms of the State's motion and agreement attached thereto; except, the Witness is not exempt from prosecution for perjury or contempt while giving testimony in any court pursuant to this Grant of Limited Use Immunity.

SIGNED this the _____ day of January, 2005.


_____
JUDGE PRESIDING

IN THE DISTRICT COURTS OF EL PASO COUNTY
34th JUDICIAL DISTRICT COURT

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | |
| VS. | § | CAUSE NO.: 20030D00505 |
| | § | |
| JUSTEN HALL | § | |

## AGREEMENT FOR HONEST TESTIMONY

WHEREAS Justen Grant Hall (hereinafter referred to as defendant) is on trial for the Offense of Capital Murder under case under cause numbers 20030D00505, and EPPD Number 02-327060; and

WHEREAS Jesse Eddy, DOB:             (hereinafter, "Witness") is a witness in the above styled and numbered cause because he was a witness to the events of September, October and  November, 2002 as described in El Paso Police Department Case 02-327060 and 02-100052; and

WHEREAS the District Attorney's office for the Thirty-Fourth (34th) Judicial District of Texas (hereinafter "District Attorney") is the appropriate prosecuting authority; and

WHEREAS the Witness and the District Attorney desire to enter into an agreement whereby the Witness will provide honest, consistent, and accurate testimony in the trial of the above-styled and numbered causes of the co-defendants, regardless of whether called to testify by the Defense or the State, in exchange for Limited Use Immunity according to the following terms:

1.      In exchange for the Witness's honest testimony in the above styled and numbered case, regardless of whether called to testify by the Defense or the State, and in conjunction with the Witness's obligation as set forth below, the District Attorney agrees to grant the Witness Limited Use

Case 3:10-cv-00135-FM   Document 45-5   Filed 08/11/11   Page 31 of 49

State of Texas v. JUSTEN HALL
Agreement
Page 2.

Immunity as to any possible offenses and lesser included offenses committed during the months of September, October, and November, 2002, involving narcotic possession, consumption and distribution.

2.  It is the intent of the parties, with the approval of the Court that this Agreement will be binding upon the District Attorney, its agents and assigns, and any and all other agencies.

3.  This Grant of Limited Use Immunity does not apply to any additional offense(s) revealed in the testimony.

4.  Further, no testimony or other evidence provided by the Witness to the District Attorney, its investigators, any Grand Jury investigating the cause, other State law enforcement, or the Court, will be used against the Witness in any criminal cause, except in a prosecution for perjury for giving a false statement.

5.  Further, this agreement does not prohibit, or in any way inhibit the prosecution of the Witness given the independent evidence, not derived in any way from the Witness's cooperation with the State in accordance with this agreement in the absence of any plea bargain agreement.

6.  This Agreement is limited to those statements made by the Witness concerning any transactions which may be offenses (and any lesser-included offenses) concerning the subject of this agreement as stated in paragraph 1, and any evidence derived from such statement by the Witness, and does not limit in any way the right or ability of the District Attorney or the State of Texas to investigate or prosecute other crimes.

7.  The Witness must supply complete, truthful, and consistent information to any and all questions provided by the District Attorney, its investigators, law enforcement officers of the State, any Grand Jury, the Defense Attorney, or the Court. The Witness must neither attempt to protect any

State of Texas v. JUSTEN HALL
Agreement
Page 3.

person or persons either through false information or omission, nor falsely implicate any person or entity.

8.  The Witness must immediately furnish any and all evidence and documents in his custody, possession, or control concerning the Defendant in this cause.

9.  The Witness must testify truthfully, consistently, accurately and completely at any trial concerning these matters.

10. The Witness must be truthful, consistent, accurate and complete in his discussions with the District Attorney, its investigators, and any law enforcement officers of the State of Texas.

11. Notwithstanding any other provision in this agreement, in the event that the Witness fails to make himself available to testify at the trial of this Defendant to this cause, or in the event that the Witness fails to testify truthfully and fully at the trial, or in the event that the Witness fails to completely cooperate with the District Attorney's Office and other law enforcement officials in the investigation and prosecution of this cause or any related cause, then this agreement shall be void and of no effect such that the District Attorney's office can prosecute the offenses that are the subject of this agreement as well as any other offenses revealed by the Witness through his testimony or evidence gained from him, and seek the maximum punishment in all cases.

