UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

JUSTEN GRANT HALL,                    §
TDCJ No. 999497,                      §
            Petitioner,               §
                                      §
V.                                    §         EP-10-CV-135-FM
                                      §
RICK THALER, Director,                §
Texas Department of Criminal          §
Justice, Correctional                 §
Institutions Division,                §
            Respondent.               §

## MEMORANDUM OPINION AND ORDER

Petitioner Justen Grant Hall ("Petitioner"), a state prisoner currently incarcerated by the

Texas Department of Criminal Justice ("TDCJ") at the Polunsky Unit in Livingston, Texas, has

filed a petition under 28 U.S.C. § 2254 for a writ of habeas corpus [ECF No. 27],[1] a

memorandum in support of his petition [ECF No. 28], a reply in support of his petition [ECF No.

43], and a supplement to his memorandum in support of his petition [ECF No. 53], challenging

his El Paso County conviction for capital murder based on his obstruction or retaliation[2] and his

sentence of death.[3]  Respondent Rick Thaler ("Respondent'), the Director of TDCJ's

Correctional Institutions Division and the person who has custody over Petitioner, has filed an

answer [ECF No. 40] asserting that Petitioner has presented only two of his issues for review by

---

[1] "ECF No." ("Electronic Case Filing Number") refers to the document number assigned to a document filed with the Court in the electronic case management system.

[2] See TEX. PENAL CODE § 19.03(a)(2) ("A person commits [capital murder] if the person commits murder as defined under Section 19.02(b)(1) and . . . the person intentionally commits the murder in the course of committing or attempting to commit . . . obstruction or retaliation . . .").

[3] State v. Hall, NO. 20030D00505 (34th Dist. Ct. El Paso County, Tex. Feb. 18, 2005), aff'd, Hall v. State, NO. AP-75,121, 2007 WL 1847314 (Tex. Crim. App. Jun 27, 2007), habeas corpus dismissed, Ex parte Hall, WR-70,834-01, 2009 WL 1617087 (Tex. Crim. App. Jun 10, 2009).

the state courts, and that all other claims remain not only unexhausted, but also defaulted.  For

the reasons set forth below, the Court concludes that Petitioner is not entitled to § 2254 relief.

The Court will accordingly deny his petition.  The Court will additionally decline to certify his

issues for appeal.

## TABLE OF CONTENTS

I.     FACTUAL AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
       A.    The Crime and Its Aftermath . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
       B.    Indictment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
       C.    Petitioner's Motions to Suppress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
       D.    Guilt-Innocence Phase of Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
             1.    Prosecution's Case-in-Chief  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
             2.    The Defense's Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
             3.    Prosecution's Rebuttal Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
             4.    The Verdict  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
       E.    Punishment Phase of Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
             1.    The Prosecution's Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
             2.    The Defense's Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
             3.    The Prosecution's Rebuttal Evidence  . . . . . . . . . . . . . . . . . . . . . . . 32
             4.    The Verdict  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
       F.    Direct Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
       G.    State Habeas Corpus Proceeding  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
       H.    Federal Habeas Corpus Proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
II.    STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
III.   INVOLUNTARY CONFESSION CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
       A.    The Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
       B.    State Court Disposition  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
       C.    Clearly Established Federal Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
       D.    AEDPA Analysis  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
       E.    Conclusions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
IV.    INSUFFICIENT EVIDENCE CLAIM  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
       A.    The Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
       B.    State Court Disposition  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
       C.    Clearly Established Federal Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
       D.    AEDPA Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
       E.    Conclusions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
V.     DENIAL OF CONTINUANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
       A.    The Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

|       | B. | State Court Disposition | 60 |
|       | C. | Clearly Established Federal Law | 63 |
|       | D. | AEDPA Analysis | 64 |
|       | E. | Conclusions | 68 |
| VI.   |    | *BRADY* CLAIMS | 69 |
|       | A. | The Claim | 69 |
|       | B. | State Court Disposition | 69 |
|       | C. | Respondent's Lack of Exhaustion and Procedural Default Arguments | 72 |
|       |    | 1. The Issue of Exhaustion | 72 |
|       |    | 2. Procedural Default on Unexhausted Claims | 76 |
|       |    | 3. Exceptions Inapplicable | 80 |
|       | D. | Clearly Established Federal Law | 82 |
|       | E. | No Merits | 84 |
|       |    | 1. The Immunity Agreements | 84 |
|       |    | 2. Chase Hale's "Deal" | 89 |
|       |    | 3. Pretrial Correspondence with Eddy | 93 |
|       | F. | Conclusions | 95 |
| VII.  |    | INEFFECTIVE ASSISTANCE CLAIMS | 96 |
|       | A. | The Claims | 96 |
|       | B. | State Court Disposition | 97 |
|       | C. | The Constitutional Standard | 97 |
|       | D. | Sleeping Lawyer Claim | 101 |
|       |    | 1. Procedural Default | 102 |
|       |    | 2. No Presumption of Prejudice | 102 |
|       |    |     a. *Cronic & Burdine* Inapplicable | 103 |
|       |    |     b. *Teague* Foreclosure | 106 |
|       |    | 3. No Credible Evidence of Deficient Performance | 107 |
|       |    | 4. No Prejudice | 109 |
|       |    | 5. Conclusions | 110 |
|       | E. | Failure to Investigate & Present Mitigating Evidence | 110 |
|       |    | 1. No Deficient Performance | 111 |
|       |    |     a. The Petitioner's Mitigating Evidence at Trial | 111 |
|       |    |     b. "New" Mitigating Evidence | 115 |
|       |    |     c. Analysis | 121 |
|       |    | 2. No Prejudice | 130 |
|       |    | 3. Conclusions | 134 |
|       | F. | Punishment Phase Argument | 135 |
|       |    | 1. No Deficient Performance | 135 |
|       |    | 2. No Prejudice | 141 |
|       |    | 3. Conclusions | 142 |
|       | G. | Jury Selection | 142 |
|       |    | 1. The Agreement to Change the Jury Selection Procedure | 143 |
|       |    |     a. No Deficient Performance | 145 |
|       |    |     b. No Prejudice | 148 |

|   | c. | Conclusions | 161 |
| 2. | | Agreeing to Excuse Venire Members Sans Individual Voir Dire | 162 |
|   | a. | No Deficient Performance | 162 |
|   | b. | No Prejudice | 163 |
|   | c. | Conclusions | 165 |
| 3. | | Failure to Object to Trial Judge's Failure to Instruct Venire on Elements of Texas Law | 165 |
|   | a. | No Deficient Performance | 166 |
|   | b. | No Prejudice | 172 |
|   | c. | Conclusions | 173 |
| VIII. | CERTIFICATE OF APPEALABILITY | | 173 |
| IX. | REQUEST FOR AN EVIDENTIARY HEARING | | 177 |
| X. | CONCLUSION AND ORDER | | 179 |

# I.   FACTUAL AND PROCEDURAL BACKGROUND

## A.   The Crime and Its Aftermath

On the evening of October 28, 2002, Petitioner Justen Grant Hall ("Petitioner") fatally strangled Melanie Billhartz ("Billhartz") with an electrical extension cord while they sat together in her pickup truck on a dirt road off Interstate 10 between Sierra Blanca and Van Horn, Texas. He then tossed her lifeless body in the back seat and drove to El Paso, Texas. There is no dispute about these facts. Petitioner gave a written confession in which he detailed how he caused Billhartz's death.[4]

In his confession, Petitioner explained that on the evening of the murder, he was involved in cooking methamphetamine at a residence on Melody Lane in El Paso with Ted Murgatroyd ("Murgatroyd") and others affiliated with a gang called the Aryan Circle. When Billhartz pulled

---

[4] Petitioner's written confession to Billhartz's murder was admitted into evidence as State Ex. no. 61 and was read in open court in its entirety. Statement of Facts from Petitioner's trial (henceforth "S.F. Trial"), Volume 73, testimony of David Samaniego, at pp. 39–46. A copy of State Ex. No. 61 appears at S.F. Trial, Volume 91.

up in front of the house in her pickup truck, Murgatroyd, an old friend of hers, asked her to take

him to a convenience store.  Murgatroyd later told Petitioner that on the way back from the store,

the two argued, exchanged blows, and Billhartz ordered him out of the truck.  After Murgatroyd

exited the truck, Billhartz drove to the Melody Lane house and told the gang members she

wanted to report Murgatroyd's assault to the police.  Petitioner explained he decided to kill

Billhartz because he feared that if she summoned the police to the residence, they would arrest

him and the others.[5]  Despite opposition from other gang members, Petitioner drove Billhartz

from the Melody Lane residence to a location east of El Paso, fatally strangled her with an

electrical cord, and returned to the residence with her body.[6]  Petitioner then directed Murgatroyd

to assist him in disposing of Billhartz's body.[7]  Petitioner and Murgatroyd drove Billhartz's truck

with her body in the back seat concealed under some clothes into the desert in New Mexico,

where they removed several rings from one of her hands by chopping off her fingers with a

machete and then buried her body.[8]

On November 23, 2002, Murgatroyd led El Paso Police officers to Billhartz's body.[9]

---

[5]  S.F. Trial, Volume 73, testimony of David Samaniego, at p. 42.

[6]  *Id.*, at pp. 43–44.

[7]  *Id.*, at p. 44.

[8]  *Id.*, at p. 44.

[9]  S.F. Trial, Volume 72, testimony of Ted Murgatroyd, at pp. 36–37.

A number of law enforcement officers testified about the discovery of Billhartz's body near Kilbourne Hole in New Mexico during the early morning hours of November 23, 2002.  S.F. Trial, Volume 69, testimony of Ludovico Granillo, at pp. 136–85; testimony of Henry Cooper, at pp. 212–14; Volume 70, testimony of Henry Cooper, at pp. 25, 36, 40–48; Volume 71, testimony of Virginia Jackson, at pp. 159–76; Volume 73, testimony of David Samaniego, at pp. 14–16; Volume 73, testimony of Mark Fernandez, at pp. 59, 75, 84, 93–100.

Early that same morning, Deputy Tommy Baker ("Deputy Baker") of the Hale County Sheriff's Office spotted Billhartz's pickup parked partially on the roadway near Plainview, Texas. A license plate check resulted in a "missing or endangered" person report on the owner. While conducting his investigation, Baker received word that authorities had found Billhartz's body, and that the occupants of the truck–including Petitioner–were suspects in her death. Accordingly, Deputy Baker arrested Petitioner for the unauthorized use of a motor vehicle. After law enforcement officers from El Paso and New Mexico arrived in Plainview, Texas, and advised Petitioner of his rights, Petitioner initially denied any responsibility for Billhartz's death, but later gave a voluntary written statement in which he confessed to fatally strangling Billhartz.

**B.     Indictment**

On February 4, 2003, an El Paso County grand jury indicted Petitioner on a single count of capital murder, to wit: intentionally causing Billhartz's death by strangling her with a ligature while in the course of committing and attempting to commit the offense of obstruction or retaliation.[10]  On August 27, 2004, the state amended Petitioner's indictment.[11]

**C.     Petitioner's Motions to Suppress**

Petitioner filed a motion to suppress his highly inculpatory written statement given on November 25, 2002. On July 27, 2004, the state trial court held an evidentiary hearing on Petitioner's motion. Petitioner did not testify, but several law enforcement officers testified Petitioner appeared to be in control of his faculties, unaffected by intoxicants, and cooperative

---

[10] Transcript of pleadings, motions, and other documents filed in Petitioner's state trial court proceeding (henceforth "Trial Tr."), Volume I, at p. 3.

[11] Petitioner's Amended Indictment appears at Trial Tr., Volume I, at pp. 360–62.

6

when he gave his written statement.[12]  At the conclusion of the hearing, the state trial court

denied Petitioner's motion.[13]  On September 3, 2004, the state trial court issued its formal

findings of fact and conclusions of law in connection with Petitioner's motion to suppress his

confession.[14]

On September 17, 2004, Petitioner, represented by different counsel, filed a second

motion to suppress and a motion to reopen the hearing on his previous motion to suppress.  In his

second motion, Petitioner argued he was sleep-deprived and was denied his right to the assistance

of counsel at the time he gave his written statement.[15]  On November 22–23, 2004, and January

19, 2005, the state trial court re-opened the hearing on Petitioner's motion to suppress and re-

heard much of the same testimony it had heard from law enforcement officers during the first

evidentiary hearing.  The state trial court also heard additional testimony, including Petitioner's

testimony that he could not recall any of the events surrounding his arrest, detention, or

interrogation in November of 2002 or his execution of his written statement because he had

abused large quantities of methamphetamine in the weeks immediately prior to his arrest and

confession.[16]  At the conclusion of the hearings, the state trial court denied Petitioner's second

motion to suppress.

---

[12]  The verbatim transcription of the July 27, 2004, hearing on Petitioner's motion to suppress appears in S.F. Trial, Volume 5.

[13]  S.F. Trial, Volume 5, at p. 201.

[14]  Trial Tr., Volume II, at pp. 399–401.

[15] Trial Tr., Volume II, at pp. 614–16.

[16]  The verbatim transcription of Petitioner's second evidentiary hearing on his motion to suppress appears at S.F. Trial, Volumes 45–46, 67.  Petitioner's testimony appears at S.F. Trial, Volume 46, at pp. 5–86.

### D.      Guilt-Innocence Phase of Trial

The guilt-innocence phase of Petitioner's capital murder trial commenced on January 24, 2005.

### 1.      Prosecution's Case-in-Chief

At Petitioner's trial, Murgatroyd testified as follows: (1) the residence on Melody Lane where those affiliated with the Aryan Circle hung out and cooked methamphetamine on the night of the murder was a "drug house," (2) he and Billhartz got into a heated exchange that turned violent while Billhartz was driving him in her vehicle, (3) after the two exchanged blows, Billhartz directed Murgatroyd to exit her vehicle and she drove on to the gang's drug house on Melody Lane, (4) by the time he arrived on foot at the drug house, Billhartz had proclaimed to several people that Murgatroyd had assaulted her and that she planned to call the police, (5) Petitioner, whom Murgatroyd identified as District Captain of the Aryan Circle, indicated he wanted to kill Billhartz, but others present attempted to dissuade Petitioner from doing so, (6) Murgatroyd went into the shed where the meth had been cooking, (7) several hours later, Murgatroyd saw Petitioner pull up in Billhartz's pickup truck, (8) Petitioner told Murgatroyd "it's done," and directed Murgatroyd to get a shovel so they could bury Billhartz's body, (9) Petitioner instructed Murgatroyd to show him where they could bury Billhartz's body, (10) Murgatroyd drove Billhartz's pickup truck into the desert with Billhartz's body concealed under clothing in the back seat, (11) Murgatroyd claimed he did not want to bury Billhartz's body, so he chose a location in the desert in Doña Ana County, New Mexico, near Kilbourne's Hole which he knew was frequented by the public, (12) when they arrived at the location, Petitioner instructed him to cut off Billhartz's fingers to remove several rings, (13) Murgatroyd cut off the

fingers with a machete he had brought along, (14) they dragged Billhartz's body from the truck, dropped her into a crevice, then pushed loose dirt on top of her body, (15) several days later, Murgatroyd saw Petitioner driving Billhartz's truck, and (16) Petitioner told him the truck was "clean," and he now had the papers for it.[17]

Chase Hale ("Hale"), another person present at the drug house on the night of Billhartz's murder testified, in pertinent part, that (1) Hale saw Billhartz arrive at the drug house looking very angry and impatient, (2) Petitioner directed Hale to leave and take another person with him, (3) Hale went for a walk and returned twenty to thirty minutes later, (4) Billhartz's truck was still at the drug house when Hale returned from his walk, (5) when Hale approached Billhartz's truck, Petitioner came running out and told Hale not to go near the truck because he had "just killed that bitch Melanie," and (6) he subsequently saw Petitioner driving Billhartz's truck.[18]

In addition to the evidence summarized above, the prosecution called Petitioner's acquaintance, Donald Frank ("Frank"), who testified, in pertinent part, that (1) Petitioner confessed to him shortly after the Billhartz murder that he had killed Billhartz by strangling her until blood came out of her nose and eyes, (2) several people knew he had committed the murder, and (3) Murgatroyd cut off some of the victim's fingers and helped him bury the body in the desert.[19]

---

[17]   S.F. Trial, Volume 72, testimony of Ted Murgatroyd, at pp. 15–35.

[18]   S.F. Trial, Volume 68, testimony of Chase Hale, at pp. 122–29, 131, 137–38, 146–49, 182, 191, 201–04, 207–10, 226.

[19] S.F. Trial, Volume 69, testimony of Donald Frederick Frank, III, at pp. 16–25.  Frank also testified (1) the Petitioner asked Frank to help clean out the truck in which Petitioner claimed to have fatally strangled Billhartz and (2) when Frank later spoke with Murgatroyd, Murgatroyd's account of the relevant events on the night of the murder was consistent with what Petitioner had told Frank. *Id.*, at pp. 24–25, 39–48.

The prosecution also called Deputy Baker who testified that Petitioner and three other persons were taken into custody during the early morning hours of November 23, 2002, near Plainview, Texas, after their vehicle was spotted parked partially on the roadway. Deputy Baker explained law enforcement officers had received information informing them that the owner of the vehicle, Billhartz, had been reported missing and instructing them to secure the vehicle.[20] The prosecution then presented testimony that, when initially questioned by law enforcement officers from El Paso and New Mexico on November 25, 2002, Petitioner denied any responsibility for Billhartz's murder,[21] but Petitioner subsequently gave a voluntary written statement in which he confessed to having fatally strangled Billhartz.[22] All three law enforcement officers who interviewed Petitioner on November 25, 2002, testified that, while

---

[20] S.F. Trial, Volume 69, testimony of Tommy L. Baker, at pp. 65–101; testimony of Jerry Johnson, at pp. 102–33. More specifically, officer Baker testified (1) he stopped to check on the occupants of what later turned out to be Billhartz's pickup truck when he noticed it was parked partially on the roadway, (2) he ran a routine check on the licence plate number, (3) after he determined the occupants were all right and directed them to move Billhartz's vehicle off the roadway, he received a call indicating the vehicle belonged to a missing person, (4) he then turned on his flashing lights and effected a stop of the pickup, (5) a subsequent consent search of the pickup revealed a small plastic baggie containing a white powder that field tested negative for drugs, (6) when asked for title papers on the pickup, Petitioner informed the officers that he was in the process of purchasing the pickup from his girlfriend, (7) the officers then received a dispatch instructing them to take Petitioner into custody and to treat the vehicle as a potential crime scene, and (8) Petitioner and the other inside Billhartz's vehicle were transported to the Hale County Jail. *Id.*, testimony of Tommy L. Baker, at pp. 67–87. A Texas Department of Public Safety trooper who made the scene along with officer Baker testified, in pertinent part, that (1) Petitioner did not appear to be intoxicated or high on drugs and (2) Petitioner explained he had borrowed the pickup truck from his girlfriend, whom Petitioner claimed to have dropped off in Mexico. *Id.*, testimony of Jerry Johnson, at pp. 112–15, 126–27.

[21] S.F. Trial, Volume 69, testimony of Henry Cooper, at pp. 215–21, Volume 71, testimony of Henry Cooper, 81–95; Volume 73, testimony of David Samaniego, at pp. 26–31; Volume 75, testimony of Jesus Pantoja, Jr., at pp. 26–28; Volume 75, testimony of David Samaniego, at p. 193.

[22] S.F. Trial, Volume 73, testimony of David Samaniego, at pp. 28–47; Volume 75, testimony of David Samaniego, at p. 232. Petitioner's written statement of November 25, 2002 was admitted into evidence as State Ex. 61.

Petitioner appeared tired, Petitioner was coherent, responsive, and showed no signs of

intoxication, mental illness, or severe sleep deprivation.[23]

    The medical examiner who performed the autopsy on Billhartz's body testified (1)

Billhartz's body showed signs Billhartz had suffered (a) internal injuries to the head and neck, (b)

fractures to the thyroid bone, nasal bones, mandible (jaw), and cartilage in the front of the neck

------

[23] S.F. Trial, Volume 69, testimony of Henry Cooper, at pp. 216–19; Volume 71, testimony of Henry Cooper, at pp. 76, 81–90, 100–01; Volume 73, testimony of David Samaniego, at pp. 26, 30–31, 54; Volume 75, testimony of Jesus Pantoja, Jr., at pp. 51–53, 73–80; Volume 75, testimony of David Samaniego, at pp. 209, 239; Volume 77, testimony of Jesus Pantoja, Jr., at pp. 36–38; Volume 77, testimony of David Samaniego, at pp. 66–69. In pertinent part, State Ex. no. 61, i.e., Petitioner's written statement concerning Billhartz's murder, states as follows:

> Ted and I went to the side of the house and I told him to slow down and tell me what happened. He told me again that she was hitting him and he "knocked the bitch." I then told everyone there to meet in the shed. I went to the shed and met with Ted, Tim, James and Jesse. I noticed that Chase was there and I told him to leave with the girl that he was with. As soon as Chase left I asked everyone what they thought about what was happening. Tim said that Melanie was going to call the cops on Ted. We had a lab going on right there and then so there was no way she was going to call the cops. The first thing that came to my mind was to kill her. I told everyone there that we were going to kill her and that I needed some trash bags. Tim and James were like no you shouldn't do it. I said if she call [sic] the cops and they come here the cops are going to arrest Ted for assault and everyone else for the drugs. James and Tim again said that we shouldn't kill Melanie and then I told them a scenario of what could happen. I told them that I was going to take care of her myself. During all this Ted did not say anything. Jesse also said that we shouldn't do it. We all dispersed and Jesse took off and left the house. I got in the truck with Melanie and we left, just us two. Melanie was sitting in the truck. I told her to [sic] lets take a ride so that she could calm down. She drove and we left the house on Melody. She told me that she wanted to do some speed. I had just finished "batching" meaning cooking it so I had some on me. I gave her like a half a gram and she smoked almost all of it. She was still driving. We had decided to get out of El Paso so Melanie had taken I-10 east and by the time she had almost finished the speed we were like in between Sierra Blanca and Van Horn. I told her to pull off to a dirt road. I had not taken any drugs that night. She was upset because all the speed was gone so she started tripping again. I told her to stop so that we could get out of the truck and just kick back on the tailgate and talk. I just wanted to calm her down. She started wigging out and I just choked her to death. I chocked [sic] her with an extension cord that I got from the house on Melody. Det. Samaniego has asked me if I remember the color of the extension cord and I do not remember the color. I really don't remember how many times I wrapped it around her neck but I did wrap it several times. I kept the pressure to her neck until she stopped fighting. After this I threw her in the backseat of the truck.

consistent with ligature strangulation, but her hyoid bone remained in tact, and (c) facial injuries consistent with having been punched in the face, (2) the decomposition and loss of tissue in the neck prevented identification of ligature marks on Billhartz's neck, (3) Billhartz's left second rib and left ninth ribs were fractured, (4) portions of Billhartz's right hand were missing, (5) at least five separate injuries would have been necessary to cause the extensive damage to Billhartz's right hand, (6) the cause of Billhartz's death was ligature strangulation, which was consistent with the cord found wrapped around Billhartz's neck at the time of autopsy, (7) Billhartz's blood alcohol level was .078 percent, but a portion of that level may have been the result of decomposition of the body, and (8) the toxicological screen on Billhartz's brain tissue was negative for narcotics.[24]

Jesse Eddy ("Eddy"), a self-described Aryan Circle "prospect," testified, in pertinent part, that (1) Petitioner was District Captain of the Aryan Circle in El Paso, (2) on the evening of Billhartz's murder, he was cooking methamphetamine at the drug house on Melody Lane, (3) Billhartz was hysterical when she arrived at the drug house, yelling, crying, and screaming that Murgatroyd had hit her, (4) Billhartz had a bloody nose and said she was going to call the police, (5) he observed no injuries to Billhartz's jaw or side, (6) shortly thereafter, Murgatroyd arrived at the drug house and a meeting was called in the shed behind the house to talk with Murgatroyd and see what had happened, (7) during the meeting, Petitioner told Murgatroyd to go get some trash bags because "I'm going to kill the bitch," (8) Eddy and others present during the meeting were surprised by Petitioner's threat and objected to his plan to kill Billhartz, (9) those present during the meeting included Petitioner, Eddy, Murgatroyd, Tim Davis ("Davis"), and James

---

[24] S.F. Trial, Volume 71, testimony of Patricia McFeeley, at pp. 109–57.

Eaton ("Eaton"), (10) at one point, Petitioner directed Hale and some girls to leave and they did so, (11) Eddy left the meeting and went to the house, (12) as he was leaving the house, Eddy saw Billhartz sitting in her truck, (13) Eddy suggested to Billhartz that she should leave, (14) the next time Eddy saw Petitioner, the Petitioner was driving Billhartz's pickup truck, (15) Petitioner told Eddy he had bought the truck, (16) not long thereafter, Eddy left El Paso with Petitioner for Carlsbad, New Mexico, where they remained for several weeks at the home of the sister of Eddy's girlfriend, (17) Eddy shared a bedroom with Petitioner, (18) Petitioner and Eddy both used methamphetamine while in Carlsbad, (19) Petitioner slept regularly while in Carlsbad, (20) after several weeks, Eddy, the Petitioner, Eddy's girlfriend, and her infant son all set out to drive to Indiana in Billhartz's pickup, (21) Eddy fell asleep and, when he woke up, the truck was stopped and a police officer was talking to the Petitioner, and (22) he did not know whether Petitioner actually killed Billhartz.[25]

Davis, a self-described Aryan Circle member, testified in pertinent part, that (1) Petitioner was the District Captain of the Aryan Circle in El Paso, (2) on the night of Billhartz's murder, Eddy came over to Davis' residence to cook methamphetamine because Davis' residence was a safe place to do so, (3) when Davis saw Billhartz that evening, her teeth were bloody and Billhartz said "Ted hit me," (4) other than a busted lip and accompanying bloody teeth, Billhartz did not appear to have any other injuries, (5) Petitioner told Davis "Hey, dude, we need to take her out.  She's going to call the police.  She just needs to go," (6) Davis objected to killing Billhartz, as did everyone present except the Petitioner, (7) Eddy left the scene, (8) the vote on Petitioner's proposal to kill Billhartz was overwhelming against Petitioner's plan, (9) Davis

---

[25] S.F. Trial, Volume 73, testimony of Jesse Eddy, at pp. 133–77, 184–97.

returned to his residence with the expectation that the Petitioner would not harm Billhartz, (10) the next time Davis exited his residence, Billhartz's truck was gone, (11) others told Davis the Petitioner had left with Billhartz, (12) Murgatroyd and Eaton were still present, (13) Davis later saw the Petitioner driving Billhartz's truck, but did not see Billhartz inside, (14) David went to Toni Anderson's ("Anderson") home, (15) the Petitioner and Murgatroyd pulled up to Anderson's house in Billhartz's vehicle, (16) Davis and a pair of women got into Billhartz's vehicle with Petitioner and Murgatroyd and they all went to a restaurant to eat, (17) Davis knew from Murgatroyd's and the Petitioner's demeanor that the Petitioner had "done it," (18) Davis went back to his residence, where Eaton told Davis what had happened, (19) a couple of days later, Davis saw the Petitioner driving Billhartz's truck, (20) the Petitioner described to Davis how he had killed Billhartz by choking her and where he had put Billhartz's body, and (21) Davis instructed the Petitioner to wash out Billhartz's truck some place other than at Davis' residence.[26]

### 2.      The Defense's Evidence

The defense's case at the guilt-innocence phase of Petitioner's capital murder trial had two prongs: first, to attack the efficacy of the procedures employed by El Paso Police Detectives investigating Billhartz's murder; and second, to suggest that Murgatroyd was the real murderer.

The defense called a Texas Department of Public Safety criminalist who testified (1) she found a stain in the back seat of Billhartz's pickup truck that was negative presumptive for blood, (2) it was difficult to see stains on the dark blue carpet inside Billhartz's vehicle, (3) liquid will dilute stains, and (4) the use of luminol would have been the next logical step in a proper

---

[26] S.F. Trial, Volume 74, testimony of Tim Ray Davis, at pp. 83–182.

inspection of the vehicle.[27]

The defense recalled El Paso Police Detective Jesus Pantoja, Jr. ("Detective Pantoja"), one of the detectives who interviewed Petitioner on November 25, 2002, who testified (1) the Petitioner initially denied killing Billhartz and became upset when he was accused having done so, (2) when the Petitioner asked to see them, he showed the Petitioner the written witness statements of Murgatroyd and Eaton to Petitioner, (3) Petitioner's eyes lit up when the Petitioner saw Detective David Samaniego ("Detective Samaniego") enter the interview room and Petitioner asked the other detectives present to leave the room so Petitioner could speak with Detective Samaniego privately, (4) the Petitioner thereafter gave Detective Samaniego a written statement, (5) at no point, did the Petitioner say or indicate he was then on methamphetamine, (6) the Petitioner did state at one point that he was insane, but the Petitioner did not elaborate on that statement when asked to do so, (7) the Petitioner was fully *Mirandized* at the start the interview on November 25, 2002, (8) at all times during the interview, Petitioner appeared coherent, even articulate, (9) the detective had no trouble communicating with the Petitioner, who explained coherently why he was driving Billhartz's truck when arrested, (10) he had no reason to question the Petitioner's sanity or to suspect the Petitioner was under the influence of drugs or intoxicants during the interview, and (11) while the Petitioner did mention that he was on medication, the Petitioner never requested any medication or indicated he needed any medication.[28]

The defense called an acquaintance of Hale, who testified in pertinent part that (1) he was present at the drug house on Melody Lane on October 28, 2002, and saw Billhartz's pickup truck

---

[27]  S.F. Trial, Volume 75, testimony of Angelina Reeves, at pp. 5–21.

[28]  S.F. Trial, Volume 75, testimony of Jesus Pantoja, Jr., at pp. 25–56, 67–88.

there, (2) the Petitioner rudely told him and Hale to take off, (3) at no point did he attempt to enter or go near Billhartz's vehicle, (4) it appeared to him that some type of meeting was taking place, (5) he left with Hale and two women when instructed to do so by Petitioner, (6) he saw Petitioner driving Billhartz's pickup about three weeks later, and (7) the Petitioner informed him that he (the Petitioner) had bought Billhartz's truck.[29]

Petitioner's defense counsel called Petitioner's court-appointed investigator who testified in pertinent part that (1) when he interviewed Hale, Hale claimed not to recall telling police the information contained in the concluding paragraph of Hale's witness statement, (2) Hale became upset when he explained that he had not received a deal from prosecutors in exchange for his trial testimony against the Petitioner, and (3) Hale claimed that the police had promised Hale he would not face drug charges if Hale gave a written statement in Petitioner's capital murder case, but prosecutors had refused to honor the deal.[30]

Petitioner's trial counsel also recalled the El Paso Police Detective who took Petitioner's written statement on November 25, 2002, who testified in pertinent part that (1) Murgatroyd's nickname was "Ted Bundy," (2) Petitioner was the captain of the Aryan Circle in El Paso, (3) he never promised Hale that Hale's drug charges would be dismissed, (4) Hale said he might know where Billhartz's body was buried, but was unable to lead police to it, (5) when he entered the interview room in Plainview, Texas, he initially got Petitioner something to eat, then began questioning Petitioner, (6) Petitioner initially said Murgatroyd murdered Billhartz, (7) Petitioner later confessed to killing Billhartz, (8) nothing he saw or heard on November 25, 2002, caused

---

[29]  S.F. Trial, Volume 75, testimony of Hector Lopez, at pp. 88–103.

[30]  S.F. Trial, Volume 75, testimony of George Huerta, at pp. 124–38.

him to believe the Petitioner was insane, (9) he spoke with the Petitioner for more than two hours on that date and had no problem communicating with Petitioner, and (10) there was never any evidence establishing that Murgatroyd murdered Billhartz.[31]

Petitioner's trial counsel also called a Texas Department of Criminal Justice ("TDCJ") gang intelligence officer who testified in pertinent part that (1) during a period of incarceration ending in November of 2000, TDCJ had no information indicating Petitioner was a member of the Aryan Circle, (2) it was unlikely the Petitioner could have risen from a non-member to the rank of Captain within the Aryan Circle between November of 2000 and October of 2002, but (3) he had very little experience with gangs outside of the prison setting.[32]

A New Mexico Detective called by Petitioner's trial counsel testified (1) Detective Samaniego questioned Petitioner alone on November 25, 2002, and (2) Detective Samaniego later told him Billhartz's murder occurred in Texas.[33]

The defense also called a jail inmate who had talked with Murgatroyd about Billhartz's murder who testified (1) Murgatroyd was a violent man who once beat up another man for not paying him on time, (2) Murgatroyd's nickname was "Ted Bundy," (3) Murgatroyd told him Billhartz was strangled because she told on one of Murgatroyd's Aryan Circle brothers, (4) while Murgatroyd never specifically admitted he strangled Billhartz, he (the inmate witness) assumed Murgatroyd had done so based upon Murgatroyd's demeanor, and (5) Murgatroyd did admit that

---

[31] S.F. Trial, Volume 75, testimony of David Samaniego, at pp, 148–241; Volume 76, testimony of David Samaniego, at pp. 5–21.

[32] S.F. Trial, Volume 76, testimony of Isabel Hernandez, at pp. 22–69.

[33] S.F. Trial, Volume 76, testimony of Henry Cooper, at pp. 70–71.

he cut off Billhartz's fingers to get her rings.[34]

The defense also called an expert in police investigative techniques who criticized the El Paso Police Department's investigation of Billhartz's murder and testified (1) there should have been a log kept of all the personnel present at the scene when Billhartz's body was first discovered and later excavated, (2) the crime scene—the location in the desert where Billhartz's body was recovered—was never properly secured or diagramed, (3) little was done to follow up on potential leads suggesting persons other than the Petitioner had actually murdered Billhartz, (4) tire tracks found near the body were not properly preserved, (5) a cracked pipe found near Billhartz's body was not examined for fingerprints, (6) police from El Paso did not attend Billhartz's autopsy in New Mexico, (7) there were discrepancies between Murgatroyd's statement to police regarding the condition of Billhartz's body and the actual condition of the body when recovered, (8) it was a better practice to videotape a suspect's statement rather than to have an officer paraphrase it in a written document, (9) no investigation was conducted to determine if Petitioner was depressed when he confessed, (10) depressed persons will confess to anything, including things they have not done, (11) Petitioner was never evaluated to determine if he was "insane" when he gave his confession, and (12) Petitioner and other persons from whom witness statements were obtained should not have been given *Miranda* warnings prior to being questioned.[35]

The defense also called a former El Paso County prosecutor who testified the reason El Paso law enforcement officers took written statements from suspects, rather than videotaping

---

[34]  S.F. Trial, Volume 76, testimony of Darrell Allen, at pp. 76–112.

[35]  S.F. Trial, Volume 76, testimony of William T. Gant, at pp. 123–245.

their interviews of suspects, was to maintain control over what was included in those statements and to avoid the "humanizing" aspects of videotapes of the suspect giving their confessions.[36]

The defense also called the El Paso Police Detective who interviewed Murgatroyd and testified Murgatroyd gave two statements to police regarding the Billhartz murder and, in his first statement, Murgatroyd failed to mention that he had cut off Billhartz's fingers.[37]

### 3.    Prosecution's Rebuttal Evidence

The prosecution then recalled one of the El Paso Police detectives who interviewed Petitioner on November 25, 2002 who testified (1) he gave Petitioner full *Miranda* warnings at the outset of their interview, (2) Petitioner indicated he understood his rights and appeared to understand them, (3) he had no problems communicating with Petitioner, and (4) Petitioner appeared to be alert and attentive throughout the interview.[38]

An El Paso Police Department crime scene photographer testified (1) the tire tracks found near Billhartz's body were extensively photographed, both from the air, and from the ground, and (2) because of the passage of more than a month since Billhartz's murder and large number of tire tracks found in the area, no conclusions could be drawn regarding the tracks at the scene.[39] Another El Paso Police Department employee testified regarding the extensive photographs taken of Billhartz's body during the process of excavating same, including the efforts taken to

---

[36]   S.F. Trial, Volume 77, testimony of Gary Weiser, at pp. 7–14.  This witness, then a practicing defense attorney in El Paso County, admitted under cross-examination that his personal knowledge of police procedures in El Paso County ended in 1992 and that amendments to the Texas Rules of Evidence since then had changed the legal landscape. *Id.*, at pp. 14–19.

[37]   S.F. Trial, Volume 77, testimony of Ray Sanchez, at pp. 25–33.

[38]   S.F. Trial, Volume 77, testimony of Jesus Pantoja, Jr., at pp. 36–38.

[39]   S.F. Trial, Volume 77, testimony of Mark Fernandez, at pp. 41–57.

photograph the condition of Billhartz's clothing.[40]

The El Paso Police Detective who took Petitioner's statement on November 25, 2002, testified (1) his first contact with Petitioner on that date came around 11:25 a.m. after he had finished interviewing Eddy and Aimme Quintela ("Quintela"), the two adults arrested with Petitioner in Plainview, Texas, two days earlier, (2) he spoke with Petitioner alone for a total of about thirty to forty-five minutes, (3) he did not give Petitioner *Miranda* warnings until about ten minutes into their interview, after he had obtained food for Petitioner, (4) Petitioner appeared to fully understand his rights, agreed to waive his rights, and to give a statement, (5) he began taking Petitioner's written statement around 12:30 p.m. and finished around 2:10 p.m., (6) Petitioner's demeanor through the interview was normal, (7) he never thought Petitioner was insane, (8) he had no problem understanding the Petitioner, (9) what the Petitioner said made sense, (10) he never spoke with the doctor who performed Billhartz's autopsy, (11) other vehicles were not checked, (12) hair fibers recovered by sifting dirt at the scene near Billhartz's body were not analyzed, (13) no attempt was made to check the cracked pipe found near Billhartz's body for DNA, and (14) various items found near Billhartz's body were never checked for fingerprints.[41]

Eaton, a self-described "lieutenant" in the Aryan Circle, testified that (1) Petitioner, who was "District Captain" of the Aryan Circle, made him one of his lieutenants, (2) he was present at the drug house on Melody Lane the evening of Billhartz's murder, (3) that evening, he saw Billhartz crying and upset with a cut lip, (4) Billhartz appeared to be talking fine and had no

---

[40] S.F. Trial, Volume 77, testimony of Ludovico Granillo, at pp. 57–64.