12. Notwithstanding this Agreement, the Witness can and will be prosecuted under the Texas Perjury Statutes for any materially false statement made under oath and may be held in contempt of court if the circumstances warrant during any trial.

13. This Agreement for Honest Testimony shall be attached to a Motion and Order to be signed and approved by the court before the Witness testifies.

State of Texas v. Justen Hall
Agreement
Page 4.

14.   This Agreement for Honest Testimony is void unless approved by the court.

15.   It is the intent of the parties that this Agreement for Honest Testimony will be binding on both the State and the Witness.


Executed this date, the _____ of January, 2005.


APPROVED AS TO FORM AND CONTENT:


_____                    _____
JESSE EDDY                               JAIME ESPARZA
WITNESS                                  DISTRICT ATTORNEY
                                         34TH JUDICIAL DISTRICT


_____
ATTORNEY FOR WITNESS

# EXHIBIT D

COUNTY OF EL PASO    }
                          }

STATE OF TEXAS       }

## DECLARATION OF IRENE RODRIGUEZ

1.  My name is Irene Rodriguez.  I am over the age of 18 and otherwise competent to give this declaration.

2.  I was a juror in Justen Hall's capital trial in 2005.

3.  The punishment phase deliberations happened on a Friday night.  It felt rushed.  Most of the other jurors were sort of in a hurry.  The court told us that if we couldn't come to a decision that we would be sequestered.

4.  Myself and another juror tried to convince the other jurors to take our time with this decision.  The other jurors just wanted to go home.  Even today I sometimes think about how I should have stood my ground on that.  It just felt so rushed. I just wanted to take my time with the decision.

5.  During the punishment phase, they talked a little bit about Justen and his background, but they didn't tell us too much.  I would have liked to know more.  Our circumstances don't necessarily shape who we are, but they are important and they do play a role.

6.  I remember there being two questions during the punishment phase.  I answered "no" to the second question, whether there was enough mitigation to warrant a life sentence.  Given the evidence the defense presented during the punishment phase, I felt that there really wasn't sufficient mitigation to answer otherwise.

7.  I have reviewed the declarations of Marilu Folmer; Becky Garcia; Deborah Hall; Gloria Meinert; Ted Meinert; Jane Morgan; and Susan Wohelking.

8.  We were not presented with this information during the punishment phase. I would have liked to hear this information.  It tells you more about who Justen was.  It tells me that he was like no one, to anybody.

9.  If I had heard the evidence in these declarations during the punishment phase, it would have changed my answer.  I would have answered "yes," that there was enough mitigation to warrant a life sentence.

1



10.   I noticed that the lead trial attorney, Frank Macias, was sleeping during one part of the guilt-innocence phase. Do you know how you nod off sometimes? This wasn't just nodding-off. He had his head down for a while. The other jurors brought it up later. One of the other jurors said "Poor kid. His life's on the line and his lawyer's sleeping." It was during a part of the trial that was really boring. It was while a witness was being questioned.

11.   During the guilt-innocence phase, I remember many of the witnesses who testified against Mr. Hall. I would have like to know whether any of them had been offered deals in exchange for testifying. If they had been, that wouldn't have made them very credible because it would have shown that they were testifying for their own personal gain.

Pursuant to 28 USC § 1746, I have read the above 11 paragraphs and declare under penalty of perjury that the foregoing is true and correct.

_____
Signature

\_\_\_\_\_5/23/10_____
Date

2

# EXHIBIT E

IN THE DISTRICT COURTS OF EL PASO COUNTY
34th JUDICIAL DISTRICT COURT

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | |
| VS. | § | CAUSE NO.: 20030D00505 |
| | § | |
| JUSTEN HALL | § | |

### STATE'S MOTION TO GRANT LIMITED USE IMMUNITY

Now comes the State of Texas, by and through her District Attorney and makes this Motion to Grant Limited Use Immunity to and compel the honest testimony of Ted Murgatroyd, DOB:          , hereinafter referred to as "Witness", and in support thereof would show the Court as follows:

I.

The State of Texas has set for trial the defendant JUSTEN HALL for the criminal offenses of Capital Murder.

II.

The State would show that said Witness is believed to have material information regarding such criminal offense and that testimony regarding the same is crucial to the prosecution of this case.