[41] S.F. Trial, Volume 77, testimony of David Samaniego, at pp. 64–79.

visible injuries other than her bleeding lip, (5) Billhartz did not appear to have a broken nose or

broken ribs, (6) Bilhartz said she was going to call the police because Murgatroyd had assaulted

her, (7) Petitioner took Billhartz's keys, told her to go to her truck, and ordered the rest of them

into the shed, (8) Petitioner ordered Hale to leave, (9) Petitioner told someone to find some large

trash bags because he was going to take care of Billhartz, (10) Eaton asked Petitioner why he

needed trash bags, (11) Petitioner responded that he needed something to put Billhartz's body in,

(12) at that point, everybody kind of blew up and expressed opposition to killing Billhartz, (13) a

vote taken in the shed was unanimous (except for Petitioner) that Billhartz should not be killed,

(14) Murgatroyd was not present during the vote, (15) Eaton and Davis discussed the possibility

of calling a high ranking Aryan Circle official in Fort Worth to seek Petitioner's removal as

District Captain, (16) Eaton went to talk to Petitioner in an attempt to dissuade Petitioner from

harming Billhartz, but Petitioner picked up some electrical cord, (17) Petitioner was usually

armed and no one present believed Petitioner would hesitate to use a weapon, (18) Eaton later

saw Billhartz's truck leave but could not see who was in it, (19) after the truck left, the Petitioner

was no longer present, but Murgatroyd was still at the drug house, (20) Petitioner was gone

between an hour and ninety minutes, (21) Eaton saw Petitioner return in Billhartz's truck, (22)

when Eaton asked where Billhartz was, the Petitioner said Billhartz was dead in the back of the

truck and said he had strangled her, (23) Petitioner asked Eaton and Davis to help him dispose of

Billhartz's body, but they refused, (24) Petitioner then told Murgatroyd it was his fault "this mess

happened" and directed Murgatroyd to help Petitioner "clean it up," (25) Murgatroyd did not

appear to want to help Petitioner, (26) but Murgatroyd did leave with Petitioner, (27) Eaton next

saw the Petitioner between 4:30 and 5:00 a.m. the next morning, (28) Petitioner said he had

dumped the body somewhere in the desert, (29) when Eaton asked about Billhartz's pickup truck, the Petitioner said he was going to hang on to it and sell it, (30) Eaton asked Petitioner not to bring Billhartz's truck to Eaton's residence any more, (31) Petitioner said it took him about five minutes to strangle Billhartz, (32) on the evening of her murder, Billhartz was speaking fine, (33) Eaton thought he and the others had dissuaded Petitioner from killing Billhartz, (34) the extension cord Eaton saw Petitioner with on the night of the murder looked like the one found wrapped around Billhartz's lifeless body, and (35) Eaton did not learn that Murgatroyd had chopped off Billhartz's fingers until about three months after the murder.[42]

An El Paso Police Detective who served on an FBI gang task force testified in pertinent part that (1) criminal sophistication was more important than age in determining to what level and how swiftly an individual could rise within the Aryan Circle, (2) the Aryan Circle is the only prison gang that accepts women as full members, (3) Petitioner is a member of the Aryan Circle and served as the District Captain for the El Paso area, (4) Murgatroyd was a prospect in 2002, but had recently been admitted into the Aryan Circle as a member, (5) a number of Petitioner's tattoos are similar to those of other Aryan Circle members, (6) Aryan Circle documents seized by law enforcement officers in the Midland-Odessa area identified Petitioner as the District Captain in El Paso, and (7) Eaton also has tattoos indicating his Aryan Circle membership.[43]

### 4.    The Verdict

On February 8, 2005, the jury returned its verdict at the guilt-innocence phase of

---

[42]   S.F. Trial, Volume 78, testimony of James Eaton, at pp. 15–74.

[43]   S.F. Trial, Volume 78, testimony of Jeffrey M. Gibson, at pp. 82–135.

Petitioner's trial, finding Petitioner guilty beyond a reasonable doubt of capital murder.[44]

### E.    Punishment Phase of Trial

The punishment phase of Petitioner's trial commenced on February 9, 2005.

#### 1.    The Prosecution's Evidence

A trio of probation officers testified regarding (1) the Petitioner's history of multiple

offenses as a juvenile and as a young adult, and (2) Petitioner's record of repeatedly violating the

conditions of his probation.[45]

A Hale County Sheriff's Sergeant who encountered Petitioner in November of 2002,

testified (1) the policy at the Hale County Jail is to send arrested persons who appear to be

intoxicated or high to the hospital to be examined, (2) Petitioner was not sent to the hospital upon

his admission to the jail, (3) shortly after Petitioner's arrest, Petitioner questioned him regarding

the charge that formed the basis for Petitioner's arrest, (4) when informed the charge was

---

[44]  S.F. Trial, Volume 79, at pp. 97–101; Trial Tr., Volume IV, at p. 1162.

[45]  More specifically, an El Paso County juvenile probation officer testified (1) Petitioner was adjudicated for delinquent conduct on August 5, 1997, in connection with two burglaries of a habitation, three burglaries of a building, and one evading arrest, (2) Petitioner was given probation and placed in an intensive program of supervision for habitual juvenile offenders, (3) Petitioner thereafter violated the terms of his probation by testing positive on a urinalysis for marijuana, (4) Petitioner was then placed in the Job Corps but was caught smoking marijuana and was sent to a group therapy center where Petitioner earned his GED, and (5) during her encounters with him, Petitioner was intelligent, cooperative, and was worth saving.  S.F. Trial, Volume 80, testimony of Kitty Heard, at pp. 15–30.
    A West Texas Community Supervision probation officer testified regarding the types of conditions usually imposed on a probationer.  S.F. Trial, Volume 80, testimony of Melanie Ramirez, at pp. 30–35.
    Another probation officer testified (1) Petitioner was convicted pursuant to a guilty plea on November 5, 1999, of unauthorized use of a motor vehicle, (2) Petitioner received a probated sentence, (3) Petitioner was convicted as an adult pursuant to a guilty plea on February 4, 2000, of burglary of a habitation and received a two-year sentence, (4) Petitioner had been on probation for his unauthorized use charge for twenty days when Petitioner committed his burglary of a habitation offense, and (5) Petitioner also violated the terms of his probated sentence by failing to report as required.  S.F. Trial, Volume 80, testimony of Jorge Carreon, at pp. 36–51.

"unauthorized use of a motor vehicle," Petitioner responded that he could not understand how the vehicle he was driving had been reported stolen if the owner was dead, (5) several days later, he observed Petitioner in the hospital after the Petitioner cut his own throat, (6) he was present with Petitioner on November 24, 2002, when Petitioner was presented to a magistrate, (7) Petitioner received no medications following his arrest until November 26, 2002, and (8) on November 26, 2002, prior to his suicide attempt, Petitioner signed a "no suicide contract."[46]

A number of Sunland Park, New Mexico, Police Officers and El Paso Police Officers testified about the discovery of the body of Arturo Diaz ("Diaz") on April 10, 2002, at a location so close to the state line that El Paso City employees were summoned to verify the body was located in El Paso.[47]  Diaz, a transvestite, had been fatally shot once in the back.[48]  Police

---

[46] S.F. Trial, Volume 80, testimony of Mark Brown, at pp, 52–85.

[47] S.F. Trial, Volume 80, testimony of Angel Colorado, at pp. 101–11; Volume 80, testimony of Javier Urrutia, at pp. 112–29; Volume 80, testimony of Rey Molinar, at pp. 121–27; Volume 80, testimony of Hilda Leon, at pp. 128–33; Volume 80, testimony of Ludovico Granillo, at pp. 133–52; Volume 80, testimony of Juan Reta, at pp. 156–60; Volume 80, testimony of Gonzalo Chavarria, at pp. 165–73, 190–95; Volume 80, testimony of David Samaniego, at pp. 174–89; Volume 81, testimony of Gonzalo Chavarria, at pp. 53–82; Volume 81, testimony of David Samaniego, at pp. 82–121.
A number of photographs of the crime scene and the items collected at the crime sene were admitted into evidence as State Ex. nos. 119–21, 124–29, 130–37, 143–50 and appear in S.F. Trial, Volume 92.

[48] Diaz a/k/a "Tury" was discovered lying face down along the side of a street, dressed as a woman, and wearing women's makeup.  S.F. Trial, Volume 80, testimony of Angel Colorado, at pp. 107–10; Volume 80, testimony of Javier Urrutia, at pp. 118–20; Volume 80, testimony of Rey Molinar, at pp. 123–26; Volume 81, testimony of Gonzalo Chavarria, at pp. 54–57.
The medical examiner who performed the autopsy of Diaz testified in pertinent part that (1) Diaz died as a result of a single gunshot wound to the back, (2) the bullet entered Diaz between the eleventh and twelfth ribs posteriorly, went through intercostal muscles, through the lower lobe of the right lung, through the right pulmonary artery, through the right atrium of the heart, through the bone of the fifth rib and exited the body through the front chest, (3) the fatal bullet entered Diaz's back around twenty inches from the top of the head and exited his chest about seventeen inches from the top of the head, (4) no bullet fragments were found inside Diaz's body, (5) chemical analysis of Diaz's blood revealed cocaine as well as the cocaine metabolite benzoylecgonine and a blood alcohol level of .09, (6) vitreous alcohol level was .12, (7) from the foregoing, it appeared Diaz ingested cocaine and alcohol within sixty to ninety

searched but never located the fatal bullet or any shell.[49]  Another transvestite furnished police

with a description of a tall, white male suspect who had been seen with Diaz in the hours

immediately before Diaz's murder.[50]

A pair of El Paso County Deputy Sheriffs testified (1) on April 22, 2002, Petitioner was

stopped while driving a vehicle that one deputy personally observed driving through a stop sign

in a residential area near a group of children, (2) a search of the vehicle driven by Petitioner led

to the discovery of a handgun, (3) while Petitioner did not claim ownership of the handgun, he

did admit he knew it was present in the vehicle, and (4) Petitioner was arrested for being a

convicted felon in possession of a firearm.[51]  A firearms expert testified the handgun seized that

day was functional, operational, and required eleven pounds of pressure on the trigger to get it to

fire.[52]

Later on April 22, 2002, a friend of Diaz, the same transvestite who had furnished police

with the description of a suspect, spotted the Petitioner at a store and recognized Petitioner as the

person whom he had seen with Diaz in the hours shortly before Diaz's murder.[53]  When Diaz's

---

minutes of his death, (8) no needle marks or defensive wounds were observed on Diaz's body, (9) there
was no gunpowder stripling on Diaz's back, suggesting the gun was at least eighteen inches from Diaz's
back when the fatal shot was fired, and (10) abrasions on Diaz's chest and chin were consistent with a
running person falling face down, the position in which Diaz's body was found by law enforcement
officers. S.F. Trial, Volume 82, testimony of Corrine Elizabeth Stern, at pp. 47–69.

[49]  S.F. Trial, Volume 80, testimony of Ludovico Granillo, at pp. 151–52; Volume 80, testimony
of Juan Reta, at p. 158; Volume 81, testimony of Gonzalo Chavarria, at p. 56.

[50]  S.F. Trial, Volume 81, testimony of Gonzalo Chavarria, at pp. 56, 58–59.

[51]  S.F. Trial, Volume 80, testimony of Michael Peters, at pp. 87–100; testimony of David Earl
Hargrove, at pp. 153–55.

[52]  S.F. Trial, Volume 82, testimony of Joe Correa, at pp. 70–83.

[53]  S.F. Trial, Volume 81, testimony of Hector Manuel Valles, at pp. 150–53.

friend began shouting, Petitioner fled the store while Petitioner's father confronted the distraught

friend and impeded the friend's ability to pursue Petitioner.[54]  Petitioner later surrendered to

police without incident.[55]  Petitioner thereafter gave a written statement, admitted into evidence

at Petitioner's capital murder trial as State Exhibit Number 153, in which he confessed to having

shot Diaz, but claimed to have done so only after Diaz, whom Petitioner claimed to believe to be

a woman, grabbed Petitioner's genitals and revealed his true gender.[56]

---

[54] *Id.*, at p. 151.  Valles, a/k/a "Dominique," testified (1) admitted to prostitution, drug, and theft convictions, (2) he was a friend of Diaz, (3) Diaz and the Petitioner came to Valles's residence during the early morning hours of April 10, 2002, (4) Petitioner asked Valles if he remembered Petitioner, (5) at first Valles did not recall Petitioner but, later recalled having had sexual relations with Petitioner on two separate occasions several years before when Valles lived in El Paso, (6) when Diaz and Valles began smoking cocaine, Petitioner said he was leaving, and (7) Petitioner drove off with Diaz.  S.F. Trial, Volume 81, testimony of Hector Manuel Valles, at pp. 137–58.

[55] S.F. Trial, Volume 81, testimony of Michael Brooks, at pp. 10–11.  Detective Brooks testified he found Petitioner at the residence of Anderson's mother and Petitioner voluntarily came to the police officer for an interview.  *Id.*

Detective Brooks also testified about a previous incident he investigated in which (1) Petitioner, Anderson, and a third person went to an apartment and beat up a fourth person and (2) a couple days, later, the victim of the beating showed up at the police office with Petitioner and two females and stated he wanted to drop the charges arising from the beating.  *Id.*, at p. 8.

[56] S.F. Trial, Volume 81, testimony of Gonzalo Chavarria, at pp. 63–75.

In pertinent part, Petitioner's written statement concerning the Diaz murder explains that Petitioner gave a ride to a person whom Petitioner believed was a woman to a location in Sunland Park, New Mexico, and then the following transpired:

> The girl asked me to go inside with her.  I told her I had to go but she said just for a minute.  I said OK and the girl opened the door and we walked in.  I sat down and then I saw a person come out of one of the bedrooms.  As soon as I saw the person I recognized him as a transvestite that I used to score cocaine from about 4 years ago.  I put one and one together and found out that the girl I had picked up was also a man.  The dude that was at the house brought a pipe out and I told them that I needed to leave and get some sleep.  The dude I brought with me said to give him just a minute and told me to give her a ride to her house.  She said she lived right around the corner.
>
> We walked out after the dude took a hit of the crack pipe.  I got in the truck and he got in.  He told me to give him a ride around the street.  I drove off and went back towards the freeway.  That's when he said, you know what I am right, and I said yes.  He then reached over and started grabbing my dick.  He was saying I had a big dick and I pushed him away.  I then grabbed my gun, a 9 mm Jennings that I always carry.  I bought it from a guy by the

The prosecution presented a witness who testified that, about two months before Diaz's murder, she witnessed the Petitioner pick up Diaz from a meeting of a support group for transgender individuals.[57] A state prison employee testified regarding Petitioner's history of disciplinary reports during his periods of incarceration.[58] A pair of El Paso Sheriff's Department employees testified regarding a note or "kite" mentioning Murgatroyd which El Paso County jail personnel intercepted, and which Petitioner attempted to send to another member of the Aryan Circle during his pretrial detention.[59] A psychiatrist testified that Petitioner's antisocial personality, escalating degree of violence, and gang membership all weigh heavily in favor of a

---

name of Billy. I took the gun from under the seat and told him to get out the fuck out of the truck. I held the gun in my left hand and he started hitting me and saying no, don't. I stopped the truck and as he was getting out of the truck I fired once at him. he got out and I took off. I shot him very close to a bridge. I took off and drove all the way to Executive. I was thinking a hundred miles per hour and figuring out what I was supposed to do. I thought oh man, the shell casing and I decided to go back and get the shell casing. I drove to the freeway all the way to Mesa and then down Doniphan. I then went back to where I thought I had shot him. I drove right by him and drove a little past the body and stopped. I got out and started looking for the casing where I thought it had landed. I didn't find it. A truck passed by and I got scared so I took off. I pulled over at the store on Redd Road and Resler to look for the casing, which I found. I flushed it down the toilet and went home. I don't remember what exactly I was wearing that day. I left to Cuero Texas that Saturday morning.

[57]   S.F. Trial, Volume 81, testimony of Paula Anaya, at pp. 173–77, 181.

[58]   S.F. Trial, Volume 82, testimony of Steven Rogers, at pp. 10–45. Petitioner's TDCJ disciplinary record included incidents of fighting, testing positive for marijuana, damaging a light fixture, and being out of place. *Id.*

[59]   S.F. Trial, Volume 82, testimony of Paul Reyes, Jr., at pp. 84–91; Volume 82, testimony of Jeffrey M. Gibson, at pp. 92–112.
   The note or "kite" was admitted into evidence as State Ex. nos. 185–86 and appears in S.F. Trial, Volume 93. In pertinent part, the note states "I can have my lawyers get them to testify that Bundy did it." The note also asks the intended recipient to report back to Petitioner on Murgatroyd a/k/a Bundy's activities.

conclusion that Petitioner posed a danger of future violence.[60]

## 2.    The Defense's Evidence

The defense presented testimony from Petitioner's father that (1) he had been convicted in 1992 of drug possession and distribution charges, (2) he used drugs with Petitioner, specifically marijuana and crystal methamphetamine, starting when Petitioner was twelve years old, (3) he began using heroin, cocaine, and marijuana when Petitioner was seven or eight years old, (4) Petitioner started using drugs when Petitioner fourteen or fifteen years old, (5) Petitioner was four or five when he divorced Petitioner's mother, who was a drug user, (6) after the divorce, Petitioner went to live with Petitioner's birth mother in Alabama, but Petitioner was abused by his birth mother and came to live with him at age seven or eight, (7) the Petitioner "never had a chance" because of the environment in which Petitioner grew up, (8) he asked Petitioner to sell drugs for him when Petitioner was nineteen or twenty years old, and (9) although he signed a statement for police, he never read it and did not know what was in his statement.[61]

Petitioner's step-mother testified (1) she met the Petitioner when he was thirteen years old, (2) Petitioner had never been disrespectful to her, (3) Petitioner was a good person, who had treated her and her daughter well, and (4) Petitioner's life was worth saving.[62]  Petitioner's

---

[60] S.F. Trial, Volume 83, testimony of Edward Brown Gripon, at pp. 51–79.  Dr. Gripon also identified Petitioner's lack of apparent guilt or remorse over Petitioner's criminal activities and Petitioner's unstable family history as supporting his conclusions regarding Petitioner's likelihood for future violence. *Id.*, at pp. 51, 73–74.

[61] S.F. Trial, Volume 81, testimony of Jimmy Donald Hall, at pp. 16–38.  The inconsistency in the text concerning the age at which Petitioner started using drugs is an accurate reflection of the inconsistent testimony given by this witness on this subject at Petitioner's trial. *Id.*, at pp. 18, 25.

[62] S.F. Trial, Volume 81, testimony of Teresita Hall, at pp. 39–43.  She admitted on cross-examination that she had never seen Petitioner on drugs. *Id.*, at p. 43.

teenage step-sister testified Petitioner was very smart, a very hard worker, had always been very good to her, and was worth saving.[63]  The defense called an Hispanic acquaintance of the Petitioner who testified the Petitioner (1) had always been respectful toward him and (2) the Petitioner had insisted that he (the Petitioner) would not be found guilty in connection with the Diaz murder once all the facts were known.[64]  Another acquaintance of the Petitioner testified Petitioner was a very good person who had helped take care of her dying grandmother.[65]  A clerical employee of a juvenile probation office's residential treatment center who met Petitioner in 1997, but had not seen Petitioner since 1998, testified Petitioner was always very respectful to her and had a life worth saving.[66]

The psychiatrist who examined Petitioner following Petitioner's apparent suicide attempt at the Hale County Jail, when Petitioner cut his own neck, testified via deposition that (1) Petitioner was apprehensive and anxious, but cooperative, when he interviewed Petitioner, (2) Petitioner's responses to his questions were "careful," (3) he diagnosed Petitioner with major depressive disorder, (4) in his report, he indicated the need to rule out schizophrenia and malingering, (5) amphetamine dependence often looks like paranoid schizophrenia, (6) the Petitioner reported hearing a voice for several days that had instructed him to cut himself, (7) Petitioner reported that his medications were not helping his depression, (8) Petitioner volunteered that he had killed a transvestite and a lady, but would not offer any details about

---

[63]  S.F. Trial, Volume 81, testimony of Amber Torres, at pp. 44–46.  She admitted on cross-examination, however, that she had never seen Petitioner on drugs. *Id.*, at p. 47.

[64]  S.F. Trial, Volume 83, testimony of Mario Escobedo, at pp. 81–84.

[65]  S.F. Trial, Volume 83, testimony of Toni Rose Anderson, at pp. 100–04.

[66]  S.F. Trial, Volume 83, testimony of Candace Lee Galaviz, at pp. 104–08.

those crimes, (9) the Petitioner displayed a lack of remorse concerning those crimes or his other antisocial behavior, and (10) Petitioner did not appear to be high.[67]

Petitioner took the stand and testified, in pertinent part, that (1) he observed needles, marijuana, and bottle caps in his parents' room as a young child, (2) he smoked his first joint at age twelve and, since then, his focus had been on himself, (3) he did cocaine, methamphetamine, and ecstacy with his father when he was twenty years old, (4) his father was never a role model to him, (5) he was arrested for unauthorized use of a motor vehicle at age fifteen or sixteen, (6) at about the same age, he burglarized a restaurant and got caught, (7) he was thrown out of Cathedral High School, a private school in El Paso, for stealing money from a fund raiser, (8) he earned his GED while in juvenile detention and went through behavior modification group training, (9) despite joining a white supremacist gang, he does not hate Hispanics or Blacks, (10) his birth mother beat him with a belt buckle when he was very little, (11) nonetheless he admires his birth mother because she has always been able to support herself, (12) on one occasion, he led police on a high speed chase, (13) he once stole tools from his own uncle's shed, (14) although he has gotten into fist fights in prison, fights are common in prison, (15) he has never smoked crack or engaged in homosexual activity, (16) he pulled a gun and told Diaz to get out of his truck after Diaz grabbed Petitioner's genitals, (17) Diaz opened the door, reached down to grab a bag, and then turned back and struck Petitioner's hand that was holding the gun, (18) Petitioner "flinched" and the gun went off, (19) he never intended to pull the trigger, (20) while he signed a statement, Petitioner never read the statement concerning Diaz's murder that Detective Chavarria wrote up, (21) he never referred to Diaz as a "faggot," (22) he never made any of the statements

---

[67] S.F. Trial, Volume 83, testimony of Victor A. Gutierrez, at pp. 111–69.

reflected in his written statement of April 22, 2002, concerning the Diaz murder, (23) he was not

sure his shot actually struck Diaz because it was dark, (24) he did return to the scene, recovered

the shell casing, and flushed it down a toilet, (25) he was never District Captain of the Aryan

Circle, (26) on the night of the Billhartz murder, he and Billhartz went for a drive, used speed,

had sex, and then returned to the drug house on Melody Lane, where a visible agitated

Murgatroyd told Petitioner to get out of the truck, then drove off with Billhartz, (27) Davis was

the person who called the meeting in the shed and it was David who suggested that Billhartz be

killed, (28) when Murgatroyd returned in Billhartz's truck, Murgatroyd told Petitioner to help

him dispose of Billhartz's body, (29) Murgatroyd said that Davis had instructed Murgatroyd to

kill Billhartz, (30) Murgatroyd chopped off Billhartz's fingers, (31) Murgatroyd dragged

Billhartz's body from the truck and into the hole, (32) Murgatroyd later told Petitioner title to

Billhartz's truck had been changed out of Bilhartz's name, (33) Petitioner went to Carlsbad with

Eddy, where Petitioner used methamphetamine and never slept even once during the several

weeks he stayed there, (34) he did not kill Billhartz, (35) he never told Frank that he had killed

Billhartz, (36) all those persons who had testified that Petitioner announced he was going to kill

Billhartz testified falsely, (37) he did not recall speaking to law enforcement officers on

November 25, 2002, (38) Davis was in charge of the drug house on Melody Lane, and (39) he did

not accept the jury's guilty verdict in connection with Billhartz's murder.[68]

The defense also called a psychiatrist who had previously examined Petitioner and who

testified, in pertinent part, that (1) humans are profoundly social and will do immoral acts to

maintain their position in the social system, (2) impulse control diminishes as one suffers from

---

[68]  S.F. Trial, Volume 84, testimony of Justen Grant Hall, at pp. 4–216.

sleep deprivation, (3) there is no such thing as true free choice because we are driven by our experiences, (4) what we see in the media influences our behavior, (5) to survive in the long term, children need at least one adult who can offer stability to the child, (6) respect for self is a necessary prerequisite to developing respect for others, (7) Petitioner has experienced major depressive disorder and sleep disorders, (8) Petitioner has a personality disorder, (9) Petitioner's suicide attempts were "real," (10) Petitioner's extremely violent reaction to Diaz's sexual advance was understandable in view of Petitioner's crystal methamphetamine abuse and attendant sleep deprivation, (11) long term methamphetamine abuse causes deterioration of the mental process, increased impulsivity, and paranoia, (12) methamphetamine withdrawal causes intense anxiety, a sense of vulnerability, depression, insomnia, and a lack of energy, (13) amphetamine addiction aggravates other disorders like antisocial personality disorder, (14) the effects of crystal methamphetamine abuse are not obvious to lay people and include throwing the brain's neurotransmitters "totally out of whack," (15) persons with antisocial personality disorder develop the tendency to split off some part of their awareness and appear to have no feelings, (16) as with post traumatic stress disorder, some memories may be so unbearable they are suppressed, (17) at present, it is not possible to treat antisocial personality disorder per se but treatments for borderline personality disorders (with anti-psychotic medications and stimulants) do offer some possibility of treatment, (18) removing crystal methamphetamine from Petitioner's life takes away a significant factor in lowering Petitioner's inhibitions against killing, and (19) when in a structured environment, Petitioner is not an apparent danger to others.[69]

### 3.      The Prosecution's Rebuttal Evidence

---

[69]   S.F. Trial, Volume 85, testimony of Walter Aeschbach, at pp. 5–94.

The prosecution called an El Paso County Jail medical employee who testified (1) at times during his stay at that facility, Petitioner occasionally refused to take his prescribed medications, (2) she had seen many suicide attempts and she did not believe Petitioner's suicide attempts were serious, (3) when Petitioner attempted suicide while an inmate at the El Paso County Jail, he re-opened the same neck wound he had created when he attempted suicide at the Hale County Jail, and (4) during his stay at the El Paso County Jail, Petitioner was rude, aggressive, and belligerent toward her.[70]

### 4.    The Verdict

On February 18, 2005, Petitioner's jury returned its verdict at the punishment phase of Petitioner's capital murder trial, finding (1) beyond a reasonable doubt there was a probability the Petitioner would commit criminal acts of violence that would constitute a continuing threat to society and (2) taking into consideration all of the evidence, including the circumstances of the offense, the Petitioner's character and background, and the personal moral culpability of the Petitioner, there were insufficient mitigating circumstances to warrant that a sentence of life imprisonment, rather than death, be imposed.[71]

### F.    Direct Appeal

Petitioner appealed his conviction and sentence.[72] The Texas Court of Criminal Appeals

---

[70]  S.F. Trial, Volume 85, testimony of Gloria Marrufo, at pp. 95–110.

[71]  Trial Tr., Volume IV, at pp. 1184–88; S.F. Trial, Volume 86, at pp. 89–92.

[72]  Petitioner's appellant's brief, filed June 7, 2006, by attorney Louis Elias Lopez, raised sixteen points of error.  Petitioner's points of error included arguments that (1) there was legally and factually insufficient evidence showing Petitioner murdered Billhartz in the course of committing the felony offense of obstruction or retaliation as defined by Texas law, (2) the trial court erred in failing to suppress evidence seized or obtained following Petitioner's arrest in Plainview, Texas, (3) the trial court erred in failing to suppress Petitioner's written confession, (4) the trial court erroneously limited the

affirmed Petitioner's conviction and sentence in an unpublished opinion. *Hall v. State*, AP 75,121, 2007 WL 184314 (Tex. Crim. App. June 27, 2007).  Petitioner did not thereafter seek further review of his conviction or sentence from the United States Supreme Court via a petition for writ of certiorari.

### G.     State Habeas Corpus Proceeding

On March 19, 2007, Petitioner filed a skeletal state habeas corpus application setting forth, in rather cryptic terms, seven grounds for relief.[73]  On July 2, 2008, the state habeas trial court held an evidentiary hearing on Petitioner's claims for relief and heard testimony from (1) Petitioner's prosecuting attorneys, Assistant El Paso County District Attorneys Diane Meraz ("ADA Meraz") and Bill Hicks ("ADA Hicks"), and (2) the surviving member of Petitioner's

---

amount of time the parties were permitted to question venire member 120, (5) the trial court erred in not granting Petitioner additional peremptory strikes, (6) the trial court erred in denying Petitioner's motion for continuance to conduct additional DNA testing, (7) the trial court erred in denying Petitioner's motion to exclude DNA evidence, (8) the trial court erred in failing to charge the jury on the lesser-included offense of murder, (9) the trial court erred in denying Petitioner's request for a new jury at the punishment phase of trial, (10) the trial court erred in failing to assign a burden of proof on the mitigation special issue, and (11) the trial court erred in denying Petitioner's motion to preclude the prosecution from "death qualifying" potential jurors.

[73]  Petitioner's three-page original state habeas corpus application, filed by attorney Robin Norris, appears in Volume I of the pleadings, motions, and other documents filed in Petitioner's state habeas corpus proceeding (henceforth "State Habeas Tr."), at pp. 20–22.  Petitioner's grounds for state habeas relief consisted of claims that (1) Petitioner's trial counsel rendered ineffective assistance by (a) failing to adequately investigate, develop, and present available (but wholly unspecified) mitigating evidence, (b) effectively relinquishing two peremptory challenges by failing to require that unspecified eligible venire members be passed to the prosecution for exercise of peremptory challenges, (c) agreeing to excuse unidentified but death qualified venire members opposed to capital punishment, (d) failing to object to the trial court's failure to instruct the jury on Article 35.17(2) of the Texas Code of Criminal Procedure, and (e) arguing at the punishment phase of trial that Petitioner deserved to die, (2) the prosecution violated Petitioner's constitutional rights under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), by failing to disclose to the defense the existence of an immunity agreement between the prosecution and an unidentified prosecution witness, and (3) there was insufficient evidence showing Petitioner murdered Billhartz in the course of committing or attempting to commit the offense of retaliation.

legal defense team, Francisco Macias ("Macias").[74]

On September 30, 2008, Petitioner filed a motion to dismiss his state habeas application and a request for a competency hearing.[75] On October 3, 2008, the state habeas trial court issued an Order directing that Petitioner submit to a mental health examination in connection with his motion to dismiss his state habeas corpus application.[76] On March 6, 2009, the state habeas trial judge held a hearing during which he personally addressed Petitioner and reviewed the reports of two mental health experts who had examined Petitioner.[77] During that hearing, Petitioner insisted that he wanted "the whole dismissal of everything right now."[78] At the conclusion of that hearing, the state habeas trial court permitted Petitioner's court-appointed state habeas counsel to withdraw and advised Petitioner that, pursuant to Petitioner's repeated *pro se* requests, the court would recommend to the Texas Court of Criminal Appeals that it dismiss Petitioner's then-pending state habeas corpus application.[79]

On March 9, 2009, the state habeas trial court issued an order containing its findings of fact and conclusions of law, which included determinations that (1) both of the mental health

---

[74] The verbatim transcription of the evidentiary hearing held July 2, 2008 in Petitioner's state habeas corpus proceeding appears in Volume II of the transcript of pleadings, motions, and other documents filed in Petitioner's state habeas corpus proceeding (henceforth "State Habeas Tr."), at pp. 87–228. Petitioner was represented throughout that evidentiary hearing by attorney Robin Norris.

[75] State Habeas Tr., Volume I, at pp. 37–40.

[76] State Habeas Tr., Volume I, at pp. 41–44.

[77] The verbatim transcription of the proceedings at the March 6, 2009, hearing appear in Volume II of the State Habeas Tr.. Copies of the two court-appointed mental health experts' reports appear at State Habeas Tr., Volume II, at pp. 53–60 and 62–86.

[78] State Habeas Tr., Volume II, at p. 42.

[79] *Id.*, at pp. 41–43.

professionals who had evaluated Petitioner believed Petitioner was competent to waive all further appeals, (2) Petitioner had advised the state habeas trial court that, while Petitioner no longer wished to drop or waive his remaining appeals, Petitioner did wish to dismiss his then-pending state habeas application and proceed with his own *pro se* filing, (3) despite being admonished of the substantial risks of adverse legal consequences of so doing, Petitioner persisted in his expressed desire to dismiss his then-pending state habeas application, (4) Petitioner was mentally competent to represent himself during his state writ proceeding, and (5) stand-by counsel was appointed to assist Petitioner.[80]  Based on the foregoing, the state habeas trial judge recommended to the Texas Court of Criminal Appeals that Petitioner's then-pending state habeas corpus application be dismissed, Petitioner's court-appointed state habeas counsel be permitted to withdraw, and Petitioner be allowed to proceed *pro se* with said counsel serving as stand-by counsel.[81]

In a *pro se* letter dated March 31, 2009—received by the Texas Court of Criminal Appeals on April 8, 2009, and by the state habeas trial court on April 13, 2009—Petitioner requested that (1) the state habeas trial court withdraw its recommendation that Petitioner's then-pending state habeas application be dismissed, (2) attorney Robin Norris ("Norris") be removed as Petitioner's stand-by counsel, (3) Petitioner be provided with a printed copy of his case, and (4) Petitioner be consulted via conference call prior to being bench-warranted back to the trial

---

[80]   State Habeas Tr., Volume II, at pp. 1–4.

[81]   *Id.*, at p. 3.

court.[82]

In an unpublished per curiam order issued June 10, 2009, the Texas Court of Criminal Appeals acknowledged receipt of Petitioner's written request that his then-pending state habeas application NOT be dismissed but, nonetheless, dismissed Petitioner's state habeas corpus application. *Ex parte Justen Grant Hall,* WR 70,834-01, 2009 WL 1617087 (Tex. Crim. App. June 10, 2009).

On July 16, 2009, Petitioner, acting with the assistance of attorney Norris, filed a document styled "Suggestion that the Court, on its own Motion, Reconsider its June 10, 2009 Order Dismissing Mr. Hall's Application for Post-Conviction Writ of Habeas Corpus."[83] Attached to Petitioner's "suggestion" were copies of Petitioner's March 31, 2009, letters to the relevant state courts[84] and an affidavit from Petitioner in which he (1) detailed the history of his dissatisfaction with the performance of his court-appointed state habeas counsel, (2) admitted he wrote a letter to the state habeas trial judge in August of 2008 expressing his desire to drop his "habeas appeal," (3) indicated he changed his mind at the hearing in March of 2009, and he did not wish to give up his appeal, although he did continue to be dissatisfied with the performance of his state habeas counsel, (4) noted his court-appointed state habeas counsel advised him the state habeas trial judge would not appoint a new state habeas counsel, (5) admitted he advised the state habeas trial judge during the hearing in March of 2009 of his desire to represent himself, (6)

---

[82] Copies of Petitioner's letter dated March 31, 2009 appear at State Habeas Tr., Volume III, at pp. 17, 21, 26, 27.

[83] State Habeas Tr., Volume III, at pp. 1–12.

[84] State Habeas Tr., Volume III, at pp. 17, 21, 26, 27.

expressed his confusion over what transpired at the hearing in March of 2009, (7) explained he

was visited by an unidentified attorney shortly after the hearing who informed him of the

consequences of dismissing his state habeas application, (8) explained he had not fully

understood the consequences of dismissing his state habeas application when he requested that

the state habeas trial judge do so at the hearing in March of 2009, and (9) explained he

immediately wrote a letter to the state habeas trial court asking that his state habeas application

not be dismissed.[85]  On August 6, 2009, the Texas Court of Criminal Appeals issued a per curiam

document styled "No Action Taken" on "Applicant's Suggestion that the Court Reconsider

Ruling on its own Motion."

## H.     Federal Habeas Corpus Proceeding

On June 10, 2010, Petitioner filed his original federal habeas corpus petition and a

memorandum in support thereof [ECF Nos. 27–28], in which Petitioner asserted ten grounds for

relief:

    (1)     Petitioner's rights under the Fourteenth Amendment were violated by the State's misconduct in failing to disclose material evidence favorable to him in violation of *Brady*;[86]

    (2)     Petitioner's conviction violates the Fifth and Fourteenth Amendments to the United States Constitution because the trial court erred in denying the motion to suppress Petitioner's involuntary confession;[87]

    (3)     Petitioner's conviction violates the Sixth Amendment to the United States Constitution because the Petitioner's lead trial counsel slept during the guilt/innocence phase of the trial;[88]

    (4)     Petitioner's conviction violates the Fifth and Fourteenth Amendments

---

[85]  State Habeas Tr., Volume III, at pp. 13–16.

[86]  Pet'r's Mem. in Supp., at 18–40.

[87]  *Id.,* at 40–49.

[88]  *Id.,* at 49–55.

to the United States Constitution because the trial court erred in denying the Petitioner's motion for a continuance;[89]

(5)     Petitioner's conviction and sentence of death violate the Due Process Clause of the United States Constitution because the evidence adduced at trial was insufficient to prove that the Petitioner murdered the victim in the course of committing or attempting to commit the offense of retaliation;[90]

(6)     Petitioner's sentence of death violates the Sixth Amendment to the United States Constitution because trial counsel failed to investigate and present substantial, readily available evidence in mitigation of the death penalty;[91]

(7)     Petitioner's sentence of death violates the Sixth Amendment to the United States Constitution because the trial counsel argued to the jury, without any plausible tactical reason and contrary to evident defense strategy, that Petitioner deserved to die for his alleged crime;[92]

(8)     Petitioner's death sentence violates the Sixth Amendment to the United States Constitution because trial counsel relinquished two peremptory challenges against objectionable jurors by failing to require that each eligible juror be passed for peremptory challenge first by the prosecution;[93]

(9)     Petitioner's death sentence violates the Sixth Amendment to the United States Constitution because trial counsel agreed to excuse death-qualified venire members who were opposed to capital punishment without questioning them;[94] and

(10)   Petitioner's sentence of death violates the Sixth Amendment to the United States Constitution because trial counsel failed to object to the Court's failure to instruct numerous venire members as required by Texas Code of Criminal Procedure Art. 35.17(2).[95]

---

[89]   *Id.*, at 55–57.

[90]   *Id.*, at 57–61.

[91]  *Id.*, at 61–77.

[92]   *Id.*, at 77–81.

[93]   *Id.*, at 81–92.

[94]   *Id.*, at 92–95.

[95]   *Id.*, at 95–101.

On September 22, 2010, Respondent filed his original answer [ECF No. 40], in which he argued, in part, that all but two of Petitioner's claims herein were unexhausted and, therefore, procedurally defaulted.