III.

Said Witness has indicated that he will refuse to give testimony or provide other information on the basis of his privilege against self-incrimination.

IV.

That in order to obtain such testimony, the State requests this Court to grant Limited Use Immunity to said Witness and to compel said Witness to testify truthfully, accurately, and consistently, if called by either side, during the prosecution of this case.

V.

Limited Use Immunity, as herein used, is defined by the attached Agreement for Honest Testimony.

Wherefore, premises considered, the State requests the Court to compel said Witness to truthfully testify after having granted this Witness Limited Use Immunity from prosecution or penalty or forfeiture for or on account of any transaction, matter or thing concerning which said witness may testify as outlined in the attached "Agreement for Honest Testimony"; except that said Witness shall not be exempt from prosecution for perjury or contempt while giving testimony before the Trial Court pursuant to this Grant of Limited Use Immunity.

Respectfully submitted,

Jaime Esparza
34th Judicial District Attorney
State Bar No. _____
500 E. San Antonio, Suite 201
El Paso, Texas 79901
(915) 546-2059
f-(915) 533-5520

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2005, a true and correct copy of the foregoing STATE'S MOTION TO GRANT LIMITED USE IMMUNITY was provided to Mr. Charles E. McDonald and Francisco F. Macias, the Attorney for the Defendant, by one or more of the listed means below:

☒ Mailed to 4150 Rio Bravo Dr. Suite 136, El Paso, TX 79902
  1001 N. Campbell St., El Paso, Texas 79902
☒ Faxed to Number (915) 544-2706
  (915) 544-5345
☐ Hand delivered

Jaime Esparza
District Attorney

Case 3:10-cv-00135-FM   Document 45-5   Filed 08/11/11   Page 40 of 49

IN THE DISTRICT COURTS OF EL PASO COUNTY
34th JUDICIAL DISTRICT COURT

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | |
| VS. | § | CAUSE NO.: 20030D00505 |
| | § | |
| JUSTEN HALL | § | |

### ORDER GRANTING LIMITED USE IMMUNITY

On this the _____ day of January, 2005, came on to be heard the State's Motion to Grant Limited Use Immunity, and the State having appeared, and the Witness having appeared in person and by his attorney, and the Court having heard the evidence, and argument of counsel, and after having considered the motion, is of the opinion that such motion should be **GRANTED**.

**IT IS THEREFORE ORDERED** that the Agreement attached to the State's motion is approved by the Court, and that the Witness, Ted Murgatroyd, DOB: _____ upon his abiding by all of the terms of the agreement, is hereby granted Limited Use Immunity under the terms of the State's motion and agreement attached thereto; except, the Witness is not exempt from prosecution for perjury or contempt while giving testimony in any court pursuant to this Grant of Limited Use Immunity.

SIGNED this the _____ day of January, 2005.


_____
JUDGE PRESIDING

IN THE DISTRICT COURTS OF EL PASO COUNTY
34th JUDICIAL DISTRICT COURT

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | |
| VS. | § | CAUSE NO.: 20030D00505 |
| | § | |
| JUSTEN HALL | § | |

## AGREEMENT FOR HONEST TESTIMONY

WHEREAS Justen Grant Hall (hereinafter referred to as defendant) is on trial for the Offense of Capital Murder under case under cause numbers 20030D00505, and EPPD Number 02-327060; and

WHEREAS Ted Murgatroyd, DOB:              (hereinafter, "Witness") is a witness in the above styled and numbered cause because he was a witness to the events of September, October and  November, 2002 as described in El Paso Police Department Cases 02-327060 and 02-100052; and

WHEREAS the District Attorney's office for the Thirty-Fourth (34th) Judicial District of Texas (hereinafter "District Attorney") is the appropriate prosecuting authority; and

WHEREAS the Witness and the District Attorney desire to enter into an agreement whereby the Witness will provide honest, consistent, and accurate testimony in the trial of the above-styled and numbered causes of the co-defendants, regardless of whether called to testify by the Defense or the State, in exchange for Limited Use Immunity according to the following terms:

1.  In exchange for the Witness's honest testimony in the above styled and numbered case, regardless of whether called to testify by the Defense or the State, and in conjunction with the Witness's obligation as set forth below, the District Attorney agrees to grant the Witness Limited Use

State of Texas v. JUSTEN HALL
Agreement
Page 2.