On November 22, 2010, Petitioner filed his reply to Respondent's answer [ECF No. 43], in which Petitioner argued, in part, that, should this Court find any of Petitioner's claims herein unexhausted, the appropriate course would be to stay this cause to permit Petitioner to return to state court and file a successive state habeas corpus application.

On August 11, 2011, Petitioner filed a motion for leave to amend [ECF No. 45] in which he requested leave not to amend his pleadings to add new claims but, rather, to submit an affidavit executed by Eddy on July 20, 2011, in support of Petitioner's claims for relief.  In an order issued September 30, 2011 [ECF No. 50], the Court granted Petitioner leave to submit Eddy's affidavit in support of Petitioner's claims herein.  On October 3, 2011, Respondent filed a pleading opposing Petitioner's supplemented claims [ECF No. 52].  On October 7, 2011, Petitioner filed a supplemental memorandum in support of his claims for relief herein [ECF No. 53].

## II.    STANDARD OF REVIEW

Because Petitioner filed his federal habeas corpus action after the effective date of the the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"),[96] the Court's review of Petitioner's claims for federal habeas corpus relief is governed by the AEDPA.  *Penry v. Johnson*, 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001).  Under the AEDPA standard of review, codified at 28 U.S.C. § 2254(d), the Court cannot grant Petitioner federal

---

[96]  Pub.L. No. 104-132, 110 Stat. 1214.  AEDPA became effective on April 24, 1996.

habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits

in state court proceedings unless the adjudication of that claim either: (1) resulted in a decision

that was contrary to, or involved an unreasonable application of, clearly established Federal law,

as determined by the Supreme Court of the United States, or (2) resulted in a decision that was

based on an unreasonable determination of the facts in light of the evidence presented in the state

court proceeding.  28 U.S.C.A. § 2254 (d) (West 2011); *Brown v. Payton*, 544 U.S. 133, 141,

125 S.Ct. 1432, 1438, 161 l.Ed.2d 334 (2005); *Williams v. Taylor*, 529 U.S. 362, 404–05, 120

S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000).

      The Supreme Court has concluded the "contrary to" and "unreasonable application"

clauses of § 2254(d)(1) have independent meanings.  *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct.

1843, 1850, 152 L.Ed.2d 914 (2002).  Under the "contrary to" clause, a federal habeas court may

grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme

Court on a question of law or (2) the state court decides a case differently than the Supreme

Court on a set of materially indistinguishable facts.  *Brown v. Payton*, 544 U.S. at 141, 125 S.Ct.

at 1438; *Mitchell v. Esparza*, 540 U.S. 12, 15–16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003) ("A

state court's decision is 'contrary to' our clearly established law if it 'applies a rule that

contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are

materially indistinguishable from a decision of this Court and nevertheless arrives at a result

different from our precedent.'").  A state court's failure to cite governing Supreme Court

authority does not, *per se*, establish the state court's decision is "contrary to" clearly established

federal law: "the state court need not even be aware of our precedents, 'so long as neither the

reasoning nor the result of the state-court decisions contradicts them.'"  *Mitchell v. Esparza*, 540

41

U.S. at 16, 124 S.Ct. at 10.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton*, 544 U.S. at 141, 125 S.Ct. at 1439; *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 2534–35, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, ___ U.S. ___, ___, 130 S.Ct. 665, 673, 175 L.Ed.2d 582 (2010) ("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of . . . clearly established Federal law,' § 2254(d)(1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins v. Smith*, 539 U.S. at 520–21, 123 S.Ct. at 2535. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 1939, 167 L.Ed.2d 836 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Wiggins v. Smith*, 539 U.S. at 520, 123 S.Ct. at 2535; *Price v. Vincent*, 538 U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003) ("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

As the Supreme Court has recently explained:

> Under the Antiterrorism and Effective Death Penalty Act, a state prisoner
> seeking a writ of habeas corpus from a federal court "must show that the state

court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."[97]

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660–61, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings.  Section 2254(d)(2) provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, ___ U.S. ___, 130 S.Ct. 841, 849, 175 L.Ed.2d 738 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410, 120 S.Ct. at 1522 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law.").  Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does

---

[97] *Bobby v. Dixon*, ___ U.S. ___, ___ S.Ct. ___, ___ L.Ed.2d ___, 2011 WL 5299458, *1 (November 7, 2011) (quoting *Harrington v. Richter*, 562 U.S. ___, ___, 131 S.Ct. 770, 786–87, 178 L.Ed.2d 624 (2011)).

not suffice to supersede the trial court's factual determination. *Wood v. Allen*, ___ U.S. at ___, 130 S.Ct. at 849; *Rice v. Collins*, 546 U.S. 333, 341–42, 126 S.Ct. 969, 976, 163 L.Ed.2d 824 (2006).

In addition, § 2254(e)(1) provides a petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. 28 U.S.C.A. §2254(e)(1); *Schriro v. Landrigan*, 550 U.S. at 473–74, 127 S.Ct. at 1939–40 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. 333, 338–39, 126 S.Ct. 969, 974, 163 L.Ed.2d 824 (2006) ("State-court factual findings, moreover, are presumed correct; the Petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. 231, 240, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005) ("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"). It remains unclear at this juncture whether § 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under Section 2254(d)(2). *See Wood v. Allen*, ___ U.S. at ___, 130 S.Ct. at 849 (choosing not to resolve the issue of Section 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice v. Collins*, 546 U.S. at 339, 126 S.Ct. at 974 (refusing likewise to resolve the Circuit split regarding the application of § 2254(e)(1)).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El v. Dretke*, 545 U.S. at 240, 125 S.Ct. at 2325 (explaining the standard is "demanding but not

insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief.").

       Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision.  *See Maldonado v. Thaler*, 625 F.3d 229, 239 (5th Cir. 2010) (explaining federal habeas review of a state court's adjudication involves review only of a state court's decision, not the written opinion explaining the decision), *cert.* denied, ___ U.S. ___, ___ S.Ct. ___, ___ L.Ed.2d ___, 2011 WL 4530498 (October 3, 2011); *St. Aubin v. Quarterman*, 470 F.3d 1096, 1100 (5th Cir. 2006) (holding § 2254(d) permits a federal habeas court to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 550 U.S. 921 (2007); *Amador v. Quarterman*, 458 F.3d 397, 410 (5th Cir. 2006) (holding the same), *cert. denied*, 550 U.S. 920 (2007); *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003) (holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable), *cert. denied*, 541 U.S. 1045 (2004); *Anderson v. Johnson*, 338 F.3d 382, 390 (5th Cir. 2003) (holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*) (holding a federal court is authorized by §2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 537 U.S. 1104 (2003).

45

## III.   INVOLUNTARY CONFESSION CLAIM

### A.   The Claim

In his second claim for relief, Petitioner argues the trial court erred in denying Petitioner's

motion to suppress his allegedly involuntary confession.[98]

### B.   State Court Disposition

Petitioner raised the same basic arguments attacking the state trial court's admission at

trial of Petitioner's written statement, given on November 25, 2002, as his sixth point of error on

direct appeal.[99]   The Texas Court of Criminal Appeals rejected this argument on the merits,

concluding Petitioner had failed to allege any facts, much less present any evidence, showing his

confession was involuntary:

> A statement is considered to be voluntary unless there was such "official,
> coercive conduct" that "any statement obtained thereby was unlikely to have
> been the product of an essentially free and unconstrained choice by its
> maker." Here, we see nothing in the record, or in anything appellant alleges,
> that demonstrates such action or coercion. According to Detective Pantoja
> of the El Paso Police Department, when he met with appellant, appellant was
> advised of his rights, waived his rights, and never requested the presence of
> his attorney. Further, Pantoja testified that while appellant mentioned that he
> was taking medication, he never requested the medication.   Pantoja also
> testified that appellant was coherent during the conversation, seemed to
> understand what he was saying, and was not emotional or distraught.
> Likewise, Detective Samaniego of the El Paso Police Department testified
> that appellant was coherent and stable when he spoke with the detective and
> when he signed the confession.   Appellant himself testified that he did not
> take his prescribed medications because he was "paranoid of the deputies"

---

[98]   Pet'r's Mem. in Supp., at pp. 40–49; Pet'r's Reply in Supp., at pp. 32–34.

[99]   Appellant's Br., at pp. 25–26.  Petitioner also included a state law version of the same
complaint as his fifth point of error on direct appeal.

that were assigned to his jail.[100]

## C.    Clearly Established Federal Law

"Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. at 167, 107 S.Ct. At 522.  "In order for a defendant to establish that his confession was involuntary, he must demonstrate that it resulted from coercive police conduct and it is essential that there be a link between the coercive conduct of the police and the confession of the defendant." *Hopkins v. Cockrell*, 325 F.3d 579, 584 (5th Cir.), *cert. denied*, 540 U.S. 968 (2003).

The constitutional standard for evaluating the voluntariness of a confession involves a broad-ranging inquiry:

> The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.[101]

"In determining whether a defendant's will was overborne in a particular case, the Court [must

---

[100]   *Hall v. State*, 2007 WL 1847314, *4 (Tex. Crim. App. June 27, 2007) (Footnote omitted).

[101]   *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

assess] the totality of all the surrounding circumstances—both the characteristics of the accused

and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. at 226, 93 S.Ct. at

2047.

### D.    AEDPA Analysis

The Texas Court of Criminal Appeals' opinion on direct appeal accurately described the

record before that court as bereft of any evidence showing there was any police coercion prior to

or during the interviews that resulted in Petitioner's November 25, 2002, confession to

Billhartz's murder.  All three of the officers who interviewed Petitioner on that date testified,

without contradiction at trial, that Petitioner was given his *Miranda* warnings, voluntarily waived

his rights, and thereafter gave and executed the written statement concerning Billhartz's murder

admitted into evidence as State Exhibit Number 61.[102]  Petitioner testified during both the pretrial

hearing on his motion to suppress and during the punishment phase of his capital murder trial

that he had no independent recollection of any of the events surrounding his interviews on

November 25, 2002, or his execution of his written statement on that date, but suggested he must

have been withdrawing from crystal methamphetamine during that time frame.[103]  Petitioner

---

[102]  S.F. Trial, Volume 69, testimony of Henry Cooper, at pp. 216–19; Volume 71, testimony of Henry Cooper, at pp. 76, 81–90, 100–01; Volume 73, testimony of David Samaniego, at pp. 26, 30–31, 54; Volume 75, testimony of Jesus Pantoja, Jr., at pp. 51–53, 73–81; Volume 75, testimony of David Samaniego, at pp. 196–206, 209, 232, 239; Volume 77, testimony of Jesus Pantoja, Jr., at pp. 36–38; Volume 77, testimony of David Samaniego, at pp. 66–69.

[103]  S.F. Trial, Volume 46, testimony of Justen Grant Hall, at pp. 15–16, 23–26, 36–39, 57–58, 60–63, 65, 67, 80–81; Volume 84, testimony of Justen Grant Hall, at pp. 181–85, 188.
    Petitioner also testified during the pretrial hearing on his motion to suppress that (1) he chose not to take all his prescribed medications while an inmate at the Hale County Jail because he was paranoid, (2) he believed the guards at that facility were trying to poison him, but (3) he never told anyone at the Hale County Jail about his fears or suspicions. *Id.*, Volume 46, testimony of Justen Grant Hall, at pp. 8–10, 47–48. Curiously, however, on cross-examination, Petitioner claimed a complete and total lack of memory with regard virtually everything that happened to him while in custody at the Hale County Jail.

presented no witnesses who contradicted the accounts of his interviews on that date offered by

Detectives Samaniego, Pantoja, and Henry Cooper ("Detective Cooper"), that Petitioner was

fully alert, coherent, comprehensible, responsive, and showed no signs of intoxication, mental

illness, or severe sleep deprivation.[104] More specifically, Petitioner presented no witnesses

---

S.F. Trial, Volume 46, testimony of Justen Grant Hall, at pp. 35–40, 54–58, 60–67, 79–81.

[104] S.F. Trial, Volume 45, testimony of Henry Cooper, at pp. 91–101, 112–14, 121–25, 131–32, 135, 138; Volume 45, testimony of Jesus Pantoja, Jr., at pp. 153, 155–56, 172–76, 179, 183–85; Volume 45, testimony of David Samaniego, at pp. 192–94; Volume 69, testimony of Henry Cooper, at pp. 216–19; Volume 71, testimony of Henry Cooper, at pp. 76, 81–90, 100–01; Volume 73, testimony of David Samaniego, at pp. 26, 30–31, 54; Volume 75, testimony of Jesus Pantoja, Jr., at pp. 51–53, 73–80; Volume 75, testimony of David Samaniego, at pp. 209, 239; Volume 77, testimony of Jesus Pantoja, Jr., at pp. 36–38; Volume 77, testimony of David Samaniego, at pp. 66–69.

In pertinent part, State Ex. no. 61, i.e., Petitioner's written statement concerning Billhartz's murder, states as follows:

> Ted and I went to the side of the house and I told him to slow down and tell me what happened. He told me again that she was hitting him and he "knocked the bitch." I then told everyone there to meet in the shed. I went to the shed and met with Ted, Tim, James and Jesse. I noticed that Chase was there and I told him to leave with the girl that he was with. As soon as Chase left I asked everyone what they thought about what was happening. Tim said that Melanie was going to call the cops on Ted. We had a lab going on right there and then so there was no way she was going to call the cops. The first thing that came to my mind was to kill her. I told everyone there that we were going to kill her and that I needed some trash bags. Tim and James were like no you shouldn't do it. I said if she call [sic] the cops and they come here the cops are going to arrest Ted for assault and everyone else for the drugs. James and Tim again said that we shouldn't kill Melanie and then I told them a scenario of what could happen. I told them that I was going to take care of her myself. During all this Ted did not say anything. Jesse also said that we shouldn't do it. We all dispersed and Jesse took off and left the house. I got in the truck with Melanie and we left, just us two. Melanie was sitting in the truck. I told her to lets [sic] take a ride to that she could calm down. She drove and we left the house on Melody. She told me that she wanted to do some speed. I had just finished "batching" meaning cooking it so I had some on me. I gave her like a half a gram and she smoked almost all of it. She was still driving. We had decided to get out of El Paso so Melanie had taken I-10 east and by the time she had almost finished the speed we were like in between Sierra Blanca and Van Horn. I told her to pull off to a dirt road. I had not taken any drugs that night. She was upset because all the speed was gone so she started tripping again. I told her to stop so that we could get out of the truck and just kick back on the tailgate and talk. I just wanted to calm her down. She started wigging out and I just choked her to death. I chocked [sic] her with an extension cord that I got from the house on Melody. Det. Samaniego has asked me if I remember the color of the extension cord and I do not remember the color. I really don't remember how many

49

possessing personal knowledge who described Petitioner's appearance or demeanor from the time of his arrest during the early morning hours of November 23, 2002, through the afternoon of November 25, 2002, in a manner suggesting Petitioner was then suffering from the effects of amphetamine intoxication, withdrawal from methamphetamine, severe sleep deprivation, or any other debilitating condition.

Thus, the state appellate court correctly concluded there was no evidence before it showing police engaged in coercive activity or behavior to induce Petitioner's execution of his written confession to Billhartz's murder. As explained above, coercive police behavior is the *sine qua non* of a claim of involuntary confession. Petitioner did not present the state trial court with any evidence showing that his November 25, 2002, confession to Billhartz's murder was the product of official coercion.

Detective Pantoja testified, in pertinent part, that (1) Petitioner never asked for any medication, (2) Petitioner did mention that he was taking medication, (3) Petitioner did not say what the medications were for, (4) Petitioner mentioned a couple names of medications Detective Pantoja did not recognize, (5) Detective Pantoja did not construe Petitioner's comments as a request to receive the medications in question and did not thereafter inquire with Hale County Jail personnel about Petitioner's medications, (6) the Petitioner appeared to be well-rested, cognizant of the presence of the police, and had no difficulty speaking with detectives, and (7) he observed no sign of intoxication in Petitioner.[105]

---

times I wrapped it around her neck but I did wrap it several times. I kept the pressure to her neck until she stopped fighting. After this I threw her in the backseat of the truck.

[105] S.F. Trial, Volume 45, testimony of Jesus Pantoja, Jr., at pp. 153, 172–76, 179, 183–85; Volume 75, testimony of Jesus Pantoja, Jr., at pp. 45, 51–53, 74–76, 80; Volume 77, testimony of Jesus Pantoja, Jr., at pp. 36–38.

Detective Cooper testified, in pertinent part, that (1) Detective Pantoja gave Petitioner his *Miranda* warnings at the outset of their interview and then took the lead during the first portion of Petitioner's interview, (2) Petitioner appeared curious as to the reason for Detective Cooper's presence at the interview, (3) Petitioner appeared to be attempting to gain information from them during the interview, (4) Petitioner denied murdering Billhartz and even denied knowing she was dead, (5) Petitioner became visibly upset when questioned about Billhartz's murder, (6) when Detective Samaniego entered the room, however, Petitioner appeared to recognize Detective Samaniego and Petitioner's demeanor changed—Petitioner became less agitated, (7) he and Detective Pantoja left the room and Detective Samaniego continued the interview of Petitioner, (8) Petitioner did not appear to be having trouble concentrating, (9) he never had any trouble understanding Petitioner, (10) when Petitioner remarked that he had prescription medications with him and wondered aloud if he would be able to get it, Detective Cooper directed Petitioner to talk with Hale County Jail administration about their policy on outside medications, (11) Detective Cooper did not recall if Petitioner ever identified his medications by name, and (12) Petitioner never said he needed his medications.[106]

Detective Samaniego testified, in pertinent part, that (1) on November 25, 2002, he was never aware the Petitioner was taking medication or had requested any medication, (2) Petitioner appeared to be acting "normal," (3) he had no reason to suspect Petitioner was in need of medical attention, (4) Petitioner did not appear to be withdrawing from drugs, (5) when he walked into the interview room, Petitioner (who had been speaking with Detectives Cooper and Pantoja)

---

[106]  S.F. Trial, Volume 45, testimony of Henry Cooper, at pp. 90–138; Volume 69, testimony of Henry Cooper, at pp. 216–19; Volume 71, testimony of Henry Cooper, at pp. 75–95, 100–01.

smiled and stood up, (6) after Detectives Cooper and Pantoja left the room, Petitioner began

telling Detective Samaniego that he had not murdered Billhartz, (7) after about ten minutes,

however, Petitioner admitted he had done it, (8) at that point, Detective Samaniego gave

Petitioner another set of *Miranda* warnings and had Petitioner sign the warnings card after

Petitioner read the card aloud and indicated he understood it, (9) Petitioner voluntarily gave his

written statement on November 25, 2002, and then reviewed and signed it, (10) nothing

Detective Samaniego saw or heard on November 25, 2002, caused him to believe Petitioner (who

was rational throughout their interview) was insane or had any trouble communicating.[107]

Petitioner did elicit testimony from the detectives who interviewed Petitioner on

November 25, 2002, that Petitioner volunteered (1) he might be crazy and (2) he was taking

medication.[108]  However, that testimony must be viewed in the context of the same detectives'

other testimony, summarized above, in which they testified without contradiction that (1)

Petitioner's demeanor on November 25, 2002, belied any suggestion the Petitioner was

intoxicated, mentally impaired, severely fatigued, or in need of immediate medical attention, and

(2) Petitioner never requested medication or suggested he needed to take it.[109]

---

[107] S.F. Trial, Volume 45, testimony of David Samaniego, at pp. 192–94; Volume 73, testimony of David Samaniego, at pp. 26–39; Volume 75, testimony of David Samaniego, at pp. 192–206, 209, 239; Volume 77, testimony of David Samaniego, at pp. 65–69.

[108]  S.F. Trial, Volume 5, testimony of David Samaniego, at p. 192; Volume 45, testimony of Henry Cooper, at pp. 99, 131, 134–35, 138; Volume 45, testimony of Jesus Pantoja, Jr., at pp. 153, 172–74; Volume 71, testimony of Henry Cooper, at p. 84; Volume 74, testimony of Jesus Pantoja, Jr., at p. 234; Volume 75, testimony of Jesus Pantoja, Jr., at pp. 51–54, 76, 80–81; Volume 75, testimony of David Samaniego, at p. 239; Volume 77, testimony of Jesus Pantoja, Jr., at pp. 36–38; Volume 77, testimony of David Samaniego, at pp. 65–69.

[109]  S.F. Trial, Volume 45, testimony of Henry Cooper, at pp. 92, 112–14, 132, 137–38; Volume 45, testimony of Jesus Pantoja, Jr., at pp. 153, 172–76, 179, 183–85; Volume 45, testimony of David Samaniego, at pp. 192–94; Volume 69, testimony of Henry Cooper, at pp. 216–19; Volume 71, testimony

It should also be noted that, during Petitioner's interview on November 25, 2002, Detectives Samaniego and Pantoja learned from the Petitioner for the first time that Murgatroyd had chopped off Billhartz's fingers with a machete and taken her rings, a fact which Murgatroyd confirmed the following day when re-interviewed by El Paso police.[110]

Insofar as Petitioner argues he did present evidence showing he had made a suicide attempt during a stay in the El Paso County Jail in April through June of 2002, and was later placed on suicide watch during his detention at the Hale County Jail, those facts do not controvert the sworn testimony of the three interviewing detectives that Petitioner showed no outward indications of mental illness on November 25, 2002. Likewise, while Petitioner testified he ingested large quantities of crystal methamphetamine in the weeks prior to his November 23, 2002, arrest in Plainview, Texas,[111] that testimony, even if credible, does not establish any of the detectives who interviewed Petitioner on November 25, 2002, were aware of that fact, were aware Petitioner was withdrawing from any drugs, or employed that knowledge to coerce Petitioner's written statement on that date.

Insofar as Petitioner complains that Detective Samaniego initiated his interrogation on November 25, 2002, without first independently obtaining a waiver of *Miranda* rights by Petitioner, that argument is without arguable merit as it was undisputed that Detective Pantoja

---

of Henry Cooper, at pp. 75–76, 78–79, 84, 100–01; Volume 73, testimony of David Samaniego, at pp. 30–31, 54; Volume 75, testimony of Jesus Pantoja, Jr., at pp. 51–54, 74–80; Volume 75, testimony of David Samaniego, at p. 239; Volume 77, testimony of Jesus Pantoja, Jr., at pp. 36–38; Volume 77, testimony of David Samaniego, at pp. 65–69.

[110] S.F. Trial, Volume 73, testimony of David Samaniego, at p. 47; Volume 75, testimony of Jesus Pantoja, Jr., at p. 83.

[111] S.F. Trial, Volume 46, testimony of Justen Grant Hall, at pp. 28–35, 45–48, 76–81

gave Petitioner full *Miranda* warnings and obtained a waiver of rights from Petitioner prior to the start of any interviews or interrogation on November 25, 2002.[112]

### E.      Conclusions

Petitioner failed to present the state trial court with any evidence showing that his November 25, 2002, written confession to Billhartz's murder was the product of official coercion. The Texas Court of Criminal Appeals' rejection on the merits in the course of Petitioner's direct appeal of Petitioner's complaints about the state trial court's refusal to suppress Petitioner's written confession to Billhartz's murder was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial court proceedings. Petitioner's second claim herein is without arguable merit and does not warrant federal habeas corpus relief.

## IV.   INSUFFICIENT EVIDENCE CLAIM

### A.      The Claim

In his fifth claim for relief herein, Petitioner argues there was insufficient evidence

---

[112]   Both Detective Pantoja of the El Paso Police Department and Detective Cooper of the Dona Ana County, New Mexico, Sheriff's Department testified during the hearings on Petitioner's motion to suppress and at trial that, before questioning Petitioner on November 25, 2002, Detective Pantoja read the Petitioner the rights on the *Miranda* warnings card, Petitioner appeared to understand same, Petitioner did not appear to be under the influence of drugs or alcohol, and Petitioner thereafter voluntarily discussed Billhartz's murder with them (during which interview Petitioner repeatedly denied any responsibility for her death). S.F. Trial, Volume 5, testimony of Jesus Pantoja, Jr., at pp. 120–27; Volume 45, testimony of Jesus Pantoja, Jr., at pp. 153–57, 173–74, 176, 179, 183–85; Volume 45, testimony of Henry Cooper, at pp. 92–93; Volume 69, testimony of Henry Cooper, at pp. 216–20; Volume 71, testimony of Henry Cooper, at pp. 81–90, 100–01; Volume 75, testimony of Jesus Pantoja, Jr., at pp. 26–28, 51–54, 73–81; Volume 77, testimony of Jesus Pantoja, Jr., at pp. 36–38. Neither Petitioner nor any other person claiming to possess personal knowledge of the events surrounding Petitioner's interrogation on November 25, 2002 offered any testimony contradicting the foregoing testimony of Detectives Pantoja and Cooper.

introduced at trial to establish Petitioner's murder of Billhartz was committed during the course

of committing or attempting to commit the predicate felony of obstruction or retaliation, as

defined by Texas law.[113]

**B.      State Court Disposition**

Petitioner presented the same insufficient evidence claim as his first point of error on

direct appeal.[114]   The Texas Court of Criminal Appeals rejected this complaint on the merits,

concluding, in part, as follows:

> Appellant claims that, in order to prove guilt in this case, the evidence
> must show that appellant killed the victim knowing that she intended to either
> report the assault or report the existence of the methamphetamine lab at the
> house.   He contends that, instead the evidence here supports only a
> conclusion that the discovery of the methamphetamine lab would have been
> a collateral consequence of the victim's report. Appellant reasons that since
> he did not care about the victim reporting the assault, but rather was
> concerned with a collateral consequence of that report, he murdered the
> victim to prevent an inadvertent drawing of the police to the
> methamphetamine lab. As support, he cites the prosecution's theory of the
> case, which included the argument that appellant murdered the victim to keep
> the police from coming to the house and finding methamphetamine on the
> premises. Therefore, according to appellant, the victim was not killed for the
> specific purpose of preventing her from calling the police and reporting an
> assault.
>
> A person commits capital murder if he intentionally commits murder in
> the course of committing or attempting to commit the offense of obstruction.
> A person commits the offense of obstruction if he intentionally or knowingly
> "harms . . . another by an unlawful act to prevent or delay the service of
> another as a person who . . . the actor knows intends to report the occurrence
> of a crime."   When determining the meaning of a statute, we begin with its
> plain language unless that language leads to absurd results.  A plain reading
> of the statute indicates that the State must prove that appellant intended to
> obstruct or prevent the victim from reporting *a* crime. Nothing in the statute

---

[113]   Pet'r's Mem. in Supp., at pp. 57–61; Pet'r's Reply in Supp., at pp. 48–51.

[114]   Appellant's Br., at pp. 10–13.  Petitioner did not cite any federal legal authority in support of
his first point of error on direct appeal.

requires an intent to prevent the reporting of a specific crime. Appellant's own reasons for committing obstruction, and in this case capital murder by way of obstruction, are relevant to show motive, but they are not an element of the offense.

Viewed in the light most favorable to the verdict, the evidence is legally sufficient. The evidence shows that appellant left the house with the victim. Upon his return, he admitted to Murgatroyd that he had murdered her, and he enlisted aid in disposing of her body. Appellant confessed to El Paso detectives that he murdered the victim, and he signed a statement to that effect. Point of error one is overruled.[115]

Petitioner re-urged his insufficient claim as his sixth ground for relief in his state habeas corpus application.[116] For the reasons explained above, however, his state habeas corpus application was summarily dismissed over Petitioner's objections without any state court reaching the merits of Petitioner's claims therein.

## C.    Clearly Established Federal Law

For more than a generation, the United States Supreme Court has consistently applied a single standard for evaluating the sufficiency of the evidence to support a state criminal jury verdict. "In *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), we held that a state prisoner is entitled to habeas corpus relief if a federal judge finds that 'upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.'" *McDaniel v. Brown,* ___ U.S. ___, ___, 130 S.Ct. 665, 666, 175 L.Ed.2d 582 (2010) (*citation omitted*). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found

---

[115]   *Hall,* 2007 WL 1847314, *2–*3 (footnotes omitted).

[116]   State Habeas Tr., Volume I, at p. 21.

the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. at 2789; *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir.), *cert. denied*, ___ U.S. ___, 129 S.Ct. 496, 172 L.Ed.2d 358 (2008).  To determine whether the evidence is sufficient to support a state criminal conviction, we must look to state law for the substantive elements of the relevant criminal offense.  *Jackson v. Virginia*, 443 U.S. at 324 n.16, 99 S.Ct. at 2792 n.16.

### D.     AEDPA Analysis

As explained above, in the course of Petitioner's direct appeal, the Texas Court of Criminal Appeals declared the essential elements of the offense of obstruction under Texas law to be intentionally or knowingly harming another by an unlawful act to prevent or delay the service of another as a person whom the actor knows intends to report the occurrence of a crime. *Hall v. State*, 2007 WL 1847314, *2.  The Texas Court of Criminal Appeals' construction of applicable state law during Petitioner's direct appeal binds this Court's federal habeas review of same.  *See Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S.Ct. 602, 604, 163 L.Ed.2d 407 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009) (quoting *Bradshaw v. Richey* for the proposition that a state court's interpretation of state law binds a federal habeas court), *cert. denied*, ___ U.S. ___, 131 S.Ct. 1050, 178 L.Ed.2d 870 (2011); *Amador v. Quarterman*, 458 F.3d 397, 412 (5th Cir. 2006) (holding a federal habeas court must defer to a state court's interpretation of state law), *cert. denied*, 550 U.S. 920 (2007); *Fuhrman v. Dretke*, 442 F.3d 893, 901 (5th Cir. 2006) (holding the same); *Young v. Dretke*, 356 F.3d 616, 628 (5th Cir. 2004) ("In our role as a federal habeas court, we cannot review the correctness of the state

habeas court's interpretation of state law."); *Johnson v. Cain*, 215 F.3d 489, 494 (5th Cir. 2000)

(holding a federal habeas court may not review a state court's interpretation of its own law);

*Gibbs v. Johnson*, 154 F.3d 253, 259 (5th Cir. 1998) (holding the same), *cert. denied*, 526 U.S.

1089 (1999).

Viewed in the light most favorable to the jury's verdict, there was a wealth of evidence

establishing Petitioner committed each of the essential elements of the Texas offense of

"obstruction" identified by the Texas Court of Criminal Appeals.  In his written confession,

Petitioner admitted he killed Billhartz to prevent her from reporting Murgatroyd's assault upon

her.[117]  Several of Petitioner's fellow Aryan Circle members testified Petitioner (1) was agitated

by Billhartz's threats to call the police and press charges against Murgatroyd and (2) suggested

they kill Billhartz to prevent her from doing so because Petitioner feared the arrival of law

enforcement officers might lead to the discovery of their methamphetamine cooking operation.[118]

As the Texas Court of Criminal Appeals explained in its opinion affirming Petitioner's

conviction, it matters not under Texas law that the offense Billhartz intended to report

(Murgatroyd's assault upon her) was different from the one Petitioner hoped to conceal by killing

her (the gang's methamphetamine cooking operation).  The evidence, when viewed in the light

favorably to the jury's verdict, shows Billhartz announced her intention to contact law

enforcement authorities to report Murgatroyd's assault upon her and Petitioner murdered her to

---

[117]   State Ex. no. 61 (found in S.F. Trial, Volume 91); S.F. Trial, Volume 73, testimony of David Samaniego, at pp. 40–44.

[118]   S.F. Trial, Volume 72, testimony of Ted Murgatroyd, at pp. 21–24, 56; Volume 74, testimony of Tim Ray Davis, at pp. 94–99, 103, 154–55, 159; Volume 78, testimony of James Eaton, at pp. 19–23, 27, 59.

prevent her from so doing.  Thus, when viewed in the light most favorable to the jury's verdict, the evidence established beyond any reasonable doubt the Petitioner's commission of all of the essential elements of the offense of "obstruction" as defined by Texas law.

### E.      Conclusions

Viewed in the light most favorable to the jury's verdict, there was overwhelming evidence establishing the Petitioner's murder of Billhartz occurred during the Petitioner's commission of the offense of "obstruction" as defined by applicable Texas law.  The Texas Court of Criminal Appeals' rejection on the merits of Petitioner's insufficient evidence claim during the course of Petitioner's direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial court and direct appeal proceedings.  Petitioner's fifth claim herein is without arguable merit and does not warrant federal habeas corpus relief.

## V.     DENIAL OF CONTINUANCE

### A.      The Claim

In his fourth claim, Petitioner argues the state trial court erred in denying his motion for continuance.[119]  Specifically, Petitioner argues that, had his trial counsel been granted a

---

[119]  Pet'r's Mem. in Supp., at pp. 55–57; Pet'r's Reply in Supp., at pp. 51–52 .

In support of his fourth claim herein, Petitioner furnishes this Court with the report of Dr. Gilbert Martinez, a neuro-psychologist, which was attached as Ex. 15 to Pet'r's Mem. in Supp.  However, this document, bearing an assessment date of May 21, 2010, was never presented to the state courts during Petitioner's trial or state appellate proceedings.  This Court may not consider this document in reviewing the Texas Court of Criminal Appeals' rejection on the merits of Petitioner's complaint about the denial of his motion for continuance.  *See Cullen v. Pinholster*, ___ U.S. ___, ___, 131 S.Ct. 1388, 1398–99, 179 L.Ed.2d 557 (2011) (holding review under Section 2254(d)(1) is limited to the record that was before

continuance in the start of trial from January 24 to February 22, 2005, Petitioner would have been able to (1) present expert testimony establishing Petitioner's November 25, 2002, confession was involuntary, (2) conduct DNA testing on unspecified evidence, and (3) interview unidentified fact witnesses.[120]

### B.      State Court Disposition

On January 10, 2005, as jury selection neared conclusion, Petitioner filed a written motion for continuance requesting a delay in the start of trial from either January 24 to February 21, 2005, or until May, 2005.[121]  During a hearing held January 11, 2005, Petitioner's trial counsel explained the February date in the written motion was a typographical error and the defense was actually requesting a delay in the start of Petitioner's trial until May, 2005.[122]  The written motion listed as reasons for the requested delay of almost four months (1) lead defense counsel's desire to attend a capital defense seminar scheduled to begin on February 10, 2005, (2) a desire to have unspecified DNA evidence tested or retested, (3) defense counsel's desire to obtain the services of an expert criminologist who could testify at trial, (4) the defense's inability

---

the state court that adjudicated the claim on the merits and it would be contrary to the AEDPA's underlying purpose to permit a Petitioner to overcome an adverse state-court decision with new evidence introduced in federal habeas court and reviewed by that court in the first stance effectively *de novo*).

[120]   Pet'r's Mem. in Supp., at pp. 56–57; Pet'r's Reply in Supp., at p. 52.

[121]   Trial Tr., Volume III, at pp. 933–36.

The written motion for continuance was far from clear regarding the specific delay defense counsel was requesting.  On the first page of the motion, it specifically requested a delay in the start of trial until February 21, 2005. *Id.*, at p. 933  Later in the motion, however, it requested a delay until sometime in May, 2005. *Id.*, at p. 935 ("Counsel for the Accused does not anticipate being ready for trial until May, 2005.").

[122]   S.F. Trial, Volume 65, at p. 4.

to locate several unidentified, yet allegedly "crucial," witnesses, and (5) a pair of special trial settings for Petitioner's defense counsel in March, 2005, and another special trial setting in April, 2005.[123]

At the hearing on January 11, 2005, Petitioner indicated he was very satisfied with the work being done by his trial counsel and agreed with the requested delay in the start of his trial.[124] The prosecution objected to the requested delay of almost four months.[125] The trial judge expressed concern over the potential hardship to the jurors, including the fact some members of the jury venire had family members facing the possibility of imminent surgery.[126] Petitioner's trial counsel explained they were not requesting a delay in the completion of jury selection, only in the start of the guilt-innocence phase of Petitioner's trial.[127] After further discussion, during which the trial judge indicated his inclination to deny the requested delay until May, Petitioner's trial counsel suggested a shorter delay until February 22.[128] At that point, the trial judge informed the parties he would delay his ruling until the following day.[129] The parties then turned their attention to other motions before the trial court. Later, after the prosecuting attorneys had been excused, Petitioner's trial counsel represented to the trial judge that they needed time to (1) find

_____

[123] Trial Tr., Volume III, at pp. 933–36.

[124] S.F. Trial, Volume 65, at pp. 6–7.

[125] *Id.*, at pp. 7–8.

[126] *Id.*, at p. 8.

[127] *Id.*, at p. 9.

[128] *Id.*, at p. 10.

[129] *Id.*, at p. 11.

an expert criminologist and to consult with their expert on addiction in preparation for their

motion to suppress, (2) locate and interview prosecution witnesses Davis, Eaton, and Eddy, (3)

conduct further investigation into Billhartz, (4) locate and interview potential witnesses Darrell

Allen ("Allen") and Marlene Cervantes ("Cervantes"), (5) test unspecified DNA evidence then in

the possession of the state, (6) interview a potential witness, (7) have lead defense counsel attend

the seminar in February, and (8) have their own expert examine the vehicle Petitioner was

driving when arrested, Billhartz's pickup truck, to see if any evidence was missed by the

prosecution during its examination of the same vehicle.[130]  The following day, January 12, 2005,

at the conclusion of jury selection, Petitioner's defense counsel re-urged their motion for

continuance, requesting a delay until February 21–22, 2005, and the trial judge denied the

motion.[131]

    Petitioner argued in his eleventh point of error on direct appeal that the state trial court

erred in denying Petitioner's motion for continuance, but framed its argument thereunder in terms

of a *Brady* violation which allegedly resulted from the inability of Petitioner's defense team to

adequately review evidence produced by the prosecution shortly before trial concerning alleged

problems with the laboratory that conducted the DNA analysis in Petitioner's case.[132]  Petitioner

also argued in his eleventh point of error *for the first time* that there was new evidence suggesting

---

[130]  *Id.*, at pp. 16–20.

[131]  S.F. Trial, Volume 66, at pp. 28–29.