Immunity as to any possible offenses and lesser included offenses committed during the months of September, October, and November, 2002, involving narcotic possession, consumption and distribution or the tampering with physical evidence as a party.

2.   It is the intent of the parties, with the approval of the Court that this Agreement will be binding upon the District Attorney, its agents and assigns, and any and all other agencies.

3.   This Grant of Limited Use Immunity does not apply to any additional offense(s) revealed in the testimony.

4.   Further, no testimony or other evidence provided by the Witness to the District Attorney, its investigators, any Grand Jury investigating the cause, other State law enforcement, or the Court, will be used against the Witness in any criminal cause, except in a prosecution for perjury for giving a false statement.

5.   Further, this agreement does not prohibit, or in any way inhibit the prosecution of the Witness given the independent evidence, not derived in any way from the Witness's cooperation with the State in accordance with this agreement in the absence of any plea bargain agreement.

6.   This Agreement is limited to those statements made by the Witness concerning any transactions which may be offenses (and any lesser-included offenses) concerning the subject of this agreement as stated in paragraph 1, and any evidence derived from such statement by the Witness, and does not limit in any way the right or ability of the District Attorney or the State of Texas to investigate or prosecute other crimes.

7.   The Witness must supply complete, truthful, and consistent information to any and all questions provided by the District Attorney, its investigators, law enforcement officers of the State, any Grand Jury, the Defense Attorney, or the Court. The Witness must neither attempt to protect any

State of Texas v. JUSTEN HALL
Agreement
Page 3.

person or persons either through false information or omission, nor falsely
implicate any person or entity.

8.  The Witness must immediately furnish any and all evidence and
documents in his custody, possession, or control concerning the Defendant
in this cause.

9.  The Witness must testify truthfully, consistently, accurately and
completely at any trial concerning these matters.

10.  The Witness must be truthful, consistent, accurate and complete in his
discussions with the District Attorney, its investigators, and any law
enforcement officers of the State of Texas.

11.  Notwithstanding any other provision in this agreement, in the event that
the Witness fails to make himself available to testify at the trial of this
Defendant to this cause, or in the event that the Witness fails to testify
truthfully and fully at the trial, or in the event that the Witness fails to
completely cooperate with the District Attorney's Office and other law
enforcement officials in the investigation and prosecution of this cause or
any related cause, then this agreement shall be void and of no effect such
that the District Attorney's office can prosecute the offenses that are the
subject of this agreement as well as any other offenses revealed by the
Witness through his testimony or evidence gained from him, and seek the
maximum punishment in all cases.

12.  Notwithstanding this Agreement, the Witness can and will be prosecuted
under the Texas Perjury Statutes for any materially false statement made
under oath and may be held in contempt of court if the circumstances
warrant during any trial.

13.  This Agreement for Honest Testimony shall be attached to a Motion and
Order to be signed and approved by the court before the Witness testifies.

State of Texas v. Justen Hall
Agreement
Page 4.

14.  This Agreement for Honest Testimony is void unless approved by the court.

15.  It is the intent of the parties that this Agreement for Honest Testimony will be binding on both the State and the Witness.

Executed this date, the _____ of January, 2005.

APPROVED AS TO FORM AND CONTENT:


_____
TED MURGATROYD
WITNESS

_____
JAIME ESPARZA
DISTRICT ATTORNEY
34TH JUDICIAL DISTRICT


_____
ATTORNEY FOR WITNESS

# EXHIBIT F

## Incident Supplement

**DONA ANA SO**                                           1/2/2003          Page:   2

| Case ID: | Seq #: | Occur Date: | Location: |
|----------|--------|-------------|-----------|
| `ASO2002008949 | | 11/22/2002  4:00:00PM | *COUNTY RD A-12* |

ject:
#S766-COOPER/12-03-02/1450HRS/RJM

USED TO DRIVE. SHE SAID MELANIE WAS A GOOD PERSON BUT A LITTLE CRAZY.  AS FAR AS MELANIE'S HOMICIDE
OR ANY INFORMATION LEADING UP TO IT MS. QUINTELA DID NOT HAVE ANY INFORMATION FOR US. SHE WAS
NOT EVEN AWARE THAT MELANIE HAD DIED UNTIL WE HAD TOLD HER.