[132]  Appellant's Br., at pp. 31–33.

the family of the deceased was involved with gangs.[133]  The Texas Court of Criminal Appeals

construed this point of error as asserting a *Brady* claim and rejected it on the merits based upon

Petitioner's failure to allege any specific facts showing any of the information allegedly withheld

by the prosecution until the eve of trial satisfied the materiality prong of *Brady* analysis:

> In order to establish that the trial court abused its discretion in refusing the continuance, an appellant must show specific prejudice to his defense. With respect to the DNA claims, appellant provides no reference to what DNA tests were questionable.  Neither does he show that the State failed to disclose DNA evidence, that DNA evidence was favorable to the defense, or that DNA evidence was material.  The only claim appellant makes regarding the relevance of the DNA evidence is a statement that the evidence contained a third person's unidentified DNA.  But this fact, even if true, is not material because there was no issue of whether appellant had been in the victim's truck, and there is no evidence regarding where the unidentified DNA was deposited.
>
> Regarding appellant's claim that the family of the deceased was involved with criminal gangs, appellant again fails to show any evidence supporting this allegation, and he provides no authority or argument as to how this alleged evidence was material, much less as to how the lack of a continuance stopped him from investigating these claims.  Point of error eleven is overruled.[134]

## C.    Clearly Established Federal Law

The Supreme Court addressed the propriety of granting or denying a criminal defendant's

motion for continuance in *Ungar v. Sarafite*, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964):

> The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend

---

[133]  *Id.*, at p. 32.  No mention of any relative of Billhartz having been involved with gangs was included in Petitioner's written motion for continuance.  Nor was such a suggestion made to the state trial court during the hearing held January 11, 2005.

[134]  *Hall v. State*, 2007 WL 1847314, *6 (footnotes omitted).

without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.[135]

## D.     AEDPA Analysis

The grand jury indicted Petitioner on February 4, 2003.[136]  The state trial court appointed an attorney, Jaime Olivas ("Olivas"), to represent Petitioner on February 19, 2003,[137] the same day the trial court issued its pretrial scheduling order.[138]  On April 3, 2003, the trial court granted Petitioner's motion requesting appointment of an investigator to assist Olivas.[139]  Olivas represented Petitioner during the evidentiary hearing held on July 27, 2004, on Petitioner's initial motion to suppress.[140]

On September 17, 2004, the state trial court appointed a new attorney, Macias, as lead counsel for Petitioner, and it appointed a second attorney, Charles McDonald ("McDonald"), as co-counsel for Petitioner.[141]  That same date, Petitioner's new counsel filed a second motion to

---

[135]   *Id.* at 589–90 (citations omitted).

[136]   Trial Tr., Volume I, at p. 3.

[137]   Trial Tr., Volume I, at pp. 23.

[138]   Trial Tr., Volume I, at pp. 24–25.

[139]   Trial Tr., Volume I, at p. 32.

[140]   S.F. Trial, Volume 5, at pp. 6–201.

[141]   Trial Tr., Volume II, at p. 613.

suppress on Petitioner's behalf.[142]  Macias and McDonald represented Petitioner throughout the

two-day hearing held on Petitioner's second motion to suppress his confession on November

22–23, 2004.[143]  The same pair of attorneys represented Petitioner throughout jury selection and

Petitioner's capital murder trial.

At the guilt-innocence phase of Petitioner's trial, his defense counsel (1) extensively

cross-examined prosecution witnesses Hale, Frank, Davis, Eddy, and Murgatroyd, and numerous

law enforcement officers involved in investigating the Billhartz murder and arresting the

Petitioner in Plainview, Texas, (2) cross-examined the prosecution's DNA expert (who had not

testified that Petitioner's DNA was found inside Billhartz's pickup truck), (3) presented

testimony from the defense's court-appointed investigator contradicting some of Hale's trial

testimony, (4) presented a state jail employee who was an expert in prison gang activity and

identification, (5) presented the testimony of TDCJ inmate Allen regarding his belief, based upon

his conversations with Murgatroyd, that Murgatroyd actually murdered Billhartz, (6) presented

the testimony of a Texas Department of Public Safety criminalist who had re-examined

Billhartz's vehicle and criticized the manner in which a previous inspection of that vehicle had

been carried out, and (7) presented an expert criminologist who criticized the investigative

techniques employed by the El Paso Police Department in its investigation of Billhartz's murder

and the interrogation of Petitioner.

At the punishment phase of trial, Petitioner's trial counsel presented a psychiatrist, Dr.

Walter Aeschbach ("Dr. Aeschbach"), who testified extensively concerning (1) his examination

---

[142]  Trial Tr., Volume II, at pp. 614–16.

[143]  S.F. Trial, Volume 45, at pp. 5–203; Volume 46, at pp. 5–89.

and diagnosis of Petitioner's mental health, (2) the impact of Petitioner's major depressive

disorder, sleep deprivation, and abuse of methamphetamine upon Petitioner's ability to recall

events and give a coherent, truly voluntary, confession, (3) Petitioner's suicide attempts, and (4)

his opinion regarding Petitioner's relatively low risk of future dangerousness if institutionalized

and deprived of access to amphetamines.[144]

Thus, insofar as Petitioner argued before the state trial court on January 11, 2005, that his

defense team needed more time in order to secure the services of an expert criminologist and a

mental health expert familiar with the effects of addiction, the trial record belies those

contentions.  Petitioner's trial counsel did, in fact obtain the services of (1) a mental health

expert, Dr. Aeschbach, who testified regarding the impact of Petitioner's addiction on

Petitioner's ability to furnish a voluntary confession, and on Petitioner's propensity for future

violence, (2) an expert criminalist, Angelina Reeves ("Reeves"), who criticized the police

inspection of Billhartz's vehicle for trace evidence, and (3) an expert criminologist, William T.

Gant ("Gant"), who challenged the efficacy of El Paso Police Department procedures.

Insofar as Petitioner argued before the state courts that he needed more time to examine

information regarding the laboratory that conducted DNA analysis, Petitioner failed to allege any

specific facts before the state court showing how a challenge to the efficacy of DNA evidence in

his case would have proven beneficial to Petitioner.  Petitioner continues that same failure in this

Court.  The only DNA evidence admitted at Petitioner's trial consisted of the testimony of an

expert that an examination of the floorboard carpet in Billhartz's pickup truck revealed a stain

---

[144]   S.F. Trial, Volume 85, testimony of Walter Aeschbach, at pp. 5–94.

containing a mixture of DNA from three sources for which Petitioner and Billhartz could not be excluded as possible donors.[145]  Given the undisputed fact that Petitioner drove Billhartz's vehicle on many occasions in the month between her death and his arrest in Plainview, Texas,[146] it is hardly surprising that Petitioner's DNA was found inside Billhartz's vehicle.  Given Petitioner's punishment phase testimony that he and Billhartz drove away from the drug house on Melody Lane on the night of the murder and had sexual intercourse before returning to that address,[147] the presence of a mixed DNA sample in Billhartz's pickup truck containing both Petitioner's and Billhartz's DNA is wholly consistent with Petitioner's version of the relevant events that night.  In short, there does not appear to have been any potential benefit for Petitioner to be gained by attacking the accuracy of the DNA evidence admitted during his trial.

Finally, as pointed out by the Texas Court of Criminal Appeals, Petitioner never identified for the state trial court or state appellate court any specific DNA evidence Petitioner claimed should have been re-tested or any material thought to contain DNA which had not been tested as of January 11, 2004.

Under the foregoing facts, Petitioner clearly failed to allege any facts in the state appellate

---

[145]  S.F. Trial, Volume 74, testimony of Vanessa Nakon, at pp. 41–80.  Ms. Nakon also testified that Luminol is highly carcinogenic and can destroy DNA evidence and, therefore, is not used as a matter of course in every investigation. *Id.*, at p. 74.

[146]  Numerous eyewitnesses testified they saw Petitioner driving Billhartz's vehicle following Billhartz's murder.  S.F. Trial, Volume 68, testimony of Chase Hale, at pp. 137–38; Volume 69, testimony of Donald Frederick Frank, at p. 23; Volume 69, testimony of Tommy L. Baker, at pp. 68–73, 89; Volume 69, testimony of Jerry Johnson, at pp. 105–07; Volume 72, testimony of Ted Murgatroyd, at pp. 26–27, 34–35; Volume 73, testimony of Jesse Eddy, at pp. 147–48; Volume 74, testimony of Mario Escobedo, at pp. 20–21; Volume 74, testimony of Tim Ray Davis, at pp. 106, 146; Volume 78, testimony of James Eaton, at pp. 28–29.

[147]  S.F. Trial, Volume 84, testimony of Justen Grant Hall, at p. 109–13.

court showing that he was harmed, prejudiced, or even inconvenienced in any manner by the refusal of the state trial court to grant Petitioner his requested delay in the start of his trial from January 24 to February 22, 2005.  There does not appear to have been anything arbitrary with the state trial court's decision NOT to delay the start of trial once jury selection was complete.  On the contrary, the trial judge was concerned that delaying the start of trial might impose a hardship on jurors whose family members faced the possibility of surgery in the coming weeks or months.

Petitioner was tried almost two years after his indictment.  The trial record does not support a claim that Petitioner was unable, by virtue of the failure of the trial court to grant his requested four-week continuance, to present any identified defense or exculpatory or mitigating evidence.  Under such circumstances, the Texas Court of Criminal Appeals reasonably concluded the trial court's denial of Petitioner's requested continuance did not deprive Petitioner of any federal constitutional right.

## E.     Conclusions

The Texas Court of Criminal Appeals' rejection on the merits of Petitioner's complaint about the denial of his motion for continuance was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial court and direct appeal proceedings.[148]  Petitioner's fourth

---

[148] For a number of reasons, it is unnecessary for this Court to review the Texas Court of Criminal Appeals' opinion applying *Brady* analysis in connection with the Petitioner's eleventh point of error on direct appeal.  First, the fourth claim presented to this Court in Petitioner's federal habeas corpus petition was phrased in terms of due process analysis, not as a backdoor *Brady* claim.  Second, under the AEDPA, it is not the duty of this Court in a federal habeas corpus proceeding to "grade the paper" of the state appellate court; rather, this Court's proper role is merely to ascertain whether the ultimate

claim herein is without arguable merit and does not warrant federal habeas corpus relief.

## VI.   *BRADY* CLAIMS

### A.     The Claims

In his first claim, Petitioner argues the prosecution withheld evidence from the defense in violation of the standard set forth in *Brady v. Maryland*.[149]  Specifically, Petitioner alleges the prosecution failed to disclose (1) the existence of immunity agreements made with two prosecution witnesses, Murgatroyd and Eddy, (2) deals offered by the police to prosecution witness Hale, and (3) correspondence between an Assistant District Attorney and Eddy.[150]

### B.     State Court Disposition

In his second ground for relief in his skeletal state habeas corpus application, Petitioner argued, cryptically, that his due process rights had been violated by virtue of the prosecution's failure to disclose "material evidence of an immunity offer made to a witness in exchange for his

---

conclusion reached by the state court was objectively reasonable in light of clearly established federal law and the evidence actually before the state court. *See Maldonado v. Thaler*, 625 F.3d at 239 (explaining that federal habeas review of a state court's adjudication involves review only of a state court's decision, not the written opinion explaining the decision); *St. Aubin v. Quarterman*, 470 F.3d at 1100 (holding § 2254(d) permits a federal habeas court to review only a state court's decision and not the written opinion explaining that decision); *Amador v. Quarterman*, 458 F.3d at 410 (holding the same); *Pondexter v. Dretke*, 346 F.3d at 148 (holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable); *Anderson v. Johnson*, 338 F.3d at 390 (holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett*, 286 F.3d at 246 (holding a federal court is authorized by § 2254(d) to review only a state court's decision and not the written opinion explaining that decision).  Finally, as the Texas Court of Criminal Appeals noted in its opinion, Petitioner failed to identify to the state court with specificity any "material" information that had allegedly been withheld by the prosecution.

[149]  *Brady v. Maryland*, 373 U.S. 83 (1963).

[150]  Pet'r's Mem. in Supp., at pp. 18–40; Pet'r's Reply in Supp., at pp. 17–32.

testimony against Applicant at trial."[151]

During the evidentiary hearing held July 2, 2008, Petitioner's state habeas counsel confronted Petitioner's prosecuting attorneys with copies of un-executed immunity agreements for prosecution witnesses Eddy and Murgatroyd.  ADA Meraz testified, in pertinent part, that (1) she made it clear from the start of her involvement in Petitioner's prosecution that she would not make any deals with Petitioner's fellow Aryan Circle members in exchange for their testimony, (2) obtaining admission of Petitioner's confession at trial was "the big thing," in her opinion, because it would secure Petitioner's conviction, (3) she did not offer any deals to any witnesses, (4) Murgatroyd was concerned he might be prosecuted for abusing Billhartz's corpse, but she told Murgatroyd she could not help him avoid possible prosecution for that offense in New Mexico, (5) she never spoke with any law enforcement authorities in New Mexico concerning possible charges against Murgatroyd, (6) based upon the evidence, she did not believe she could prosecute Murgatroyd as a party to Billhartz's murder, (7) other witnesses corroborated what Murgatroyd had told the prosecution prior to trial, (8) although reluctant to testify against his friend, Eddy was willing to testify at Petitioner's trial and Eddy did not ask her about any other charges which might be brought against him, (9) most of the witnesses who testified at Petitioner's trial had already been prosecuted fully for any pending criminal charges by the time Petitioner's capital murder trial commenced, (10) she told Hale there would be no deals concerning any of his drug charges, (11) nonetheless, the prosecution prepared immunity agreements for Murgatroyd and Eddy in case the prosecution called them to testify at Petitioner's trial and those witnesses balked, and (12) there were no discussions with any witnesses about

---

[151]   State Habeas Tr., Volume I, at p. 21.

immunity agreements.[152]

ADA Hicks testified during the same hearing, in pertinent part, that (1) Murgatroyd was not concerned about being prosecuted for Billhartz's murder, but was concerned about being prosecuted in New Mexico for mutilating Billhartz's body, (2) he did not recall Murgatroyd asking him about any deals, (3) no deals were discussed with Murgatroyd, (4) ADA Meraz told him no deals would be extended to any witnesses who were incarcerated, (5) while several of the witnesses had admitted to using methamphetamine, mere use of drugs would not likely have resulted in their prosecution for drug possession, and there were no drugs in existence to test and verify as illicit narcotics or use as evidence in a drug possession prosecution, (6) none of the witnesses on the prosecution's list were indispensable, (7) he vaguely recalled preparing the draft immunity agreements in the prosecution's file in case a witness refused to testify at trial, (8) there were no discussions with any witnesses concerning immunity agreements, (9) he did not know why the draft immunity agreements had been printed out, and (10) the prosecution offered no benefit to any witness the prosecution called to testify at Petitioner's trial.[153]

Petitioner did not call either Eddy or Murgatroyd, or either of their attorneys, to testify about any alleged immunity agreements.  Petitioner did call his former lead trial counsel, Macias, but did not question Macias concerning his knowledge of any immunity agreements between the

---

[152]   State Habeas Tr., Volume II, Statement of Facts from the evidentiary hearing held July 2, 2008 in Petitioner's state habeas corpus proceeding (henceforth "S.F. State Habeas Hearing July 2, 2008"), testimony of Diane Meraz, at pp. 97–137.

[153]   State Habeas Tr., Volume II, S.F. State Habeas Hearing July 2, 2008, testimony of Bill Hicks, at pp. 154–80.

prosecution and prosecution witnesses.[154]

For the reasons discussed above, the state habeas trial court never made any factual findings or conclusions of law regarding Petitioner's *Brady* claim, and the Texas Court of Criminal Appeals chose not to address the merits of any of Petitioner's state habeas claims.

### C.      Respondent's Lack of Exhaustion and Procedural Default Arguments

Respondent argues that, by virtue of the failure of Petitioner to obtain a ruling from the state habeas court on the merits of his *Brady* claim, Petitioner has failed to exhaust available state remedies on his *Brady* claim and, consistent with well-settled precedent, Petitioner has thereby procedurally defaulted on his "unexhausted" claim.[155]   This argument ignores the reality of what actually transpired during Petitioner's state habeas corpus proceeding.

#### 1.      The Issue of Exhaustion

During the evidentiary hearing held July 2, 2008, Petitioner "fairly presented" the state habeas court with a *Brady* claim premised upon the failure of the prosecution to disclose to Petitioner's trial counsel the alleged existence of immunity agreements between the prosecution and prosecution witnesses Murgatroyd and Eddy.   Unfortunately, other than the un-signed draft immunity agreements themselves, Petitioner presented the state habeas court with no evidence establishing that any actual immunity agreements were ever entered into between the prosecution and either Murgatroyd or Eddy.   On the contrary, as explained above, ADA Meraz and ADA Hicks categorically denied they ever even discussed the possibility of immunity with any

---

[154]   State Habeas Tr., Volume II, S.F. State Habeas Hearing July 2, 2008, testimony of Francisco Macias, at pp. 181–226.

[155]   Respondent's Original Answer, filed September 22, 2010, docket entry no. 40, at pp. 2–3.

prosecution witness, much less entered into actual immunity agreements with Murgatroyd or Eddy. Instead of addressing the merits of Petitioner's "fairly presented" *Brady* claim, the Texas Court of Criminal Appeals, over Petitioner's strenuous objection, summarily dismissed Petitioner's state habeas corpus application after granting Petitioner leave to proceed *pro se*. Under such circumstances, Petitioner cannot reasonably be faulted for the failure of the state habeas court to reach the merits of Petitioner's *Brady* claim.

The exhaustion doctrine requires that a state prisoner "fairly present" a federal constitutional claim to the state courts; thus, they must reasonably alert the state court to the *federal constitutional* nature of his complaint and give the state court an opportunity to pass upon and correct alleged violations of the prisoner's federal rights. *Duncan v. Henry*, 513 U.S. 364, 365–66, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1996); *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971). A petitioner making a claim critically dependent on specific allegations of error never brought to the state court's attention has not "fairly presented" that claim. *McKaskle v. Vela*, 464 U.S. 1053, 1055, 104 S.Ct. 736, 737, 79 L.Ed.2d 195 (1984); *Rose v. Lundy*, 455 U.S. 509, 526–27, 531–32, 102 S.Ct. 1198, 1207–08, 1210, 71 L.Ed.2d 379 (1982). In sum, the state prisoner must have "fairly presented" to the state courts "the substance of his federal habeas corpus claim." *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982); *Rose v. Lundy*, 455 U.S. at 519–20, 102 S.Ct. at 1204; *Picard v. Connor*, 404 U.S. at 275, 277–78, 92 S.Ct. at 512–14.

The exhaustion doctrine requires that a petitioner present his *federal* claim in a manner reasonably designed to afford the State courts a meaningful opportunity to address it. The exhaustion requirement is satisfied when the substance of the *federal* habeas claim has been

73

"fairly presented" to the highest state court, i.e., the petitioner has presented his claims before the state courts in a procedurally proper manner according to the rules of the state courts. *Baldwin v. Reese*, 541 U.S. at 29–32, 124 S.Ct. at 1349–51 (holding a petitioner failed to "fairly present" a claim of ineffective assistance by his state appellate counsel merely by labeling the performance of said counsel "ineffective," without accompanying that label with either a reference to *federal* law or a citation to an opinion applying *federal* law to such a claim); *Moore v. Cain*, 298 F.3d 361, 364 (5th Cir. 2002), *cert. denied*, 537 U.S. 1236 (2003); *Mercadel v. Johnson*, 179 F.3d at 275. However, the petitioner need not spell out each syllable of the claim before the state court for the claim to have been "fairly presented" and thereby fulfill the exhaustion requirement. *Riley v. Cockrell*, 339 F.3d 309, 318 (5th Cir. 2003), *cert. denied*, 543 U.S. 1056 (2006); *Fisher v. Texas*, 169 F.3d 295, 303 (5th Cir. 1999).

The exhaustion requirement is not met if the petitioner presents new legal theories or factual claims in his federal habeas petition. *Anderson v. Harless*, 459 U.S. at 6–7, 103 S.Ct. at 277–78; *Riley v. Cockrell*, 339 F.3d at 318 ("It is not enough that the facts applicable to the federal claims were all before the State court, or that the petitioner made a similar state-law based claim. The federal claim must be the 'substantial equivalent' of the claim brought before the State court."); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001) ("where petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement"); *Finley v. Johnson*, 243 F.3d 215, 219 (5th Cir. 2001). Likewise, to have "fairly presented" his *federal* claim, the petitioner must have reasonably alerted the state courts to the *federal* nature of his claim. *Baldwin v. Reese*, 541 U.S. at 29–32, 124 S.Ct. at 1349–51 (holding a petitioner failed to "fairly present" a claim of

74

ineffective assistance by his state appellate counsel merely by labeling the performance of said

counsel "ineffective," without accompanying that label with either a reference to *federal* law or a

citation to an opinion applying *federal* law to such a claim); *Wilder v. Cockrell*, 274 F.3d at 260

("A fleeting reference to the federal constitution, tacked onto the end of a lengthy, purely state-

law evidentiary argument, does not sufficiently alert and afford a state court the opportunity to

address an alleged violation of federal rights.").

Petitioner's skeletal state habeas corpus application did not allege any specific facts in

support of Petitioner's cryptic *Brady* claim, referring only vaguely to a single, unidentified,

prosecution witness with whom the prosecution had allegedly entered into an immunity

agreement.[156]  Nonetheless, at the evidentiary hearing held July 2, 2008, Petitioner presented

evidence, without objection from the state, supporting his conclusory claim which identified

prosecution witnesses Murgatroyd and Eddy as the recipients of the alleged immunity

agreements.  Thus, at least insofar as Petitioner argues in this Court that his rights under *Brady v.*

*Maryland* were violated by virtue of the alleged failure of the prosecution to disclose the

existence of immunity agreements with Eddy and Murgatroyd, Petitioner most certainly "fairly

presented" that aspect of his multi-faceted first claim herein to the state habeas court.

---

[156]  As a matter of fact, the Petitioner's state habeas corpus application (including his cryptic *Brady* claim) was so lacking in specific factual assertions that, had it been presented to this Court under pre-AEDPA case law, it would have been subject to summary dismissal without the necessity of an evidentiary hearing.  Conclusory assertions of violations of federal constitutional rights, such as those contained in Petitioner's skeletal state habeas pleading, have never warranted an evidentiary hearing, much less federal habeas relief, even under pre-AEDPA standards. *See, e.g., Johnson v. Scott*, 68 F.3d 106, 112 (5th Cir. 1995) (holding in a pre-AEDPA case that "bold assertions on a critical issue in a habeas petition, unsupported and unsupportable by anything else contained in the record, are insufficient to warrant an evidentiary hearing"), *cert. denied*, 517 U.S. 1122 (1996); *Byrne v. Butler*, 845 F.2d 501, 513-14 (5th Cir.) (holding the same), *cert. denied*, 513 U.S. 1192 (1995).

The remaining aspects of Petitioner's first claim herein are a different story, however. Nothing in Petitioner's skeletal state habeas corpus application, and nothing Petitioner presented or argued to the state habeas court during the evidentiary hearing held July 2, 2008, reasonably alerted the state habeas court that Petitioner was contending his rights under *Brady* were violated by virtue of the prosecution's failure to disclose either (1) any alleged deals offered by police to prosecution witness Hale or (2) the correspondence between an Assistant District Attorney and Eddy. Thus, Petitioner has failed to "fairly present" these aspects of his multi-faceted *Brady* claim to the state courts.

### 2.    Procedural Default on Unexhausted Claims

The Fifth Circuit has consistently held that federal habeas review on unexhausted claims presented by a convicted Texas criminal defendant is barred under the procedural default doctrine. *See, e.g., Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008) ("This court has held that, since 1994, the Texas abuse of the writ doctrine has been consistently applied as a procedural bar, and that it is an independent and adequate state ground for the purpose of imposing a procedural bar."), *cert. denied*, ___ U.S. ___, 129 S.Ct. 2378, 173 L.Ed.2d 1299 (2009); *Aguilar v. Dretke*, 428 F.3d 526, 533 (5th Cir. 2005) (holding the Texas abuse of the writ rule ordinarily is an adequate and independent procedural ground on which to base a procedural default ruling), *cert. denied*, 547 F.3d 1136 (2006); *Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir. 2004) (holding the violation of the Texas writ-abuse rule ordinarily furnishes an adequate and independent procedural ground which bars federal habeas review of a claim), *cert. denied*, 543 U.S. 1124 (2005); *Bagwell v. Dretke*, 372 F.3d 748, 755–56 (5th Cir. 2004) (holding a petitioner procedurally defaulted by failing to "fairly present" a claim to the state courts in his

76

state habeas corpus application), *cert. denied*, 543 U.S. 989 (2004); *Cotton v. Cockrell*, 343 F.3d

746, 755 (5th Cir. 2003) (holding the Texas writ abuse doctrine is an adequate and independent

barrier to federal habeas review of unexhausted claims), *cert. denied*, 540 U.S. 1186 (2004);

*Henderson v. Cockrell*, 333 F.3d 592, 605 (5th Cir. 2003) (recognizing the Texas writ-abuse

doctrine has been strictly and regularly applied since before August of 1997), *cert. denied*, 540

U.S. 1163 (2004); *Smith v. Cockrell*, 311 F.3d 661, 684 (5th Cir. 2002) (holding unexhausted

claims were procedurally barred), *cert. dism'd*, 541 U.S. 913 (2004); *Jones v. Johnson*, 171 F.3d

270, 276–77 (5th Cir. 1999) (holding unexhausted ineffective assistance claim procedurally

barred from federal habeas review), *cert. denied*, 527 U.S. 1059 (1999); *Muniz v. Johnson*, 132

F.3d 214, 221 (5th Cir. 1998) (holding unexhausted claims procedurally barred), *cert. denied*,

523 U.S. 1113 (1998); *Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997) (holding the Texas

writ-abuse rule an adequate and independent barrier to federal habeas review of unexhausted

claims), *cert. denied*, 523 U.S. 1139 (1998).

Section 5 of Article 11.071 of the Texas Code of Criminal procedure prohibits a

successive state habeas corpus application except in limited circumstances which do not apply to

Petitioner's complaints about the prosecution's alleged failure to disclose its correspondence

with Eddy regarding the scheduled start for Petitioner's trial or alleged El Paso Police promises

of leniency to Hale. *See* Art. 11.071, §5, TEX. CODE CRIM. PROC. ANN. (Vernon Supp. 2006)

(barring consideration on the merits of new claims contained in a subsequent state habeas corpus

application unless either (1) the new claims could not have been presented in a previous

application because the legal or factual basis for the new claims were unavailable at the time the

previous application was filed; (2) by a preponderance of the evidence, but for a violation of the

United States Constitution, no rational juror could have found the applicant guilty beyond a

reasonable doubt; or (3) by clear and convincing evidence, but for a violation of the United States

Constitution, no rational juror would have answered in the state's favor one or more of the

capital sentencing special issues). The Texas Court of Criminal Appeals has grafted an

additional requirement on the first prong of 11.071 § 5(a): "to satisfy Art. 11.071, § 5(a)(1), 1)

the factual or legal basis for an applicant's current claims must have been unavailable as to all of

his previous applications; and 2) the specific facts alleged, if established, would constitute a

constitutional violation that would likely require relief from either the conviction or sentence."

*Ex parte Campbell,* 226 S.W.3d 418, 421 (Tex. Crim. App. 2007) (internal footnotes omitted)."

*Williams v. Thaler*, 602 F.3d 291, 306 (5th Cir.), *cert. denied,* ___ U.S. ___, 131 S.Ct. 506, 178

L.Ed.2d 376 (2010).

Absolutely nothing prevented Petitioner from asserting his complaints about the alleged

failure of the prosecutors to disclose either their pretrial correspondence with Eddy or the alleged

El Paso Police promises to Hale in the course of his state habeas corpus proceeding. The factual

basis for those aspects of Petitioner's *Brady* claim herein existed as of the date Petitioner's filed

his state habeas corpus proceeding. Petitioner alleges no facts in this Court which satisfies either

of the final two exceptions to the Texas writ-abuse barrier erected by Section 5 of Article 11.071.

On the contrary, the evidence of Petitioner's guilt was overwhelming, as was the evidence

supporting the jury's answers to the Petitioner's capital sentencing special issues.

Nothing in Petitioner's state habeas corpus application "fairly presented" the Texas Court

of Criminal Appeals with the same *federal constitutional* arguments contained in Petitioner's

first claim for relief herein relating to the alleged failure of prosecutors to disclose either police

deals with Hale or the prosecutor's pretrial correspondence with Eddy.  In short, nothing in Petitioner's pleading or arguments in his state habeas corpus proceeding "fairly presented" the state courts with those portions of Petitioner's *Brady* claim herein arising from the alleged failure of state prosecutors to disclose either (1) police deals with Hale or (2) the prosecutors' pretrial correspondence with Eddy.

If Petitioner were to attempt at this juncture to return to state court and assert these new, clearly unexhausted, aspects of his *Brady* claim in a successive state habeas application, the applicable provisions of the Texas writ-abuse statute would preclude him from doing so.  Thus, Petitioner failed to exhaust available state remedies on the latter two aspects of his first claims for relief herein and, thereby, procedurally defaulted on them.  *See Ries v. Quarterman*, 522 F.3d 517, 526 (5th Cir.) (affirming dismissal of unexhausted ineffective assistance claim as procedurally defaulted), *cert. denied*, ___ U.S. ___, 129 S.Ct. 485, 172 L.Ed.2d 351 (2008); *Hughes v. Dretke*, 412 F.3d 582, 594–95 (5th Cir. 2005) (holding petitioner procedurally defaulted on a jury misconduct claim by presenting the state courts with purely state-law arguments supporting same and waiting until he reached federal court to first urge federal constitutional arguments), *cert. denied*, 546 U.S. 1177 (2006); *Beazley v. Johnson*, 242 F.3d 248, 264–68 (5th Cir.) (holding petitioner procedurally defaulted on a claim by failing to present same to the Texas Court of Criminal Appeals either on direct appeal or in a state habeas corpus application where claim was readily available at the time petitioner filed his state habeas application), *cert. denied*, 534 U.S. 945 (2001); *Hicks v. Johnson*, 186 F.3d 634, 637–38 (5th Cir. 1999) (holding petitioner procedurally defaulted on an unexhausted claim for relief), *cert. denied*, 528 U.S. 1132 (2000).

### 3.    Exceptions Inapplicable

The Supreme Court has recognized exceptions to the doctrine of procedural default where a federal habeas corpus petitioner can show "cause and actual prejudice" for his default or that failure to address the merits of his procedurally defaulted claim will work a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. at 750, 109 S.Ct. at 2565; *Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989).  To establish "cause," a petitioner must show either that some objective external factor impeded the defense counsel's ability to comply with the state's procedural rules or that petitioner's trial or appellate counsel rendered ineffective assistance. *Coleman v. Thompson*, 501 U.S. at 753, 111 S.Ct. at 2566; *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986) (holding that proof of ineffective assistance by counsel satisfies the "cause" prong of the exception to the procedural default doctrine).  While a showing of ineffective assistance can satisfy the "cause" prong of the "cause and actual prejudice" exception to the procedural default doctrine, Petitioner does not argue or allege any specific facts suggesting his state appellate counsel's failure to present the same federal constitutional complaints about the prosecutors' alleged failure to disclose either police deals with Hale or the prosecutors' pretrial correspondence with Eddy constituted ineffective assistance by Petitioner's appellate counsel.[157]  Thus, Petitioner has failed to allege any facts satisfying the "cause and actual prejudice" exception to the procedural default doctrine.

---

[157]  Moreover, as will be explained hereinafter, any such contention would have been legally frivolous because neither of Petitioner's *Brady* claims arising from the failure of prosecutors to disclose police deals with Chase Hale or the prosecutors' correspondence with Jesse Eddy possess any arguable legal merit.

In order to satisfy the "miscarriage of justice" test, the petitioner must supplement his constitutional claim with a colorable showing of factual innocence. *Sawyer v. Whitley*, 505 U.S. 333, 335–36, 112 S.Ct. 2514, 2519, 120 L.Ed.2d 269 (1992). In the context of the punishment phase of a capital trial, the Supreme Court has held that a showing of "actual innocence" is made when a petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under applicable state law. *Sawyer v. Whitley*, 505 U.S. at 346–48, 112 S.Ct. at 2523. The Supreme Court explained in *Sawyer v. Whitley* this "actual innocence" requirement focuses on those elements which render a defendant *eligible* for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Sawyer v. Whitley*, 505 U.S. at 347, 112 S.Ct. at 2523. Petitioner has alleged no specific facts satisfying this "factual innocence" standard. Because Petitioner has failed to satisfy the "actual innocence" test, he is not entitled to relief from his procedural default on his claim herein under the fundamental miscarriage of justice exception to the procedural default doctrine.

Petitioner procedurally defaulted on his complaints about the prosecutors' alleged failure to disclose either police deals with Hale or the prosecutors' pretrial correspondence with Eddy. None of the recognized exceptions to the procedural default doctrine apply to these two aspects of Petitioner's multi-faceted *Brady* claim. Out of an abundance of caution, however, this Court will address the merits of all three aspects of Petitioner's *Brady* claim, in accordance with §2254(b)(2), which empowers a federal habeas court to deny an exhausted claim on the merits. *Smith v. Cockrell*, 311 F.3d 661, 684 (5th Cir. 2002), *cert. dism'd*, 541 U.S. 913 (2004); *Daniel v. Cockrell*, 283 F.3d 697, 701–02 (5th Cir. 2002), *cert. denied*, 537 U.S. 874 (2002).

81

### D.      Clearly Established Federal Law

As the Court has noted, few constitutional principles are more firmly established by Supreme Court precedent than the rule that "'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256, 1272, 157 L.Ed.2d 1166 (2004); *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963); *Berkley v. Quarterman*, 507 F. Supp.2d 692, 746 (W.D. Tex. 2007), *CoA denied*, 310 F. App'x 665 (5th Cir. February 18, 2009), *cert. denied*, ___ U.S. ___, 130 S.Ct. 366, 175 L.Ed.2d 70 (2009).

The Supreme Court has consistently held the prosecution's duty to disclose evidence material to either guilt or punishment—the rule announced in *Brady v. Maryland*—applies even when there has been no request by the accused. *Banks v. Dretke*, 540 U.S. at 690, 124 S.Ct. at 1272; *Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 l.Ed.2d 286 (1999); *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976).   This duty also applies to impeachment evidence. *Strickler v. Greene*, 527 U.S. at 280, 119 S.Ct. at 1948; *United States v. Bagley*, 473 U.S. 667, 676 & 685, 105 S.Ct. 3375, 3380 & 3385, 87 L.Ed.2d 481 (1985).

The rule in *Brady* encompasses evidence known only to police investigators and not personally known by the prosecutor.  *Strickler v. Greene*, 527 U.S. at 280–81, 119 S.Ct. at 1948; *Kyles v. Whitley*, 514 U.S. 419, 438, 115 S.Ct. 1555, 1568, 131 L.Ed.2d 490 (1995).  "[T]he individual prosecutor has a duty to learn of any favorable evidence *known to the others acting on*

82

*the government's behalf* in this case, including the police." *Strickler v. Greene*, 527 U.S. at 281,

119 S.Ct. at 1948 (emphasis added); *Kyles v. Whitley*, 514 U.S. at 437, 115 S.Ct. at 1567.

Under clearly established Supreme Court precedent, there are three elements to a *Brady*

claim: (1) the evidence must be favorable to the accused, either because it is exculpatory or

because it is impeaching; (2) the evidence must have been suppressed by the State, either

willfully or inadvertently; and (3) the evidence must be "material," i.e., prejudice must have

ensued from its non-disclosure. *Banks v. Dretke*, 540 U.S. at 691, 124 S.Ct. at 1272; *Strickler v.*

*Greene*, 527 U.S. at 281–82, 119 S.Ct. at 1948.    Evidence is "material" under *Brady* where

there exists a "reasonable probability" that had the evidence been disclosed, the result at trial

would have been different. *Banks v. Dretke*, 540 U.S. at 698–99, 124 S.Ct. at 1276.

The Supreme Court has emphasized four aspects of the *Brady* materiality inquiry.  First, a

showing of materiality does *not* require demonstration by a preponderance that disclosure of the

suppressed evidence would have resulted in the defendant's acquittal. *See United States v.*

*Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383 (expressly adopting the "prejudice" prong of the

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), analysis of

ineffective assistance claims as the appropriate standard for determining "materiality" under

*Brady*).  Second, the materiality standard is *not* a sufficiency of the evidence test. *Kyles v.*

*Whitley*, 514 U.S. at 434–35, 115 S.Ct. at 1566.  Third, once materiality is established, harmless

error analysis has no application. *Kyles v. Whitley*, 514 U.S. at 435–36, 115 S.Ct. at 1566–67.

Finally, materiality must be assessed collectively, not item by item. *Kyles v. Whitley*, 514 U.S. at

436–37, 115 S.Ct. at 1567.

### E.      No Merits

Because the state habeas court never reached the merits of any of Petitioner's *Brady*

claims, this Court's analysis is necessarily *de novo*. *See Cone v. Bell*, 556 U.S. 449, ___, 129

S.Ct. 1769, 1784, 173 L.Ed.2d 701 (2009) (holding *de novo* review applicable to a claim the state

courts did not reach on the merits).

### 1.      The Immunity Agreements

At trial, Murgatroyd testified, in pertinent part, that (1) he had no deals with police

protecting him from the revocation of his parole, (2) there were no *sub rosa* agreements between

him and the prosecutors, and (3) his parole was not revoked, even though he was on parole

during the time of Billhartz's murder.[158] Eddy testified at trial that (1) he was not expecting any

kind of leniency in exchange for his testimony at Petitioner's trial, (2) he saw Billhartz alive and

spoke with her as he was leaving the drug house on Melody Lane that evening, (3) Billhartz did

not appear to have any trouble moving her mouth, (4) he did not expect Petitioner to kill Billhartz

when he left the drug house on Melody Lane that evening, (5) the next time he saw Petitioner, the

Petitioner informed him that he (the Petitioner) had purchased Billhartz's pickup truck, (6) he

and Petitioner both slept regularly during the weeks they spent in Carlsbad immediately after

Billhartz's murder, (7) he fell asleep during their trip to Indiana and, when he awoke, the truck

was stopped and Petitioner was telling police the truck belonged to his (Petitioner's) girlfriend,

(8) he does not know if Petitioner killed Billhartz, and (9) he did not believe Petitioner killed

---

[158]   S.F. Trial, Volume 72, testimony of Ted Murgatroyd, at pp. 38, 87, 89.

Billhartz.[159]

　　As explained above, during the state habeas hearing held July 2, 2008, (1) Petitioner

confronted the prosecutors with copies of the un-executed draft immunity agreements for Eddy

and Murgatroyd which Petitioner's state habeas counsel had discovered in the prosecution's

files[160]; (2) both prosecuting attorneys testified without contradiction that the unsigned immunity

agreements were prepared for the purpose of allowing them to compel the testimony of Eddy and

Murgatroyd if either of those witnesses refused to testify when called by the prosecution during

Petitioner's trial; and (3) Petitioner offered no testimony from either Murgatroyd or Eddy, or

from either of their attorneys or anyone else who claimed to have personal knowledge of the

existence of any alleged immunity agreement between either witness and the prosecution.