WE THEN INTERVIEWED JESSE EDDY. HE WAS READ THE MIRANDA WARNING AND HE GAVE A STATEMENT AND
WE LEARNED THE FOLLOWING: JESSE SAID HE HAS KNOWN JUSTEN HALL FOR SOME TIME. THEY GREW UP
TOGETHER IN EL PASO, TEXAS. SOMETIMES THEY WOULD GO INTO NEW MEXICO TO DIFFERENT AREAS IN THE
SOUTHERN PART OF DONA ANA COUNTY AND PARTY. MR. EDDY SAID THAT ABOUT ON OR ABOUT OCTOBER 28,
2002, HE WAS IN A HOUSE ON MELODY STREET IN EL PASO, TEXAS. HE WAS THERE WITH OTHER SUBJECTS. HE
ADMITTED TO BEING IN A GROUP THAT HOLDS WHITE SUPREMACIST VIEW POINTS. HE ALSO SAID THAT HE HAS
SOLD METHAMPHETHMINE OR ILLEGAL NARCOTICS. HE SAID HE WAS MOVING UP TO INDIANA TO GET AWAY
FROM THAT LIFE STYLE. ON THE NIGHT HE WAS TALKING ABOUT, HE SAID HE WAS THERE WITH SOME SUBJECTS,
INCLUDING JUSTEN GRANT HALL. WHILE THERE AT THE HOUSE TED MURGATROYD AND MELANIE BILLHARTZ
SHOWED UP AT THE HOUSE. MELANIE WAS CRYING AND UPSET AND IT APPEARED THAT HER LIP OR MOUTH WAS
BLEEDING VERY BADLY. APPARENTLY TED AND MELANIE GOT INTO AN ARGUMENT AND DURING THE PROCESS
OF THE ARGUMENT THERE WAS PHYSICAL VIOLENCE. TED STRUCK MELANIE IN THE FACE OR PUSHED HER IN THE
FACE AND THIS CAUSED THE CUT TO FORM. MELANIE THEN BEGAN CRYING LOUDLY SHE WAS GOING TO CALL
THE POLICE. TED BROUGHT HER TO THE HOUSE SO THAT HIS FRIEND WOULD HELP HER CALM DOWN. SHE
REFUSED TO DO SO. SHE CONTINUALLY SAID THAT SHE WAS GOING TO CALL THE POLICE. JUSTEN GRANT HALL
TOLD MELANIE TO GO INTO HER PICKUP TRUCK, WHICH WAS A WHITE EXTENDED CAB CHEVY. HE TOLD HER TO
CALM DOWN AND THAT HE WOULD MAKE THINGS BETTER BUT NOT TO CALL THE POLICE. SHE WAS STILL
CRYING AND YELLING THAT SHE WAS GOING TO CALL THE POLICE AND RUIN IT FOR EVERYBODY. JUSTEN ASKED
VARIOUS MEMBERS OF HIS GROUP TO GO INTO A SHED THAT IS LOCATED BEHIND THE HOUSE. AS THEY WERE IN
`  J SHED JUSTEN BEGAN ASKING DIFFERENT MEMBERS OF THE GROUP TO GET GARBAGE BAGS BECAUSE HE
`  .D, "I'M GOING TO GET RID OF THIS BITCH" AND THEN SAID, "SHE'S GOING TO MESS THINGS UP FOR US." JESSE
SAID THAT HE AND OTHER MEMBERS OF THE GROUP, WHICH INCLUDED TED MURGATROYD, TIM CHASE AND
OTHERS, ATTEMPTED TO CALM JUSTEN DOWN AND TELL HIM NOT TO DO ANYTHING STUPID. JESSE SAID HE THEN
GOT SCARED AND NERVOUS AND LEFT. HE DID PASS BY MELANIE WHILE SHE WAS SITTING IN HER TRUCK BUT
DID NOT WARN HER ABOUT JUSTEN'S ACTIONS OR HIS THREATS TO HURT HER. JESSE SAID HE WENT HOME
WHERE HE LIVES IN EL PASO. THE NEXT DAY TED MURGATROYD SHOWED UP AT HIS HOUSE AND WANTED SOME
MONEY. HE SAID, "THEY KILLED HER." JESSE SAID HE DIDN'T WANT TO GET INVOLVED WITH ANYTHING AND
GAVE HIM $10.00 FOR GAS TO GET HIM OUT. THEN, AFTER AWHILE TED CAME BACK ALONG WITH JUSTEN. ALL
THEY DID WAS TALK. A COUPLE OF DAYS LATER JESSE ASKED JUSTEN GRANT HALL TO TAKE HIM TO CARLSBAD
WHERE HIS GIRLFRIEND, MS. QUINTELA, WAS LIVING ALONG WITH THEIR CHILD. THEY WERE TALKING ABOUT
MOVING TO INDIANA AND SINCE JUSTEN WAS NOW DRIVING MELANIE'S PICKUP TRUCK HE ASKED JUSTEN TO
HELP HIM MOVE TO INDIANA. HE SAID JUSTEN HAS NEVER THREATENED HIM AND HE IS NOT SCARED OF HIM.
THEN, HE CHANGED A COUPLE OF MINUTES LATER AND SAID HE WAS SCARED OF HIM. JUSTEN DROVE JESSE TO
CARLSBAD AND THEN FROM THERE JUSTEN LEFT FOR A FEW DAYS THEN CAME BACK AND AGREED TO TAKE MS.
QUINTELA, JESSE AND THEIR SON UP TO INDIANA. JESSE KNEW THE TRUCK JUSTEN WAS DRIVING DID BELONG
TO MELANIE. JESSE ALSO KNEW MELANIE, BUT HE SAID HE WAS RUNNING AWAY FROM HIS OLD LIFE STYLE
FROM THE WHITE SUPREMACIST GROUP AND SELLING METH AND WANTED TO START A NEW LIFE FOR HIM AND
HIS FAMILY. HE SAID HE ALSO KNEW ABOUT ANOTHER KILLING THAT JUSTEN HAD BEEN INVOLVED IN. THIS
INVOLVED THE KILLING OF A PERSON WHO DRESSED AS A WOMAN IN SUNLAND PARK, NEW MEXICO. THE
KILLING TOOK PLACE IN ANAPRA ON THE TEXAS SIDE OF THE RIO GRANDE RIVER. JESSE TOLD US THAT JUSTEN
HAD TOLD HIM THAT HE ADMITTED TO PICKING THE PERSON UP AND THEN SHOOTING THAT PERSON IN THE HEAD
AND DUMPING HIM OUT BY THE RIO GRANDE.