　　In support of his *Brady* claim, Petitioner presents this Court with an affidavit executed by

Eddy on July 20, 2011,[161] in which Eddy swears (1) he has no independent recollection of any of

the events at the drug house on Melody Lane on October 28, 2002, because he was "under the

influence of methamphetamine at the time," (2) when arrested in Plainview, Texas, on November

23, 2002, he and Petitioner had been using methamphetamine "continuously for several weeks,"

"had just hit bottom physically and mentally," and "had not slept for days," (3) the detective from

New Mexico who interviewed Eddy after Eddy and Petitioner ate lunch together threatened Eddy

---

[159]   S.F. Trial, Volume 73, testimony of Jesse Eddy, at pp. 135, 146–49, 150–51, 170, 175.

[160]   A copy of the unsigned immunity agreement for Ted Murgatroyd appears herein as Ex. 3 to
Pet'r's Mem. in Supp.  A copy of the immunity agreement for Jesse Eddy signed by the El Paso District
Attorney but not signed by Eddy or Eddy's attorney appears as Ex. 4 to Pet'r's Mem. in Supp.

[161]   Ex. B, attached to Pet'r's Supplement to Mem. in Supp., filed October 7, 2011, ECF No. 53
(henceforth "Eddy Affidavit").

with prosecution in Billhartz's murder and extradition to Colorado to face charges there unless Eddy gave a statement that was consistent with the statements of unidentified "other witnesses," (4) Eddy thereafter gave a statement which was based solely upon the information Eddy had read in the other statements, and not upon Eddy's own independent recollection, (5) after Petitioner attempted suicide and was taken back to El Paso, Eddy remained in Plainview, Texas, for several months because El Paso detectives said Eddy was not being cooperative, (6) in December of 2004, El Paso prosecutors wrote Eddy and offered to bring Eddy back to El Paso in time for the holidays if Eddy would agree to "work on my testimony for Justen's trial," (7) Eddy agreed to the transfer because he wanted to see his family at the holidays, (8) prosecutors told Eddy to stick to his statement and he would not get into trouble "with other charges, including drug-related charges involving the house on Melody [Lane]," (9) Eddy also claimed he signed a document which Eddy understood to be an immunity agreement, (10) the testimony Eddy gave at trial was based on the statements of other witnesses and not his own memory of the events on October 28, 2002, and (11) he gave his trial testimony because he believed he had been granted immunity from "any charges in exchange for my testimony."[162]

Because the Court is reviewing this aspect of Petitioner's *Brady* claim *de novo*, the Court has the authority to evaluate the credibility of Eddy's recanting affidavit. Recanting affidavits are viewed with extreme suspicion. *Summers v. Dretke*, 431 F.3d 861, 872 (5th Cir. 2005), *cert. denied*, 549 U.S. 840 (2006); *Graves v. Cockrell*, 351 F.3d 143, 153 (5th Cir. 2003); *United States v. Greshom*, 118 F.3d 258, 267 (5th Cir. 1997), *cert. denied*, 522 U.S. 1052 (1998);

---

[162] *Id.*

*Baldree v. Johnson*, 99 F.3d 659, 663 (5th Cir. 1996), *cert. denied*, 520 U.S. 1194 (1997).

In light of (1) the absence of any evidence in the record now before this Court showing the existence of an immunity agreement actually signed by Eddy or Eddy's counsel, (2) Eddy's sworn testimony at Petitioner's trial denying he expected any leniency in exchange for his trial testimony, (3) the sworn testimony during Petitioner's state habeas corpus proceeding of ADA Meraz and ADA Hicks denying they ever extended any offers of immunity to Eddy or any other prosecution witness, (4) the absence of any affidavits or testimony from Eddy's attorney of record suggesting Eddy was ever offered immunity in exchange for his trial testimony against Petitioner, (5) Eddy's long and inglorious criminal record (including the fact Eddy is currently incarcerated and, therefore, stands to lose very little by submitting a false affidavit), and (6) Eddy's professions of friendship for Petitioner and thinly veiled attempts during his testimony at Petitioner's trial to cast doubt on Petitioner's guilt, the Court finds Eddy's 2011 affidavit incredible. The Court finds there is no credible evidence now before this Court establishing the prosecution ever entered into any immunity agreement with either Eddy, Murgatroyd, or any other prosecution witness in connection with Petitioner's capital murder trial.

Furthermore, even if an immunity agreement had existed between Petitioner's prosecutors and Eddy at the time of Petitioner's trial and such agreement was not disclosed by the prosecution, those facts would not, standing alone, satisfy the "materiality" prong of *Brady* analysis. Contrary to the assertions in Petitioner's pleadings, Eddy was not a key prosecution witness. He offered virtually no testimony concerning the events of October 28, 2002, that was

other than repetitive of the testimony of other members of the Aryan Circle.[163]  Eddy denied any

personal knowledge concerning Petitioner's guilt and even expressed doubt as to Petitioner's

guilt.  More significantly, Eddy's 2011 affidavit does not purport to recant the portion of Eddy's

trial testimony in which Eddy testified the Petitioner slept just about every night and did not do

much methamphetamine while they were in Carlsbad.[164]

     Eddy's trial testimony did little more than corroborate several aspects of the trial

testimony of Hale, Murgatroyd, Davis, and Eaton (primarily that the Petitioner became

noticeably agitated when he heard Billhartz threaten to call the police to report Murgatroyd's

assault upon her and the Petitioner's ensuing threats to kill her).  Eddy offered no direct

testimony on the subject of whether Petitioner actually murdered Billhartz; Eddy claimed to have

left the drug house on Melody Lane before Petitioner and Billhartz left the scene in Billhartz's

pickup.  Eddy did not offer any trial testimony suggesting he had ever heard Petitioner confess to

Billhartz's murder.  Thus, impeaching Eddy's limited trial testimony would not have had any

impact upon the highly inculpatory nature of (1) the trial testimony of Hale, Davis, Murgatroyd,

Frank, and Eaton or (2) Petitioner's own written confessions to having murdered Billhartz and

Diaz.  Nor would impeaching Eddy have altered the devastating impact of Petitioner's own

---

[163]  The one aspect of Eddy's trial testimony that was different from that of the trial testimony of Chase Hale, Tim Ray Davis, Ted Murgatroyd, and James Eaton was Eddy's insistence that he stopped by Melanie Billhartz's truck as she was crying and counseled her to leave the scene. S.F. Trial, Volume 73, testimony of Jesse Eddy, at pp. 146–47, 172. Nothing in the trial testimony of any of the other persons present at the drug house that evening suggested Eddy had conferred with Bilhartz in such a manner. Thus, contrary to Eddy's 2011 affidavit, there was at least one aspect of his trial testimony that was distinct and unique from the trial testimony and pretrial statements of other Aryan Circle members who later testified for the prosecution at Petitioner's trial.

[164]  S.F. Trial, Volume 73, testimony of Jesse Eddy, at pp. 150, 188.

testimony at the punishment phase of trial, when Petitioner suggested his murder of Diaz was accidental—a point utterly refuted by the uncontradicted forensic evidence—and refused to accept any responsibility for Billhartz's murder.

There is simply no reasonable probability that, had Petitioner's trial counsel been able to impeach Eddy's trial testimony by producing a signed immunity agreement (or even with a copy of Eddy's 2011 affidavit), the outcome of either phase of Petitioner's capital murder trial would have been any different. An executed immunity agreement for Eddy would not have been "material" within the meaning of *Brady* even if such a document had ever existed—a fact Petitioner has failed to establish to this Court's satisfaction.

### 2.      Chase Hale's "Deal"

The most nonsensical of Petitioner's *Brady* claims is his argument the prosecution failed to disclose to Petitioner's trial counsel the existence of a secret deal between the El Paso Police and prosecution witness Hale. In point of fact, both Hale and defense investigator George Huerta ("Huerta") testified that, during a pretrial interview, Hale told the defense about a promise of leniency allegedly made to Hale by El Paso Police Detectives, that was never honored by the prosecution.[165] More specifically, Hale testified at trial (1) he was afraid he would get more years imposed upon him if he refused to testify against Petitioner, (2) the El Paso Police (specifically Detective Samaniego) promised to drop all marijuana charges against Hale if Hale testified against Petitioner, (3) in fact, Hale received a three-year sentence in connection with his marijuana charge, (4) Hale originally received a probated sentence in connection with that charge

---

[165]   S.F. Trial, Volume 75, testimony of George Huerta, at p. 127; Volume 68, testimony of Chase Hale, at pp. 153–56, 169, 171, 201, 210, 227–28.

but, by the time of Petitioner's trial, Hale had violated the terms of his probation and been

sentenced to serve a three-year term of imprisonment, and (5) after his arrest on the marijuana

charge, Hale contacted jail authorities and attempted (apparently unsuccessfully) to trade his

knowledge about Billhartz's murder for a reduced sentence.[166]  Huerta testified Hale became

angry during their pretrial interview when Hale described an unkept promise allegedly made by

El Paso Police Detective Samaniego that Hale would not face prosecution for a drug charge if

Hale agreed to give a written statement and testified against Petitioner.[167]  Not surprisingly,

Detective Samaniego denied making any such promise to induce Hale's written statement or trial

testimony.[168]

        Whatever else may be said about the alleged agreement between the prosecution and Hale

(or between Hale and Detective Samaniego), Petitioner's trial counsel were most certainly well

aware of that alleged agreement prior to Petitioner's trial.  The existence of the alleged agreement

with Hale, and the fact the prosecution failed to honor it, were both made known to Petitioner's

defense team by Hale himself prior to Petitioner's trial.  Petitioner cannot rely upon information

his trial counsel actually had in their possession prior to trial—and which said counsel employed

to Petitioner's advantage at trial during cross-examination of Hale—as the basis for a *Brady*

claim.

        The same holds for Petitioner's assertion that Hale received a lighter sentence (compared

---

[166] S.F. Trial, Volume 68, testimony of Chase Hale, at pp. 153–56, 169, 171, 201, 210, 227–28.

[167]  S.F. Trial, Volume 75, testimony of George Huerta, at p. 127.

[168]  S.F. Trial Volume 73, testimony of David Samaniego, at pp. 9–10; Volume 75, testimony of
David Samaniego, at pp. 169–70.

to Hale's co-defendants) in a drug case in exchange for Hale's trial testimony against Petitioner. Petitioner furnishes the Court no credible evidence, such as an affidavit from the prosecutor or Hale's attorney in the drug case, suggesting prosecutors ever took any action to ensure Hale would receive a sentence less onerous than that of Hale's co-defendants *in exchange for* Hale's testimony against Petitioner. That Hale received a lighter sentence than Hale's co-defendants in an unrelated drug case does not, standing alone, establish Hale's relatively lighter sentence was a *quid pro quo* for Hale's trial testimony against Petitioner. Hale may have played a minor role in that drug offense, cooperated with law enforcement authorities investigating that offense, or otherwise demonstrated he was less culpable than his fellow co-defendants and, therefore, deserving of a lesser sentence. Petitioner has not presented the Court with any specific facts, much less any admissible evidence, showing Hale received any benefit from El Paso County prosecutors *in exchange for* Hale's trial testimony against Petitioner.

Furthermore, even if Hale could have been impeached at Petitioner's trial with evidence showing Hale received a lesser sentence in his drug case in exchange for testifying against Petitioner, there is no reasonable probability such impeachment would have resulted in a different outcome at either phase of Petitioner's trial. Like Eddy, most of Hale's trial testimony at the guilt-innocence phase of Petitioner's trial concerning the events of October 28, 2002, was corroborated by the trial testimony of Davis, Murgatroyd, and Eaton. Hale did not claim to possess any personal knowledge regarding the actual murder of Billhartz. Hale did not claim to have seen Petitioner drive away from the drug house on Melody Lane with Billhartz. Nor did Hale claim to have seen Billhartz's body inside the pickup truck. Instead, Hale testified he attempted to approach Billhartz's truck at one point, but Petitioner yelled emphatically at Hale to

91

stay away from the truck because Petitioner had just killed Billhartz.[169]  Impeaching Hale on this

point would have done nothing to impeach (1) the trial testimony of Frank regarding Petitioner's

confession to having murdered Billhartz, (2) the trial testimony of Davis, Murgatroyd, Eaton, and

Eddy regarding (a) Petitioner's agitation when he learned Billhartz was threatening to call the

police and (b) Petitioner's threats to kill Billhartz, or (3) the Petitioner's own signed confession

to Billhartz's murder.

   Moreover, Petitioner's trial counsel impeached Hale to at least some extent by eliciting

testimony from Hale that (1) he feared he would receive more prison time if he failed to testify

against Petitioner, (2) he had been promised that his drug charge would be dismissed if he

testified against Petitioner (but that promise had not been kept), (3) he was a long term drug

abuser and criminal who was often dishonest, (4) he had tried to trade his knowledge about

Billhartz's murder for a reduced sentence, (5) it was difficult for Hale to concentrate when he

was using crystal methamphetamine, and he was using it on October 28, 2002, (6) Hale expected

to receive something for cooperating with the investigation of Billhartz's murder, and (7) he had

not seen the murder happen.[170]  Furthermore, Petitioner's trial counsel impeached Hale on the

relevant portion of Hale's trial testimony by calling Hector Lopez, who, in contrast to Hale,

denied he and Hale ever went near Billhartz's truck the evening of her murder.[171]

   There is simply no reasonable probability that, but for the failure of Petitioner's trial

---

[169] S.F. Trial, Volume 68, testimony of Chase Hale, at p. 129.

[170] S.F. Trial, Volume 68, testimony of Chase Hale, at pp. 141–42, 148, 151–57, 169, 171, 201, 227–28, 230–31.

[171] S.F. Trial, Volume 75, testimony of Hector Lopez, at p. 93.

counsel to *further* impeach Hale by showing Hale had been offered a lesser sentence in Hale's

drug case in exchange for testifying against Petitioner, the outcome of either phase of Petitioner's

capital murder trial would have been any different.  Impeaching Hale further would have done

little to diminish the overwhelming evidence establishing Petitioner's responsibility for both the

Billhartz and Diaz murders.  Nor would it have mitigated the impact of Petitioner's own

punishment phase testimony.

### 3.      Pretrial Correspondence with Eddy

Petitioner has presented the Court with a pair of letters between Eddy and ADA Hicks.[172]

Contrary to Petitioner's contentions in his pleadings, however, those letters do not establish the

existence of an agreement by prosecutors to transport Eddy back to El Paso in exchange for

Eddy's agreement to testify against Petitioner.

Eddy's undated letter reads as follows:

> I am writing to find out what is going on with your case and to find out
> if you still will be bringing me back to El Paso to speak to me about Justen
> and what I know of him because I do have a couple of things to say that I
> didnt [sic] tell the detectives when they first questioned me[.]  I do not know
> if they will be of any help but I am willing to tell you whatever I do know
> about justen [sic] and what happened.  If you would please get back to me
> ASAP about this matter and let me know if I really am going to EPT because
> I do not want to get my hopes up about seeing my family and then end up not
> going to EPT[.  T]hank you for your time and once again I do look forward
> to helping out any way possible[.]  I hope to see and speak to you soon.

ADA Hicks' reply letter, dated November 30, 2004, reads as follows:

> I am writing to let you know what has happened in our case.

---

[172]   The letters are attached as Ex. 11 and Ex. 12 to Pet'r's Mem. in Supp.

93

We were originally set to begin trial in early December.  However, the jury selection process has taken more time than originally expected.  We are now expecting to begin the evidence portion of trial on January 10, 2005.

We will be bringing you from Indiana to El Paso sometime shortly before Christmas to allow us plenty of time to meet with you to discuss what you know of Justen Hall.  We anticipate your return to Indiana sometime in early February, 2005.

You can expect to be brought back to Madison County Circuit Court again for another hearing on the State's motion to have you released to the custody of the Sheriff of El Paso County.

In the mean time, should you have any questions, please feel free to contact me at the below address and phone number.  Thank you for your continued cooperation and I look forward to meeting you soon.

Contrary to the suggestions contained in Petitioner's pleadings, there is nothing in these letters which establishes that Eddy received any *quid pro quo* in exchange for his trial testimony against Petitioner or that the timing of Eddy's transport to El Paso from Indiana vis-a-via the Christmas-New Year's holiday season of 2004 was anything other than coincidental or fortuitous.  Given ADA Hicks' representation (unchallenged by any other evidence now before this Court) that the evidentiary portion of Petitioner's trial was then set to begin shortly after the first of the year, and the expressed (and perfectly understandable) desire of prosecutors to meet with Eddy prior to trial, the letters do not establish the existence of a quid pro quo for Eddy's trial testimony.  On the contrary, the only rational inference to be drawn from these letters is that Eddy had represented to the El Paso prosecutors his willingness to testify against Petitioner *long before* Eddy ever wrote ADA Hicks the letter Petitioner has now presented to this Court. Nothing in Eddy's letter or ADA Hicks' reply suggests that Eddy's willingness to testify against Petitioner was ever contingent upon the El Paso prosecutors returning Eddy to El Paso before the 2004 holiday season.  Nor is there any hint in either of these letters that the prosecutors offered to

94

arrange Eddy's return to El Paso as an inducement to obtain Eddy's testimony against Petitioner. On the contrary, Eddy's letter makes clear that he is willing to testify against Petitioner and is simply seeking information regarding his return date and expressing his hope he can do so before the holidays. However, it is equally clear to the Court that Eddy was not attempting to make his return to El Paso before the 2004 holiday season a condition precedent to his willingness to testify against Petitioner. Insofar as Eddy's 2011 affidavit suggests something to the contrary, this Court finds Eddy's 2011 affidavit incredible.

Finally, for the same reasons discussed above, impeachment of Eddy through the use of the correspondence in question would not have impacted the overwhelming evidence of Petitioner's guilt in the murders of both Billhartz and Diaz. Impeaching Eddy would have undermined one of the few prosecution witnesses who expressed doubt over Petitioner's guilt and done nothing to undermine the inculpatory effect of Petitioner's written confessions to both the Billhartz and Diaz murders, much less the impact of Petitioner's abject refusal to accept responsibility for either of those murders during his punishment phase testimony. There is no reasonable probability that, but for the failure of the prosecution to disclose the correspondence in question to Petitioner's trial counsel prior to trial, the outcome of either phase of Petitioner's trial would have been any different.

## F.    Conclusions

Petitioner exhausted state remedies with regard to his complaint that prosecutors failed to disclose the existence of immunity agreements with Murgatroyd and Eddy. The problem is, Petitioner has presented this Court with no credible evidence showing Petitioner's prosecutors

ever actually entered into any immunity agreements with either Eddy or Murgatroyd.  Moreover, even if such immunity agreements had existed at the time of Petitioner's trial, there is no reasonable probability that, but for the failure of the prosecution to disclose the immunity agreements to Petitioner's trial counsel prior to trial, the outcome of either phase of Petitioner's trial would have been any different.

Petitioner failed to exhaust available state remedies with regard to his *Brady* claims premised upon (1) the alleged deals with Hale and (2) Eddy's pretrial correspondence with ADA Hicks and, thereby, procedurally defaulted on those two claims.  Alternatively, in view of the overwhelming evidence establishing Petitioner's guilt in the murders of Billhartz and Diaz and Petitioner's refusal to accept responsibility for either of those crimes during his punishment phase trial testimony, neither of those two claims satisfy the "materiality" prong of *Brady*.

Petitioner's first ground for relief herein does not warrant federal habeas corpus relief.

## VII.   INEFFECTIVE ASSISTANCE CLAIMS

### A.      The Claims

In his third and sixth through tenth claims herein, Petitioner argues his trial counsel rendered ineffective assistance by (1) sleeping through portions of trial, (2) failing to adequately investigate Petitioner's background, develop, and present potentially mitigating evidence regarding Petitioner's abused and neglected childhood, (3) arguing at the punishment phase of trial that Petitioner deserved to die, (4) failing to insist that each venire member be submitted to the prosecution for possible peremptory challenge before the defense exercised its peremptory challenges, (5) agreeing to excuse members of the jury venire who were opposed to the death

penalty without questioning these persons, and (6) failing to object to the trial court's failure to instruct the jury on a variety of procedural and substantive legal matters, such as burden of proof and the meaning of reasonable doubt, as required by state procedural law.

### B.     State Court Disposition

Petitioner "fairly presented" his sixth through tenth claims herein to the state habeas court as his first, third through fifth, and seventh grounds for relief in his state habeas corpus application.[173]  During the evidentiary hearing held July 2, 2008, in Petitioner's state habeas corpus proceeding, Petitioner introduced evidence relating to these complaints, including testimony from Petitioner's surviving state trial counsel, attorney Macias.[174]  Thus, Petitioner did everything possible to secure a ruling from the state habeas court on these five assertions of ineffective assistance.  For the reasons discussed above, Petitioner cannot be faulted for the failure of the Texas Court of Criminal Appeals to reach the merits of those claims when that state court—over Petitioner's strenuous objection—dismissed Petitioner's state habeas corpus application after allowing Petitioner's state habeas counsel to withdraw.  However, at no point during his direct appeal or state habeas corpus proceeding did Petitioner imply, suggest, hint, or allude to a complaint about his trial counsel allegedly sleeping through any portion of Petitioner's capital murder trial.

### C.     The Constitutional Standard

The United States Constitution's Sixth Amendment guarantees an accused the right to the

---

[173]   State Habeas Tr., Volume I, at p. 21.

[174]   State Habeas Tr., Volume II, testimony of Francisco Macias, at pp. 181–226.

assistance of counsel for his defense in all criminal prosecutions. U.S. CONST. amend. VI.

Moreover, "the right to counsel is the right to the effective assistance of counsel." *McMann v.*

*Richardson*, 397 U.S. 759, 771 n.14 (1970). Thus, an accused is entitled to legal representation

that does not (1) fall below an objective standard of reasonableness in light of prevailing

professional norms and the circumstances of the defendant's case, *Wong v. Belmontes*, ___ U.S.

___, ___, 130 S.Ct 383, 384, 175 L.Ed.2d 328 (2009); *Bobby v. Van Hook*, ___ U.S. ___, ___,

130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009); and (2) give rise to a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been different,

*Porter v. McCollum*, ___ U.S. ___, ___, 130 S.Ct. 447, 452–53, 175 L.Ed.2d 398 (2009); *Wong*

*v. Belmontes*, ___ U.S. at ___, 130 S.Ct. at 386.

      The constitutional standard for determining whether a criminal defendant has been denied

the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced

by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80

L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as
> to require reversal of a conviction or death sentence has two components.
> First, the defendant must show that counsel's performance was deficient.
> This requires showing that counsel made errors so serious that counsel was
> not functioning as the "counsel" guaranteed the defendant by the Sixth
> Amendment.   Second, the defendant must show that the deficient
> performance prejudiced the defense.  This requires showing that counsel's
> errors were so serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable.

      To satisfy the first prong of *Strickland*, i.e., establish that his counsel's performance was

constitutionally deficient, a convicted defendant must show that counsel's representation "fell

below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. at 521, 123 S.Ct. at 2535; *Williams v. Taylor*, 529 U.S. 362, 390–91, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687–91, 104 S.Ct. at 2064–66. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, ___ U.S. at ___, 130 S.Ct. at 16; *Strickland v. Washington*, 466 U.S. at 688–89, 104 S.Ct. at 2065. It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.*

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong v. Belmontes*, ___ U.S. at ___, 130 S.Ct. at 386; *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542. *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a capital murder trial would have been different. *Wong v. Belmontes*, ___ U.S. at ___, 130 S.Ct. at 390–91.

In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, the Court's review of the un-adjudicated prong is *de novo*. *See Porter v. McCollum*, ___ U.S. at ___, 130 S.Ct. at 452 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. 374, 390, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005) (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Rogers v. Quarterman*, 555 F.3d 483, 489 (5th Cir. 2009), *cert. denied*, ___ U.S. ___, 130 S.Ct. 365, 175 L.Ed.2d 62 (2009); *Blanton v. Quarterman*, 543 F.3d 230, 235 (5th Cir. 2008), *cert. denied*, ___ U.S. ___, 129 S.Ct. 2383, 173 L.Ed.2d 1301 (2009); *Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000), *cert. denied*, 522

100

U.S. 1067 (2001).

Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong

presumption that counsel rendered adequate assistance and made all significant decisions in the

exercise of reasonable professional judgment. *Bell v. Cone*, 535 U.S. at 698, 122 S.Ct. at 1852;

*Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066; *Scheanette v. Quarterman*, 482

F.3d at 820; *Sonnier v. Quarterman*, 476 F.3d 349, 356 (5th Cir. 2007), *cert.* denied, 552 U.S.

948 (2007); *Amador v. Quarterman*, 458 F.3d at 410; *Gonzales v. Quarterman*, 458 F.3d 384,

390 (5th Cir. 2006), *cert. denied*, 549 U.S. 1323 (2007).

### D.    Sleeping Lawyer Claim

In his third claim, Petitioner argues his lead trial counsel slept through critical parts of the

trial.[175] In support thereof, Petitioner presents the sworn declarations of two of Petitioner's

jurors, Irene Rodriguez and Gloria Lopez ("jurors Rodriguez and Lopez").[176]

---

[175]   Pet'r's Mem. in Supp., at pp. 49–55; Pet'r's Reply in Supp., at pp. 41–45.

[176]   Ms. Rodriguez's sworn declaration appears as Ex. 13 to Pet'r's Mem. in Supp. and states, in
pertinent part, as follows:

> I noticed that the lead trial attorney, Frank Macias, was sleeping during one part of the
> guilt-innocence phase.  Do you know how you nod off sometimes? This wasn't just nodding
> off.  He had his head down for a while.  The other jurors brought it up later.  One of the
> other jurors said "Poor kid.  His life's on the line and his lawyer's sleeping."  It was during
> a part of the trial that was really boring.  It was while a witness was being questioned.

Ms. Lopez's sworn declaration, Ex. 14 to Pet'r's Mem. in Supp., states in pertinent part as
follows:

> I remember that the lead trial attorney, Frank Macias, was asleep during portions of the
> guilt-innocence phase of trial, he would put his head down on his chest, and there would be
> no motion for several minutes.  I believe this happened more than once.
> There was testimony during the guilt-innocence phase that was a little hard to follow,
> and it was difficult for me to see the relevance of the testimony.  When Mr. Macias would

1.     **Procedural Default**

Petitioner failed to "fairly present" this specific ineffective assistance complaint to the state courts, either on direct appeal, in his state habeas corpus application, or during the evidentiary hearing held July 2, 2008.  Accordingly, Petitioner failed to exhaust available state remedies on this claim and has procedurally defaulted on it.  For the same reasons in Section VI.C. above, this ineffective assistance claim is procedurally defaulted and does not furnish a basis for federal habeas relief.  Petitioner was present at his own trial—and therefore necessarily cognizant of any sleeping by his own trial counsel—and could easily have complained on direct appeal or in his state habeas corpus proceeding about it.  Under such circumstances, there is no possibility Petitioner could return to state court at this juncture and obtain state habeas review on the merits of such a claim.  Texas writ-abuse principles would foreclose it.  This unexhausted claim is, therefore, procedurally defaulted.

Alternatively, as explained hereinafter, this Court finds the conclusions drawn by jurors Rodriguez and Lopez that attorney Macias was asleep during trial insufficiently credible to support a factual finding that Macias actually did sleep through unspecified portions of the guilt-innocence phase of Petitioner's capital murder trial.  Likewise, Petitioner's "sleeping lawyer" claim neither furnishes a basis for "presumed prejudice" nor satisfies the prejudice prong of *Strickland* analysis.

2.     **No Presumption of Prejudice**

---

fall asleep, I got the impression that he felt the same way about the testimony that I did.
Seeing Mr. Macias asleep made it more difficult for me to appreciate the relevance of the
testimony being presented.

a.      *Cronic & Burdine* **Inapplicable**

Petitioner argues that, like the petitioner in *Burdine v. Johnson*, 262 F.3d 336 (5th Cir. 2001), *cert. denied*, 535 U.S. 1120 (2002), he is entitled to a presumption of prejudice based upon his lead trial counsel allegedly sleeping during trial.  However, unlike the petitioner in *Burdine*, Petitioner was represented throughout his trial by two very competent counsel who constantly fought the introduction of evidence by the prosecution, even when there was no arguably legitimate legal basis to contest the admissibility of the evidence.  There is no allegation, much less any evidence, before the Court establishing Petitioner was ever wholly deprived of legal representation at any point in his capital murder trial.  Petitioner's argument that only his lead attorney could furnish Petitioner with effective assistance of counsel is belied by even a cursory review of the record from Petitioner's trial.  Petitioner's co-counsel, attorney McDonald, aggressively executed the defense team's trial strategy of contesting virtually every piece of evidence the prosecution attempted to admit at the guilt-innocence phase of Petitioner's trial.

Petitioner does not identify precisely when attorney Macias allegedly fell asleep, other than stating it occurred sometime during the guilt-innocence phase of trial.  Petitioner does not identify any point during his capital murder trial when he was without the representation of either attorney Macias or attorney McDonald.  Thus, unlike the situation, in *Burdine*, there is no allegation, much less any evidence, before this Court establishing Petitioner was ever completely deprived of legal representation during trial.

In *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), decided

103

the same day as *Strickland*, the Supreme Court held a presumption of prejudice, similar to that

recognized in *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333

(1980), arises in three narrow circumstances: first, when a criminal defendant is *completely*

denied the assistance of counsel; second, when counsel entirely fails to subject the prosecution's

case to meaningful adversarial testing; and finally, where the circumstances are such that even

competent counsel very likely could not render effective assistance. *United States v. Cronic*, 466

U.S. at 659, 104 S.Ct. at 2047.  As examples of the latter two situations, respectively, the

Supreme Court cited the denial of effective cross-examination in *Davis v. Alaska*, 415 U.S. 308,

318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974) (holding that the refusal to allow a defendant to

cross-examine a key prosecution witness denied the defendant his constitutional right to confront

witnesses), and the incendiary circumstances surrounding the trial of the so-called "Scottsboro

Boys" addressed in *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932) (holding

that the failure of the trial court to make effective appointment of counsel to assist defendants

accused of rape where defendants were young, ignorant, illiterate, and surrounded by hostile

sentiment, was a denial of due process). *United States v. Cronic*, 466 U.S. at 659–61, 104 S.Ct.

at 2047–48.  In a footnote, the Supreme Court recognized the continuing efficacy of its earlier

holding in *Cuyler*, presuming prejudice where a defendant establishes an actual conflict of

interest adversely affected his counsel's performance. *United States v. Cronic*, 466 U.S. at 661

n.31, 104 S.Ct. at 2048 n.31.

In *Bell v. Cone*, 535 U.S. 685, 695–96, 122 S.Ct. 1843, 1851, 152 L.Ed.2d 914 (2002),

the Supreme Court reiterated that the second exception to the "prejudice" requirement of

*Strickland* it had envisioned in *Cronic* was limited to situations in which defense counsel

*completely* failed to subject the prosecution's case to meaningful adversarial testing. *See Bell v. Cone*, 535 U.S. at 697–98, 122 S.Ct. at 1851–52 (holding complaints about trial counsel's waiver of closing argument at the punishment phase of trial and failure to adduce mitigating evidence was insufficient to create a presumption of prejudice absent a showing trial counsel completely failed to challenge the prosecution's case throughout the sentencing proceeding).

The presumption of prejudice recognized in *Cronic* does not apply where the defendant complains of merely shoddy or poor performance by his trial counsel; for a defendant to be entitled to such a presumption, his attorney's failure must be complete. *See Bell v. Cone*, 535 U.S. at 697, 122 S.Ct. at 1851 (holding the presumption applicable only when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing); *United States v. Griffin*, 324 F.3d 330, 364, 364 (5th Cir. 2003) ("When the defendant complains of errors, omissions, or strategic blunders, prejudice is not presumed; bad lawyering, regardless of how bad, does not support the *per se* presumption of prejudice."); *Riddle v. Cockrell*, 288 F.3d 713, 718 (5th Cir. 2002) (holding "constructive denial of counsel" sufficient to support a presumption of prejudice arises only when counsel was absent from the courtroom, there was an actual conflict of interest, or there was official interference with the defense), *cert. denied*, 537 U.S. 953 (2002); *Mayo v. Cockrell*, 287 F.3d 336, 340 n.3 (5th Cir. 2002) (holding the same), *cert. denied*, 537 U.S. 975 (2002); *Burdine v. Johnson*, 262 F.3d 336, 344 n.4 (5th Cir. 2001) (holding the same), *cert. denied*, 535 U.S. 1120 (2002); *Gochicoa v. Johnson*, 238 F.3d 278, 284 (5th Cir. 2000) ("'A constructive denial of counsel occurs in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all.' We have found constructive denial in cases

105

involving the absence of counsel from the courtroom, conflicts of interest between defense

counsel and the defendant, and official interference with the defense; and have stated that

constructive denial will be found when counsel fails to subject the prosecution's case to any

meaningful adversarial testing." (*citations and footnote omitted*)).

There is no legal authority supporting Petitioner's implicit contention that he possessed a

constitutional right to the presence and active participation of his lead trial counsel during the

entirety of his capital murder trial.

### b.    *Teague* Foreclosure

There is no legal authority supporting Petitioner's contention that a presumption of

prejudice arises whenever a criminal defendant's *lead* trial counsel is absent from the courtroom

(or allegedly sleeping) during unspecified portions of trial when the Petitioner's co-counsel is

undisputedly present and still actively representing the Petitioner's legal interests.  Moreover, the

non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103

L.Ed.2d 334 (1989), forecloses adoption of the new principles advocated by Petitioner in his

third claim.  Under the holding in *Teague*, federal courts are generally barred from applying new

constitutional rules of criminal procedure retroactively on collateral review.  *Caspari v. Bohlen*,

510 U.S. 383, 389–90, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994).  A "new rule" for *Teague*

purposes is one which was not dictated by precedent existing at the time the defendant's

conviction became final.  *See O'Dell v. Netherland*, 521 U.S. 151, 156, 117 S.Ct. 1969, 1973,

138 L.Ed.2d 351 (1997) (holding a "new rule" either "breaks new ground," "imposes a new

obligation on the States or the Federal Government," or was not "dictated by precedent existing

106

at the time the defendant's conviction became final"). Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.*

### 3.    No Credible Evidence of Deficient Performance

The Fifth Circuit issued its landmark opinion in *Burdine* in August, 2001. Petitioner's trial concluded in February, 2005. Petitioner's brief on direct appeal was filed in June, 2006. Petitioner's state habeas corpus application was filed in March, 2007. Petitioner was present before the state habeas trial court for evidentiary hearings in July of 2008 and March of 2009. Yet, Petitioner never voiced any complaint that his lead trial counsel ever allegedly slept through any portion of Petitioner's capital murder trial until Petitioner filed his federal habeas corpus petition herein in June of 2010.

The Court has carefully reviewed the entire record from Petitioner's trial and has identified nothing therein that suggests either of Petitioner's trial counsel were absent or asleep during any portion of Petitioner's trial. Petitioner has not alleged any specific facts suggesting he was unable to notice or comprehend that his lead counsel was asleep at the time of his trial. Given the lack of complaint by Petitioner regarding his trial counsel's alleged sleeping at trial for more than half a decade following Petitioner's trial, this Court views the conclusory affidavits of jurors Rodriguez and Lopez with extreme skepticism. Neither of those two former jurors offers any specific facts to support their assertions that attorney Macias was actually asleep. With all due respect, given Petitioner's failure to alert any court to this alleged deficiency in the

performance of his lead trial counsel until more than five years after the conclusion of

Petitioner's trial, that one or more jurors recall—again, more than five years later—that attorney

Macias closed his eyes and remained motionless for an unspecified period of time—described

cryptically by one former juror as "several minutes"—does not, standing alone, establish that

Macias actually fell asleep at any point during Petitioner's trial.  Contrary to the suggestions

contained in the affidavits of the former jurors, there did not appear to be any "boring" portions

of the guilt-innocence phase of Petitioner's trial.  Petitioner's trial counsel vigorously cross-

examined virtually every prosecution witness, frequently voiced objections to the testimony of

prosecution witnesses, and seemingly constantly injected side bar comments attacking the

prosecution's witnesses.  Without something to better identify when Macias's alleged sleeping

took place—and in the absence of any contemporaneous objection or timely complaint about

same by Petitioner on direct appeal or in his state habeas corpus proceeding—this Court feels

confident in rejecting as incredible the former jurors' conclusions Macias actually slept at trial as

opposed to simply closing his eyes and listening to what one former juror termed "boring"

testimony.  Petitioner had the opportunity during his state habeas corpus proceeding to confront

and cross-examine Macias regarding Macias allegedly sleeping at trial.  The failure of Petitioner

to do so during that proceeding, more than five years after the Fifth Circuit rendered its *Burdine*

decision and at a time when Petitioner was represented by competent state habeas counsel,

speaks volumes about the incredibility of Petitioner's eleventh hour assertion of a complaint that

Macias slept during trial.

     Having reviewed the entirety of Petitioner's trial record, the Court finds there is no

credible evidence in the record now before the Court establishing attorney Macias actually slept

through any portion of Petitioner's capital murder trial.  Moreover, insofar as jurors Rodriguez and Lopez attempt to furnish testimony concerning their subjective thought processes in response to what they perceived as attorney Macias' sleeping during Petitioner's trial, their testimony is circumscribed by the provisions of Rule 606(b) of the Federal Rules of Evidence.  *See Tanner v. United States*, 483 U.S. 107, 121–22, 107 S.Ct. 2739, 2748, 97 L.Ed.2d 90 (1987) (explaining juror affidavits may not be admitted to impeach the jury's verdict, even when there are allegations contained therein that a member of the jury was asleep, inattentive, lost in thought, or even intoxicated during trial or deliberations); *Summers v. Dretke*, 431 F.3d 861, 873 (5th Cir. 2005) ("Under Rule 606(b) of the Federal Rules of Evidence, jurors' affidavits are inadmissible 'regarding the following four topics: (1) the method or arguments of the jury's deliberations, (2) the effect of any particular thing upon an outcome in the deliberations, (3) the mindset or emotions of any juror during deliberation, and (4) the testifying juror's own mental process during the deliberations.'"), *cert. denied*, 549 U.S. 840 (2006).

The Court remains unconvinced by the evidence now before it that Macias ever actually slept during any portion of Petitioner's trial.  Petitioner was described by the state trial judge during the hearing on March 6, 2009, as competent and alert.[177]  It simply defies credulity to believe Petitioner would have remained utterly silent for more than half a decade if Macias had, in fact, slept during any portion of trial.