JESSE SAID THAT WHEN JUSTEN LEFT HE PICKED UP AN EXTENSION CORD BEFORE HE TOOK MELANIE OUT.
JUSTEN LEFT BY HIMSELF WITH MELANIE. NOBODY WENT WITH HIM.

.  JSE SAID HE DID NOT KNOW HOW JUSTEN KILLED MELANIE, ONLY THAT HE KNEW THAT HE KILLED HER FROM
THE WAY HE WAS TALKING AND TRYING TO GET PEOPLE TO GET GARBAGE BAGS FOR HIM. AS FAR AS HE KNEW,
NOBODY WENT WITH JUSTEN WHEN MELANIE WAS KILLED AND HE DID NOT KNOW WHERE JUSTEN KILLED
MELANIE.

# EXHIBIT G

# EL PASO POLICE DEPARTMENT

## WITNESS STATEMENT

Case#:

Offense: Capital Murder
Complainant: Melanie Billhartz
Address: 6440 Regal Crest

This statement was given voluntarily to: Det. Samaniego
Of the El Paso Police Department by: Jesse Eddy
Social Security:
Address:
D.O.B.:
Home Phone Number:
Work Phone Number:
Driver's License:
Date & Time: 11/25/02

My name is Jesse Eddy and I am 25 years of age. I have lived in El Paso about six years. I am originally from California. I am under arrest right now in Hale County for Unauthorized use of a motor vehicle. Det. Samaniego warned me of my rights and I read them out loud. Det. Samaniego asked me that he was investigating the death of Melanie Billhartz. I told Det.Samaniego that I did have information and that I had nothing to hide about this.