### 4.      No Prejudice

Petitioner has not alleged any specific facts, much less furnished any credible evidence,

---

[177] State Habeas Tr., Volume II, at p. 35.

showing that any act or omission by his co-counsel which occurred while Macias was allegedly

sleeping during the guilt-innocence phase of Petitioner's trial caused Petitioner "prejudice"

within the meaning of *Strickland*.  Assuming for purposes of argument that Macias did nod off

for unspecified periods during the guilt-innocence phase of Petitioner's trial, that fact, standing

alone, does not satisfy the "prejudice" prong of *Strickland. See Gregory v. Thaler*, 601 F.3d 347,

353 (5th Cir. 2010) (conclusory statements regarding the content of uncalled witnesses'

testimony are insufficient to demonstrate ineffective assistance), *cert. denied*, ___ U.S. ___, 131

S.Ct. 265,k 178 L.Ed.2d 175 (2010); *Day v. Quarterman*, 566 F.3d 527, 540 (5th Cir. 2009)

(conclusory allegations about trial counsel's alleged failure to adequately cross-examine

witnesses would not support an ineffective assistance claim).

### 5.    Conclusions

Petitioner procedurally defaulted on his unexhausted third claim.  Alternatively,

Petitioner's complaint that his lead trial counsel slept during unspecified portions of the guilt-

innocence phase of Petitioner's capital murder trial is not supported by credible evidence.

Petitioner's complaint about his allegedly sleeping lead trial counsel does not invoke the

presumed prejudice rule of *Cronic*.  Petitioner's conclusory complaint about Macias' alleged

naps during trial does not satisfy either prong of *Strickland* analysis.  Petitioner's third claim does

not warrant federal habeas corpus relief.

### E.    Failure to Investigate & Present Mitigating Evidence

In his sixth claim, Petitioner argues his trial counsel failed to adequately investigate

Petitioner's background, and failed to develop and present at trial additional available mitigating

evidence.[178] More specifically, Petitioner argues his trial counsel could and should have developed and presented evidence showing (1) Petitioner's horrific childhood and difficult past detailed in a series of affidavits which purport to describe Petitioner's drug use, physical and psychological abuse, and neglect, and (2) Petitioner's cognitive and emotional deficiencies such as those detailed in a report prepared by Dr. Gilbert Martinez ("Dr. Martinez").

### 1.    No Deficient Performance

#### a.    The Petitioner's Mitigating Evidence at Trial

In *Wiggins v. Smith*, 539 U.S. 510, 527, 123 S.Ct. 2527, Wiggins argued that his trial counsel failed to investigate sufficiently his dysfunctional upbringing. Wiggins's attorney knew at least some of the facts, but did not investigate to uncover them fully and did not present them as mitigating evidence at sentencing. The Supreme Court explained "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case." *Wiggins v. Smith*, 539 U.S. at 533, 123 S.Ct. 2541. However, "'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.'" *Id.* (quoting *Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2066). The Court found in *Wiggins* that the decision not to investigate fully was objectively unreasonable; therefore, the attorney's performance was deficient. *Wiggins v. Smith*, 539 U.S. 533–34, 123 S.Ct. 2541–42.

In the context of evaluating Petitioner's *Wiggins* claim, it is important to remember that,

---

[178]  Pet'r's Mem. in Supp., at pp. 61–77; Pet'r's Reply in Supp., at pp. 35–41.

at the punishment phase of trial, Petitioner's trial counsel did furnish the jury with extensive, potentially mitigating evidence in the form of testimony from the Petitioner himself, Petitioner's father, Petitioner's step-mother and step-sister, and others who claimed to know Petitioner's character, as well as two mental health experts who testified regarding their examination of Petitioner and their diagnoses of Petitioner's emotional and mental problems.[179]  That testimony is summarized at length in Section I.E.2. above.

Among the potentially mitigating testimony Petitioner's trial counsel presented to the jury were admissions by Petitioner's father that (1) both he and Petitioner's mother abused drugs before and during Petitioner's childhood, (2) he divorced Petitioner's mother when Petitioner was five years old, (3) Petitioner went to live with Petitioner's mother in Alabama, but was abused by Petitioner's mother and placed in foster care until Petitioner returned to live in Texas with him, (4) he abused drugs in front of Petitioner when Petitioner was seven or eight years old, (5) he abused drugs with Petitioner when Petitioner was twelve years old, (6) "Justen never had a chance," (7) he asked Petitioner to sell drugs when Petitioner was nineteen or twenty, (8) the Petitioner began using drugs around age fourteen or fifteen, (9) he gave police a written statement concerning the Diaz murder, but did not read it before he signed it, and that statement contains many false statements, (10) he saw Petitioner driving a white pickup in late October of 2002, but Petitioner said he had borrowed it from Melanie, and (11) Petitioner never admitted to killing Billhartz.[180]

Petitioner's trial counsel elicited testimony from Petitioner's friends Mario Escobedo and

---

[179]  *See* Section I.E.2. above, i.e., notes 58–66 supra and accompanying text.

[180]  S.F. Trial, Volume 81, testimony of Jimmy Donald Hall, at pp. 16–38.

Toni Anderson, along with a juvenile probation office employee, all of whom testified to Petitioner's good character and personal worth.

Dr. Gutierrez, the psychiatrist who treated Petitioner following Petitioner's suicidal gesture in Hale County in December, 2002, testified, in part, that (1) Petitioner suffered from major depressive disorder with psychotic features, and reported suicidal ideation, (2) amphetamine dependence often looks like paranoid schizophrenia, and (3) Petitioner's demeanor was coherent but apprehensive.[181]

Dr. Aeschbach, the psychiatrist who treated Petitioner following Petitioner's suicide attempt in the Spring of 2002 at the El Paso County Jail, testified, in part, that (1) Petitioner was deprived of a mentor during childhood, which often results in a child failing to develop a sense of moral responsibility, (2) a bad family environment, such as what Petitioner experienced during his childhood, leaves a person vulnerable to dysfunction, (3) Petitioner had major depressive disorder and insomnia, (4) sleep deprivation, such as that resulting from crystal methamphetamine abuse, negatively affects a person's impulse control, (5) Petitioner's antisocial personality might benefit from anti-psychotic medications, (6) Petitioner needs drug rehabilitation, (7) Petitioner's violent reaction to Diaz's sexual advance was understandable given the decreased inhibitions against killing that are a cultural phenomenon, (8) withdrawal from methamphetamine causes a person to suffer intense anxiety, depression, and yet remain unable to sleep or even rest, (9) long term crystal methamphetamine abuse throws the neurotransmitter of the brain totally out of balance and can interfere with long term memory, (10) removing crystal methamphetamine from Petitioner's daily life would take a way a significant

---

[181]   S.F. Trial, Volume 83, testimony of Victor A. Gutierrez, at pp. 111–69.

factor reducing Petitioner's inhibition to kill, and (11) based upon his examination of Petitioner, he believed that, once Petitioner was placed in a structured environment free from drugs, Petitioner would not pose a risk of danger to others.[182]

Moreover, Petitioner himself insisted on taking the stand at the punishment phase of trial and testified extensively concerning his childhood, long history of drug abuse, long criminal record, and a wide range of other matters, including Petitioner's assertions that (1) he observed drug paraphernalia in his parents home from an early age and first abused marijuana at age twelve, (2) his father was never "a father figure" to him, (3) he went through a behavior modification program while in juvenile detention, (4) he earned his GED while in juvenile detention, (5) he appreciates and loves his Hispanic step-mother, (6) he does not dislike members of other races, but feels the races should not mix, (7) his mother beat him with a belt buckle when he was little, (8) he has never engaged in homosexual activity and thought Diaz was female until Diaz grabbed Petitioner's genitals, (9) he pointed a gun at Diaz but never intended to shoot Diaz, (10) contrary to his written statement, he never told police he killed Diaz because Diaz was "a faggot," (11) he did not make the statements contained in his confession concerning Diaz's murder, (12) he did not murder Billhartz, (13) he was never a District Captain of the Aryan Circle, (14) Murgatroyd buried Billhartz's body, (15) crystal methamphetamine makes him paranoid, (16) his father beat Petitioner as a child whenever Petitioner cried, (17) as a result, he learned to show little emotion, (18) he was no longer a part of the Aryan Circle, (19) prosecution witnesses testified falsely when they accused Petitioner of Billhartz's murder or knowing Diaz prior to the date of Diaz's murder, (20) he has no recollection of the circumstances surrounding

---

[182]   S.F. Trial, Volume 85, testimony of Walter Aeschbach, at pp. 5–94.

his arrest on November 23, 2002 or of his interrogation on November 25, 2002, (21) Davis gave the order that Billhartz be killed and Murgatroyd carried it out, and Murgatroyd disposed of Billhartz's body, (22) he was not aware that he had shot Diaz until he was interrogated by police on April 22, 2002, (23) Diaz "jogged off" after exiting Petitioner's vehicle and, when Petitioner later returned to the scene to recover the spent shell casing, he did not see Diaz's body, and (24) he did not accept the jury's guilty verdict in connection with Billhartz's murder.[183]

Thus, contrary to the implications of Petitioner's pleadings, Petitioner's trial counsel did not utterly fail to furnish the jury with any mitigating evidence during the punishment phase of trial. Petitioner's trial counsel presented testimony from Petitioner, his family and friends, and a pair of mental health experts who had treated Petitioner, which established (1) the difficult circumstances of Petitioner's childhood, (2) the detrimental impact of Petitioner's abused, neglected, childhood on Petitioner's emotional and psychological development, (3) Petitioner's psychological problems, including major depressive disorder, and (4) Petitioner's good personality characteristics.

### b.      "New" Mitigating Evidence

In his instant petition, Petitioner presents the Court with sworn declarations from a number of persons who knew Petitioner as a child.

Petitioner's fourth grade teacher testified Petitioner (1) was "a very hyper child," who had trouble focusing, was always into things, and could not control himself, (2) was always unkempt, with uncut hair and unclean clothes, appeared to have slept in his clothes and to be raising himself, all of which resulted in him being picked on by other students, (3) fought with other

---

[183]   S.F. Trial, Volume 84, testimony of Justen Grant Hall, at pp. 4–216.

children, but was not a bully, because his fights resulted from him being bullied by other students, (4) was not aggressive as a child, (5) craved attention, (6) could be loving and eager to please, (7) was neglected by his parents, who would not come to school to meet with her, and (8) she was never contacted by Petitioner's trial counsel.[184]

The attendance clerk at an elementary school Petitioner attended for two years declared (1) Petitioner was a neglected child, who seemed almost homeless, (2) came to school dirty and often wore the same clothes day after day, (3) often lacked money for breakfast or lunch, (4) lacked money to participate in school activities, (5) often came to school without his permission slips for field trips signed by a parent, (6) she often bought Petitioner clothes and meals, (7) Petitioner rarely smiled and was a quiet loner, (8) Petitioner arrived at school without school supplies, (9) Petitioner's parents never came to the school, (10) Petitioner did not fit in with the affluent white students or the non-affluent Hispanic students at school, (11) she was never contacted by Petitioner's trial counsel.[185]

A relative declared (1) Petitioner was very hyper as a six or seven year old and remained hyper throughout life, (2) at age eleven or twelve, Petitioner lived in a home where his step-mother was a drug addict, (3) both Petitioner's father and step-mother abused drugs, (4) Petitioner stayed with relatives when he was a teenager because both his father and step-mother were in prison, (5) Petitioner often came over to her home and asked for food, (6) Petitioner never had a mother around, and (7) she was never contacted by Petitioner's trial counsel.[186]

---

[184]   Declaration of Marilu Folmer, Ex. 16 attached to Pet'r's Mem. in Supp.

[185]   Declaration of Becky Garcia, Ex. 17 to Pet'r's Mem. in Supp.

[186]   Declaration of Gloria Meinert, Ex. 18 Pet'r's Mem. in Supp.

Petitioner's "uncle" declared (1) Petitioner's father was constantly angry and often went into uncontrollable rages, (2) Petitioner witnessed his father's outbursts of uncontrollable rage, (3) Petitioner's parents had a stormy and volatile relationship, (4) Petitioner's mother had very little contact with Petitioner after Petitioner returned to El Paso from Alabama, (5) Petitioner often stayed with his first step-mother while his father was on the road, (6) Petitioner's first step-mother was also a drug abuser, (7) Petitioner's father and first step-mother were both drug abusers, (8) Petitioner's first step-mother was promiscuous, (9) he visited Petitioner's home once when Petitioner was twelve or thirteen and found the house in disarray, Petitioner's father and first step-mother both intoxicated on drugs, and Petitioner dirty, unkempt, and in need of a hair cut, (10) when Petitioner's farther and first step-mother were both sent to prison for dealing drugs, Petitioner went to live with a relative who resented having to take in Petitioner and verbally abused Petitioner, (11) Petitioner's female cousins tormented Petitioner "insatiably," and (12) he was never contacted by Petitioner's trial counsel.[187]

Petitioner's biological maternal grandmother declared (1) Petitioner's biological parents had a volatile relationship, (2) Petitioner's father was on drugs a lot, (3) Petitioner's parents' relationship did not improve after Petitioner's birth, (4) Petitioner witnessed his father's brothers abusing animals, (5) Petitioner's biological mother had no patience for children, and yelled at Petitioner a lot, (6) Petitioner's mother was frustrated that Petitioner struggled in school, (7) she often found Petitioner alone watching television at her daughter's home, (8) once Petitioner moved to El Paso to live with his father, she rarely saw Petitioner, (9) Petitioner returned to Alabama to live with his biological mother around age fourteen or fifteen, but quickly got into

---

[187]   Declaration of Ted Meinert, Ex. 19 to Pet'r's Mem. in Supp.

117

trouble for stealing his mother's car, got kicked out of school, and returned to El Paso, and (10) she was never contacted by Petitioner's trial lawyers.[188]

A counselor at the elementary school Petitioner attended for two years (third and fourth grades) declared (1) she remembered Petitioner was not very well kept, had a shaggy appearance, and often looked like he had just gotten up and gotten himself to school, (2) showed up at school without school supplies or permissions slips signed by his parents, (3) was not a priority in his home, (4) something was out of sync in Petitioner's home, (5) by today's standards, Petitioner would have been referred for counseling, but was never referred because the school's counseling program was then in its infancy and, as a result, Petitioner never received counseling, (6) Petitioner was not a troublemaker and did not call attention to himself, (7) she never met Petitioner's parents, (8) Petitioner was referred to a program for students having academic difficulties, (9) Petitioner's Alabama school records indicate Petitioner received special education services in reading as early as the second grade, (10) Petitioner did not receive special education services in El Paso until just before Petitioner left the fourth grade, (11) in hindsight, Petitioner would likely have benefitted from special education services in the third and fourth grades, and (12) she was never contacted by Petitioner's trial counsel.[189]

Petitioner's biological mother declared (1) she was contacted by and conferred with Petitioner's trial co-counsel, attorney McDonald, several times, (2) McDonald never asked her any questions about Petitioner's background, (3) the Petitioner's father abused cocaine and was both verbally and physically abusive toward both her and Petitioner, threatening to kill both her

---

[188]   Declaration of Jane Morgan, Ex. 20 to Pet'r's Mem. in Supp.

[189]   Declaration of Susan Wohleking, Ex. 21 to Pet'r's Mem. in Supp.

and Petitioner on multiple occasions, (4) the Petitioner's father was physically violent, often going into violent rages in which he locked Petitioner in his room while he beat Petitioner's mother, (5) she often had bruises and cuts from the assaults upon her by Petitioner's father, (6) Petitioner witnessed his father beating his mother, (7) Petitioner often cried after witnessing his father beat his mother, (8) Petitioner's father often struck Petitioner in the head, (9) during one physical confrontation, Petitioner's father took away a Mace canister from Petitioner's mother and used it on Petitioner and Petitioner's mother, (10) on another occasion, Petitioner's father kept Petitioner and Petitioner's mother as veritable prisoners in their own home for several days before Petitioner's mother managed to steal car keys from her husband and escape with Petitioner, (11) on another occasion, Petitioner's mother spent a night in a battered woman's shelter, (12) during another episode in which Petitioner's mother was attempting to separate from Petitioner's dangerously abusive father, Petitioner's father picked up Petitioner from day care and refused to allow Petitioner's mother to see Petitioner for two months, (13) she eventually filed for divorce from Petitioner's father and obtained full custody of Petitioner, (14) after Petitioner completed his first year of school, she allowed Petitioner to visit his father one summer but, when Petitioner returned to Alabama, Petitioner was a completely different person, completely rebellious and out of control, (15) at age eight, Petitioner reported to authorities that she was abusing him and Petitioner was placed in foster care, (16) based on her attorney's advice, she agreed to allow Petitioner to move to El Paso to get Petitioner out of foster care, (17) when Petitioner was twelve, she tried to contact Petitioner several times, but was unable to reach him because Petitioner's father and step-mother often had their phone disconnected, (18) she traveled to El Paso and saw Petitioner leaving for school dressed in ragged, wrinkled, dirty clothing and

looking malnourished, (19) when she entered the residence where Petitioner was then living with Petitioner's father, she observed (a) drug paraphernalia in plain sight, (b) the home was filthy, (c) Petitioner's clothing was dirty, (d) Petitioner's bedroom was a "total wreck," and (e) Petitioner's bed was "disgusting," (20) she observed the same circumstances when she visited El Paso again at Christmas in 1993, (21) Petitioner was withdraw, quiet, without emotion, and did not appear to have any friends, (22) she unsuccessfully tried to convince Petitioner to return to Alabama with her, (23) while living with his father and step-mother, Petitioner became very meek, quiet, and withdrawn, (24) Petitioner lived briefly with her during ninth grade, but was caught smoking marijuana on a school bus and expelled, (25) Petitioner's drug abuse escalated and later included paint sniffing, (26) Petitioner had no rules or responsibilities when living with his father, (27) while in prison, Petitioner joined the Aryan Circle after he was jumped by the Crips and had the name "Crips" carved into his abdomen, (28) once he left prison, Petitioner returned to El Paso and ran drugs for his father, and (29) Petitioner has attempted suicide at least three times and is clinically depressed, a condition for which he receives prescription medication.[190]

In his report dated May 21, 2010, Dr. Martinez, a neuro-psychologist, concludes, in pertinent part, that (1) Petitioner reported using marijuana at age twelve and continuing to use marijuana sporadically until age seventeen, when Petitioner began using marijuana practically daily and continued into adulthood, (2) Petitioner reported using cocaine beginning at age fourteen or fifteen with regular use of cocaine beginning at age seventeen, (3) Petitioner reported using crystal methamphetamine beginning in 2002 with daily amphetamine abuse for several months prior to his arrest, (4) Petitioner also reported use of ecstacy and "acid" in 2001 and

---

[190]   Declaration of Deborah Hall, Ex. 22 to Pet'r's Mem. in Supp.

2002, (5) Petitioner reported his mother physically abused him by beating him with a belt buckle and forcing him to remain outside in his underwear on a cold night, (6) Petitioner reported being shuffled back and forth between his parents as a child, being sent to El Paso after his mother's abuse was discovered and returning to Alabama because of his father's drug problems and incarceration, (7) Petitioner displayed low average general cognitive ability, (8) Petitioner's ability to sustain attention, concentrate, and exert mental control was in the average range, (9) due to variability in Petitioner's scores on subtests, however, Petitioner displayed a degree of inattention, impulsivity, and mildly reduced frustration tolerance, (10) Petitioner suffers from mild to moderate cognitive disorder, characterized by verbal memory deficits, fluctuating deficits in attention and executive functioning, suggesting impaired functioning in the frontal lobes of the brain, (11) Petitioner's pattern of deficits was consistent with severe chronic affective/thought disorder, related to a poorly documented childhood traumatic brain injury, an extended period of polysubstance abuse, Hepatitis C, a history of childhood physical and emotional abuse, and possibly childhood attention deficit disorder that continued into adulthood, (12) Petitioner has a history of mood instability and chronic depression, as well as possibly bi-polar disorder, and (13) Petitioner has limited coping skills and is likely to exhibit episodes of acute emotional and cognitive decompensation if he is overwhelmed by stressors or if there are changes to his psychotropic medication regimen.[191]

### c.      Analysis

The first problem with assessing the objective reasonableness of the conduct of Petitioner's trial counsel in the course of counsel's investigation into Petitioner's background is

---

[191]   Report of Gilbert Martinez, dated May 21, 2010, Ex. 15 to Pet'r's Mem. in Supp.

that Petitioner has presented this Court with no evidence establishing precisely what information regarding Petitioner's background Petitioner's trial counsel actually possessed prior to, or at the punishment phase of, Petitioner's trial. Petitioner's trial counsel called both Petitioner and Petitioner's father to testified at trial, both of whom described Petitioner's childhood in very negative terms and acknowledged Petitioner witnessed drug abuse and experimented with drugs himself from a very young age. Petitioner's trial counsel also presented testimony from several persons, including Petitioner's second step-mother and step-sister, who sought to humanize Petitioner. Finally, Petitioner's trial counsel presented the testimony of Dr. Gutierrez and Dr. Aeschbach regarding Petitioner's major depressive disorder and the negative impact of Petitioner's long-term amphetamine abuse on Petitioner's mental condition.

While the new declarations from various family members, family friends, and educators furnish a wealth of additional details concerning the horrific circumstances under which Petitioner grew up, Petitioner neither alleges any facts nor furnishes the Court with any evidence showing that his trial counsel were unaware of these details at the time of Petitioner's trial. Petitioner and Petitioner's father both possessed personal knowledge regarding the squalid, drug-infected, conditions under which Petitioner grew up in his father's home. Both Petitioner and his father possessed personal knowledge regarding the extensive neglect to which Petitioner was subjected as a child. While neither of them offered the amount or type of detail offered by Petitioner's "new" declarations in their punishment phase trial testimony, their punishment-phase trial testimony does make clear that Petitioner grew up in an environment characterized by rampant drug abuse and parental neglect. Petitioner does not allege any specific facts showing that either he or his father withheld from Petitioner's trial counsel any of the information

122

contained in the "new" declarations from Petitioner's other family members, family friends, and

educators.  In fact, other than establishing that (1) Petitioner's trial counsel consulted with

Petitioner, Petitioner's father, Petitioner's step-mother, and Petitioner's step-sister before putting

them on the stand at the punishment phase of trial, (2) Petitioner's co-counsel, attorney

McDonald, consulted with Petitioner's mother, but chose not to call her to testify, and (3)

Petitioner's trial counsel did not contact any of the other persons who furnished the "new"

declarations, the record before this Court is virtually silent regarding exactly what investigation

Petitioner's trial counsel undertook in preparation for the punishment phase of Petitioner's

capital murder trial.  Petitioner's lead trial counsel, attorney Macias, testified during Petitioner's

state habeas corpus proceeding in pertinent part, that (1) Petitioner's defense team did not

interview Petitioner's teachers or mental health care providers, (2) the focus of the defense team

was on locating Petitioner's parents and finding out what had happened to Petitioner as a child,

(3) the defense team's court-appointed investigator did that, (4) he personally interviewed

Petitioner in preparation for the punishment phase of trial, (5) attorney McDonald did most of the

work in preparation for the punishment phase of trial, including interviewing the mental health

professional who saw Petitioner in Plainview, Texas, and (6) he was vehemently opposed to

Petitioner testifying at trial because he felt Petitioner was taking the stand for the wrong

reasons.[192]  Petitioner never bothered to ask attorney Macias whether the defense team was aware

---

[192]   State Habeas Tr., Volume II, testimony of Francisco Macias, at pp. 193, 197, 210–11,
224–26.
     Insofar as Petitioner criticizes attorney Macias for not recalling "much" of the defense team's
interview with Petitioner's biological mother (Pet'r's Mem. in Supp., at p. 69), that argument lacks any
weight when viewed in the context of (1) Deborah Hall's declaration, in which she stated she spoke *only*
with attorney McDonald and (2) attorney Macias's uncontradicted testimony at Petitioner's state habeas
corpus proceeding that attorney McDonald took the lead in terms of contacting potential punishment

at the time of his trial of the horrific details of Petitioner's abused and neglected childhood offered by Petitioner's "new" declarations. Dr. Martinez's report contains (1) additional details concerning Petitioner's long term drug abuse, (2) a suggestion Petitioner was involved in a car accident as a child that resulted in a traumatic brain injury, (3) conclusions that Petitioner suffers from cognitive deficits relating to Petitioner's polysubstance abuse, childhood head injury, and history of childhood physical and emotional abuse, and (4) an ominous conclusion the Petitioner "is likely to exhibit episodes of acute emotional and cognitive decompensation if he is overwhelmed by stressors or if there are changes to his psychotropic medication regimen."

Absent some showing a counsel's subjective decision-making was objectively unreasonable in view of the information and evidence then available to counsel, it is almost impossible for a habeas corpus Petitioner to overcome the presumption of reasonableness afforded his counsel's strategic and tactical decisions under *Strickland*. *See Neal v. Puckett,* 286 F.3d 230, 237 (5th Cir. 2002) (recognizing that, in evaluating the performance of trial counsel against a claim that counsel failed to investigate and present mitigating evidence, the relevant inquiry focuses on what counsel did to prepare for sentencing, what mitigating evidence counsel accumulated, what additional leads counsel had, and the results said counsel might reasonably have expected from those leads), *cert. denied,* 537 U.S. 1104, 123 S.Ct. 963, 154 L.Ed.2d 772 (2003); *Gutierrez v. Dretke,* 392 F.Supp.2d 802, 875–76 (W.D. Tex. 2005) (recognizing the burden on a habeas Petitioner asserting a *Wiggins* claim includes demonstrating that, in light of the potentially mitigating evidence and information available at the time of trial, his trial counsel's efforts to investigate, develop, and present potentially mitigating evidence were

_____

phase witnesses.

*objectively* unreasonable), *certificate of appealability denied,* 201 F. App'x 196 (5th Cir. 2006), *cert. denied,* 549 U.S. 1227, 127 S.Ct. 1297, 167 L.Ed.2d 112 (2007).

It is essential for a habeas Petitioner asserting a claim of ineffective assistance by his trial counsel arising from deficient performance not manifested on the face of the trial or appellate record to develop and present evidence regarding the objective unreasonableness of his trial counsel's performance in light of the circumstances as they existed at the time of the Petitioner's trial. This necessarily requires inquiry into both the quality and objective reasonableness of trial counsel's subjective thought processes. *Moore v. Quarterman,* 526 F.Supp.2d 654, 695 (W.D. Tex. 2007), *certificate of appealability denied,* 534 F.3d 454 (5th Cir. 2008). As a practical matter, this means, in most cases, a habeas Petitioner must place each of the attorneys who represented the Petitioner at trial under oath and inquire into precisely (1) what information helpful to Petitioner counsel knew at the time of Petitioner's trial, (2) the steps counsel took to obtain additional information which might have helped Petitioner's cause at trial, and (3) the reasons why counsel chose not to investigate the case against the Petitioner or the Petitioner's background further than they did. *Bartee v. Quarterman* 574 F.Supp.2d 624, 649–50 (W.D. Tex. 2008), *certificate of appealability denied,* 339 F. App'x 429 (5th Cir. 2009), *cert. denied,* \_\_\_ U.S. \_\_\_, 130 S.Ct. 1882, 176 L.Ed.2d 370 (2010); *Moore v. Quarterman,* 526 F.Supp.2d at 695. Petitioner failed to present the state habeas court with any evidence showing the conduct of his trial counsel in investigating, developing, and presenting mitigating evidence was objectively unreasonable in view of the information reasonably available to his counsel at that time. The same is true for Petitioner's ineffective assistance claim in this Court. Petitioner's "new" declarations do offer new details of Petitioner's horrific childhood, but they do not explain

whether Petitioner's trial counsel were made aware of that same information through their interviews of Petitioner and Petitioner's father, both of whom Petitioner's trial counsel called to testify at the punishment phase of Petitioner's trial.

In sum, Petitioner has not furnished this Court with any evidence showing his trial counsel were unaware of the horrific details of his neglected, abused childhood contained in Petitioner's "new" declarations. On the contrary, given the substantial amount of detail in Petitioner's extensive punishment-phase testimony concerning his childhood (much of which dealt with Petitioner's lengthy juvenile criminal record), it is clear Petitioner and his trial counsel extensively discussed at least some aspects of Petitioner's childhood. Nothing prevented Petitioner from telling his trial counsel himself about his neglected, abused, childhood. Petitioner does not allege any facts, nor does he furnish any evidence, showing he or his father withheld the details of Petitioner's neglected, abused childhood from his own trial counsel. Thus, the fact Petitioner's trial counsel did not contact most of the people who furnished Petitioner's new declarations, or make detailed inquiry of Petitioner's biological mother about her knowledge of the circumstances of Petitioner's childhood, does not necessarily mean his counsel were unaware of those circumstances. Petitioner and Petitioner's father could have furnished Petitioner's trial counsel with virtually all the information contained in Petitioner's new declarations. In conclusion, Petitioner has not presented any evidence showing his trial counsel failed to adequately investigate the details of his childhood and background with an eye for potentially mitigating evidence. It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066.

The pivotal question before the Court is whether Petitioner's trial counsel and their investigator adequately investigated Petitioner's background, including the circumstances of his childhood, for the purpose of identifying potential mitigating evidence. The record now before the Court does not establish that Petitioner's trial counsel were unaware of the "new" details of abuse and neglect contained in Petitioner's "new" declarations.

The second problem with Petitioner's *Wiggins* claim is that much of the "new" evidence Petitioner presents to the Court for the first time clearly falls within the parameters of the type of "double-edged" evidence reasonably competent trial counsel might well have wished not to emphasize to Petitioner's capital sentencing jury. The horrific neglect and deprived circumstances of Petitioner's childhood—including the extreme physical and emotional abuse to which Petitioner's father subjected Petitioner both as a young child and later as an adolescent—could possibly have caused Petitioner's jury to feel sympathy or empathy for Petitioner. The same evidence, however, could just as easily have led the jury to conclude Petitioner would logically be expected to engage in amoral, violent, conduct as an adult. Dr. Aeschbach's expert testimony at trial tends to support this latter, fairly logical, deduction to be drawn from such double-edged evidence. Furthermore, Dr. Martinez's report concludes Petitioner poses a risk of "acute emotional and cognitive decompensation if he is overwhelmed by stressors or if there are changes to his psychotropic medication regimen." Given Petitioner's candid admissions during his punishment-phase trial testimony regarding his sporadic adherence to his prescribed medications while free on bond in the months prior to and immediately after Billhartz's murder, Dr. Martinez's conclusions could have been utilized by a shrewd prosecutor to argue Petitioner would pose a substantial risk of future dangerousness.

If the "new" declarations of Petitioner's biological mother, maternal grandmother, family friends, and elementary school teachers and counselors now before this Court are believed, (1) Petitioner's biological parents were not prepared for parenthood and all but abandoned Petitioner from a very early age, and (2) Petitioner was emotionally and physically abandoned by his father and first step-mother, who egregiously neglected Petitioner and left Petitioner to raise himself while they spent their days in a drug-intoxicated stupor.  In fact, the picture of Petitioner's childhood painted during Petitioner's declarations is so utterly bleak and bereft of hope it would likely have furnished a shrewd prosecutor with compelling evidence from which to argue Petitioner was molded by his own family into a person without a conscience who posed a substantial risk of future violence.  Thus, Petitioner's trial counsel may have had perfectly legitimate, objectively reasonable, strategic reasons for not emphasizing the worst circumstances of Petitioner's childhood, particularly the extreme violence to which Petitioner was exposed at an early age (including Petitioner's father's uncontrollable rages, assaults upon Petitioner's biological mother, and threats against Petitioner, as well as Petitioner's own abuse of animals after witnessing his father's family abuse animals).

Given the absence of any fact-specific allegations, much less any evidence, before the Court establishing precisely what additional information about Petitioner's background (including Petitioner's physically and emotionally abused and neglected childhood) Petitioner's trial counsel possessed prior to Petitioner's trial, it is impossible to objectively evaluate (and identify any deficiencies in) the performance of Petitioner's defense team in their investigation of Petitioner's background for potentially mitigating evidence.  Petitioner has, therefore, failed to carry his burden of proving the scope of his trial counsel's investigation into Petitioner's

128

background was objectively unreasonable or professionally deficient.  Contrary to the implication underlying this aspect of Petitioner's ineffective assistance claims, trial counsel are not required to interview each and every person who has ever met the Petitioner in an open-ended, wide-ranging, search for potentially mitigating evidence.  *See Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992) ("The defense of a criminal case is not an undertaking in which everything not prohibited is required.  Nor does it contemplate the employment of wholly unlimited time and resources."), *cert. denied*, 510 U.S. 829 (1993).  Petitioner has alleged no specific facts, and furnished the Court with no evidence, showing his trial counsel were unaware of the details of Petitioner's abused and neglected childhood.

Furthermore, given (1) the extensive potentially mitigating evidence Petitioner's trial counsel did present to the jury at the punishment phase of Petitioner's trial (which included an admission by Petitioner's father that Petitioner "never had a chance"), and (2) the obviously double-edged nature of the evidence contained in Petitioner's "new" declarations and Dr. Martinez's report, the Court concludes Petitioner has failed to carry his burden to establish that the failure of Petitioner's trial counsel to present the gist of Petitioner's "new" declarations to Petitioner's capital sentencing jury caused the performance of his counsel to fall below an objective level of reasonableness.  There were obvious reasons why Petitioner's trial counsel may have wished to withhold from Petitioner's capital sentencing jury the horrific details of Petitioner's childhood, including Petitioner's mother's physical abuse of Petitioner, the extreme physical and emotional violence Petitioner's father directed toward Petitioner's mother and Petitioner, Petitioner's long history of childhood drug abuse, and the extreme neglect to which Petitioner was subjected as a child.  Such evidence could have been used by the prosecution to

support an affirmative finding to the future dangerousness special issue.[193]

For the foregoing reasons, Petitioner has failed to carry his burden of proving by admissible evidence that the conduct of Petitioner's trial counsel in connection with either (1) their investigation of Petitioner's background for potentially mitigating evidence or (2) their decision not to present evidence showing the details of Petitioner's unstable, abused, violent, and neglected childhood was objectively unreasonable.

> **2.      No Prejudice**

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available

---

[193] There were other practical problems with attempting to employ the details of Petitioner's childhood as a basis for an emotional appeal for mercy. Chief among them is the difficulty in presenting a witness who possessed personal knowledge of Petitioner's abused, neglected, childhood who could avoid impeachment based upon his or her failure to timely report that abuse to the appropriate state authorities. None of the Petitioner's family members or family friends who claim to have witnessed the extreme abuse to which Petitioner was subjected state in their sworn declarations that they ever reported that abuse to appropriate authorities. Those persons would all have been subject to cross-examination and impeachment based upon their failure to report what they described as Petitioner's horribly abused circumstances.

This same failure to report child abuse is present in the sworn declarations of the school officials who worked at the elementary school Petitioner attended in third and fourth grade. Those school officials' sworn declarations include no mention of any of them ever reporting to appropriate state officials the horrible abuse of Petitioner they claim to have personally witnessed. Their duty to report same was clear long before Petitioner enrolled at their school. The current state statute requiring school officials to report suspected child abuse appears in Section 261.101 of the Texas Family Code Annotated (Vernon 2008). Similar versions of this same statutory requirement have been on the books in Texas at least since 1965. At the time Petitioner attended Horizon Hill Elementary School, the Texas statutory reporting requirement for child abuse was found in Chapter 34 of the Texas Family Code, specifically at Section 34.01.

Finally, any attempt to employ the testimony of Petitioner's father or biological mother at Petitioner's trial to establish the details of the horrific conditions under which Petitioner grew up would have subjected both of those witnesses to cross-examination and impeachment based upon Petitioner's testimony asserting both these individuals physically abused him as a child. Moreover, Petitioner's biological mother also includes no statement in her sworn declaration indicating she ever reported to appropriate state authorities the extreme child abuse she claimed to have witnessed in the home of Petitioner's father around Christmas of 1993.

mitigating evidence (had the Petitioner's trial counsel chosen a different course). *Wong v. Belmontes*, ___ U.S. at ___, 130 S.Ct. at 386; *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542. *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a capital murder trial would have been different. *Wong v. Belmontes*, ___ U.S. at ___, 130 S.Ct. at 390–91. "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542.

There is no evidence before the Court establishing there was anything Petitioner's trial counsel could have done to prevent Petitioner from exercising his constitutional right to testify during the punishment phase of his capital murder trial and abjectly refusing to accept any responsibility for Billhartz's and Diaz's murders. What Petitioner continues to refuse to comprehend is that his refusal to accept any responsibility for either Billhartz's or Diaz's murder effectively threw fuel on the prosecution's fire at the punishment phase of trial by demonstrating to the jury that Petitioner remained wholly remorseless and unrepentant with regard to the murders of Billhartz and Diaz. Petitioner's punishment phase testimony also furnished his capital sentencing jury with the opportunity to observe firsthand Petitioner's demeanor when he gave an account of Diaz's murder that was wholly at odds with the forensic and physical evidence (i.e., Petitioner testified that he did not realize he had shot Diaz because Diaz either "walked" or "jogged" away from Petitioner's truck *after* Petitioner fired the fatal shot[194] despite

---

[194]   S.F. Trial, Volume 84, testimony of Justen Grant Hall, at pp. 97–98, 158–60, 167, 204, 211–13.

the medical examiner's uncontradicted testimony the fatal shot passed through Diaz's heart,

destroying the right atrium and right pulmonary artery[195]).  Likewise, Petitioner informed his

capital sentencing jury he did not accept the same jury's verdict holding him criminally

responsible for Billhartz's murder.[196]  Petitioner also claimed all the prosecution's guilt-

innocence phase witnesses had testified falsely regarding their descriptions of Petitioner's actions

(and in Frank's case Petitioner's confession) in connection with Billhartz's murder.[197]  Finally,

Petitioner's line by line rejections of the accuracy of his own written confessions to the Diaz and

Billhartz murders—despite Petitioner's acknowledgments that he initialed and signed both

statements—certainly did nothing to help the efforts of Petitioner's trial counsel to gain favorable

answers to either of the Petitioner's capital sentencing special issues.[198]

       Petitioner's trial counsel did make Petitioner's capital sentencing jury aware of at least

some aspects of Petitioner's abused, neglected, childhood.  Presenting the Petitioner's jury with

the full panoply of the horrific details of Petitioner's childhood contained in Petitioner's "new"

declarations—and arguing Petitioner was not morally responsible for his crimes because of his

---

[195]   S.F. Trial, Volume 82, testimony of Corrine Elizabeth Stern, at pp. 55–57.

[196]   S.F. Trial, Volume 84, testimony of Justen Grant Hall, at p. 216.

[197]   S.F. Trial, Volume 84, testimony of Justen Grant Hall, at pp. 172–73, 176–77, 179, 181.