About a month ago I was at Christy's house on Melody and I had got there with O.J. I do not know the address on Melody but it is a red brick house with a big garage in the back. O.J.'s name is Oscar Cooper and he is a friend of mine. When we got there to Christy's house Chase, two girls that I do not know, Tim Davis, James Eaton, Christy, and Justen were already there. I had gone over just to hang out with these guys. I am not part of the circle but I do associate with them. Justen wanted me to become a member but I didn't want to. As far as I know Justen is the leader of the circle in El Paso.

I was there about half an hour and then Melanie Billhartz showed up and she was hysterical and crying saying that Ted had assaulted her. Ted's last name is Murgatroyd. Ted then showed up and started telling us that Melanie started assaulting him and that he tried to push her away and hit her from her mouth. I noticed that Melanie was bleeding to her mouth. I did not see Ted bleeding. Melanie started saying that she was going to call the cops on Ted and throw him in jail.
Justen then told Ted, James, Tim and myself meet in the garage. When we got there Justen told Chase who was there with those two girls and he told Chase to take a walk with the girls. Chase did not ask him why and he left with the two girls. Justen then all of a sudden told us to go get some trash bags cause he was going to kill the bitch. We all told Justen that this wasn't right and to forget about it. I told Justen this wasn't going to happen while I was here and he told me that I didn't have to be here. I then told Justen that I was leaving. Justen did not say anything and I walked off. When I walked out of the garage I noticed that O.J. was sitting in his car. I got in the car and I told O.J. to let's leave. We left and went to Tony's apartment. Tony's real name is Irene Castro but she changed her name to Tony Rose Anderson. She lives at 233 Montego Bay off of Ressler. I spent the night there with her. Tony and I are good friends with her.

1

# EL PASO POLICE DEPARTMENT

## WITNESS STATEMENT

**Case#:**

O.J. also slept there that night. I got to the apartment at about 1:00am. Det. Samaniego has asked me if I remember what day of the week it was and I really don't remember. I would like to add that when I was leaving Christy's house on Melody Street I saw Melanie sitting in her truck outside alone in the driveway.

At about 6:00am this same morning Ted came over to Tony's apartment asking to borrow some gas money. Ted looked scared and he started telling me that Melanie was dead and that him and Justen dumped her in the desert. I told him that I didn't want to know anything else. Ted told me that he didn't want to dump the body but that Justen forced him to do it. I told Ted that he didn't have to do a mother fuckin thing. I gave Ted 10 bucks and he left. Ted then came back right away and stayed with us at Tony's house. Ted told me that he told Justen that his mother was going to pick him up at Tony's. I did not see what they were driving.

About a week later I saw Justen at Christy's house and I noticed that Justen was driving Melanie's truck. I did not see Melanie there. I did not ask Justen anything about the truck. I had gone over to see my mom. My mom had parked her RV in front of Christy's for a couple of days. That day I asked Justen to take me to Carlsbad so I could get out of El Paso. He agreed and told me that we could leave whenever I was ready. I told him that I would be ready the next day. The following day Justen and me went to Carlsbad and I met up with my girlfriend Aimme Quintela. I stayed with Aimme from then on and I did not leave anywhere since. I was in Carlsbad for about 3 weeks until just recently when we left to Indiana. I wanted to go to Indiana to get away from the lifestyle I was living in El Paso. I talked to a friend of mine named Joel Hoskins and he told me to come move up there with him and he could get me a job and I could get my life straight. His number in Franklin Indiana is 317-736-9409. Joel use to live in El Paso at one time and I let him live with me so he returning the favor.

Ever since this has happened Justen has never told me anything about that night and I have not asked him. I am afraid of what Justen is capable of doing so I chose to not talk about the murder. Justen told me that he bought the truck for 13,000.00 and he was in the process of changing the title. I pretty much knew that he had the truck illegally but I just wanted to get out of El Paso and be with my girlfriend and our son and start all over. I have been wanting to do this for a while but I was just waiting for my case to get dismissed. I was waiting for disposition on my case in El Paso and on 10/24/02 the case was dismissed. Now that I think about it the murder happened a couple of days after my charge of burglary was dismissed.

This is all I know about the murder and I am willing to assist the El Paso Police Department with what I can.

I HAVE READ THIS STATEMENT AND EVEN THOUGH IT IS NOT IN MY EXACT WORDS, I FIND IT TO BE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

SUBSCRIBED AND SWORN TO BEFORE ME, THE UNDERSIGNED AUTHORITY.

2