[198] S.F. Trial, Volume 84, testimony of Justen Grant Hall, at pp. 77–101, 157–61, 165, 167–71, 178, 184–85, 205–06.
    Petitioner's capital sentencing jury apparently found wholly incredible Petitioner's testimony that, despite his extensive experience with the criminal justice system, Petitioner signed his April 22, 2002, statement without bothering to read it.
    Despite the length of Petitioner's punishment phase testimony, Petitioner never furnished a rational explanation for why, after having fled the scene of Diaz's fatal shooting (purportedly without any knowledge that Diaz had been struck by the shot Petitioner "accidentally" fired), Petitioner felt is was necessary for him to return to the scene, retrieve the shell casing, and dispose of it.

abused, neglected, childhood— would have amounted to making an emotional appeal for an affirmative answer to the Texas capital sentencing scheme's "mitigation" special issue.

The very practical problem with attempting to make such an emotional appeal for mercy on Petitioner's behalf was that Petitioner's punishment phase testimony made it abundantly clear (1) Petitioner was unwilling to accept any responsibility for his murders of Billhartz or Diaz, and (2) on the contrary, Petitioner was willing to take the stand and deliver a patently absurd account in terms of the physical and forensic evidence of the Diaz murder.

Having re-weighed the "new" mitigating evidence offered in Petitioner's declarations presented to this Court for the first time against the veritable mountain of evidence supporting the jury's answers to the Texas capital sentencing special issues at the punishment phase of Petitioner's capital murder trial, the Court concludes there is no reasonable probability that, but for the failure of Petitioner's trial counsel to furnish the Petitioner's capital sentencing jury with the "new" evidence contained in Petitioner's declarations and Dr. Martinez's report, the outcome of the punishment phase of Petitioner's capital murder trial would have been any different. By the time of jury argument at the punishment phase of Petitioner's trial, the Petitioner's capital sentencing jury had already found Petitioner guilty beyond a reasonable doubt of Billhartz's brutal murder and was confronted with evidence establishing (1) Petitioner's long history of drug abuse, (2) Petitioner's equally long criminal record including the overwhelming evidence of Petitioner's guilt in Diaz's murder, and (3) Petitioner's abject refusal to accept any responsibility, or express any sincere contrition for either Billhartz's or Diaz's murder. Under such circumstances, there is no reasonable probability an emotional appeal for mercy based upon the neglect and abuse Petitioner had suffered as a child would have convinced Petitioner's capital

sentencing jury to answer either of the special issues before it differently.  The person before the

jury in February of 2005 was not a child; he was a violent, remorseless, predator who had

murdered two people in separate incidents and refused to accept any responsibility for his

criminal misconduct.[199]

### 3.   Conclusions

Petitioner's complaints about his trial counsel's alleged failure to adequately investigate

his background for potentially mitigating evidence are not supported by evidence showing the

scope of his counsels' investigation into Petitioner's background was objectively unreasonable.

Petitioner failed to carry his burden of showing the actions of his trial counsel in investigating his

background and presenting readily available mitigating evidence was objectively unreasonable.

Furthermore, the failure of Petitioner's trial counsel to present Petitioner's capital sentencing jury

with the "new" evidence contained in Petitioner's declarations and the report of Dr. Martinez did

not "prejudice" Petitioner within the meaning of *Strickland*.  Most of the "new" evidence

Petitioner argues should have been presented was double-edged in nature and pales in

comparison to (1) the overwhelming evidence the prosecution presented showing Petitioner's

responsibility for both the Billhartz and Diaz murders and (2) the negative impact upon

---

[199]   As was explained above, FED. R. EVID. 606(b) precludes this Court from considering the portions of the declarations of Petitioner's former jurors in which they speculate upon how their subjective thought processes might have differed had they been presented with additional or different mitigating evidence. *Tanner v. United States*, 483 U.S. at 121–22, 107 S.Ct. at 2748 (juror affidavits may not be admitted to impeach the jury's verdict, even when there are allegations contained therein that a member of the jury was sleep, inattentive, lost in thought, or even intoxicated during trial or deliberations); *Summers v. Dretke*, 431 F.3d at 873 ("Under Rule 606(b) of the Federal Rules of Evidence, jurors' affidavits are inadmissible 'regarding the following four topics: (1) the method or arguments of the jury's deliberations, (2) the effect of any particular thing upon an outcome in the deliberations, (3) the mindset or emotions of any juror during deliberation, and (4) the testifying juror's own mental process during the deliberations.'").

Petitioner's efforts to secure a life sentence of his own punishment phase testimony during which Petitioner refused to accept any responsibility for his criminal misconduct. Petitioner's sixth claim herein does not satisfy either prong of *Strickland* and does not warrant federal habeas corpus relief.

### F.    Punishment Phase Argument

In his seventh claim, Petitioner argues his trial counsel rendered ineffective assistance by arguing at the punishment phase of trial that Petitioner deserved to die.[200]

### 1.    No Deficient Performance

By plucking a series of rhetorical questions and statements out of context from the punishment phase argument of Petitioner's co-counsel McDonald, Petitioner attempts to create the impression attorney McDonald argued Petitioner deserved to die for his crimes. Nothing could be further from the truth. In point of fact, at the punishment phase of Petitioner's trial attorney McDonald argued as follows:

> Justen has killed; why shouldn't we kill him? Why shouldn't we kill him?
> He doesn't need your sympathy. He showed no sympathy for those two people. Why shouldn't we kill him?
> Yesterday, Dr. Aeschbach talked about the fact that some of us can rise above our environment. Many of us can. Maybe most of us can. All of us know someone in our family, a friend, someone—someone we have grown up with, who is in prison, who has had problems with the law, who may have killed someone. Why didn't we all end up in prison?
> He talked about—Dr. Aeschbach talked about, basically, a role model, someone who is around you constantly, someone on whom you can base your life.
> Justen had someone like that at Southwest Keys, Mr.—I think the name starts with an M. It escapes me.
> But for a year Justen had someone to emulate, and he did well at

---

[200]  Pet'r's Mem. in Supp., at pp. 77–81; Pet'r's Reply in Supp., at pp. 45–48.

Southwest Keys.  He didn't get into fights.  He did break some rules.  He didn't get into fights.

He didn't get into fights when he was under Kitty Heard's supervision. For that year, when he was in a structured environment, he probably accomplished more than he has ever accomplished in his life before.  He has something in him.  The prison is a structured environment.

We all have reservations about putting someone in jail for the rest of their lives, taxpayers assuming responsibility for caring for that person, when the reason that they are in prison is because they have killed.

You've heard how Justen is able to function in prison.  You have heard that he's broken rules.  He had a shank.  But you also heard, even from the gentleman who came in from TDC, that that's not unusual in the prison environment.  It's common.

The rules that he broke, that he was unable to follow, weren't major infractions.  Justen explained to you that he—the possession of that shank, it was an attempt to get him back into the free world.  It wasn't done.  The consequences of him having a shank were relatively minor.  The prison was able to control Justen Hall.

You've heard references to this kite.  We don't know who wrote it.  We don't know if there were any attempts to get fingerprints off of it.  You can draw whatever inferences you like.  But even this kite was stopped.  This kite doesn't contain a command or an order.  It contains information.  Prison can control Justen Hall.

Why shouldn't you kill him?

Does rehabilitation play any part in our criminal justice system?  Not one of you, when you answered your voir dire questionnaires, indicated that rehabilitation should be a form of punishment.  For the most part, you answered that it should—punishment should be to protect society.  You can put Justen Hall in prison and protect society.

Why shouldn't you kill him?  He has killed two people.

The second question, the question about mitigating and aggravating circumstances, shows a wisdom on the part of the—wisdom on the part of our Legislature.  Usually wisdom and Legislature are contradictory terms, oxymorons.

But in this instance our Legislature, because of a number of appellate decisions, designed that second question, that contains no burden of proof—there's no burden of proof on the defense.  It permits you to impose your own burden of proof.  It permits you to hold the state to a burden of proof higher than that we use in determining whether—

MS. MERAZ: Objection.  Misstatement of the law.  There is no burden period.

MR. MCDONALD: The law permits them to impose their own burden based on their understanding.  There is no restriction in the law, Your Honor.

That's why that question is—

MS. MERAZ: The law says there is no burden.

THE COURT: There is no burden.  The jury will refer to the charge on the issue.

MR. MCDONALD: You can impose what you want to impose.  You get no instructions from the court.  You don't leave your common sense outside the door.

You can demand a greater degree of certitude before you execute an individual than you do —or you sentence —or when you determine that an individual is guilty.  You have that freedom.

If Justen Hall truly was having a trial and judged by his peers, his true peers, then he should have been shot when he shot Hector Diaz —or Tury Diaz.  Excuse me.

Loosely speaking, they are his peers.  But each one of you have a conscience that Justen maybe hasn't yet developed.  It's not an excuse; it's a statement of fact.

Dr. Aeschbach talked about a patient that he had in Austin, a woman who was receiving ongoing medication, and who was around 50 years or so.  She was—she appeared to be stable.  Her diagnosis was very much like Justen's diagnosis was in 2002.

In reviewing her history, Dr. Aeschbach found out that she had killed a young person.  He found out that she had been a drug user.  He found out that she had been in the penitentiary.

We don't know if she was accused of a capital crime.  We don't know, but we know that she killed.  And we know that, after a period of time, she was able to function in the free world.

Justen won't ever see the free world again.  He'll never walk in the desert.  He'll never—probably never even have physical human contact.  He deserves the consequences of his actions.  Do you need to kill him?

Our law doesn't require that.  It doesn't require that you sentence him to death.  It gives you that option.

As Judge Moody told you at the beginning of punishment, you are going to reconsider evidence—not in terms of setting aside your decision of the guilt phase, but in terms of determining what punishment is appropriate.  Your judgment at guilt was premised on your acceptance of Detective Samaniego's confession.  We understand that.

It was premised on the testimony of Eaton and Hale and Davis and Jesse Eddy and all of those others folks.

But did that testimony for guilt, regarding Melanie Billhartz's death, did that testimony in the guilt phase give you the high degree of certitude that I think each of you would require before imposing death?  It didn't.  What could have provided you with that high degree of certitude?

You know, we have beaten this—

MS. MERAZ: I'm going to object to this line of questioning. It doesn't require this high degree of certainty. The standard is beyond a reasonable doubt for the first question, and—

MR. MCDONALD: We're talking about punishment. They can impose whatever they like, Your Honor.

THE COURT: Within the—within the guidelines of the charge, they may. But they have to follow the charge.

MR. MCDONALD: Follow the charge. There is nothing that prevents you. It's ridiculous to speak that there is no burden of proof. It's absolutely ridiculous to take that at face value. It's not logical.

Everything in the law requires some degree of proof. But you're free to impose your own on the second question.

Your decision isn't going to be based on what Justen Hall might decide. It's based on what you're going to decide, based upon your education, your background, your life experiences, your moral character.

The Judge alluded yesterday to an ongoing philosophical dispute regarding capital punishment. And that's true. That's out there for you to consider. Ten of you agree that there should be a death penalty. Two do not.

A person who says that they cannot consider the death penalty doesn't have a right to sit on this jury.

You can still believe, in the abstract, in the death penalty, but believe that a mitigating circumstance is—is that when we impose that death sentence—sure, it will go for years and years on appeal. But more likely than not, what you decide is what's going to happen to Justen Hall.

Maybe it will be 15, 20 years on appeal. But, ultimately, I believe that what you decide, the punishment that you give, is what he will receive.

I respect each and every one of you. I read over your voir dire transcriptions, in each of your voir dire, over and over and over again, trying to understand your mind. I know that each of you understands that, in determining whether or not to kill Justen Hall, you'll look at the principles that lie behind the law. The judgment that you reach will be based on society's well-being and on Justen Hall's well-being, because he is a human being.

Perhaps—and I agree with them—he's a—he's a poor representative of what being a human being—what it means to be a human being.

Would I want him dating my daughter? No.

Should he be out on the street? No.

But you don't have to kill him.

You know that 12 of you have to agree that there are no mitigating circumstances, and the result will be death.

You can infer from the charge—well, you also are told in the charge, that if ten of you agree there are mitigating circumstances, even if you don't agree as to what those mitigating circumstances are—and you-all are far more

intelligent that I.  And you—all can think about the evidence and determine on your own, in your own mind, whether there is something, some reason, not to kill him.

He doesn't deserve not to be killed, but you don't have to kill him.  He can be put into a structure.

Each one of your votes is very important, because if you can't agree, ten of you can't agree on mitigating and 12 of you can't agree on death, there is one person that holds, then the Court is obliged to impose a life sentence.

MS. MERAZ: Objection.  Your Honor, that's improper.

THE COURT: Yes.  The jury will have to disregard that.

MR. MCDONALD: Each one of you—each one of you have the power and can hold on to your honest convictions, to make sure that Justen Hall is sentenced to life in jail.

There is something in Justen that's worth keeping alive.   Not because—not because he deserves it, because he doesn't.  It's because of something greater than Justen.  It's because our system of justice, it's because your moral development, gives you the ability to make him stay alive, to hopefully learn what it's like to develop a conscience, because he does have that spark.

Death is too easy.  Death is too quick.  True punishment makes—means making someone face the consequences of their actions.  Justen isn't capable of that right now.  Justen is functioning on the lowest level, a purely self-serving level of human existence.

You remember Dr. Aeschbach's discussion of the developmental process?  The second phase—the first phase, pure self-serving.  Pure self-serving.

The second phase, guided purely by the law, by the letter of the law.  And we can see where that would be a problem.  We can see where that can be a problem.

The Japanese, in World War II, were banded by the letter of their law.

The terrorists that attacked us in New York were banded by the letter of their law.

The Nazis were banded by the letter of their law.

The highest degree of moral development means that you look behind, you look beyond, you go through.  We make our own judgments based on moral principles.

And that's the power that each one of you have, that you can't surrender your honest conviction.  You can't—if there is only one of you who refuses to impose the death penalty, don't surrender.  Don't surrender.  Don't give in to the majority.

I respect each of you very much.  I know that none of you have decided what to do about Justen Hall.  I know that.  You have a heavy responsibility.

*   *   *   *   *

139

> Each of you have it within you to judge Justen Hall in a way that the system demands.  Because it's not about Justen Hall, it's about the integrity of our system, an integrity that will protect even someone like Justen Hall from Old Testament mindless justice, an eye for an eye, a tooth for a tooth.
> You have the duty to talk with each other.  You know that.  We have gone through this before.  And you have a duty not to surrender your honest conviction.  We just need one of you, just one.  Not because he deserves it, but because you do.[201]

Under the facts and circumstances of Petitioner's capital murder trial, the Court finds the approach employed by Petitioner's co-counsel in his closing jury argument at the punishment phase of trial to have been eminently reasonable.

Making a naked emotional appeal for mercy premised on Petitioner's abused and deprived childhood—as Petitioner now argues should have been made—might have had some efficacy had Petitioner also presented the jury with some credible evidence showing he was sincerely remorseful for his monstrously brutal assault on Billhartz, his cold execution of Diaz, or any of his prior criminal offenses.  But the record confronting Petitioner's trial counsel at the punishment phase of Petitioner's capital murder trial was bereft of any evidence showing Petitioner had ever expressed sincere contrition or remorse for his criminal conduct.  On the contrary, Petitioner's abject refusal to accept any responsibility for the murders of either Billhartz or Diaz during his punishment phase testimony effectively rendered any attempt to appeal to the jury's sympathies a dubious strategic choice.

Under such circumstances, it was eminently reasonable for Petitioner's trial counsel to make an appeal to the intellect of Petitioner's capital sentencing jury rather than their emotions. Petitioner's trial counsel could have reasonably concluded it would be difficult for Petitioner's

---

[201]  S.F. Trial, Volume 86, at pp. 50–59.

jury to feel sympathy for Petitioner—no matter how horrific the details of his childhood—if Petitioner were incapable of expressing any trace of sincere remorse for his offenses.

Petitioner's co-counsel's use of rhetorical questions and comments, i.e., asking rhetorically "why should you kill him?" or "why shouldn't you kill him?" or even stating that Petitioner "deserved to die" *but then offering reasons why the jury should exercise its discretion NOT to impose a death sentence* was well within the broad range of strategic or tactical decision-making that is objectively reasonable. Petitioner's co-counsel effectively communicated to the jury that it possessed broad discretion to answer the second Texas capital sentencing special issue—the mitigation or *Penry* special issue—affirmatively and encouraged individual jurors to hold fast to their honest convictions if they found themselves as the single holdout against imposing the death penalty. Viewed in its entirety, this Court finds there was nothing objectively unreasonable about the closing jury argument made by Petitioner's co-counsel at the punishment phase of Petitioner's trial. *See Nixon v. Epps*, 405 F.3d 318, 327–28 (5th Cir.) (holding it was not ineffective for defense counsel to acknowledge the heinousness of the defendant's offense in the context of asking for mercy for the defendant), *cert. denied*, 546 U.S. 1016 (2005).

### 2.      No Prejudice

This Court concludes there is no reasonable probability that, but for the rhetorical closing argument of Petitioner's co-counsel at the punishment phase of trial, the outcome of that portion of Petitioner's capital murder trial would have been different. The evidence supporting the jury's guilty verdict at the punishment phase of trial was overwhelming. The evidence showing Petitioner's criminal responsibility for Diaz's death was likewise overwhelming and included the following statement in Petitioner's written confession of April 22, 2002: "I want people to know

141

that I killed the transvestite for one reason and one reason only.  Because he was a faggot.'[202]

Petitioner's initials appear immediately after that portion of his voluntary statement.  During his

punishment phase testimony, Petitioner denied making that pejorative comment about Diaz and

denied making most of the statements contained in his April 22, 2002, statement.[203]  Petitioner

also denied the factual accuracy of his written confession to Billhartz's murder.[204]

     The choice by Petitioner's co-counsel to employ rhetorical questions and comments

asking why Petitioner should or should not be sentenced to death, and even suggesting Petitioner

"deserved" such a sentence, but then explaining why he felt such a sentence was not appropriate

for Petitioner, did not "prejudice" Petitioner within the meaning of *Strickland.*

### 3.    Conclusions

     Petitioner's complaints about his co-counsel's closing argument at the punishment phase

of trial do not satisfy either prong of *Strickland* analysis.  Petitioner's seventh claim herein does

not warrant federal habeas relief.

### G.    Jury Selection

     In his eighth, ninth, and tenth claims herein, Petitioner argues his trial counsel rendered

ineffective assistance during voir dire by (1) effectively relinquishing two peremptory challenges

by not requiring the prosecution to exercise its peremptory challenges first, as required by Texas

law, (2) agreeing to excuse "death-qualified venire members" who were opposed to capital

---

[202]   State Ex. 153, S.F. Trial, Volume 92, at p. 1.

[203]   S.F. Trial, Volume 84, testimony of Justen Grant Hall, at pp. 69–100, 151–71, 204–07, 212–14.

[204]   *Id.,* at pp. 105–120, 184–85, 193, 199–203, 209.

punishment without questioning them, and (3) not objecting to the trial court's failure during voir

dire to instruct venire members on a variety of subjects such as reasonable doubt, burden of

proof, presumption of innocence, and other subjects required by Texas law.[205]

### 1.    The Agreement to Change the Jury Selection Procedure

Article 35.13, Texas Code of Criminal Procedure, provides that a juror in a capital case in

which the state is seeking the death penalty "shall be passed for acceptance or challenge first to

the state and then to the defendant."[206] Prior to the commencement of jury selection at

Petitioner's capital murder trial, however, on August 30, 2004, Petitioner's trial counsel entered

into a written agreement with the prosecution which provided:

> 1. A juror shall be questioned by both parties.
> 2. Upon completion of the examination of a juror by both sides, the State shall make its challenge(s) for cause, if any.
> 3. If the State has no challenge for cause or said challenge is denied, the Defense shall then make its challenge(s) for cause, if any.
> 4. Once there are at least 48 qualified jurors, the parties would request that the court summon the qualified jurors to court to ensure they are still qualified and have not had any intervening events to [sic] prevent them from serving.
> 5. If there are at least 46 jurors still qualified, the State and Defense shall then exercise their peremptory strikes. Each side will have a list of the qualified jurors and make their strikes independently.
> 6. If there are not 46 jurors qualified, then the questioning would continue.[207]

During the evidentiary hearing in Petitioner's state habeas corpus proceeding, Petitioner's

---

[205]  Pet'r's Mem. in Supp., at pp. 81–101; Pet'r's Reply in Supp., at pp. 52–59.

[206]  TEX. CODE OF CRIM. PRO. ANN. art. 35.13(Vernon 2006). This statutory provision has remained unchanged since 1967.

[207]  Trial Tr., Volume II, at p. 387.

former lead trial counsel, attorney Macias, testified (1) he had tried five capital murder cases, but had never selected a jury in the unique manner prescribed by the Texas Code of Criminal Procedure for capital trials, (2) he had always conducted voir dire in the manner voir dire was conducted in Petitioner's case, (3) he suggested the procedure employed during Petitioner's voir dire and entered into the written agreement with the lead prosecuting attorney to alter the method of voir dire, (4) he did so "[b]ecause I'd rather see the jury selection the same way I do in normal jury selection and have my notes and everything and do my strikes all at one time," (5) he preferred to exercise his peremptory strikes after seeing the entire venire panel, rather than having to strike a venire members without knowing what the rest of the jury venire looked like, (6) he did not believe the method of voir dire set forth in the Texas Code of Criminal Procedure furnished the defense with any tactical or strategic benefit, and (7) even with the advantage of hindsight, including the ex post facto knowledge the prosecution struck two of the same venire members as did Petitioner's trial counsel, he still believed the method of jury selection employed in Petitioner's case was more advantageous to the defense than the statutorily prescribed procedure for jury selection in death penalty cases.[208]

Petitioner argues the statutory scheme set forth in Texas Code of Criminal Procedure Article 35.13 furnishes a capital murder defendant with an important strategic advantage: the ability to compel the prosecution to exercise challenges for cause and peremptory challenges before the defense is required to do so. Petitioner argues further that, under the procedure attorney Macias agreed to employ during jury selection at Petitioner's trial, the defendant runs the risk of forfeiting any strikes he uses on jurors who are also stricken by the prosecution.

---

[208]   State Habeas Tr., Volume II, testimony of Francisco Macias, at pp. 197–204.

Petitioner argues that, had Macias not entered into the agreement quoted above, the Petitioner could have used the two peremptory challenges—which Petitioner claims he "lost" when the prosecution struck the same venire members as Petitioner—to strike eventual jurors James Griffith ("Griffith") and Kenneth Sudimack ("Sudimack"), both of whom the Petitioner claims his trial counsel unsuccessfully challenged for cause, as biased.[209]

### a.   No Deficient Performance

Petitioner argues Macias' decision to enter into the agreement in question "was not driven by a tactical or strategic decision, as he did not ever understand the advantages provided by Article 35.13 to make an informed decision to forego them." This argument disregards Macias' testimony at Petitioner's state habeas corpus hearing, during which Macias explained precisely why (1) he preferred to have the opportunity to interview the entire venire panel *before* he exercised any of his peremptory challenges because it permitted him to see all the venire members before he decided against whom he would exercise his peremptory challenges, and (2) he did not consider the ability to require the prosecution to exercise its peremptory challenges sequentially before the defense more advantageous than the procedure he was able to negotiate with Petitioner's prosecutors.[210] What Petitioner characterizes as Macias' alleged inability to "understand" the alleged strategic advantages to the defense of the statutory jury selection

---

[209]   The voir dire examination of venire member (and later juror) James Griffith appears at S.F. Trial, Volume 15, at pp. 65–130; Volume 16, at pp. 8–71. Petitioner's trial counsel did make challenges for cause to venire member Griffith, which the trial court overruled. S.F. Trial, Volume 15, at pp. 129–30; Volume 16, at pp. 69–70.

The voir dire examination of venire member (and later juror) Kenneth Sudimack appears at S.F. Trial, Volume 39, at pp. 61–156. Contrary to the statement contained in Pet'r's Mem. in Supp., at p. 88 ("While Mr. Macias challenged Mr. Sudimack for cause, the challenge was denied, . . . . "), Petitioner's trial counsel did NOT challenge venire Sudimack for cause. S.F. Trial, Volume 39, at p. 154.

[210]   State Habeas Tr., Volume II, testimony of Francisco Macias, at pp. 197–204.

145

scheme for Texas capital trials is actually a refusal on the part of Petitioner to accept the potential

validity of Macias' preference for examining the *entire* jury venire prior to exercising any

peremptory challenges.  This Court finds Macias' explanations of the reasons for his preference

for the procedure employed during Petitioner's voir dire were objectively reasonable.  Petitioner

fails to recognize the significant strategic disadvantage the defense would have faced had it been

required to conduct jury selection under the statutory procedure, i.e., the defense's inability to

interview the entire jury venire before being required to exercise peremptory challenges.

     In the course of reviewing the performance of Petitioner's trial counsel, the Court must

avoid the distorting effect of hindsight:

> A fair assessment of attorney performance requires that every effort be made
> to eliminate the distorting effects of hindsight, to reconstruct the
> circumstances of counsel's challenged conduct, and to evaluate the conduct
> from counsel's perspective at the time.  Because of the difficulties inherent
> in making the evaluation, a court must indulge a strong presumption that
> counsel's conduct falls within the wide range of reasonable professional
> assistance; that is, the defendant must overcome the presumption that, under
> the circumstances, the challenged action "might be considered sound trial
> strategy."[211]

     The Court finds it was objectively reasonable for Petitioner's trial counsel to examine the

entire jury venire before exercising any of its peremptory challenges.  The procedure Macias

negotiated with the prosecutors effectively permitted the defense to ascertain which members of

the jury venire it *most* wished to exclude through the use of its peremptory challenges before the

defense was required to exercise any of its peremptory challenges.  This procedure reduced the

possibility the defense would exhaust its peremptory challenges before reaching those members

---

[211] *Strickland v. Washington*, 466 U.S. at 689, 104 S.Ct. at 2065.

of the jury venire it most wished to exclude. As James Madison recognized, knowledge is power.[212] The procedure Macias negotiated with the prosecutors furnished the defense team with far more information about the makeup of the jury venire *as a whole* than the defense would have possessed had it been required to exercise or withhold its peremptory challenges sequentially after each individual member of the jury venire was interviewed by the parties.

Petitioner's argument that adherence to the Texas statutory scheme would have resulted in Petitioner "gaining" two additional peremptory challenges is premised upon precisely the type of speculative hindsight the Supreme Court declared in *Strickland* to be inappropriate for reviewing the performance of trial counsel. Moreover, it is impossible to know at this juncture if the prosecution would have exercised its peremptory challenges in precisely the same manner it did had the parties employed the procedure set forth in Article 35.13. Had the prosecution been required to exercise its peremptory challenges sequentially after voir dire of each individual venire member concluded, it may not have exercised its peremptory challenges against the same members of Petitioner's jury venire as it did. Thus, Petitioner's arguments premised upon the peremptory challenges he allegedly "lost" as a result of the method of jury selection employed at his trial are without sound foundation in law or fact.

This Court concludes the agreement attorney Macias negotiated with the prosecutors, which furnished the defense the opportunity to examine the entire jury venire before exercising

---

[212] "A popular Government, without popular information, or the means of acquiring it, is a Prologue to a Farce or a Tragedy; or perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives." *Press-Enterprise Company v. Superior Court of California*, 478 U.S. 1, 18, 106 S.Ct. 2735, 2745, 92 L.Ed.2d 1 (1986) (*Stevens, J., dissenting*).

any of its peremptory challenges, fell within the very broad scope of objectively reasonable

professional conduct.  Thus, Petitioner fails to satisfy the first prong of the *Strickland* analysis.

### b.    No Prejudice

> With respect to prejudice, a challenger must demonstrate "a reasonable
> probability that, but for counsel's unprofessional errors, the result of the
> proceeding would have been different.  A reasonable probability is a
> probability sufficient to undermine confidence in the outcome." *Strickland
> v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068.  It is not enough "to show
> that the errors had some conceivable effect on the outcome of the
> proceeding." *Id.,* 466 U.S. at 693, 104 S.Ct. at 2067.  Counsel's errors must
> be "so serious as to deprive the defendant of a fair trial, a trial whose result
> is reliable." *Id.,* 466 U.S. at 687, 104 S.Ct. at 2064.[213]

"[P]eremptory challenges are not constitutionally protected fundamental rights . . . [and]

may be withheld altogether without impairing the constitutional guarantee of an impartial jury

and a fair trial." *Georgia v. McCollum*, 505 U.S. 42, 57, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992).

Thus, the alleged "loss" by Petitioner of two peremptory challenges does not, standing alone,

implicate any constitutional right. *See Rivera v. Illinois*, 556 U.S. 148, ___, 129 S.Ct. 1446,

1453, ___ L.Ed.2d ___ (2009) ("If a defendant is tried before a qualified jury composed of

individuals not challengeable for cause, the loss of a peremptory challenge due to a state court's

good-faith error is not a matter of federal constitutional concern."); *Georgia v. McCollum*, 505

U.S. at 57, 112 S.Ct. at 2358 ("peremptory challenges are not constitutionally protected

fundamental rights; rather, they are but one state-created means to the constitutional end of an

impartial jury and a fair trial.").

---

[213]  *Harrington v. Richter*, ___ U.S. ___, ___, 131 S.Ct. 770, 787–88, 178 L.Ed.2d 624 (2011).

While Petitioner argues that Macias' agreement with prosecutors resulted in the defense having to accept biased venire members Griffith and Sudimack on Petitioner's petit jury, Petitioner failed to convince the Texas Court of Criminal Appeals either of these two jurors were in fact biased:

> In points of error eight, nine, and ten, appellant claims trial error in the denial of his challenges for cause of three venire members.  Appellant exhausted all his preemptory [sic] challenges, requested more challenges that were denied, and identified objectionable persons on the jury.  In all three instances, appellant claims that the venire member was biased in favor of law enforcement.
>
> A trial court's decision to deny a challenge for cause will not be overturned absent an abuse of discretion by the trial court.
>
> The voir dire of venire member Griffith shows that, during a witness-credibility discussion, he admitted that he might be biased towards a police officer rather than a gang member if he knew who they were beforehand. However, he also stated that he would evaluate the credibility of witnesses based upon what they said, not who they were, and that he would not automatically believe a witness simply because he was a police officer.  To be challengeable for cause based on his views about a specific type of witness, a venire member must hold extreme positions with respect to that witness's testimony.  With respect to venire member Sudimack, nothing in the record demonstrates any bias in favor of law enforcement.  In fact, Sudimack said that law enforcement agents, specifically the FBI, "probably" lie, since they are people too.  With respect to venire member Lopez, nothing in the record shows a bias in favor of law enforcement, and appellant has not pointed to any such bias in the record.  The trial court did not abuse its discretion in denying appellant's challenges for cause.  Points of error eight, nine, and ten are overruled.[214]

Moreover, Petitioner's trial counsel did not challenge venire member Sudimack for cause.[215] The only reasons for challenging venire member Griffith for bias voiced by Petitioner's

---

[214] *Hall v. State*, 2007 WL 1847314, *5 (*Footnotes omitted*).

[215] S.F. Trial, Volume 39, voir dire examination of Kenneth Robert Sudimack, at p. 154.

trial counsel during voir dire were Griffith's statements suggesting (1) he would give more

credibility to a law enforcement officer than to a gang member, and (2) he would convict based

on proof of murder by a gun when the indictment alleged the murder was committed with a

knife.[216]

The Court has independently reviewed the entirety of the voir dire examination of venire

members Griffith and Sudimack and found absolutely no arguable basis exists for excusing either

of these venire members for bias of the type alleged by either Petitioner's trial counsel or

Petitioner's federal habeas counsel.[217] *See Skilling v. United States*, ___ U.S. ___, ___, 130 S.Ct.

2896, 2925, 177 L.Ed.2d 619 (2010) ("It is sufficient if the juror[s] can lay aside [their]

impression[s] or opinion[s] and render a verdict based on the evidence presented in court.");

*United States v. Duncan*, 191 F.3d 569, 573–74 (5th Cir. 1999) (explaining a venire member's

statements during voir dire that she was raised to respect authority and saw a law enforcement

officer as an authority figure, and her questionnaire answer suggesting she would give more

weight to the testimony of a law enforcement witness than that of another witness, did not

necessarily constitute a disqualifying bias; rather, her answers reflected "responsible citizenship"

and merely formed a predicate for further voir dire examination), *cert. denied*, 529 U.S. 1122

(2000).

---

[216]  S.F. Trial, Volume 15, voir dire examination of James Edgar Griffith, at pp. 129–30;
Volume 16, voir dire examination of James Edgar Griffith, at p. 69.

[217] Respondent correctly argues Petitioner never "fairly presented" the state habeas court with
any allegation suggesting or implying either of these two venire members ever demonstrated any
disqualifying bias during their voir dire examination.  In point of fact, Petitioner failed to even identify
for the state habeas court any member of the jury venire whom Petitioner claimed should have been
excused for bias.

Venire member Sudimack stated during his voir dire examination that (1) he had a problem keeping people in jail forever for committing a serious crime because, as a taxpayer, he would not want to pay for it,[218] (2) he could nonetheless put aside his personal feelings on that subject and answer the questions before him based upon the law and the evidence before him,[219] (3) he understood the concepts of presumption of innocence, burden of proof, and beyond a reasonable doubt, as explained to him by counsel for both parties,[220] (4) he believed sitting in prison for the rest of one's life was harsher than to have a death sentence imposed, but he would not allow his personal views to color his answer to the second capital sentencing special issue,[221] (5) he believed the execution of criminals was disgraceful, but the death penalty is just and necessary,[222] (6) people probably join prison gangs to help defend themselves in a difficult environment,[223] and (7) he generally believed what people said unless he was given a reason not to do so and he would not automatically disbelieve a person based upon their having a criminal record or their membership in a prison gang or automatically believe a person because they were a law enforcement officer.[224]   Contrary to the suggestions contained in Petitioner's pleadings, venire member Sudimack repeatedly emphasized that he was not predisposed to impose a death

---

[218]   S.F. Trial, Volume 39, voir dire examination of Kenneth Robert Sudimack, at pp. 64–65.

[219]   *Id.*, at pp. 94–95, 101–04.

[220]   *Id.*, at pp. 70–74, 111–19, 143, 147.

[221]   *Id.*, at p. 133.

[222]   *Id.*, at pp. 136–37.

[223]   *Id.*, at p. 139.

[224]   *Id.*, at pp. 140–41, 145–46.

sentence on a person convicted of capital murder:

Q. (MR. MACIAS) Now, the fact you have a problem as a taxpayer with giving someone a roof over their head and three meals a day for doing nothing in return to the state, does that make you predisposed toward the death penalty?

A. People like Charles Manson, yes. That aggravates me that he's, you know, sitting in jail in California after doing what he did. Cases like that, yeah, I have a problem supporting him.

Q. Is there any difference between who he killed and who someone else kills?

A. No.

Q. So if—

A. But the circumstances involved in that case were pretty horrific.

Q. Okay. Well, let's—

A. When somebody accidentally kills somebody, I don't necessarily want them to die for it. It depends on the circumstances. But in cases like Charles Manson, I don't like paying for that.[225]

*  *  *  *  *

A. Yes. But let me just say this.

Q. Sure.

A. I don't know, necessarily, the difference between legal murder, manslaughter—you used the word "killing," or whatever. I don't know the difference.

Q. I agree.

A. You know, and if you guys had the time, you could give me a lesson in this. But my point is that: It depends on the circumstances, okay? It depends on the circumstances. You know, I'm not saying everyone that's in jail for murder ought to be, you know, shot because it would save the state a lot of money than keeping them in jail. I'm saying, in certain cases, obviously headline cases, whatever, I think it's, you know, not a good thing to keep these guys in jail for 40 years at taxpayer expense. That's all I'm saying. I'm not saying that's true for every convicted murder case, because it depends on the circumstances.

Q. And what I want to know is, how it affects you, as a juror, that you

-----------------------

[225]  S.F. Trial, Volume 29, voir dire examination of Kenneth Sudimack, at p. 101.

have that predisposition?

A.  I don't know.  That's up to you, I guess.

Q.  It's not to me.  It's up to you.  It's up to me to find out, and that's what I'm trying to do.

A.  Okay.

Q.  Okay.  Now, the fact that you don't want to pay for these, for prisons, is that going to make you predisposed or is it going to be easier for you to find the death sentence for a person who you have found guilty of capital murder?

A.  I don't know what the circumstances of the case are.  I don't think I'm predisposed to saying anybody guilty ought to be—whatever.

Q.  Anybody guilty ought to be what?

A.  Killed.[226]

Like the Texas Court of Criminal Appeals, the Court finds no evidence of any disqualifying bias in favor of law enforcement by venire member Sudimack.  Nor, apparently, did Petitioner's trial counsel.  Petitioner's trial counsel advised venire member Sudimack early on during the defense's voir dire—but after the foregoing exchanges—that he expected Sudimack to wind up on Petitioner's jury.[227]  Contrary to the assertion contained in Petitioner's pleadings, Petitioner did not challenge Sudimack for cause.

Venire member Griffith repeatedly stated during his voir dire examination that (1) he would not automatically assume that a defendant's confession was voluntary,[228] (2) he understood that a confession could be rendered involuntary by coercion, i.e., through force,

---

[226]  *Id.*, at pp. 103–04.

[227]  S.F. Trial, voir dire examination of Kenneth Robert Sudimack, Volume 39, at p. 113: (MR. MACIAS: "And I have a feeling that you are going to be on the jury, because I have a feeling that nobody is going to strike you, okay?").

[228]  S.F. Trial, Volume 16, voir dire examination of James Edgar Griffith, at pp. 41–46, 63, 67–68.

threats, sleep deprivation, denial of food, etc.,[229] and (3) while he generally believed that law

enforcement officers were honest and truthful, he would nonetheless evaluate the testimony of

any law enforcement officer in light of all the testimony and other evidence before determining

whether the law enforcement officer's testimony was credible or incredible, and he would not

automatically credit a law enforcement officer's testimony over that of a criminal defendant.[230]

In response to a confusing hypothetical from the prosecution, Griffith explained that he would

hold the prosecution to its burden of proving the elements of the offense as set forth in the

indictment:

> (MR. HICKS) Let's talk about indictments for a second. And this is kind
> of a real simplified version, because lawyers, you know, we have to put in
> other legal stuff here and there. But these are the basics for an indictment of
> murder, okay? Regular murder, not capital murder. And that would be, in the
> County of El Paso, the State of Texas, on or about some date—of course the
> date, this is just made up. But on some date, in this case, our make-believe
> case, December 25th, 2003—a defendant intentionally caused the death of Mr.
> Claus—Santa Claus—by shooting him with a firearm.
>
> Okay. That's the basics of the indictment. That's what the grand jury
> passed down and that's what we present in court to a defendant on a murder
> case. Okay. We say, "This is what we're going to prove," okay?
>
> A. Uh-huh.
>
> Q. Now, let's take you to a hypothetical situation where you're sitting on
> a jury. You're one of the jurors in this pretend case where Santa Claus was
> killed. Okay. And you know that this is in the indictment. And we go to trial
> and the State of Texas comes forward, and we have all of our evidence and we
> prove to you beyond a reasonable doubt that it occurred in El Paso County, in
> Texas, and it happened on December 25th, 2003 and that the same person
> named in the indictment is the same person that was there that night and that
> that person there, that Bad Guy, did in fact kill Santa Claus, proved it beyond
> a reasonable doubt to you. We proved to you that he killed Santa Claus by

---

[229] *Id.*, at pp. 44–46, 63, 67–68.

[230]   S.F. Trial, Volume 15, voir dire examination of James Edgar Griffith, at pp. 109–16;
Volume 16, voir dire examination of James Edgar Griffith, at pp. 50–57, 61–62.

stabbing him with a knife.  Okay.  What would your verdict be?

A.  Guilty.

Q.  Okay.  Well, wait a minute.  *I'm tricking you*, is what I'm doing.  How did I just say that that bad guy killed Santa Claus?

A.  With a knife.

Q.  Okay.  What did we tell the defendant we were going to prove?

A.  Firearm.

Q.  Right.  Right.  Okay.  So see, this is what we're bound to.  What is in the indictment is what we are bound to.  If we don't prove what is in the indictment, then the jury has to find the defendant not guilty.  And if, you know, we put forward a case where Santa Claus has been shot with a firearm and it turns out he was actually stabbed with a knife, and we went through trial like that, you could probably come and visit Diana and I down at the unemployment line, because we shouldn't be employed if we mess up that bad, right?  But you would understand why you would have to find the defendant not guilty if the proof is he was stabbed with a knife?  Does that make sense to you?

A.  Yes.

Q.  You understand that?

A.  Right.

Q.  And if the proof varies from what we say here, could you find a defendant not guilty?

A.  Yes.  He would have to be found not guilty.

Q.  He would have to.  You're right.  He would have to.  And that's what the jury would have to do.  Do you have any questions about that?  Because it's one of those things they call a technicality, right?  But it's a very real thing, because it's only fair, right?  We tell the defendant, "hey, you killed Claus by shooting him," and if we don't come and prove that, well, that's not very fair.  So it's only fair that we do what we say we're going to do, right?

A.  Right.

Q.  No problem finding the defendant not guilty if we don't prove up what we say in our indictment?

A.  I wouldn't have any problem.[231]

The following day, Griffith reiterated his understanding of the burden of proof imposed

---

[231]  S.F. Trial, Volume 15, voir dire examination of James Griffith, at pp. 73–75.

upon the prosecution to prove all elements of the offense:

Q. Yesterday the prosecution used the word "technicalities" in one of the examples. The difference between—remember there was that example that was given to you early yesterday afternoon about an indictment stating that somebody had murdered somebody using a gun and what was proven was a knife or vice versa. Do you remember that yesterday?

A. I will never forget that.

Q. Now, the prosecution emphasized that, you know, there—what people call technicalities are still valid reasons for finding no guilt, right? Right?

A. There would be some, perhaps, you know, like the conduct of a trial. I don't know that I would have anything to do with that.

Q. Okay. But you understand that after the evidence comes in, if the state hasn't proven or hasn't met its burden of proof beyond a reasonable doubt, you're required to find the defendant not guilty?

A. Yes, I understand that.

Q. And it doesn't matter whether it seems to you that it's some kind of technicality, right? You understand that, don't you? You're hesitating.

A. I'm not sure what you mean by a "technicality."

Q. A technicality will be, for example—well, what people would call a technicality would be variance between an indictment that says that someone was killed with a gun—

A. Oh.

Q. —or, on the other hand, any proof had to do with somebody being killed with a knife.

A. Yes.

Q. There is a variance there, right?

A. Right.

Q. So you have to follow the law?

A. Yes.

Q. And you would have to find a defendant in a hypothetical case not guilty?

A. Yes.

Q. Regardless of criticism that you might receive for indulging in technicalities?

A. Yes.[232]

\* \* \* \* \*

Q. (MR. MCDONALD) So we have got a scenario where two or three law enforcement officers are saying basically the same thing. They're taking a position adverse and contrary to the accused in the case. Now, based on the opinions that you—the opinion that you hold, that, in general, law enforcement is going to do the right thing, in that type of a scenario, isn't it fair to say that honestly, it's going to be—you are going to have trouble following the law because you have got someone accused of the crime and you have got these three law enforcement guys, and you are going to think that these three law enforcement guys are going to do the right thing, say the right thing? So isn't it far [sic] to say that your opinion about law enforcement would affect your ability to be fair and impartial, in that scenario?

A. I think that—

MR. HICKS: Your honor, I'm going to object. That's contracting the witness.

MR. MCDONALD: Respectfully—I'm sorry.

THE COURT: The Court is going to sustain the objection.

Q. (BY MR. MCDONALD) Are you able to follow the law in that situation?

A. Yes. And consider all of the evidence and the testimony.

Q. Now, who starts better when they testify, if anyone at all, in a criminal case, the police officers or the defendant, in terms of credibility? Without knowing anything. You're looking at a case, at a hypothetical case where you don't know all the facts, because we can't talk about too many facts.

A. Well, without knowing anything, you couldn't say beforehand who's going to be more credible.

Q. You do know this: You have got witnesses who are law enforcement and you have got someone who is accused of doing the crime. Now, who starts off better?

A. To be fair, neither one. You would have to listen to their testimony and make a judgment based on what you felt about that person and what they were saying.

Q. And that's the ideal, but is there anything about the opinions that you hold, anything about your life experience—in general, isn't it fair to say that

---

[232] S.F. Trial, Volume 16, voir dire examination of James Griffith, at pp. 25–27.

someone who has been with the military is basically going to be pro-law enforcement and assume that law enforcement is going to do the right thing? Is that a fair statement?

A. I would feel that the law enforcement in most cases is going to abide by the law. I would hope, you know, that's the case and I believe that that is the case. That's how we function in such a reasonable kind of society here. If we had corrupt law enforcement, then I don't think our country would be what it is.

Q. And you understand that we're not here to pass moral judgment. We just want to make sure that you don't hold any opinions that might affect your ability to be fair and impartial. And the concern I have and the concern that we have at this table is that your feelings about law enforcement are going to prevent you from—you know, law enforcement is basically starting off on a better foot when they testify, by virtue of being law enforcement. And I don't—certainly that's a goal that we want to have in our society, but I don't know that it reflects reality. But your opinion is, in general, that law enforcement is going to do the right thing and that they're going to start off better on the witness stand, right, by virtue of being law enforcement? Isn't that fair to say?

A. That they are going to start off better?

Q. More credible.

A. More credible?

Q. Uh-huh.

A. Well, it depends on who you are comparing them to.[233]

\* \* \* \* \*

Q. We have to zealously protect the rights of our client. And it's tough hyp—it's a tough hypothetical situation. It's not really fair to you, but it's testing your gut feeling. And we just need to know, police are going to start off generally better with you right? I think you already said that?

A. The police what?

Q. The police will generally start off more credible for you is that fair to say? That's your opinion?

A. Well, like I said, it depends on what the other—who the other witness is. If you want to define the other witness as the defendant—

Q. That's what we're doing. We're pinning you down to police officers and the defendant. Who is going to be more credible? And I think your

---

[233] *Id.*, at pp. 52–55.

answer would have to be that the police officer is going to be more credible.
That's your opinion, right?

A. Well, you know, I would have to hear the testimony first.

Q. Well, but I'm talking about the opinion that you generally have about
law enforcement that you have already expressed, and I am trying to bring
you back to that. And my understanding of what you expressed is that, in
general, without taking into account that they say, police officers, law
enforcement, is going to start out more credible. That accurately reflects your
opinion?

A. I am not sure you are ever going to get me to admit to that.

Q. But I think you already have, sir. I really—I really think you have
already admitted to it.

MR. HICKS:   Your Honor, I'm sorry.   I'm going to object to the
argumentative statements from the defense.

THE COURT: Sustained, sir.

Q. (BY MR. MCDONALD) Do you really want to be on this jury?

A. Well, I like to feel like, you know, I do my duty for my community.[234]

\* \* \* \* \*

Q. \* \* \* (BY. MR. MCDONALD) So just getting back to this issue of
credibility and whether you can follow the law in regards to listening to
police officer witnesses and, for example, a defendant—

A. Uh-huh.

Q. —honestly, after thinking about it, are you able to follow the law?

A. Yes. I'm an honest person to a fault.

Q. I believe that. It's just that sometimes, again, when we have a bias or
prejudice, we're not even aware of it.

A. But I am aware, you know, the part that plays in our lives, too. And,
you know, like I would be the type of person that might even go overboard
to offset that bias and know what I was doing.

Q. What I hear you saying is that, for example, when you hear a police
officer testify and you're trying to assimilate the information, and then later
you hear—or maybe you hear police officers, then you hear a defendant
testify, that you are going to—because you have this bias, you're going to
examine how you interpret evidence that comes from the witness stand from
police officers and make sure that your bias isn't playing a part in it?

---

[234] *Id.*, at pp. 56–58.

A.  Well, what I will do is just concentrate on paying attention a little more than perhaps I would any other, you know, kind of situation.

Q.  Okay.  And you're absolutely confident that you can set aside what honestly is a bias in favor of law enforcement?  You can set that aside and you can treat all witness [sic] the same?

A.  Yes.

Q.  It doesn't matter if it's an FBI agent, an ATF agent, whatever?

A.  No, doesn't make any difference.

Q.  Because you understand that every individual, everybody can lie; everyone is capable of telling a lie?

A.  Yes.[235]

There is no credible evidence now before the Court establishing that Petitioner was denied a fair and impartial jury by virtue of the service of either Griffith or Sudimack on Petitioner's petit jury.  *See United States v. Duncan*, 191 F.3d at 573–74 (rejecting the argument that a venire person's respect for law enforcement generally constitutes disqualifying bias).  This Court's independent review of the entirety of the voir dire examination of venire members Sudimack and Griffith revealed absolutely no arguable basis for a finding that either venire member displayed or possessed any disqualifying bias.

Furthermore, the evidence presented by the prosecution at both phases of Petitioner's capital trial was overwhelming.  Petitioner signed written confessions to both Billhartz's murder and Diaz's murder.  Numerous eyewitnesses identified Petitioner as the last person seen with Billhartz when she was alive.  An eyewitness also identified Petitioner as the last person seen with Diaz when he was alive.  Petitioner took possession of Billhartz's vehicle and drove it for weeks after her murder, and lied to police when arrested in Plainview, Texas, about how he came

---

[235]  *Id.*, at pp. 61–62.

to possess the truck. Petitioner confessed to a friend, Frank, that he had killed Billhartz. Petitioner admitted that the handgun discovered by police in a vehicle he was driving only weeks after Diaz's murder was, in fact, the weapon that killed Diaz. Petitioner admitted he had a long criminal record and an even longer history of abusing drugs. Despite all the evidence establishing his guilt for both the Billhartz and Diaz murders, Petitioner took the stand at the punishment phase of his trial and denied any responsibility for their deaths. Petitioner denied the accuracy of virtually the entire contents of his own written, initialed, and signed statements concerning Billhartz's murder which were consistent with the forensic evidence. Petitioner gave an account during his trial testimony of Diaz's murder that was inconsistent with the forensic evidence. Given the overwhelming evidence of Petitioner's guilt and the equally overwhelming evidence supporting the jury's answers to the capital special issues, there is no reasonable probability that, had Petitioner's trial counsel somehow managed to prevent Griffith and Sudimack from serving on Petitioner's jury, the outcome of either phase of Petitioner's trial would have been different.

For the foregoing reasons, there is no reasonable probability that, but for either (1) Petitioner's trial counsel's agreement with the prosecution regarding the non-statutory procedure for conducting voir dire or (2) the service of venire members Griffith or Sudimack on Petitioner's petit jury, the outcome of either phase of Petitioner's capital murder trial would have been different.

### c.    Conclusions

Petitioner's eighth claim herein fails to satisfy either prong of *Strickland* analysis and

does not warrant federal habeas corpus relief.

### 2.    Agreeing to Excuse Venire Members Sans Individual Voir Dire

In his ninth claim herein, Petitioner argues his trial counsel rendered ineffective assistance by agreeing to excuse a number of venire members based upon their answers to the trial court's questionnaire, without questioning them individually.[236]

During the evidentiary hearing held in Petitioner's state habeas corpus proceeding, Petitioner's former lead trial counsel testified, in pertinent part, that (1) he agreed to excuse those venire members whom he believed had communicated in their questionnaire answers that they were so opposed to the death penalty they were incapable of performing as jurors in a capital trial, i.e., incapable of answering the Texas capital sentencing special issues based on the evidence, (2) he only agreed to excuse those venire members who consistently expressed opposition to the death penalty throughout their questionnaire answers, and (3) he only agreed to excuse venire members whom he did not like.[237]  Petitioner has not furnished the Court with copies of any of the excused-by-agreement venire members' questionnaires and does not allege any specific facts showing what information was contained in those questionnaire answers.

### a.    No Deficient Performance

Petitioner failed to identify any venire members whom Petitioner believes were improperly excused by Petitioner's agreements with the prosecution.  Contrary to the implications underlying this ineffective assistance claim, the possibility some of these venire

---

[236]  Pet'r's Mem. in Supp., at pp. 92–95; Pet'r's Reply in Supp., at pp. 56–58.

[237]  State Habeas Tr., Volume II, testimony of Francisco Macias, at pp. 212–16.

members were not "per se unqualified" does not, standing alone, establish the actions of

Petitioner's trial counsel in making the agreements in question were objectively unreasonable.

Absent some showing—or at least a fact-specific allegation—as to what information was

contained in the venire members' questionnaire answers (i.e., a showing that Petitioner's trial

counsels' agreement to excuse a particular venire member was unreasonable in light of that

venire member's questionnaire answers), Petitioner has failed to carry his burden of showing the

actions of his trial counsel were *objectively* unreasonable.  Without some definitive proof as to

what information regarding the venire members' views on the death sentence was contained in

the questionnaire answers Petitioner's trial counsel relied upon in agreeing to excuse the

unidentified venire members, Petitioner fails to satisfy the deficient performance prong of

*Strickland. See Woodfox v. Cain*, 609 F.3d 774, 809 n.17 (5th Cir. 2010) (speculative and

conclusory arguments will not support a finding of ineffective assistance); *Gregory v. Thaler*,

601 F.3d 347, 353 (5th Cir.) (conclusory statements regarding the content of uncalled witnesses'

testimony are insufficient to demonstrate ineffective assistance), *cert. denied*, ___ U.S. ___, 131

S.Ct. 265, 178 L.Ed.2d 175 (2010).

　　　Petitioner has failed to allege any specific facts, much less furnished any evidence,

showing the decision by Petitioner's trial counsel to agree with prosecutors to excuse various

unidentified members of Petitioner's jury venire was objectively unreasonable.

### b.　　No Prejudice

　　　For the same reasons set forth in detail in section VII.G.1.b. above, Petitioner's complaint

about his trial counsels' agreement to excuse unidentified members of the jury venire based upon

their questionnaire answers without conducting individual voir dire fails to satisfy the prejudice prong of *Strickland*. As was explained at length above, Petitioner has failed to identify any biased jurors who actually sat on Petitioner's petit jury. Petitioner has also failed to furnish the Court with any venire questionnaire completed by a venire member whom Petitioner claims should not have been excused by Petitioner's trial counsel agreement with the prosecution. In fact, Petitioner has failed to specifically identify any members of the jury venire excused by the agreement of Petitioner's trial counsel whom Petitioner claims should have been subjected to individual voir dire before they were excused. The overwhelming nature of the prosecution's evidence at both phases of Petitioner's capital murder trial means there is no reasonable probability that, but for the failure of Petitioner's trial counsel to conduct individual voir dire of all venire members, the outcome of either phase of Petitioner's trial would have been any different.

Petitioner does not allege any specific facts, much less furnish any evidence, showing that individual voir dire of any of the venire members whom his trial counsel agreed to excuse would have resulted in any of those venire members not being excused for cause based upon their personal views on the death penalty. Petitioner's conclusory and speculative complaints about his trial counsels' agreements to excuse unidentified members of Petitioner's jury venire do not satisfy the prejudice prong of *Strickland*. *See Day v. Quarterman*, 566 F.3d 527, 540 (5th Cir. 2009) (conclusory allegations of ineffective assistance during cross-examination did not satisfy the prejudice prong of *Strickland*); *Williams v. Wynne*, 533 F.3d 360, 369 (5th Cir. 2008) (conclusory allegations of prejudice will not support an ineffective assistance claim); *United States v. Demik*, 499 F.3d 644, 647 (5th Cir.) (failure to allege specific facts showing how alleged

deficient performance of trial counsel would have impacted outcome of trial fails to satisfy

prejudice prong of *Strickland*), *cert. denied*, 552 U.S. 982 (2007).

### c.    Conclusions

Petitioner's ninth claim herein fails to satisfy either prong of *Strickland* analysis and does

not warrant federal habeas corpus relief.

### 3.    Failure to Object to Trial Judge's Failure to Instruct Venire on Elements of Texas Law

In his tenth and final claim herein, Petitioner argues his trial counsel rendered ineffective

assistance by failing to object when one of the two trial judges who presided over voir dire failed

to instruct the venire members on a variety of procedural aspects of Texas criminal law, as

required by Article 35.17(2) of the Texas Code of Criminal Procedure.[238]

Article 35.17(2) provides as follows:

> In a capital felony case in which the State seeks the death penalty, the
> court shall propound to the entire panel of prospective jurors questions
> concerning the principles, as applicable to the case on trial, of reasonable
> doubt, burden of proof, return of indictment by grand jury, presumption of
> innocence, and opinion.  Then, on demand of the State or defendant, either
> is entitled to examine each juror on voir dire individually and part from the
> entire panel, and may further question the juror on the principles propounded
> by the court.[239]

During the evidentiary hearing held in Petitioner's state habeas corpus proceeding,

Petitioner's former lead trial counsel testified, in pertinent part, that (1) two different state judges

---

[238] Pet'r's Mem. in Supp., at p. 95–101; Pet'r's Reply in Supp., at pp. 58–59.

[239] Article 35.17(2), TEX. CODE CRIM. PROC. ANN. (Vernon 2006).

presided over portions of the jury selection at Petitioner's trial, (2) Judge William Moody ("Judge Moody") instructed the jury on the procedural subjects contained in the Texas Code of Criminal Procedure, but Judge Jerry Woodard ("Judge Woodard") did not, and (3) he could not recall why he failed to object to Judge Woodard's failure to do so.[240]

### a.        No Deficient Performance

While Petitioner complains generally about the failure of Judge Woodard to question the jury venire members, either as a group or individually, on the procedural subjects listed in Article 35.17(2), Petitioner identifies only one member of the jury venire who actually sat on Petitioner's petit jury whom Petitioner claims was inadequately questioned during voir dire—venire member and eventual juror Sudimack—against whom Petitioner made no challenge for cause.[241]  The Court has independently reviewed the entirety of venire member Sudimack's individual voir dire examination and finds, contrary to Petitioner's contention, no evidence exists in the record suggesting Sudimack was confused or mis-informed by the state trial judge or either party regarding any of the procedural elements listed in Article 35.17(2).  Petitioner's trial counsel questioned Sudimack extensively on the topics of presumption of innocence, burden of proof, reasonable doubt, and indictment by grand jury.[242]

Petitioner's only specific complaint about the voir dire examination of Sudimack deals with the subject of reasonable doubt.  The prosecution examined Sudimack on his understanding

---

[240]   State Habeas Tr., Volume II, testimony of Francisco Macias, at pp. 207–08.

[241]   S.F. Trial, Volume 39, voir dire examination of Kenneth Sudimack, at p. 154.

[242]   S.F. Trial, Volume 39, voir dire examination of Kenneth Sudimack, at pp. 70–75, 117–18, 125, 131, 143, 147.

166

of that term:

Q. (BY MR. HICKS) The highest level we have is beyond a reasonable doubt, and that's what we have in our criminal cases. Now, you know, this goes from top to bottom, but, certainly, reasonable doubt is the highest level. I am not trying to confuse you on that. Reasonable doubt is the highest level. Now, the problem is, I can't define that for you, okay?

A. Uh-huh.

Q. I can tell you what it's not. I just can't tell you what it is. It is not beyond all doubt. It is not beyond a shadow of a doubt. It's beyond reasonable doubt. And if you have a reasonable doubt, that doubt has to be based on the evidence and the law in front of you. It can't be on something that's kind of in the back of your head or what-if or something like that. Has to be based on the evidence in front of you, right?

A. But you can't come up with an example of beyond a reasonable doubt? There is no definition in a law book or anything?

Q. That's right. It's kind of a you know it when you see it. I mean, I can give you an example. What color is this pen?

A. I think it's black.

Q. Okay. And you can say beyond a reasonable doubt that that's a black pen. Okay. But if I ask you to define "black," well, how do you define "black"?

A. Right.

Q. Darker than dark, dark, dark, dark gray. You know, you could do it, maybe, but it's going to be difficult.

A. Yeah.

Q. Well, it's kind of the same thing with beyond a reasonable doubt. You will know it when you get there.

A. Okay.

Q. You, as the juror, have to define what beyond a reasonable doubt means to you, and I can only tell you what it's not, what it isn't. What it is to you is what it is.

A. Okay.

MR. MACIAS: Your Honor, I would object at this point. I think the juror asked a question, and I think it has to be answered for him truthfully. On the federal side, there is a definition of what "reasonable doubt" is.

MR. HICKS: Your Honor, I'm going to object. This is not the federal side. This is the State of Texas.

167

MR. MACIAS: We don't have it anymore.  You need to tell him that.

THE COURT: Reasonable doubt means reasonable doubt.

MR. MACIAS: Thank you, Your Honor.

MR. HICKS: Thank you.

Q. (BY MR. HICKS) Okay.  Do you have any questions about that?

A. That was the only one.[243]

Petitioner's trial counsel also questioned Sudimack on the same subject:

Q. (BY MR. MACIAS) Now, proof beyond a reasonable doubt.  You remember you asked if there was a definition?

A. Yeah.

Q. Well, there is a definition, if you cross the street and go into federal court.  Except, for some reason, the powers that be, the Texas Court of Criminal Appeals, decided that we shouldn't have a definition on this side of the street; so, therefore, we don't have a definition as far as "beyond a reasonable doubt."  But this, you know, poppycock, that you will recognize it when you see it—

MR. HICKS: Objection, Your Honor.  Argumentative, sidebar.

Q. (BY MR. MACIAS) —that's just—

THE COURT: Sustained.

Q. (BY MR. MACIAS) —that's just not true, okay?  Now, do you feel that if you witnessed something, that it would prove it beyond a reasonable doubt, if you saw it with your own eyes?

A. I would be pretty convinced.

Q. You would be pretty convinced?

A. It depends on what we're talking about.

Q. Really.  Let me give you an example and a scenario concerning beyond a reasonable doubt.

A. Okay.

Q. Assume, just as an example, that there's a law in the State of Texas, and it's in effect in this courtroom, that says, "If an attorney drinks coffee in front of a jury, he has broken the law, and we punish him in a capital fashion," okay?

---

[243] S.F. Trial, Volume 39, voir dire examination of Kenneth Sudimack, at pp. 73–75.

A. Okay.

Q. Do you understand what all that means?  Tell me.  What's the law, first of all?

A. I think what you said was, assume that there is a law in the State of Texas, in fact in this courtroom, that if an attorney is seen drinking coffee, he can be prosecuted as a capital case.

Q. As a capital case.

A. Is that what you just said?

Q. That's what I just said.  Now, I want you to watch something.

A. Okay.

Q. All right?

A. (Venireperson complies.)

Q. Now, man, that tastes horrible, cold.  Now, are you convinced beyond a reasonable doubt that the law has been broken in this courtroom?

A. I don't know what was in the cup.

Q. That's one of the reasons why I'm not guilty at this point.  What's the other one?  There's a technical reason.

A. I don't know.

Q. You're a prospective juror, part of a venire.  But the jury is made up of how many people?

A. I think 12.

Q. Twelve.  Okay.  So we don't have a jury yet, right?

A. Right.

Q. Okay.  And the last reason?

A. Does the law make sense?

Q. Well, the law doesn't have to make sense.  There is a lot of law out these that doesn't make any sense at all, okay?  There is a lot of law.  Plus, we're just using this as an example.  The other thing is, no one has proven to you that I'm an attorney.  I mean, for all you know, it's going to be some big, huge joke.  They're just letting some crazy idiot talk to you for 45 minutes, or maybe it's 40, okay?  But beyond a reasonable doubt.  Remember—let me see if I can—I'm not real big on visual aids, okay?  Especially when somebody else does them.  But what is significant about this one is that it should be this way, right?  Because probable cause is the lowest thing that you need, you know, just a suspicion.  In these beauty contests, you have—

MR. MACIAS: What's the civil?

MR. MCDONALD: Preponderance of the evidence.

Q. (BY MR. MACIAS) Preponderance of the evidence.  51/49 percent.
You can tell I don't do much civil work.

It gets a lot more serious when the state is going to take children away
from their parents.  There, you need clear and convincing evidence.  But not
in a criminal case.  In any criminal case, whether it be a traffic ticket or
whether it be capital murder, you need beyond a reasonable doubt.  And
that's where this should be, up here.  So this one, in my opinion, is just—you
know, you can tell it was the prosecution that did this visual aid.

Now, will you hold these people to the burden of convincing you, where
they take every reasonable doubt out of your mind, in order for you to find a
person guilty of a crime?

A.  Yes.[244]

Petitioner criticizes Sudimack's voir dire examination but does not offer any rational

explanation as to precisely what else his trial counsel could have done to elicit a more detailed

definition of reasonable doubt from the trial court.  Article 35.17(2) does not define "reasonable

doubt" or any of the other terms listed therein and does not mandate that the trial court give

instructions to the venire members regarding the definitions of the terms listed therein.  By its

own terms, that statute directs only that the trial court "propound" questions concerning the

subjects listed therein to the venire members.  Petitioner does not identify any specific questions

he claims the trial court would have "propounded" to venire member Sudimack on the subject of

reasonable doubt or any of the other terms listed in the statute had Petitioner objected on Article

35.17(2) grounds.

When questioned at the evidentiary hearing held July 2, 2008, in Petitioner's state habeas

corpus proceeding, attorney Macias responded that he could not recall why he failed to object on

---

[244] *Id.*, at pp. 114–17.

Article 35.17(2) grounds when Judge Woodard failed to "propound" questions regarding the terms listed in that statute.[245]  But he also suggested he may have done so because he wished to voir dire the venire members on those subjects himself.[246]  The inability of Macias to recall why he failed to object to the failure of the trial court to propound questions in accordance with Article 35.17(2) is not conclusive on the issue of whether Macias' actions were *objectively* reasonable.

The failure of Petitioner's trial counsel to object on Article 35.17(2) grounds to the trial court's failure to "propound" questions about the subjects listed in that statute must be viewed in the context of what Petitioner's counsel did during voir dire.  Having independently reviewed the entirety of Sudimack's voir dire examination, this Court finds the failure of Petitioner's trial counsel to object to the trial court's failure to "propound" unspecified questions regarding the subjects listed in Article 35.17(2) did not cause the performance of said counsel to fall below an objective level of reasonableness.  Petitioner's trial counsel (1) examined Sudimack—the only venire member whom Petitioner specifically identifies as having received an allegedly inadequate voir dire examination—about the subjects listed in Article 35.17(2), as did the prosecution, and (2) specifically requested the state trial court instruct Sudimack on the definition of "beyond a reasonable doubt."  Petitioner has not identified any questions the trial court could have "propounded" to Sudimack that would have proven any more informative to Sudimack, or helpful to the defense, than the information Petitioner's trial counsel actually managed to elicit from the state trial court during Sudimack's voir dire examination.  Under those circumstances,

---

[245]   State Habeas Tr., Volume II, testimony of Francisco Macias, at pp. 207–08.

[246]   *Id.*, at p. 208.

this Court concludes the performance of Petitioner's trial counsel in conducting Sudimack's voir dire did not fall below an objective level of reasonableness.

### b.      No Prejudice

For the same reasons set forth in section VII.G.1.b. above, Petitioner's complaint about his trial counsels' failure to object to the failure of Judge Woodard to "propound" questions to the venire members on the subjects listed in Article 35.17(2) fails to satisfy the prejudice prong of *Strickland*. As was explained at length above, Petitioner has failed to identify any biased jurors who actually sat on Petitioner's petit jury. Sudimack was so clearly unbiased Petitioner did not even bother to challenge him for cause.[247] The overwhelming evidence supporting the jury's verdict at both phases of Petitioner's capital murder trial also supports this Court's conclusion there is no reasonable probability that, but for the failure of Petitioner's trial counsel to object to Judge Woodard's failure to propound questions to the venire members on the subjects listed in Article 35.17(2), the outcome of either phase of Petitioner's capital murder trial would have been different.

Petitioner has not identified any member of the jury venire who actually sat on Petitioner's petit jury who was not thoroughly examined during voir dire by either the trial court or the parties' counsel on the subjects listed in Article 35.17(2). Petitioner alleges no facts establishing that the identity of the party "propounding" questions about the subjects listed in Article 35.17(2) had any impact whatsoever on the ultimate composition of Petitioner's jury or the outcome of either phase of Petitioner's trial.

---

[247]   S.F. Trial, Volume 39, voir dire examination of Kenneth Sudimack, at p. 154.

c.    **Conclusions**

Petitioner's tenth and final claim herein fails to satisfy either prong of *Strickland* analysis.

**VIII.   CERTIFICATE OF APPEALABILITY**

The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA").  *See Hill v. Johnson*, 114 F.3d 78, 80 (5th Cir. 1997) (recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson*, 114 F.3d 43, 45 (5th Cir. 1997) (holding the standard for obtaining a CoA is the same as for a CPC).  The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA.  *Robison v. Johnson*, 151 F.3d 256, 259 n.2 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999); *Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997), *cert. denied sub nom. Monroe v. Johnson*, 523 U.S. 1041 (1998).  Effective December 1, 2009, Rule 11(a) of the Rules Governing Section 2254 Cases in United States District Courts requires the Court to issue or deny a CoA when it enters an order adverse to a federal habeas corpus Petitioner.

Under the AEDPA, before a Petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the Petitioner must obtain a CoA.  28 U.S.C.A. §2253(c)(2) (West 2011); *Miller-El v. Johnson*, 537 U.S. 322, 335–36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003).  Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted.  *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir.

2002) (holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain*, 227 F.3d 228, 230 n.2 (5th Cir. 2000) (holding the same); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. 28 U.S.C.A. §2253(c)(3); *Crutcher v. Cockrell*, 301 F.3d at 658 n.10; *Lackey v. Johnson*, 116 F.3d at 151; *Hill v. Johnson*, 114 F.3d at 80; *Muniz v. Johnson*, 114 F.3d at 45; *Murphy v. Johnson*, 110 F.3d 10, 11 n.1 (5th Cir. 1997).

A CoA will not be granted unless the Petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282, 124 S.Ct. 2562, 2569, 159 L.Ed.2d 384 (2004); *Miller-El v. Johnson*, 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. 473, 483, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983).

To make such a showing, the Petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether—or, for that matter, agree—the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569; *Miller-El v. Johnson*, 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604; *Barefoot v. Estelle*, 463 U.S. at 893 n.4, 103 S.Ct. at 3394 n.4. This Court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas Petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts.*

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the Petitioner must demonstrate reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The Petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U.S. at 338, 123 S.Ct. at 1040 (*quoting Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604). *Accord Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569. In a case in which the Petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the Petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the Petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the Petitioner's favor. *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir.), *cert. denied*, ___ U.S. ___, 130 S.Ct. 536, 175 L.Ed.2d 350 (2009); *Moore v. Quarterman*, 534 F.3d 454, 460 (5th Cir. 2008); *Foster v. Quarterman*, 466 F.3d at 364; *Dickson v. Quarterman*, 462 F.3d 470, 476 (5th

Cir. 2006); *Pippin v. Dretke*, 434 F.3d at 787; *Bridgers v. Dretke*, 431 F.3d 853, 861 (5th Cir. 2005), *cert. denied*, 548 U.S. 909 (2006).

Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See* Miller-El v. Cockrell 537 U.S. at 337, 123 S.Ct. at 1040 ("It follows that issuance of a COA must not be *pro forma* or a matter of course."); *Sonnier v. Quarterman*, 476 F.3d at 364–69 (denying CoA on a wide variety of challenges to the Texas capital sentencing scheme).

Reasonable minds could not disagree over this Court's conclusions as to the lack of any arguable merit in Petitioner's *Brady* claim or Petitioner's complaints about insufficient evidence, the denial of his motions to suppress his allegedly involuntary confession, or the trial court's denial of his motion for continuance. The record refutes each of these claims.

Petitioner's ineffective assistance claim premised upon his lead trial counsel allegedly sleeping through unspecified portions of Petitioner trial was never presented in any form to any state court and is now procedurally defaulted. That same claim also lacks any arguable merit because Petitioner was represented by two defense counsel who vigorously represented Petitioner throughout trial.

Moreover, reasonable minds cannot disagree with this Court's *de novo* conclusion that Petitioner's complaints about his trial counsels' failure to present mitigating evidence showing Petitioner's abused, deprived, childhood fail to satisfy either prong of *Strickland* analysis. Given Petitioner's well-documented history of violent criminal acts and the absence of any evidence showing Petitioner has ever made a sincere expression of remorse or contrition for any of his criminal acts, there is no rational basis for disagreement with this Court's conclusion there is no

reasonable probability an emotional appeal to the jury's sympathies premised upon Petitioner's abused, deprived, childhood would have produced a life sentence for Petitioner. Petitioner's capital sentencing jury was well aware of Petitioner's assertions that he experienced a deprived, abused, neglected childhood and was kicked back and forth between a pair of dysfunctional parents. Petitioner effectively gutted the mitigating impact of that evidence when he took the stand at the punishment phase of trial, denied any responsibility for the murders of Billhartz or Diaz, and claimed all the prosecution's witnesses had committed perjury.

Reasonable minds could not disagree with this Court's de novo rejection on the merits of Petitioner's ineffective assistance claims. Even if it were possible to quibble over this Court's analysis of the deficient performance prong of *Strickland* with regard to some of Petitioner's ineffective assistance claims, reasonable minds could not disagree with this Court's conclusions that none of Petitioner's ineffective assistance claims satisfy the prejudice prong of *Strickland*.

Accordingly, the Court will deny Petitioner a CoA.

## IX.    REQUEST FOR AN EVIDENTIARY HEARING

Petitioner has requested an evidentiary hearing to develop new facts and new evidence relevant to Petitioner's claims herein. Petitioner is not entitled to an evidentiary hearing to develop new facts and new evidence in support of those of his claims which the state habeas court rejected on the merits. *See Cullen v. Pinholster*, ___ U.S. at ___, 131 S.Ct. at 1398–1400 (holding an evidentiary hearing is unnecessary when a state court has rejected a claim on the merits and federal habeas review of that rejection is governed by §2254(d)(1)); *Pape v. Thaler*, 645 F.3d 281, 288 (5th Cir. 2011)(holding the same). Thus, Petitioner is not entitled to a federal

evidentiary hearing on his second, fourth, or fifth claims herein, his complaints of insufficient evidence and the denials of his motions to suppress and motion for continuance.

Petitioner's *Brady* claim is not supported by any credible evidence, i.e., affidavits from disinterested, unbiased, witnesses such as the attorneys who represented the prosecution witnesses whom Petitioner asserts in conclusory fashion were given immunity agreements. Petitioner's *Brady* claim is refuted by the sworn testimony of Petitioner's prosecuting attorneys. Moreover, for the reasons discussed at length above, even if an immunity agreement had existed between Petitioner's prosecutors and prosecution witness Eddy, under the circumstances of Petitioner's trial—especially the relative insignificance of Eddy's testimony to the issues before the jury at either phase of Petitioner's capital trial—the failure of the prosecution to disclose that agreement does not satisfy the materiality prong of *Brady*.

Petitioner's un-excused procedural default on his third claim—Petitioner's complaint about his allegedly sleeping lead trial counsel—makes unnecessary a federal evidentiary hearing on that claim.

Petitioner is likewise not entitled to an evidentiary hearing on his *Wiggins* claim—his sixth claim—that his trial counsel rendered ineffective assistance by failing to adequately investigate Petitioner's background and present additional mitigating evidence establishing the extremely abused and deprived circumstances of Petitioner's childhood.  Petitioner has alleged no facts in support of his sixth claim herein which, if proved, would satisfy the prejudice prong of *Strickland.*

Petitioner's seventh claim is refuted by the record from closing arguments at the

178

punishment phase of Petitioner's trial which, when reviewed in their entirety, establishes the objective reasonableness of Petitioner's trial counsel's rhetorical arguments and statements in the context of the evidence and the prosecution's argument.

Petitioner's eighth through tenth claims are refuted by the record from Petitioner's trial, including record from the voir dire examinations of venire members Griffith and Sudimack, neither of whom displayed any disqualifying bias and the latter of whom Petitioner's trial counsel never challenged for cause.

Thus, Petitioner is not entitled to a federal evidentiary hearing to develop new facts and new evidence supporting any of his claims.

## X.    CONCLUSION AND ORDER

For the reasons stated above, the Court concludes that Petitioner is not entitled to § 2254 relief. The Court will accordingly deny his petition. The Court will additionally decline to certify his issues for appeal. Accordingly, it is hereby **ORDERED** that:

1. All relief requested by Petitioner Justen Grant Hall in his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 [ECF No. 27], memorandum in support of his petition [ECF No. 28], reply in support of his petition [ECF No. 43], and supplement to his memorandum in support of his petition [ECF No. 53], is **DENIED**.

2. Petitioner Justen Grant Hall is **DENIED** a Certificate of Appealability on all of his claims herein.

3. Petitioner Justen Grant Hall's request for an evidentiary hearing [ECF No. 28] is **DENIED**.

4.  All other pending motions are **DISMISSED AS MOOT**.

**SIGNED** this ___*20*___ day of December **2011**.

**FRANK MONTALVO**
**UNITED STATES DISTRICT JUDGE**